## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CONSTANCE COLLINS
61 Grand Banks Cir.
Marlton, Burlington County, NJ 08053;

AND

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.
501 Front St.
Norfolk, VA 23510,

         *Plaintiffs*,

         v.

TRI-STATE ZOOLOGICAL PARK OF
WESTERN MARYLAND, INC.
10105 Cottage Inn Ln.
Cumberland, Allegany County, MD 21502;

ANIMAL PARK, CARE & RESCUE, INC.
10105 Cottage Inn Ln.
Cumberland, Allegany County, MD 21502;

AND

ROBERT L. CANDY
12605 Moores Hollow Rd.
Cumberland, Allegany County, MD 21502,

         *Defendants*.

Civil Action No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.    INTRODUCTION

    1.    Defendants Tri-State Zoological Park of Western Maryland, Inc.,

Animal Park, Care & Rescue, Inc., and their principal Robert (Bob) L. Candy

(collectively "Defendants") operate a public nuisance in the form of a roadside zoo ("Tri-State") that confines and exhibits approximately 110 animals of various species in conditions that deprive the animals of basic necessities—including nutritious food in sufficient quantity, necessary veterinary care, proper drink, proper space, proper shelter, and proper protection from the weather—and inflict unnecessary suffering on the animals.

2.      Defendants do not provide appropriate care for any of the animals exhibited at Tri-State. The allegations specific to certain animals set forth in this Complaint are exemplary of Defendants' conduct; at Tri-State *every* animal suffers from Defendants' failure to provide appropriate care as well as the pervasive inadequate and inhumane conditions.

3.      The enclosures confining animals at Tri-State are wholly inadequate and unsanitary, chronically littered with animal and food waste, void of proper environmental enrichment, and often in disrepair. As a judge of this district recently found, "[f]ilth and feces dominate Tri-State." *PETA v. Tri-State Zoological Park of W. Maryland*, No. 8:17-CV-02148-PX, 2019 WL 7185560 ("*PETA*"), at *3 (D. Md. Dec. 26, 2019).

4.      Defendants' mistreatment of animals confined at Tri-State causes annoyance and physical discomfort to Tri-State visitors of ordinary sensibilities, tastes, and habits. It also unreasonably interferes with public morals, including by violating Maryland law against cruelty to animals as well as the federal Animal

Welfare Act, which are indicative of public policy concerning animal welfare and the corresponding moral prohibition against treating animals cruelly.

5.      Through their neglect and mistreatment of animals and violations of state and federal law, Defendants have unreasonably interfered with the rights of the general public and created a public nuisance.

6.      Plaintiffs Constance (Connie) Collins, who visited Tri-State in July 2018, and People for the Ethical Treatment of Animals, Inc. ("PETA," and together, "Plaintiffs"), bring this action to enjoin the public nuisance created by Defendants' conduct.

## II.     JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and Defendants, and the amount in controversy, including the value of the injunctive relief sought, exceeds $75,000, exclusive of interest and costs.

8.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because the public nuisance alleged in this Complaint occurred, and continues to occur, on premises located in this judicial district.

## III.    THE PARTIES

9.      Plaintiff Connie Collins is a resident of New Jersey who derives personal, recreational, educational, and aesthetic benefits from being in the presence of animals and observing animals in a humane setting. Ms. Collins visited Tri-State, where she observed and developed aesthetic and emotional connections to many of the animals at Tri-State. Due to the animal mistreatment and suffering that she

witnessed, she became too distressed to return to Tri-State while the animals are in their current condition.

10.     Plaintiff PETA is a Virginia nonstock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code. Its headquarters are located in Norfolk, Virginia.

11.     Defendant Animal Park, Care & Rescue, Inc. ("Animal Park") is a Maryland corporation that is not in good standing, located at 10105 Cottage Inn. Ln., Cumberland, MD 21502. Animal Park owns some of the animals that are the subject of this action.

12.     Defendant Tri-State Zoological Park of Western Maryland, Inc. ("Tri-State Zoological Park") is a Maryland corporation located at 10105 Cottage Inn. Ln., Cumberland, MD 21502. Tri-State Zoological Park exhibits and owns some of the animals that are the subject of this action.

13.     Defendant Bob Candy is a resident of Allegany County, Maryland. Mr. Candy is and was at all relevant times the registered agent and principal of Tri-State Zoological Park and Animal Park. Mr. Candy acts on behalf of Tri-State Zoological Park and Animal Park by, among other things, overseeing their day-to-day operations, managing animal care, acting as the primary animal caregiver, and supervising volunteers.

IV.    **FACTUAL BACKGROUND**

   A. **Defendants unreasonably interfere with public morals by
      mistreating and neglecting animals in violation of federal and
      state law.**

   14.    Tri-State is a roadside zoo in Cumberland, Maryland operating on the

grounds of a former campground.

   15.    At Tri-State, Defendants confine and exhibit approximately 110

animals, including mammals, birds, and reptiles, and charge the public a nominal fee

to view and interact with the animals.

   16.    Tri-State is not accredited as a zoo or sanctuary. It does not hold, for

example, an accreditation from the Association of Zoos & Aquariums or the Global

Federation of Animal Sanctuaries.

   17.    Defendants frequently deny many of the animals at Tri-State timely

veterinary care, daily care by staff experienced in animal care and husbandry,

sufficient environmental enrichment, proper food, potable water, shelter from the

elements, and, in some cases, appropriate social groups.

   18.    Defendants' continuous mistreatment and neglect of the animals

confined at Tri-State violate federal and state laws, which are indicative of public

policy concerning animal welfare and the corresponding moral prohibition against

treating animals cruelly, thus constituting a public nuisance.

   19.    Maryland's Legislature has made it a crime to "deprive an animal of

necessary sustenance"; to "inflict unnecessary suffering or pain on an animal"; or to

"cause, procure, or authorize" such deprivation of sustenance or infliction of suffering

or pain. Md. Code, Crim. Law § 10-604. State law also prohibits a "person [who] has

charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with: (i) nutritious food in sufficient quantity; (ii) necessary veterinary care; (iii) proper drink; (iv) proper air; (v) proper space; (vi) proper shelter; or (vii) proper protection from the weather." *Id*.

20.    The Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131-2159, provides protection from animal neglect similar to the Maryland Criminal Code, and establishes bare minimum federal protections for certain categories of animals in captivity. Since 2008, Tri-State has been cited on inspection reports by the U.S. Department of Agriculture ("USDA") for more than seventy violations of the AWA. These USDA inspection reports do not even capture *all* violations of the AWA and, in fact, wholly omit several species of animals at Tri-State that the AWA does not cover.

21.    The USDA inspection reports detail Defendants' pattern of disregarding animal welfare and demonstrated failure to provide proper care for animals. These violations concern issues of serious neglect, including, for example, failure to provide adequate veterinary care and failure to prevent the buildup of feces in multiple enclosures.

22.    Defendants' chronic and willful disregard for animal welfare led to a 45-day suspension of the facility's AWA license in 2013. *Tri-State Zoological Park of Western Maryland, Inc.*, 72 Agric. Dec. 128, 2013 WL 8214620 (U.S.D.A. 2013) (Decision & Order); *Tri-State Zoological Park of Western Maryland, Inc.*, 71 Agric. Dec. 915, 2012 WL 3877392, (U.S.D.A. 2012) (Decision & Order). Even after the facility's license was suspended, Defendants continued to disregard the AWA's

6

minimum standards of care, resulting in an official warning against the facility in 2015.

      **1.** ***Defendants fail to provide animals necessary veterinary care.***

23.     Defendants have a pattern and practice of failing to provide animals in their custody with necessary veterinary care, contrary to applicable law. *See, e.g.*, Md. Code, Crim. Law § 10-604.

24.     The *PETA* court, opining on Tri-State's care of lions, tigers, and lemurs, found that Defendant Tri-State's veterinarians "utterly failed to implement a satisfactory program of veterinary care." *PETA*, 2019 WL 7185560, at *4.

25.     Tri-State's program of veterinary care for other animals is similarly deficient. As the *PETA* court found, Defendants "[s]tunningly . . . maintained only 86 pages of medical records in connection with [former Tri-State veterinarian] Dr. Fox's veterinary care for the *last decade* and for the *entire zoo population*" and "only 121 pages of records . . . associated with [current Tri-State veterinarian] Dr. Duncan's care." *PETA*, 2019 WL 7185560, at *4 (emphasis in original).

26.     Defendants failed to treat two Himalayan black bears suffering from obvious chronic, severe, and painful dental disease.

27.     Defendants failed to have a veterinarian examine a macaque until the animal had a baseball-size firm mass and maggots in her vaginal area.

28.     Defendants failed to have a veterinarian examine a kinkajou named Chewy who appeared weak and did not have an appetite, and subsequently died.

29.     Defendants failed to have a veterinarian examine a dog named Cumber with diarrhea until she stopped eating and was unable to stand up and thereafter was diagnosed with worms.

30.     Defendants denied a wolf—whose condition was left to deteriorate until he was unable to move his hind end and was no longer eating or drinking—adequate veterinary care.

31.     Defendants failed to treat overgrown hooves in pigs, which can make it painful or difficult to walk.

32.     On information and belief, Defendants failed to treat a macaw suffering with a body wound for at least one month, requiring a wing amputation for which Defendant Candy refused to pay.

33.     Defendants also deny proper veterinary care to free-roaming cats and other animals present at Tri-State.

34.     The USDA previously found Defendants have also failed to maintain a program of adequate veterinary care for goats with hoof problems.

## 2. *Defendants fail to provide animals proper drink.*

35.     Defendants have a pattern and practice of failing to provide animals in their custody with proper drink, contrary to applicable law. *See, e.g.*, Md. Code, Crim. Law § 10-604.

36.     On information and belief, there are no formal protocols in place to ensure that volunteers perform their assigned duties or to ensure that animals

routinely receive fresh water. Defendants frequently failed to refresh animals' water at Tri-State.

37.      Defendants frequently let animals at Tri-State go without potable water.

38.      For example, Ms. Collins observed no visible drinking water in the outdoor portion of the Himalayan black bear enclosure, despite warm weather.

39.      As the USDA found, Defendants have also failed to clean water bowls, which contained a buildup of dark brown-green material.

### 3. *Defendants fail to provide animals proper shelter.*

40.      Defendants have a pattern and practice of failing to provide animals in their custody with proper shelter, including safety and sanitation in violation of applicable law. *See, e.g.*, Md. Code, Crim. Law § 10-604.

41.      By way of example, Defendants failed to take steps to prevent an enclosure from being destroyed by a falling tree.

42.      Defendants also failed to prevent a primate from escaping and leaving Tri-State when a volunteer left the enclosure door open.

43.      As the USDA found, Defendants have also:

    a.  left the cord of a heat lamp adjacent to a pigtail macaque enclosure, resulting in the macaque's electrocution and death;

    b.  failed to repair a porcupine's nest box containing jagged edges;

    c.  failed to repair sharp, broken, and exposed wires in a fence surrounding animals used in a petting zoo;

d.  failed to repair loose boards in the fence between the puma and tiger enclosures;

e.  failed to repair a wooden ramp with holes, splinters, and protruding nail heads in a wildcat enclosure;

f.  failed to have structurally sound fencing in the petting zoo enclosures;

g.  failed to remove excessive debris near the areas housing the macaques;

h.  failed to fix an overhang to protect animals and the shelter structure from water damage in the bobcat enclosure;

i.  failed to provide sufficient barriers between a squirrel monkey and the public;

j.  repeatedly failed to provide a secure perimeter fence to prevent the entry of trespassing humans; and

k.  left in disrepair a gate that does not close properly in the squirrel monkey enclosure.

44.   The *PETA* court found that lions, tigers, and lemurs at Tri-State were "housed in fetid and dystopic conditions," a "bacteria-ridden wasteland, and in stark contrast to their natural habitats." *PETA*, 2019 WL 7185560, at *3, *10.

45.   Defendants also fail to maintain adequate sanitation in the other animal enclosures at Tri-State.

46. On information and belief, there are no formal protocols in place to ensure that volunteers perform their assigned duties or to ensure that all of the animal enclosures are routinely cleaned. Defendants routinely fail to clean the animal enclosures at Tri-State.

47. Defendants fail to dispose of waste. Many enclosures are chronically littered with soiled bedding, animal and food waste.

48. Defendants routinely allow feces to accumulate in animal enclosures, including the kinkajou, reptile, Himalayan black bear, squirrel monkey, and farm animal enclosures. Failure to clean feces can result in the spread of parasites to other animals and can otherwise interfere with the animals' health and wellness.

49. Defendants' failure to routinely clean animal enclosures subjects the animals to noxious smells. For example, upon nearing the reptile exhibit, Ms. Collins experienced an odor so potent and overbearing that she could not enter the building.

50. Defendants deny clean water to animals, and for those who have access to pools of water for submerging, routinely leave those water sources turbid and fetid, including water in the alligator, turtle, and Himalayan black bear enclosures.

51. Due to inadequate drainage at the facility, mud and water routinely pool in animal enclosures. Standing water increases the risk of mosquitos carrying diseases such as the West Nile virus, to which alpacas and equines are particularly susceptible.

52. Defendants allow many of the animals at Tri-State to roam freely, including chickens, ducks, turkeys, peafowls, and rabbits. Scores of free-roaming cats

also roam the grounds and can move in and out of animal exhibits and food preparation areas.

53.   Free-roaming animals are disease vectors and can transmit diseases such as toxoplasmosis to the animals confined at Tri-State. For example, domestic cats can spread a number of diseases to bobcats, including feline leukemia virus and feline immunodeficiency virus.

54.   Defendants failed to prevent free-roaming rodents from entering enclosures. On information and belief, Defendants failed to prevent rodents from attacking and killing three birds.

55.   Defendants also fail to clean moldy food off bird cages, which can lead to the presence of disease-carrying rodents and other animals.

56.   As the USDA found, Defendants have also:

    a.  failed to provide animals with clean and dry shelter;

    b.  failed to dispose of waste properly outside an enclosure housing pigs;

    c.  failed to keep water receptacles clean and sanitary;

    d.  failed to remove excessive amounts of tortoise and bird feces near the opossum and New Guinea singing dog enclosures;

    e.  failed to remove excessive feces from the coatimundi enclosure;

    f.  failed to keep an enclosure holding a skunk sanitary, leaving excessive food waste, thereby attracting flies;

g.  failed to remove excessive weeds and high vegetation in the New Guinea singing dog enclosure, denying the animal full access to the outdoor enclosure;

h.  failed to have proper drainage in the pig enclosure, which was excessively muddy with puddles of water that could lead to foot problems;

i.  failed to have proper sanitation for the kinkajou, allowing the buildup of a brown material in the enclosure and allowing the buildup of food, excreta, urine, and debris in the litter pan; and

j.  failed to have proper drainage in the alpaca enclosure, which had standing water and mud that could lead to food contamination.

57.  The facility grounds themselves at Tri-State are routinely littered with an excessive accumulation of waste and debris, which can harbor disease-carrying vectors and attract disease-carrying rodents and other animals.

58.  The unsanitary conditions at Tri-State pose a serious threat of injury and illness to the animals confined at Tri-State.

59.  As the USDA found, Defendants have also:

a.  failed to keep the grounds free of excessive amounts of excreta and debris;

b.  failed to store food in a way that minimizes the risk of contamination, including by having open boxes of fruits and vegetables outside in the rain, with feral cats resting inside them;

  c. failed to maintain a clean facility;

  d. failed to remove rodent feces from the food-storage area;

  e. failed to maintain surfaces in the kitchen that can be effectively cleaned and sanitized;

  f. failed to maintain an effective program to control insects (many cockroaches were found in the building housing the kinkajou); and

  g. allowed open bags of feed and an excessive amount of feed spilled on the floor that could harbor and attract pests.

60. Defendants fail to provide birds with appropriate humidity and ventilation in their enclosure. For example, Defendants place heaters in birds' small enclosures, which can emit toxic gases and harm the birds. On information and belief, eight birds, including cockatoos, macaws, and parrots, died due to a propane tank malfunction resulting in carbon dioxide poisoning, which could have been prevented with proper heating.

61. Defendants deny animals adequate sunlight or appropriate UVA/UVB sources of light.

62. Defendants place incompatible animals in close proximity of one another, which creates stress and may lead to physical injury.

    **4. *Defendants inflict unnecessary suffering or pain on animals.***

63. Defendants have a pattern and practice of inflicting unnecessary suffering or pain on animals in their custody, including psychological suffering by denying animals appropriate environmental enrichment or socialization, including

through conduct in violation of applicable law. *See, e.g.*, Md. Code, Crim. Law § 10-604.

64.     The *PETA* court, opining on Tri-State's care of lions, tigers, and lemurs, found that Defendants "made no meaningful effort to even come close to industry standards [of providing enrichment]." *PETA*, 2019 WL 7185560, at *10.

65.     Defendants deny other animals adequate enrichment as well.

66.     Defendants also deny animals adequate socialization, including Misty, a solitary llama, alpaca, or llama-alpaca hybrid, whom Tri-State's veterinarian Dr. Gale Duncan described as "exhibit[ing] aggression characteristic of 'berserk[] male llama' syndrome."

67.     Stereotypic behaviors, such as repetitive pacing and fence chewing, indicate psychological distress and may be caused from inadequate living conditions, including a lack of species-appropriate enrichment programs and improper social groups. They also create risks of physical harm, including foot damage from excessive pacing and dental damage from chewing of hard or dangerous materials.

68.     Animals at Tri-State engage in stereotypic behavior.

69.     For example, at least one Himalayan black bear repetitively paced and chewed the bars of the enclosure.

70.     Further, Ms. Collins observed a solitary wolf pacing repetitively for approximately five minutes.

71.     Most primates are highly social animals that suffer when confined without other members of their species. As the USDA has explained, "[s]ocial

interactions are considered to be one of the most important factors influencing the psychological well-being of most nonhuman primates." USDA, Animal & Plant Health Inspection Service, *Final Report on Environment Enhancement to Promote the Psychological Well-Being of Nonhuman Primates* § IV.A (1999). This is particularly true for social primate species such as capuchin and squirrel monkeys. Companions provide social company along with "environmental novelty, multi-sensory stimulation, something to manipulate, and opportunities for cognitive challenge and control." *Id*.

72.    Defendants deny adequate socialization to primates, including Dodger, a capuchin monkey, and Spazz, a squirrel monkey, both of whom Tri-State has kept in solitary confinement.

73.    Ms. Collins observed Dodger confined alone, with a bald spot at the base of his tail due to picking skin off his tail until it started to bleed. Dodger scratched, pulled, and picked at his stomach.

74.    Spazz is also confined alone and is housed in a small room that also contains animals that are predators, including various species of snakes, and has thin hair and bald patches on his arm, legs, and back.

75.    As the USDA found, Defendants have also failed to have an environmental enrichment plan for primates that addressed the special needs of several species of primates who were confined alone.

76.     Defendants have also denied other animals adequate socialization, including by confining social species such as a wolf and a New Guinea singing dog to enclosures by themselves.

77.     Defendants' pattern and practice of failing to provide animals in their custody with veterinary and palliative care and failure to implement an adequate program of veterinary care also inflict unnecessary suffering on animals who become sick and injured as a result of Defendants' neglect, and prolongs that suffering.

### 5. *Defendants fail to provide animals proper food.*

78.     Defendants have a pattern and practice of failing to provide animals in their custody necessary sustenance as well as nutritious food in sufficient quantity, in violation of applicable law. *See, e.g.*, Md. Code, Crim. Law § 10-604.

79.     Discussing Defendants' treatment of tigers and lions, the *PETA* court found that the animals "were not provided 'basic nutritional needs,'" and that Defendants' "repeated defiance of USDA [nutritional] guidelines presents not only loss in nutritional value but also places the Big Cats at risk of 'serious [gastrointestinal] diseases' including sepsis, from which India [a tiger] succumbed." *PETA*, 2019 WL 7185560, at *18, *20 (internal citations omitted).

80.     On information and belief, there are no protocols in place to ensure that volunteers perform their assigned duties or that the animals are actually fed. This results in Defendants frequently failing to adequately feed the animals at Tri-State.

81.     Ms. Collins observed a miniature horse or pony who appeared lethargic and malnourished.

82.   Defendants fail to provide farm animals with adequate amounts of appropriate hay or feed. For example, in lieu of hay, Defendants placed straw in farm animals' enclosures and allowed it to become moldy.

83.   Defendants locked the Himalayan black bears in an indoor enclosure during winter months and denied them any food and water during this time.

84.   Defendants frequently fed the Himalayan black bears an inappropriate diet, including dog food, cat food, and baked goods.

85.   Defendants used inappropriate methods to thaw frozen mice and rats used to feed snakes.

86.   Defendant Mr. Candy told volunteers that he would stop paying for animals' food, requiring volunteers to pay for the animals' food to keep them alive.

87.   Defendants stored food in an improper manner, risking spoilage and contamination from disease-carrying vectors, including free-roaming cats and rodents.

88.   Defendants have fed spoiled meat to animals.

89.   Defendants failed to adequately feed Dream, a miniature horse, whom Tri-State's own veterinarian, Dr. Gale Duncan, described as "severely underweight" and suffering from malnutrition.

### 6. *Defendants fail to provide animals proper space.*

90.     Defendants have a pattern and practice of failing to provide animals in their custody with proper space, contrary to applicable law. *See* Md. Code, Crim. Law § 10-604.

91.     Defendants have denied numerous animals adequate space in their enclosures, including alligators, snakes, bobcats, foxes, rabbits, and an owl who was kept in a cat carrier.

92.     Defendants continue to deny animals adequate space.

### 7. *Defendants fail to provide animals proper protection from the weather.*

93.     Defendants have a pattern and practice of failing to provide animals in their custody with proper protection from the weather, contrary to applicable law. *See* Md. Code, Crim. Law § 10-604.

94.     Defendants failed to add any form of temperature and humidity monitoring or control to many enclosures, denying animals appropriate shelter from temperature extremes.

95.     Defendants failed to fix leaking roofs, denying animals adequate protection from rain.

96.     On information and belief, Defendants denied the capuchin monkey Dodger protection from the weather. Dodger had some of his digits amputated after he contracted frostbite, a condition caused by prolonged exposure to cold temperatures.

97.    As the USDA found, Defendants have also failed to heat the building holding Japanese macaques sufficiently, allowing the temperature to drop below 45 degrees.

### B. Tri-State is financially unviable.

98.    Defendants charge a nominal fee for admission to Tri-State, and are open only for approximately seven months per year. On information and belief, they are not financially viable, and otherwise lack the resources and ability to adequately provide for the animals. In this regard, Defendants are, on information and belief, financially unable to purchase adequate, appropriate, and nutritious food for the animals, and instead rely, in large part, on substandard food donated by others to feed the animals.

99.    Defendants are further, on information and belief, financially unable to hire trained and experienced employees to care for the animals; instead, they rely, in large part, on untrained and inexperienced volunteers in an attempt to care for the animals. At times, these same volunteers are provided shelter on the zoo's premises in exchange for their volunteer work.

100.    Defendants' apparent financial weakness also precludes them from providing adequate and clean enclosures, sufficient enrichment, and necessary veterinary care to the animals. In other words, even if Defendants wanted to provide adequate care to the animals, they simply are not, on information and belief, financially able to do so. This likely explains, at least in some part, Defendants' failure to provide proper care for many animals at Tri-State.

101.   Because Tri-State is financially unviable, they are unable to fully correct the public nuisance unless Defendants forfeit all animals confined at Tri-State.

### C. Defendants' mistreatment and neglect of captive animals causes Plaintiff Connie Collins distress, anguish, and injury.

102.   Ms. Collins derives personal, recreational, educational, and aesthetic benefits from being in the presence of animals and observing animals in a humane setting. For example, she enjoys observing ducks, squirrels, and other animals who come to her backyard.

103.   Ms. Collins visited Tri-State once and personally witnessed the deplorable conditions to which Defendants subject the animals confined there, including living in tiny enclosures, having no potable water despite the heat, and living in enclosures contaminated with filth and feces.

104.   Ms. Collins experienced particularly severe distress and anguish as a result of her visit to Defendants' property and her observations of animals in the conditions that she found at Defendants' property.

105.   The inhumane setting and mistreatment of the animals that Ms. Collins observed at Tri-State made her sick and upset her too much to return to visit the animals in their current conditions.

106.   Ms. Collins has also devoted significant effort trying to improve the animals' situation. She, along with her husband, contacted Allegany Animal Control,

news media, and other government and non-governmental agencies, including the USDA and PETA, to report what they observed at Tri-State.

107.   As someone who personally has visited the animals confined at Tri-State, formed a specific emotional attachment to the animals, and made efforts on behalf of the animals to improve their conditions, Ms. Collins has suffered significant harm and a particularized injury, different in kind and degree than the general public, resulting from the unreasonable and unlawful conduct of Defendants with respect to the animals at Tri-State.

108.   Defendants have injured and continue to injure Ms. Collins' personal, aesthetic, recreational, and educational interests by depriving her of a right to personally observe the animals confined by Defendants living in a humane setting.

109.   Because Ms. Collins appreciates, is attached to, and is concerned about the animals' welfare, she wishes to see the animals currently confined by Defendants in a humane setting and to avoid seeing them in an inhumane setting.

110.   If the animals were no longer mistreated and were given a humane setting at Tri-State, or were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in a humane setting, Ms. Collins would return to visit the animals.

**D. Defendants' mistreatment and neglect of captive animals perceptibly impairs PETA's activities and programs, and has forced it to divert resources.**

111.   PETA is dedicated to protecting animals, including animals used in entertainment, from abuse, neglect, and cruelty. PETA's motto, which summarizes

its mission, reads, in part: "Animals are not ours to . . . use for entertainment[] or abuse . . . ."

112.   By mistreating and neglecting captive animals, and therefore increasing the number of animals subject to abuse and neglect in entertainment, Defendants directly frustrate PETA's mission to eliminate the abuse and neglect of animals.

113.   To achieve its objectives of ending the abuse and neglect of animals, including animals used for entertainment, PETA pursues many programs, including public education, cruelty investigation, research, animal rescue, legislation, special events, celebrity involvement, and protest campaigns. It brings this suit on its own behalf to protect its programs, which have been perceptibly impaired by Defendants' actions.

114.   By continuing to engage in cruelty to animals without repercussion, Defendants create the incorrect public impression that the conditions in which these animals are kept are humane and lawful and that Defendants can lawfully abuse, neglect, and mistreat animals. This frustrates PETA's programs by making it harder to persuade the public that it should not tolerate Tri-State's unlawful mistreatment of the animals who are the subject of this action and the use of animals in entertainment.

115.   Moreover, Defendants falsely present Tri-State as a refuge for abandoned and unwanted animals, thus creating the incorrect public impression that Defendants are providing an essential rescue service and that but for Defendants' efforts, the animals confined at Tri-State would not be adequately provided for. This

too frustrates PETA's programs by making it harder to persuade the public that it should not tolerate Tri-State's unlawful mistreatment of the animals who are the subject of this action and the use of animals in entertainment.

116.    As a result, PETA has been forced to divert resources in order to counteract the public impression that Defendants' practices are lawful and consistent with animal welfare and that Defendants are providing an essential rescue service. In order to counteract this public impression, PETA has been and continues to be forced to, among other activities: submit complaints about Tri-State to government agencies; post multiple posts on the PETA.org blog; review and respond to complaints from the public about Tri-State; compile and publish information on PETA's website about Defendants' history of animal welfare violations; and distribute press releases on Defendants' AWA violations. PETA has also filed and litigated lawsuits over Tri-State's AWA license renewal and Tri-State's Endangered Species Act violations, and has sent an attorney to meet with Mr. Candy to offer to find the animals homes at reputable facilities.

117.    In order to compile accurate information about Tri-State to share with the public and its members, as well as to counteract the public misimpression that Defendants' practices are lawful and consistent with animal welfare, PETA has been and continues to be forced to: track and gather Defendants' USDA inspection reports; monitor Defendants' social media pages and website; submit multiple public records requests related to the facility; file an administrative appeal regarding the apparent unlawful withholdings of public records; and review and analyze numerous

responsive documents. Before commencing the Endangered Species Act action, PETA also arranged for staff and activists to visit Tri-State.

118.   PETA has also been and continues to be forced to undertake all of the actions listed in the preceding two paragraphs, and is therefore compelled to divert resources, to address Defendants' unlawful mistreatment of the animals who are the subject of this action.

119.   PETA's ongoing need to expend resources to investigate and counteract Defendants' unlawful cruelty to animals has perceptibly impaired PETA's ability to advance its mission. Specifically, the expenses incurred identifying and counteracting Defendants' illegal activity has forced PETA to divert resources away from campaigns against other non-accredited roadside zoos and traveling animal shows with egregious records of animal neglect and abuse, and from funding animal rescues, among other efforts.

120.   PETA suffers an injury different in kind and degree than the general public due to the perceptible frustration of its programs caused by Defendants' nuisance, which makes it harder for PETA to persuade the public that it should not tolerate the use of animals in entertainment and should not tolerate animal abuse and neglect. Unlike other members of the public, PETA has been forced to divert resources to counteract the public impression that Defendants' treatment of animals is lawful and consistent with animal welfare, when it is in fact illegal and cruel to the animals, and that Defendants are providing an essential rescue service, when they are not.

121.   If PETA prevails in this action, Defendants will no longer be able to maintain the animals at issue in conditions that are unlawful and inconsistent with animal welfare, and PETA will no longer have to divert resources to counteract the incorrect public impression caused by Defendants' unlawful acts or to counteract the unlawful acts themselves.

122.   PETA's additional efforts and the resulting expenditures would not be necessary but for Defendants' unlawful mistreatment of animals.

123.   Plaintiffs are in a position to secure new homes at bona fide wildlife sanctuaries or otherwise appropriate zoological facilities or homes for all affected animals.

## V.   CLAIM FOR RELIEF

### Count I—Public Nuisance

124.   Plaintiffs incorporate by reference all allegations of the Complaint.

125.   Defendants' operation of Tri-State, including the treatment of animals confined therein, unreasonably interferes with the rights of the general public and constitutes a public nuisance.

126.   The public nuisance created by Defendants' actions is unreasonable—it has caused and continues to cause significant interference with public morals.

127.   Defendants' conduct also is unreasonable because it constitutes cruelty to animals in violation of state law and violates animal welfare standards under federal law. *See* Md. Code, Crim. Law § 10-604; 7 U.S.C. §§ 2131-2159.

128.   These violations of law support a finding of public nuisance under Maryland law.

129.   As a direct and proximate result of Defendants' creation of a public nuisance, Plaintiffs have suffered harm different in kind and degree than that suffered by members of the public.

130.   Plaintiff Connie Collins has a particular emotional attachment to the confined animals and incurred an injury including but not limited to her aesthetic, recreational, educational, and personal interest in seeing the animals in a humane, safe, and psychologically enriching setting. Ms. Collins would return to Tri-State if the animals were to receive proper food, necessary veterinary care, proper drink, proper space, proper shelter, and proper protection from the weather, and were to no longer unnecessarily suffer, or she would visit the animals if they were moved to a sanctuary.

131.   Plaintiff PETA has incurred economic damages including but not limited to the use of its resources to investigate and counteract Defendants' unlawful conduct and to counteract the incorrect public impression caused by Defendants' unlawful acts.

132.   If unabated, Defendants' conduct will continue to threaten the rights of the general public and Plaintiffs' rights. Equitable relief, including transfer of the animals to a bona fide sanctuary or otherwise appropriate zoological facilities or homes and an injunction prohibiting Defendants from obtaining other animals, would redress ongoing harms to Plaintiffs by Defendants' conduct at Tri-State.

133. If equitable relief were granted, Ms. Collins would no longer be distressed by the inhumane setting in which the animals confined at Tri-State currently suffer.

134. If equitable relief were granted, PETA would cease incurring costs related to investigating and counteracting Defendants' unlawful conduct and the resulting public misimpressions.

**Relief Requested**

WHEREFORE, Plaintiffs pray for the following relief:

A. An order declaring that Defendants' operation of Tri-State violates Maryland's cruelty to animals statute, Md. Code, Crim. Law § 10-604, and the Animal Welfare Act, 7 U.S.C. §§ 2131-2159, and is a public nuisance under Maryland law.

B. An injunction:

    1. ordering Defendants to cease maintaining a public nuisance, namely by confining animals in inhumane and unsafe conditions;

    2. terminating all Defendants' ownership and possessory rights with respect to the animals confined at Tri-State or Defendants' real property;

    3. prohibiting Defendants from obtaining or exhibiting other animals; and

    4. prohibiting Defendants from holding Tri-State out as a sanctuary or animal rescue.

C.  An order appointing a special master or guardian ad litem to identify reputable sanctuaries or otherwise appropriate zoological facilities or homes and to determine the most appropriate placement for the forfeited animals, consistent with the animals' best interests; and

D.  An order granting such other and further relief as the Court deems just and proper.

Date   May 14, 2020
       Baltimore, Maryland

Respectfully submitted,

*/s/ Adam Abelson*
Adam Abelson (#29532)
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
(410) 332–0444; (410) 659–0436 (fax)
aabelson@zuckerman.com

Marcos E. Hasbun (Pro Hac Vice Pending)
Zuckerman Spaeder LLP
101 East Kennedy Boulevard, Suite 1200
Tampa, Florida 33602–5838
(813) 221–1010; (813) 223–7961
mhasbun@zuckerman.com

Caitlin Hawks (Pro Hac Vice Pending)
Zeynep Graves (Pro Hac Vice Pending)
James Erselius (Pro Hac Vice Pending)
PETA Foundation
2154 West Sunset Boulevard
Los Angeles, CA 90026
(323) 210-2263; (213) 484-1648 (fax)
caitlinh@petaf.org
zeynepg@petaf.org
jamese@petaf.org

*Counsel for Plaintiffs Constance Collins and People for the Ethical Treatment of Animals, Inc.*