**EXHIBIT A**

## IN THE IOWA DISTRICT COURT IN AND FOR DELAWARE COUNTY

| | |
|---|---|
| TRACEY K. KUEHL, LISA K. KUEHL, PAMELA J. JONES and HALEY A. ANDERSON,<br>        Petitioners,<br><br>Vs.<br><br>PAMELA SELLNER, THOMAS SELLNER, CRICKET HOLLOW ZOO, INC. and PAMELA SELLNER, THOMAS SELLNER. AN IOWA GENERAL PARTNERSHIP, d/b/a CRICKET HOLLOW ZOO,<br>        Respondents. | Case No. 01281 EQCV008505<br><br>DECLARATORY JUDGMENT AND ORDER OF INJUNCTION |

This matter comes before the Court upon a Petition for Declaratory Judgment and Injunctive Relief.  The Petitioners appeared personally and with Attorneys Jessica Blome, Kristy Rogers, Olivia Norwood and Amanda Howell.  Pamela Sellner appeared personally and as representative of the partnership and d/b/a Cricket Hollow Zoo, along with Attorney Lawrence Thorson.

The Petitioners are requesting that the Court find that the Respondents' operation of a roadside zoo, known as the Cricket Hollow Zoo a/k/a Cricket Hollow Animal Park,[1] violates Iowa's Animal Neglect Law as enumerated in Iowa Code §. 717B.3(1)(a-c).  Petitioners are asking that the Court remove the animals from the property and prohibit the Sellners from purchasing wild or exotic animals in the future.

The Court resolved pre-trial motions and instructed the parties on the rulings on the record.  The parties agreed and understood that the matter was being tried in equity and therefore equitable principles pertaining to the offering and receiving of exhibits applied.  The Petitioners filed a Motion for a Site Visit that was not resisted by the Respondents.  The Court conducted the inspection and thereafter provided some impressions to the parties to encourage talks about settlement.  Neither party was interested in attempting settlement.

There were no motions filed by the Respondent to dismiss the action based on the assertion that the pleadings failed to state a claim upon which relief could be granted.  There was no motion filed to object to standing of the Petitioners.  There was no motion for directed verdict at the conclusion of the Petitioners' case or at the end of the presentation of evidence.

---

[1] Per Defendant's Ex G the Defendants filed a fictitious name resolution adopting the name Cricket Hollow Animal Park on October 22, 2018.

The Court sat for five (5) full days and received exhibits and testimony from the parties, visitors to the zoo, and the experts. The parties requested the ability of file post-trial briefs. The Court has received and reviewed the briefs. The Defendants raise the issue of federal preemption as a means to indicate the Court cannot render a decision herein. The Court addresses that assertion before embarking upon the decision on the petition.

## PROCEDURAL CLAIMS

### Preemption by Federal Animal Welfare Act

The Petitioners correctly point out that under the Animal Welfare Act, the state reserves the right to control animal welfare. When the federal government acts within its constitutional authority, it is empowered to preempt state or local laws to the extent it believes such action to be necessary to achieve its purposes. *DeHart v. Town of Austin, IN*, 39 F.3d 718, 721 (7th Cir. Court of App. 1994). The supremacy clause of the Constitution authorizes this federal action, and the phrase "Laws of the United States" of *Article VI, Clause 2* encompasses both federal statutes and federal regulations that are properly adopted in accordance with statutory authorization. *Id.* (citations omitted). Preemption occurs in three situations. Congress may define expressly to what extent a federal statute preempts a state or local law. *Id.* (citations omitted). We may also infer preemption when a pervasive scheme of federal regulation makes it reasonable to conclude that Congress intended exclusive federal regulation of the area. *Id.* (citations omitted). Finally, where state or local law actually conflicts with federal law, state or local law must give way. *Id.* (citations omitted). Such a conflict arises when "compliance with both federal and state or local regulations is a physical impossibility," or when state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted).

"[W]hen regulation is of a field traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest* purpose of Congress.' " *Id.* at 722 (citations omitted). "The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals." *Id.* citing *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 569, 111 S.Ct. 2456, 2462, 115 L.Ed.2d 504 (1991). The regulation of animals has long been recognized as part of the historic police power of the States. *Id.* (citations omitted).

"[T]he Animal Welfare Act does not evince an intent to preempt state or local regulation of animal or public welfare." *Id.* Indeed, the Animal Welfare Act expressly contemplates state and local regulation of animals. *Id.* For example, § 2145(b) declares: "The Secretary is authorized to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject." *Id.* citing 7 U.S.C. § 2145(b).

Kuehl v. Cricket Hollow Zoo
EQCV008505
Page **3** of **18**

     The Court hereby concludes that the State of Iowa has an interest in the regulation of animal care and therefore the Court has the authority pursuant to Iowa Code Chapter 717B to determine the compliance therewith by the Defendants.

**Taking Under the Constitution**

     The Defendants have set forth a minor issue in their brief to the extent that the Petitioners' cannot take the animals owned by the Sellners without just compensation. In support of this argument the Respondents' reference the 5th Amendment to the United State Constitution and *City of Eagle Grove v. Cahalan Investments, LLC.*, 904 N.W.2d 552, 560-561 (Iowa 2017).

     Both the Iowa and United States Constitutions mandate that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. 1, § 9; U.S. Const. amend. XIV. A person is entitled to procedural due process when state action threatens to deprive the person of a protected liberty or property interest. *Bowers v. Polk County Bd. of Supervisors,* 638 N.W.2d 682, 690 (Iowa 2002). Procedural due process requires, at a minimum, notice and an opportunity to be heard in a proceeding that is adequate to safeguard the right for which the constitutional protection is invoked. *City of Cedar Rapids v. Mun. Fire & Police Ret. Sys.,* 526 N.W.2d 284, 291 (Iowa 1995).

     A municipality may exercise its police power by adopting ordinances to promote the public welfare, to provide for the safety and comfort of its inhabitants, and to declare and prevent nuisances. *City of Cedar Fall v. Fleet,* 330 N.W.2d 251 (Iowa 1983) citing *Town of Grundy Center v. Marion,* 231 Iowa 425, 433, 1 N.W.2d 677, 681 (1942). To be constitutional, however, the ordinance must have a definite, rational relationship to the ends sought to be obtained. *Id.* citing *MRM, Inc. v. City of Davenport,* 290 N.W.2d 338, 343 (Iowa 1980).

     The Respondents have been provided proper notice of these proceedings and have had a full opportunity to defend the claims raised against them.

     The Supreme Court, as indicated herein, has made the determination that the State has the ability protect the welfare and safety of animals. *Iowa Code Chapter* 717B is the mechanism by which that is accomplished. It has not been found to be arbitrary or capricious. It has a rational basis in the protection of the public health, safety and welfare.

     The Court in *Johnson County v. Kriz,* 582 N.W.2dd 759, 762 (Iowa 1998), noted that the statute was not intended to maximize the income to the owner. "Indeed, the power to seize and dispose of neglected animals is analogous to the state's traditional power to take action to abate a nuisance or to protect the public health. As such, the state's disposal of neglected animals falls within the class of property deprivations for which the Fifth Amendment does not require compensation." *Id.* citing *Porter v. DiBlasio*, 93 F.3d 301, 310 (7th Cir. 1996).

The claims of the Respondent under the constitutional taking and lack of due process have no merit. The case law put forth by the Respondent relate to eminent domain and have no application herein as to Iowa Code Chapter 717B.

### Iowa Code Chapters 162 and 717F
### Application to Zoos

By definition, Iowa Code Chapter 162 was enacted to insure that all dogs and cats handled by commercial establishment are provided with humane care and treatment. It by definition has no application to the Sellners' operation on its farm.

Chapter 717F.1 defines the terms for the application of this specific subsection of the chapter. It references agricultural animals, assistive animals and circuses holding a Class "C" license under the United State Department of Agriculture (USDA). It specifically exempts presenters to children at a public school. The code section does reference a wildlife sanctuary, but the Sellners' facility has not been licensed for that purpose. The Court is unclear however to the status of the Respondents' licensing and the possibility that there may be a grandfathering of the zoo's ability to maintain ownership of wild animals. The Iowa Department of Agriculture and Land Stewardship IDALS has not intervened in this action so, there is no indication of their role once this court renders its decision.

### SYNOPSIS

Based on the evidence provided, the Court hereby finds that the Petitioners have met their burden and established a nuisance and violations under the Animal Neglect Law. The animals are living in deplorable conditions. The environment is unhealthy not only for the animals but also to the public who visit the facility as invitees. The enclosures of the animals are subpar in all manners. The enclosures do not provide appropriate enrichment or have the necessary similarities to the natural habitats of the animals, deemed to be a necessity for a healthy animal as per testimony of the experts.

The testimony and exhibits provided a picture of exotic animals that are left to eat and defecate in the same areas where they live. Many, if not all of the animals, do not have a clean water source constantly available to them. Proper sustenance that is not contaminated is also not provided. These issues are systemic. There is no effort on the part of the Sellners to modify any of their husbandry practices to provide for a better environment for the animals. The Sellners have shown no interest in rectifying problems by hiring informed staff, retaining a properly trained veterinarians and maintaining proper shelter.

Testimony from the witnesses described animals climbing on their food after walking on the substrate that contains excrement. Expert testimony indicated that the substrates present at

the Cricket Hollow Zoo are not the proper substrate material for the specific breed of animals and are likely to cause illness and even death due to the contamination. Further expert testimony provided that predators are living next to their prey, which is considered stressful because the prey animal lives in fear sensing the predator. The animals are in too close of proximity. The animals are exhibit stereotypic behavior such as self-mutilation and pacing. The experts opined the stress, aggression and agitation is due to poor environment and diet, which leads to an unhealthy animal. The animals have little to no veterinarian care on a regular basis. On-site visits by a veterinarian who specializes in exotic animal care are non-existent by Respondents' own testimony.

The operation of the Cricket Hollow Zoo is injurious and dangerous to the health and comfort of individuals such as the Petitioners, visitors such as who testified at court, and to the general public who might venture onto the property.

## FINDINGS OF FACT

Pamela and Thomas Sellner (Pamela) own property located at 1512 210th Street, Manchester, Delaware County, Iowa. They operate a Grade "A" dairy farm as their primary business on that property. Their home is on the property. Pamela grew up on a farm in Buck Creek and graduated from Maquoketa High School. She attended Kirkwood Community College for one quarter. Her studies focused on animal husbandry. She abandoned her studies and decided that dairy farming was her first love. They have a total of 10 acres with an older barn and attached milk house with a step-up parlor.

In 1986 Pamela bought her first non-traditional animal: a llama. Pamela continued to make purchases of animals with the intention of bringing farm life to rural areas. Tom would transport the animals to community functions, nursing homes and schools to educate children. They eventually purchased a squirrel monkey, a cougar and a lion cub. Tom is a welder by trade, and as the number of animals on the farm grew, he built cages and enclosures for them. Pam testified that they have used corn cribs and pre-fabricated enclosures, along with chain link fencing, gates, coops and wire caging. Some of the construction consists of barker panels and heavy-duty chain link.

Eventually the Sellners came to own more than 200 exotic animals. Neither Pamela nor Tom has any degrees or certifications to care for these type of animals. They belong to mentor groups such as the Feline Conservation Society and the Simeon Society to educate themselves on the care of the animals. There was no evidence offered to show the completion of any seminars or educational courses. Pursuant to her testimony, Pamela does extensive research on-line and in the library as her main source of gaining information on caretaking for these exotic animals. Pamela was licensed as a mobile exhibit in 1992. She then sought further licensure to become a zoo from the USDA. She was authorized for such in 2002. She indicated this designation was

Kuehl v. Cricket Hollow Zoo
EQCV008505
Page 6 of 18

sought by her as it made exposure of the animals easier. The community could come to the farm and see animals they would not otherwise be able to, and do so up close and live.

The entrance to the zoo is a driveway off 210th Street, which is Main Street as you head east into Manchester. The driveway takes you to the side of the Sellners' home. There are no marked or paved parking spaces for the public to use. The entire facility is comprised of dirt and gravel. Pamela allows the visitors to enter, pay and conduct their own tour. Once entering the zoo (side entrance to the home), there is what she calls an education center and the reptile room. The space is shaped like a "T" so visitors can go to the left or right upon leaving the entrance space. Pamela greets visitors with ambassador animals, which she holds and allows to be petted by the visitors. The education center and reptile rooms contain large glass aquariums which house fish, frogs, sugar gliders, ferrets, snakes, iguanas, lizards, turtles, vermin (including cockroaches), rodents, and an alligator/crocodile. There are numerous tropical birds in wire cages.

Once you exit into the "backyard" area, there are cages / chicken coops that house goats, chickens, raccoons, skunks, rabbits, other turtles and porcupine. Rounding the corner, there is what is called an imagination garden. It is full of brush and plants indigenous to a farm. As you continue, there is a pond with geese and other water fowl on the grounds surrounding it. Once you leave this semi-circle route, you enter the long passageway where the larger animals are kept. First you encounter the two foxes. To the right, there are Macaque monkeys, baboons, a camel, and a llama. On the left there are bears, mountain lions, wallabies, a wolf / hound mix, bobcat, ponies, a horse, a white small horse or mull, pot-bellied and Meishan pigs, a donkey, rams, sheep and goats.[2] At the end of the long passageway the land abuts the farm operation and further pasture areas.

Pamela indicated that she has a skid loader with a 100-gallon water bin that is used for watering, which is done two times a day. When it's colder, she indicated the water is left to freeze over to permit the animals the ability to lick the ice. Pamela's daily routine starts with the dairy barn for approximately 2 hours. Once she finishes with the cows, she goes to the animal park. She feeds and waters the animals and conducts a daily "spot cleaning", which takes approximately 1 hour to complete. Visitors are accepted starting at 10:00 a.m. during the months the zoo is open. She performs chores in the reptile room between 4:30 – 5:00 p.m. followed by topping off the water and feeding the animals at the end of the day. She returns to the dairy barn to start the milking process. On Mondays and Tuesdays, she performs her major cleaning of the zoo as it is not open on those days. Tom works 55 hours per week at his employment at Henderson (Mills Mfg.) Manufacturing. There are no other zoo employees. The zoo does have some volunteers that occasionally help her, according to Pamela. The Court notes that none of the volunteers came forward to testify.

---

[2] This is not a complete list of animals. The description is provided only to provide a mental impression of the layout of the zoo.

Kuehl v. Cricket Hollow Zoo
EQCV008505
Page **7** of **18**

Pamela has used local veterinarians over the years for the care of the animals. She also makes contact with a veterinarian at the Omaha Zoo. There were no records offered to indicate what those contacts may have been about or when they would have been made. She has a farm veterinarian in the Ryan area. Pamela presently discusses her medical needs, nutrition and enrichment with Dr. Ivan Lilienthal, who testified he is a graduate of what is believed to be the College of Veterinary Medicine in St. Paul, Minnesota. He did not present a curriculum vitae. He did not present any details of publications written or co-authored by him. He did not provide information about continuing education or seminars. He did not provide the Court with his Iowa licensing credentials. His main area of practice is hoof trimming. He also cares for cattle. He has no office; he uses the back of his pick-up as an examination table.

Dr. Lilienthal visits the zoo approximately six (6) times a year, stating he sometimes does not see every animal every time. He is presented with details of nutrition from Pam and signs the form for her USDA requirements. He signed the USDA Veterinarian Care for Exotic Animals stating "because that is the only way she could get it." He has no training in exotic animal care. He also testified that he had never read the Animal Welfare Act because it's taking information off a piece of paper and you are telling people how to run their life.[3] He has no knowledge of enrichment requirements for the animals at the zoo. He also was not able to discuss the term "enrichment". His impression is that the word is made up by the animal rights activists and means nothing. Most importantly, he does NOT conduct any hands-on examination of the animals or do necropsies at their death. (emphasis added). The majority of his veterinary care to Cricket Hollow Zoo is provided through phone calls with Pamela relating the issue with the animal and him giving her instructions on what medicine or treatment to use and how to use it. Over the three years he has been the zoo's signatory veterinarian he has never sent a bill to Pamela indicating it would not be fair. The total sum of his records on her animals consists of five pages of notes. The former veterinarian maintained three pages of records and billed approximately $6,363.00 for an eight year period.

Pamela is usually the person to meet with the inspectors from the USDA. She has been in conflict with the inspectors over a variety of violations and for a significant number of years. She has been told in the past to hire help. She does not believe she has to do so. She has a Facebook friend who works at the local Fish Shack who is identified as her contingency plan, if one were ever needed. The Court was not presented with details of her experience with wild or exotic animals. When this person has helped her in the past, Pamela instructed the woman not to engage the animals. It appears this woman will simply sit in the entrance area and take the admission fee from zoo visitors. There was no testimony offered to indicate the woman either fed or watered the animals while present.

---

[3] This is a paraphrase from the testimony of Dr. Lilienthal.

Kuehl v. Cricket Hollow Zoo
EQCV008505
Page 8 of 18

Pamela has no financial reserve for the care of the animals. The farm and the zoo operate at a deficit according to the Sellners' tax returns. She has no emergency care plan or equipment on the farm. This has been brought to her attention on many occasions by USDA inspectors. She feels it is sufficient that police and emergency personnel are close in the City of Manchester. After one inspection, Pamela wrote to the inspector and asked what was meant by "good enough" as it related to compliance with this and many other issues.

Pamela has made some but not all changes to her husbandry care, despite the recommendations and continual violation reports of the USDA inspectors. She testified that one inspector in particular was "nit-picky and obsessive." Pamela has paid fines in the past that have exceed $10,000.00. It may have been more prudent to use that money to make changes to her practices that to be fined for continued non-compliance.

The cages where the animals are housed are old and rusty. The rust can cause any number of issues according to the experts. Some of the cages have a lock-out unit for purposes of cleaning. Tom has been mauled by one of the cats while he was cleaning. He had to be life-flighted to the University of Iowa Hospitals for his injuries. The baboons have a Guillotine door in the rear of the cage. The surrounding cage is chain link and has a front gate access that appears to be latched with a padlock. The camel is housed in an area that has a welded metal guard rail connected to the two sides of an arched sheet of metal that is used for the animal's shelter. There is a perimeter fence that is held up with thin metal fencing posts. Since the USDA permits the equines to be touched by the public, their fencing is different from the other animals.

In 2016, the Sellners were brought before the United States District under the Animal Welfare Act. The Unites States Magistrate Judge for the Northern District of Iowa ordered the endangered species owned by the Sellners to be transferred to another facility. The decision was appealed to the Court of Appeals for the 8th District. A three-judge panel rendered its decision in Case Nos. 16-1624, 16-3147 on April 11, 2018. The appellate ruling affirmed the magistrate decision. In rendering his decision, the magistrate looked to the United States Code of Regulations that defined "harass" as an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering. The regulations define "harm" by an act which will kill or injure wildlife. The act may include significant habitat modification or degradation by significantly impairing essential behavioral patterns.[4] The magistrate found harassment and harm in the practices evidenced at the zoo. The magistrate referenced testimony of Dr. Pries, who indicated that enrichment or enhancement of an animal's living quarters is not part of his role as a veterinarian.[5] The magistrate also found

---

[4] Petitioners' Exhibit 13 referencing 50 C.F.R. § 17.3.

[5] Petitioners' Exhibit 13, page 10.

that the regulations were violated in that the excreta was not removed from the primate enclosures as often as necessary to prevent contamination of the animals and to minimize disease and reduce odors.[6]  Pamela criticized the decision, saying that the judge did not observe the zoo or the animals and yet made the decision that they had been mistreated.

The Sellners' neighbors, the Brockmeyers, appeared before the Court and expressed that they have no issues with the zoo.  They moved in sometime in 1980 and own 3.5 acres.  They testified that the Sellners are good neighbors.  They both indicated they had been to the zoo but it was approximately 10 years ago when the zoo first opened.  Neither indicated they could smell offensive odors.  They have not experienced water pollution coming from the farm.  Neither have been back to the zoo since their initial visit.  They could not testify to the present conditions of the zoo or the animals.

Compliance Investigator for the State of Iowa, Douglas Anderson, began investigating issues at the zoo in 2012 as a result of complaints about its conditions.  He is required to prepare reports that are provided to the Iowa State Veterinarian.  He had been to the zoo between 10 – 12 times since obtaining his position.  His observations have been that the animals were well fed and watered, with good body condition.  On occasion he would be there with the USDA inspectors and other times he would be on his own.  He noted in one of his reports that the USDA inspector told Pamela to provide water to one of the smaller mammals.  Upon doing so the mammal drank for over one minute, which is a sign of dehydration.

Mr. Anderson has no training in the care or husbandry of exotic animals.  He refers to anyone placing a concern about the facility as the "complainers."  His reports however show that he has found violations in the past and has not taken any action to rectify the same.   He does acknowledges that the facility is daunting in its size and care requirements.  He has expressed concern over the lack of staff and assistance afforded Pamela.

The Sellners have a professional relationship with Gregory Woody,[7] who shows and raises exotic animals.  His business is called Woody's Menagerie.  He has been the recipient of animals of the Sellners in the past.  He believes it is important for the preservation of these animals that the public sees them live and in person.  He has taken animals to many schools and has even appeared on television.  He used to have a full staff of employees and veterinarians on staff but he has reduced his operation down to him and his wife.  He testified that it is important to have more than one veterinarian to work with the animals due to the differences amongst the species.  He believes you need someone who has a "step above that's more familiar with the situation."  He has worked to inform legislative groups of matters that needs to be addressed in the law.  He stated that his difficulty in staying active in the arena is the time it takes to care for the animals.  He does not show his animals as his main focus is on traveling and transporting

---

[6] Petitioners' Exhibit 13, page 12.

[7] Mr. Woody indicated he has known the Sellners for 15 years from their contacts in the industry.

animals across the country. Mr. Woody exhibited anger about animals' rights groups and USDA inspectors stating, "I do not understand how a person can show up and see an animal once and become an expert on what the situation is with the animal." Mr. Woody has been cited by the USDA for not receiving proper veterinarian care for his animals. He also testified that he "slaughters" his animals by shot gun and harvests their meat. This would not be a humane way to euthanize animals.

The Sellners have lost a large number of animals over the years due to infection, zoonotic illnesses and improper veterinarian care. If a cause of death has not been identified, Pamela indicates in her individual veterinarian records that the animal dies of old age. There is rarely an examination into the cause of death as Dr. Lilienthal does not believe it is necessary. Pamela agrees with this approach as she does not insist on sampling of the animals to be sent to a lab or necropsies even when other animals may be exposed to disease or a large number of animals pass at once.

The USDA records produced by the parties show a history of improper care. According to Table A, there have been reports dating back to 2010 up to an including 2019 showing recurrent violations. The watering practices have been found to be inadequate. The veterinarian care has been inadequate. Sanitation issues have been noted with concerns relating to pests, flies, vermin, and excreta not only in food but also in shelter areas. Animals have escaped the facility while being under inspection. Care issues were raised in the inspections that the Sellners were not even aware of due to lack of proper supervision of the cages, i.e. dead animals in the living spaces. Of note is the fact that there were violations relating to the shelters on numerous occasions. The reports over the years noted that the animals that are caged together do not have ample space to sit, stand and lie in normal manner. One "dog crate" cannot be sufficient for more than one animal to be able to escape the elements. The inspector noted that a "dog crate" is not designed as shelter, especially when it comes to proper ventilation and the animal's ability to make adjustments to body position while enclosed. The other indoor and outdoor structures are required to be of sound structural strength and free of potential injury causing disrepair. Many photos of the zoo show shelters that are not properly sized and not in good repair.[8]

The primate facility has been photographed with holes in the ceiling and insulation falling through. Many of the chain link fences are curled on the bottom with the points protruding into the animals' living space. The food preparation areas are not sanitized. In fact they appear corroded with dirt and unhealthy surfaces. In the winter, the reports and attached photographs show that many of the shelters are broken leaving the animals exposed in the winter. There are repeated reports of feces, urine and other excreta in the living spaces. This has been a recurrent theme over the years and yet consistently ignored.

---

[8] The Court did not receive any documentation from the USDA as to the standards for sizing. The experts testified as to the improper sizing due to the needs of the species.

  Persons who viewed the zoo as a result of looking it up on the internet had very similar concerns as those raised by the Petitioners' in this action.[9] They saw things that have been repeated health concerns for not only persons but also animals. One such individual, Kathy Shunk, a resident of Cedar Rapids, came to the trial and testified about the first observations made by her. She was upset during her testimony. She felt the facility should be shut down due to the deplorable conditions. She witnessed animals with no water or food. She indicated the buildings reeked. She observed the overall condition of the animals and described them as scraggly and lacking in care.

  The Association of Zoos and Aquariums promulgates rules and regulations found in *The Accreditation Standards and Related Policies Manual*, (2015 Ed.)[10] that provides for consideration of the psychical facilities where animals are housed. The recommendations suggest as its first priority that general housekeeping be a regular practice. Animal enclosures should have proper lighting with UV spectrum lights per the specifics of each species. The enclosures must be of a size and complexity sufficient to provide for the animals' physical, social and psychological well-being. They must also provide for the behavioral enrichment of the animals. The manual also suggests that staff have the regular opportunity for continuing education on the care of the animals. The Sellners do not ascribe to the suggestions in this manual as they are not members of the association.

  Each of the Petitioners have been to the zoo over the years. They expressed severe distress over what they witnessed. The Kuehl sisters have attempted on numerous occasions to seek redress of what they have observed. They have been offended by the persistent care and mistreatment. As the Petitioners' point out, the courts have repeatedly recognized a cognizable aesthetic interest in observing animals in humane condition that may be injured upon observing animals living in inhumane conditions. See, e.g. *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 432, (D.C. Cir. 1998). The expert veterinarians provided the Court with extensive details about the impact the current conditions are having on the animals. The reports prepared by each of them are adopted by the Court as further support of the decision rendered herein.

  It is unclear to this Court why actions were not taken to remedy the situations with the USDA mandating closure of the facility until compliance was 100%. Reading the articles provided by the Respondent concerning Pat Craig,[11] the Court understands there may be other areas of life that have a higher priority. There is a lack of manpower. There may also be a lack of resources to care for the animals when taken from the negligent owners. The general public and even state employees such as Inspector Anderson see the issues very complacently and treat the issues as bothersome. The Sellners are nice people and that seems to grant them exemptions.

---

[9] Petitioner's Exhibit 67.
[10] Petitioner's Exhibit 69.
[11] Respondent's Exhibit P.

Kuehl v. Cricket Hollow Zoo
EQCV008505
Page **12** of 18

There have been extreme actions taken by some individuals such as calling the Sellners and making death threats to them. These types of melodramatic expressions lend less credence to the cause of helping the animals. Basically as the Craig article indicates, the problem will perpetuate as long as peoples' fascination with what is wild and unattainable persists. This is what leads to breeding these animals and then placement of them into the hands of uneducated and untrained persons. Mr. Craig operates a very large acreage with 140 acres that encompasses many 20 acre habitats with tall grass, trees, lakes and dens. Even with the level of staff including a number of veterinarians, he still experiences USDA violations.

## LAW OF NUISANCE AND
## ANIMAL NEGLECT

The online Oxford dictionary defines a zoo as an establishment which maintains a collection of wild animals, typically in a park or gardens, for study, conservation, or display to the public. It defines a farm as an area of land and its buildings used for growing crops and rearing animals, typically under the control of one owner or manager; a place for breeding a particular type of animal or producing a specified crop. The Sellners are farmers attempting to maintain a collection of wild animals with the intent to display the animals to the public.

Iowa Code § 657.1 defines what constitutes a nuisance and provides for abatement procedures. It reads:

> "Whatever is injurious to health, indecent, or unreasonably
> offensive to the senses, or an obstruction to the free use of
> property, so as essentially to interfere unreasonably with the
> comfortable enjoyment of life or property, is a nuisance, and a civil
> action by ordinary proceedings may be brought to enjoin and abate
> the nuisance and to recover damages sustained on account of the
> nuisance."

The definition of a nuisance is defined statutorily in Iowa Code § 657.2 as:

> "…the use of a building or other place for the exercise of any
> trade, … which, by occasioning noxious exhalations, offensive
> smells, or other annoyances, becomes injurious and dangerous to
> the health, comfort, or property of individuals."

These statutory provisions do not modify the common-law's application to nuisance. *Weinhold v. Wolff*, 555 N.W.2d 454, 459 (Iowa 1996) (citations omitted). These provision are skeletal and the court looks to the common-law to fill in the gaps. Whether a lawful business is a

nuisance depends on the reasonableness of conducting the business in the manner, at the place, and under the circumstances in question. *Id.* Thus the existence of a nuisance does not depend on the intention of the party who created it. *Id.*

"A fair test of whether the operation of a lawful trade or industry constitutes a nuisance has been said to be the reasonableness of conducting it in the manner, at the place and under the circumstances in question. *Patz v. Farmegg Products, Inc.*, 196 N.W.2d 557, 560-561 (Iowa 1972) (citations omitted). Thus the question whether a nuisance has been created and maintained is ordinarily one of fact, and not of law, depending on all the attending or surrounding circumstances. *Id. at 561.* Each case of this nature must depend on its own facts. *Id.*

"Our legislature has made animal abuse and neglect a crime in Iowa." *City of Dubuque V. Francher*, 590 N.W.2d 493, 495 (Iowa 1999), *Iowa Code § 717B.2, 717B.3.* The action is a civil proceeding, and is unrelated to any criminal proceeding that may result from the neglect. *Id.* The disposition that may result from the hearing includes destruction of the animal by a humane method. *Id.* § 717B.4(4). Additionally, the district court may order the owner of the neglected animal to pay the "expenses incurred in maintaining the neglected animal rescued pursuant to § 717B.5, and reasonable attorney fees and expenses related to the investigation of the case." *Id.* § 717B.4(3).

The Iowa Animal Neglect law is found in Iowa Code chapter 717B. *Iowa Code §§* 717B.3(1)(a) & (c) define the offense of neglect and provides for criminal punishment:

> "A person who impounds or confines, in any place, an animal is guilty of animal neglect, if the person does any of the following: (a) fails to supply the animal during confinement with a sufficient quantity of food or water ... or (c) tortures, deprives of necessary sustenance, mutilates, beats, or kills an animal by any means which causes unjustified pain, distress, or suffering."

"The statute, we believe, gives the court considerable latitude as to the disposition of neglected animals." *Johnson County v. Kriz*, 582 N.W.2d 759, 761 (Iowa 1998) (animals could be placed in sanctuaries or zoos under supervision of veterinarians.)

## ANALYSIS

The Court made a personal site inspection of the zoo pursuant to the motion filed by the Petitioners. The motion was not resisted by the Respondents. The Court received testimony from expert veterinarians. The Court received testimony from a visitor to the zoo who posted her opinions of the zoo on the zoo's website. The Court received testimony from all of the Petitioners. The testimony received was factually consistent as to the condition of the zoo. The

testimony was credible as to the concerns all of the witnesses expressed about the animals. A number of the witnesses, despite their efforts to be professional and informational only, broke down and wept.

The Court found all of the same concerns still existed at the time of trial that prompted Tracey Kuehl's letter-writing campaign back a number of years ago. Before reaching the door, an offensive smell was overwhelming and deplorable. One of the experts indicated she regurgitated in her mouth while inside. The aquariums were encrusted with algae. In some instances, one could not see inside through the glass to view the animal on exhibit. The floor was filthy and sticky. The bird cages were riddled with poop, cobwebs, rust, and dirty substrate. The ventilation in the reptile house was so bad it was suffocating. The snakes were not properly maintained to an untrained eye. They were unable to fully stretch or maneuver. There were no visible UV lights, which was testified is required to simulate sunshine and infusion of Vitamin D necessary for their health. There were no visible humidity gages or temperature gauges, which allows the snakes to perform proper shedding behaviors. The alligator / crocodile was in a container that was no larger than an infant bathtub with sides no taller than possibly 2 – 3 inches. It had no space to move. It had no water in which to swim. In one quick movement it could have been at visitors' feet. The turtles had elevated scutes on their shells, which was testified by the experts to be evidence of improper care. This is very harmful to a turtle as the scutes on their backs help create the shield to protect their vital organs. Both of these animals had rotten food in the cages. What water was in containers was dirty.

The area where the sugar gliders and ferrets are kept is something that should be condemned. As the Court walked around the small, narrow and overcrowded space, a huge spray of some kind of flying insects surrounded the body, most particularly the head. Again, the smell in this confined space was overwhelming.

The coops and smaller animal cages were inadequate for the animals to move with any freedom from being in contact with other members of the cage or to find a quiet, secluded space for rest. The cages were old and rusty and appeared very fragile. As previously indicated, there was more than one instance where a predator was next to prey. The expert veterinarians indicated this causes a great deal of stress for the prey and can lead to physical illness or injury and psychological damage. This was evident in the stereotypic behavior that was exhibited such as pacing and aggressive hissing.

The zoo animals that like to burrow did not have space or substrate to do so. Animals that need to be with others in groups or colonies were housed in solitary. The saddest example of that was the wolf / hound mix. Dogs, wolves and coyotes are pack animals. For this animal to have no contact with its own breed is sadistic, especially when he is a mere chain link fence away from bears and wallabies.

The goats and rams were walking around with their hooves turned up as a result of improper hoof care and standing on top of filthy substrate pursuant to testimony and Court observation. Some were also standing on top of the food that was in a feed bunk placed too low to the ground. The expert veterinarians agreed that this was unhealthy for many reasons, mostly for the bacteria that could contaminate the food. Consumption of that contaminated food will eventually kill them if not provided proper veterinary care. One of the rams had one horn on its head that was so curled it was physically poking into the animal's eye.

The bears were also a very sad sight to see in their enclosures. The huge black bear was in a corn crib in full view. It was laying prostrate on the top of a metal platform with its head hanging over the side. It had some kind of discharge or substance dripping from its mouth and nasal cavity on a continuous basis. At first glance and upon continuous observation, it truly appeared dead until there was a very slight head movement at one point noting life. No other bear appeared to be in that enclosure. In a separate enclosure, there were at least 3 brown bears in a very small space for their size and number. They appeared to not have sufficient enrichment to occupy them in their enclosure. The animals paced back and forth at the front of their enclosure as the site visit occurred, obviously agitated. The space under which they could receive shelter from the elements was a curved piece of metal that was rusty and unsafe and would not hold all of the bears at one time. Placed into their cages are PVC pipes leading from the visitors' area into the enclosure, presumably where food as treats can be slid down from the visitors for the bears to eat. The bases of the PVC pipes lay in mud and feces, which would contaminate anything flung into the tube. There was no supervision by zoo staff to make sure unwanted material was not slid into the tube. There were also no signs to instruct visitors as to what was acceptable practice and what was not.

The camel and the llama were in gated areas that were run down to the point where if the animals touched the certain gate pieces, the animal would be able to walk right over it into the pasture. There were actual metal guard rails, commonly used on highways, attached to the camel's metal cover. Again, all of the metal was rusted and in poor condition.

Finally, the primates had to be the saddest and scariest animals at the zoo. There was no enjoyment to be realized from observing them. The baboon came charging at the gate at the front of the chain link fence enclosure it was in that appeared to only be locked by what could best be described as a larger-than-normal padlock and held in place by individual steel wires. The primate was so forceful in its charge that the gated door shook to the point it appeared it would come loose. The animal was obviously bothered by the visitors' presence as it was bearing its teeth as it was clinging to the fencing of the enclosure. The cages were very rusted. There was straw strewn everywhere in a random order. The fur on the bodies of the Macaques was blotchy. The skin was red and irritated and fur was missing. Again, there was a lack of enrichment for play or socialization upon observing their behavior. There was nothing at all to

depict even the slightest resemblance to the normal habitat or behavior of a non-human primate. The stereotypical behavior was evident and witnessed by all of the visitors.

Lastly and most significantly, knowing that the Petitioners' experts would be making inspections for the preparation of expert reports to the court, and that there was a motion on file for the Court to make a personal inspection, the facilities were not in pristine condition at the time of the experts or Court visits. Pamela testified that she performed her deep cleaning on Mondays and Tuesdays. The Court notes it accomplished its site visit to the zoo on Wednesday after the first witness of the day completed his testimony at approximately 10:45 a.m.

The zoo is a public nuisance as defined in the Iowa Code and pursuant to common law in that it is injurious to the health of the animals and potentially to the invitees due to the poor care and living conditions of the animals. Furthermore, the zoo is unreasonably offensive to the senses in the inhumane manner of living of the animals. The viewing of the animals presents no comfort to the visitor. It is not representative of the ideal of a zoo. It has no education or conservation aspects in its current and historic condition. There is no other remedy available such as abatement as the Sellners have never expressed any willingness to modify their husbandry practices or remedy the unhealthy environment. Lastly, the noxious smell of the interior of the areas labeled as reptile and education centers are not only annoying, but injurious to health, comfort of the animals and the visitors.

The Petitioners have established the elements of neglect as defined in Iowa Code Chapter 717B. The Sellners contain a variety of exotic and wild animals. The Sellners have failed to supply with sufficient quantities of food and water. The Sellners have deprived the animals of sustenance for their well-being and psychological development.

### RELIEF REQUESTED

The Petitioners are praying for injunctive relief in this action. They ask the Court to declare the continued maintenance of the Cricket Hollow zoo is a public nuisance. Based thereon, they ask the Court to enjoin the Sellners from any further ownership interest in the animals now living at the zoo; terminate ownership and possessory rights to the animals; direct that the animals be removed from the location of the Cricket Hollow Zoo in Manchester, Iowa; and place the animals in a proper sanctuary. No abatement opportunity is proffered by the Petitioners.

### JUDGMENT OF NUISANCE
### ORDER OF INJUNCTION

**IT IS HEREBY THE JUDGMENT OF THIS COURT** that there exists a nuisance on the property of Tom and Pamela Sellner in the form of a roadside zoo known as Cricket Hollow

Zoo.  The Sellners are in violation of Iowa Code Chapter 717B, the Iowa Animal Neglect
Statute.  The Sellners are enjoined from ownership of exotic animals or wildlife.  They are
hereby divested of all ownership interest in the exotic animals and wildlife currently in their
possession and or listed on the inventory of animals provided to the USDA.

   **IT IS HEREBY ORDERED** that the animals that are deemed exotic, especially the ones
specifically delineated on the attached list, animals covered under the Animal Welfare Act, with
the exception of any exempted as livestock, and other wild life in the care and custody of Tom
and Pamela Sellner and/or the Cricket Hollow Zoo are to be removed immediately.  All
arrangements for the removal shall be made by the Petitioners or their agents.  The veterinarians
presented on behalf of the Petitioners who have been involved in this action are empowered with
the ability to make recommendations to the Petitioners or their agents for proper placement of
the animals into accredited sanctuaries or zoos.

   All costs associated with this action are assessed to the Respondents, to wit: Tom and
Pamela Sellner, and Tom Sellner and Pamela Sellner d/b/a Cricket Hollow Zoo / Cricket Hollow
Animal Park.

# EXOTIC ANIMALS SUBJECT TO THE

# COURT'S RULING

1. Bears – black and brown totaling 7

2. Mountain lions totaling 2

3. Foxes totaling 2

4. Coyotes totaling 2

5. Hybrid wolf / hound totaling 1

6. Non-human primates
   a. Baboons totaling 3
   b. Macaques totaling 2

7. Camel

8. Llama

9. Small mammals kept indoors
   a. Sugar gliders
   b. Ferrets
   c. rabbits

10. Reptiles
    a. Turtles
    b. Alligator / crocodile
    c. Albino python
    d. All other snakes

11. Birds
    **a.** All tropical birds



State of Iowa Courts

**Type:**        OTHER ORDER

**Case Number**        **Case Title**
EQCV008505        TRACEY KUEHL ET AL V PAMELA SELLNER ET AL

So Ordered

Monica Zrinyi Wittig, District Court Judge,
First Judicial District of Iowa

Electronically signed on 2019-11-24 18:57:10    page 19 of 19