IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CONSTANCE COLLINS, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:20-cv-01225-PX |
| TRI-STATE ZOOLOGICAL PARK OF WESTERN MARYLAND, INC., *et al.*, | * | |
| | * | |
| Defendants. | | |

\*\*\*

## **MEMORANDUM OPINION**

Plaintiffs Constance Collins and People for the Ethical Treatment of Animals, Inc. ("PETA"), bring this public nuisance action, alleging that the roadside zoo owned and operated by Defendants Tri-State Zoological Park of Western Maryland, Inc., Animal Park, Care & Rescue, Inc., and Robert L. Candy (collectively "the Zoo") violates Maryland's cruelty to animals statute, Md. Code, Crim. Law § 10-604, and the Animal Welfare Act, 7 U.S.C. §§ 2131–2159 ("AWA"), and thus constitutes a public nuisance under Maryland common law. ECF No. 1. Pending before the Court is Defendants' Motion to Dismiss. ECF No. 14. The Motion is fully briefed and no hearing is necessary. *See* Local R. 105.6. For the following reasons, Defendants' motion to dismiss is denied.

**I.    Background**

The Court takes the facts plead in the Complaint as true and in the light most favorable to Plaintiffs. Defendants own and operate a roadside zoo in Cumberland, Maryland. ECF No. 1 ¶¶ 11–13. The Zoo houses approximately 110 animals including mammals, birds, and reptiles. *Id.* ¶ 15. The Zoo exhibits are open to the public for a small admission fee. *Id.*

Plaintiffs contend that the Zoo abuses and neglects its animals in violation of Maryland's

cruelty-to-animals statute, Md. Code, Crim. Law § 10-604, and the AWA, 7 U.S.C. §§ 2131–2159.  Defendants fail to provide the animals with the most basic of necessities.  The animals are not given proper nutrition or clean water.  ECF No. 1 ¶¶ 35–39, 78–89.  They instead live on a diet of commercial cat and dog food, spoiled donations, and baked goods.  *Id.* ¶¶ 82, 84–85, 87–88.  At times, the Zoo does not feed the animals at all, and at other times volunteers have been forced to buy food for the animals when Candy refused to do so.  *Id.* ¶¶ 83, 86.

Animals also live in dangerous and substandard conditions.  ECF No. 1 ¶¶ 40–62, 90–97.  Defendants do not clean the animal enclosures which are littered with rotten food and feces.  *Id.* ¶¶ 47–48.  These unsanitary conditions produce noxious smells and significantly increase the risk of illness for the animals.  *Id.* ¶¶ 49, 51, 53, 57–59.  The animal habitats are poorly constructed, not maintained, and are plagued by structural hazards, resulting in injury and on occasion, death.  *Id.* ¶¶ 42–43, 60–62.  The structures are bereft of any meaningful enrichment or appropriate opportunities for socialization.  *Id.* ¶ 63–76.

Defendants do not provide the animals adequate—or sometimes any—veterinary care.  Sick and dying animals are left to suffer instead.  ECF No. 1 ¶¶ 23–34.  Inadequate veterinary care at the Zoo has resulted in at least one animal's—a kinkajou's—death.  *Id.* ¶ 28.  These failures inflict pain and suffering on the entirety of the Zoo's inhabitants.  *Id.* ¶¶ 63-77.

The deplorable conditions at the Zoo are readily apparent to regulatory authorities.  Since 2008, the Zoo has received several citations for violations of the AWA.  ECF No. 1 ¶¶ 20-21, 22 (citing *Tri-State Zoological Park of W. Maryland, Inc.*, 72 Agric. Dec. 128, 2013 WL 8214620 (U.S.D.A. 2013) (Decision & Order); *Tri-State Zoological Park of W. Maryland, Inc.*, 71 Agric. Dec. 915, 2012 WL 3877392 (U.S.D.A. 2012) (Decision & Order)).  Additionally, this Court has found after trial that Defendants had committed several violations of

the Endangered Species Act constituting a "take" of the lions, tigers and lemurs at the Zoo. *PETA v. Tri-State Zoological Park of W. Maryland*, 424 F. Supp. 3d 404 (D. Md. 2019). The trial evidence demonstrated that Defendants' acts and omissions plainly led to the horrifying deaths of several protected species. *Id.* at 408, 420–426. The trial evidence also demonstrated that Defendants' mistreatment of the animals constituted all manner of AWA violations. *Id.* at 412–14.

Visitors to the Zoo also bear witness to the animals' suffering. Plaintiff Collins, a New Jersey resident, visited the Zoo in July 2018. ECF No. 1 ¶¶ 6, 9. Collins derives much personal pleasure from viewing animals in their natural habitats. *Id.* ¶¶ 9, 102. During her visit, Collins became emotionally attached to the animals and experienced the pain of viewing their suffering. *Id.* ¶¶ 9, 103–07. So great was Collins' emotional distress and anguish that she became ill after the visit. *Id.* ¶¶ 104–05. Collins decided that she could not return to the Zoo so long as the animals continued to live in the above-described conditions and set out to improve the animals' situation. *Id.* ¶¶ 9, 105–06. In particular, Collins first contacted Allegany County Animal Control to seek help for the animals. She also alerted media organizations, the U.S. Department of Agriculture, and PETA about what she witnessed. Her objective was to rectify the Zoo's mistreatment of the animals in its care. *Id.* ¶ 106.

Plaintiff PETA is an animal welfare organization dedicated to protecting animals from abuse, neglect, and cruelty. ECF No. 1 ¶ 111. The organization engages in a variety of efforts to this end, such as educational programming, cruelty investigations, protests, legislative lobbying, and litigation. *Id.* ¶ 113. PETA avers that as a result of Defendants' longstanding animal abuse and mistreatment, it has been forced to engage in programming and advocacy efforts to eradicate the mistreatment of animals at the Zoo. *Id.* PETA must also redirect substantial efforts to

disabuse the public of the sense that the Zoo is some kind of "refuge" or sanctuary for abandoned or unwanted animals. *Id.* at ¶¶ 114–15. PETA has sent staff and volunteers to observe the Zoo's mistreatment of the animals, gather the evidence necessary to file formal complaints to government agencies, and document the Zoo's mistreatment of the animals on PETA's website and other platforms. *Id.* ¶¶ 116–17. PETA has also been forced to engage in protracted litigation before this Court to combat Defendants' abuse and mistreatment of the animals.[1]

On May 14, 2020, Plaintiffs filed the Complaint against Defendants, alleging a single public nuisance claim. ECF No. 1. Plaintiffs' liability theory is that the Zoo's operations violate Maryland's animal cruelty statute as well as the AWA, and thus constitute an unreasonable interference with public morals, justifying equitable relief from this Court. *Id.* ¶¶ 125-128. Defendants now move to dismiss the Complaint, principally arguing that the claim fails as a matter of law, and relatedly, that each Plaintiff lacks standing. ECF No. 14. At this juncture, the Court finds that Collins maintains standing and that the action, as pleaded, must go forward.

## II.   Standard of Review

A motion to dismiss under Rule 12(b)(1) for lack of standing challenges the Court's power to hear the case. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 145 F.3d 660, 661–62 (4th Cir. 1998) (affirming the district court's dismissal of the complaint for lack of standing pursuant to Rule 12(b)(1)). Thus, as a general matter, the Court must determine whether it has jurisdictional standing before reaching the merits of the case. *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999).

---

[1] The Court notes specifically that at trial, PETA investigators testified about their firsthand observations of the Zoo's deplorable conditions and the injuries visited on the animals. *PETA*, 424 F. Supp. 3d at 410–11 (citing Trial Tr. Vol. 1, 101, 149) (PETA investigators testified that the Zoo "was 'the dirtiest' and 'worst place' they had seen.").

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive challenge, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."). Likewise, the Court need not accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**III.     Analysis**

    **A.     Standing**

Defendants contend that Plaintiffs lack standing to pursue a Maryland common law public nuisance claim. "Standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 507 U.S. 693, 714–15 (2013). Article III of the United States Constitution makes plain that federal courts are of limited jurisdiction, hearing only live "cases" and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992); U.S. Const. art.

III, § 2.  A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Davis v. FEC*, 554 U.S. 724, 733 (2008) (citations omitted).

Standing requires that any one Plaintiff demonstrate she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, *Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61).  Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (citations omitted); *see also Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) (quoting *Lujan*, 504 U.S. at 561).  Because Defendants challenge standing "on the pleadings, [the Court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party."  *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181–82 (4th Cir. 2013)).

Defendants challenge only the injury-in-fact prong, arguing that Plaintiffs cannot show they have a "legally protected interest" to bring a public nuisance claim.  To show an injury-in-fact, a plaintiff bears the burden of showing "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61 (internal citations omitted).  "[W]here state-created interests are at issue, state law certainly plays a part in the determination" of a plaintiff's legally protected interests.  *Higdon v. Lincoln Nat. Ins. Co.*, No. ELH-13-2152, 2014 WL 6951290, at *7 (D. Md. Dec. 8, 2014).  This is so because for "legal rights created under state law," such as state

6

common law claims, a litigant may have "no greater ability to assert" the legal claim in federal court than it would otherwise enjoy in state court. *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 118 (4th Cir. 2004). Accordingly, federal courts look to state law to inform "the 'injury' a plaintiff may assert to meet Article III requirements." *Higdon*, 2014 WL 6951290, at *7.

In Maryland, a plaintiff maintains standing to sue for public nuisance only if she has suffered harm "of a kind different from that suffered by other members of the public exercising the right common to the general public. . . ." Restatement (Second) of Torts § 821C (Am. L. Inst. 1979). *See also United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.*, 228 Md. App. 203, 231 (2016). Defendants maintain that neither Plaintiff has made plausible having suffered any injury of a kind different from any other member of the public. ECF No. 14 at 15–18. The Court disagrees.

At a minimum, Collins has specifically averred particularized harm suffered that can be reasonably inferred as different than the public. Collins "derives personal, recreational, educational, and aesthetic benefits from being in the presence of animals" and observing them in humane conditions. ECF No. 1 ¶ 9. As pleaded, the nature of her injury when seeing the extent of the animals' mistreatment was "particularly severe"—to the point where she became physically ill and could not return to the Zoo. *Id.* ¶¶ 103–105. To corroborate the severity of her anguish, Collins took several steps to rectify the mistreatment, lending further credence to her having experienced a special harm or injury. *Id.* ¶ 106. This is sufficient at this stage to find that Collins has pleaded a harm different than that experienced by the general public. *Cf. Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, 387 F. Supp. 3d 1202, 1206 (W.D. Wash. 2019) (finding similar aesthetic injuries suffered by Plaintiff's members sufficient to constitute "special

injury" to satisfy standing on public nuisance claim); *Animal Legal Def. Fund v. Lucas*, No. 19-40, 2019 WL 5068531, at *1, 4 (W.D. Pa. Oct. 9, 2019) (same).

As to the remaining standing requirements, traceability and redressability, each are easily satisfied. Collins' injury derives from her visit to the Zoo, and so is fairly traceable to Defendants' wrongdoing. Further, Collins intends to return to the Zoo if Defendants' chronic mistreatment of the animals ceases, and so her injuries are redressable by the injunctive relief requested. ECF No. 1 ¶ 110. Because, at a minimum, Collins has demonstrated Article III standing, the case may proceed. *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) ("[S]tanding for one party on a given claim is sufficient to allow a case to proceed in its entirety on that issue[.]); *Md. Ass'n of Health Maint. Orgs. v. Health Servs. Cost Review Comm'n*, 356 Md. 581, 589 (1999) ("Where there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing."). The motion to dismiss on standing grounds is denied.

### B.     Public Nuisance Claim

The Court next turns to whether Plaintiffs have stated a viable public nuisance claim under Maryland law. Maryland has adopted the Restatement on public nuisance which defines the tort as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (Am. L. Inst. 1979); *see Tadjer v. Montgomery Cty.*, 300 Md. 539, 551-52 (1984); *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 467 (D. Md. 2019). As articulated in the Restatement, conduct may amount to an unreasonable interference with a public right if it: (a) "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience", or (b) "is proscribed by a statute, ordinance or administrative regulation." Restatement § 821(B). *See also Adams v.*

*Commissioners of Town of Trappe*, 204 Md. 165, 176 (1954) ("It has been held that to engage in any form of business in [defiance] of laws regulating or prohibiting the business constitutes nuisance *per se*…").  Maryland has historically recognized a public nuisance claim where a defendant's business operations involve dereliction of public morals.  *Tadjer*, 300 Md. 539, 552 (1984); *Whitaker v. Prince George's Cnty.,* 307 Md. 368 (1986) (enjoining a "bawdy house" as a public nuisance); *Grace v. Bd. of Liquor License Comm'r for Baltimore City*, No. 1389, Sept. Term 2016, 2018 WL 367852, at *4−*6 (Md. Ct. Spec. App. Jan. 11, 2018) (upholding denial of liquor license where establishment's activities constituted a public nuisance). [2]  Out of district courts similarly have found a public nuisance claim exists where the defendant's business involves the abuse or mistreatment of animals much like the mistreatment averred here.  *See Olympic Game Farm*, 387 F. Supp. 3d at 1206−07; *cf. Lucas*, No. 19-40, 2019 WL 5068531, at *1, 4.

When viewing the Complaint facts as true and most favorably to Plaintiffs, the Complaint has made plausible that Defendants have unreasonably interfered with a right common to the public as evidenced by their violations of both criminal and civil animal welfare statutes.  Defendants operate a business on the backs of the animals, charging a fee to the public for access to the exhibits.  ECF No. 1 ¶15.  As part of that business, Defendants deny the animals adequate veterinary care, food, water, and shelter.  *Id.*  ¶¶17, 21−62; 78−97.  The barren environs also inflict unnecessary psychological and physical pain and suffering on them.  *Id.* ¶¶ 63−77.  The

---

[2]     It is also well settled under Maryland law that a private plaintiff may bring a public nuisance claim, even where the conduct sought to be enjoined is also prohibited by law.  *See, e.g.*, *Potomac River Ass'n, Inc. v. Lundeberg Maryland Seamanship Sch., Inc.*, 402 F. Supp.  344, 358−59 (D. Md. 1975) (public nuisance action brought by private environmental organization); *see also Agbebaku v. Sigma Aldrich, Inc*, No. 24-C-02-004175, 2003 WL 24258219, at *13–14 (Md. Cir. Ct. June 24, 2003) (private citizen suit); *United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.*, 228 MD. App. 203, 230–32 (2016) (private corporation suit).

gravity of Defendants' misconduct is patent and well documented; the Zoo has been sanctioned repeatedly for violations of animal welfare laws. *Id.* ¶¶ 19−22. Accordingly, Defendants lack of care and mistreatment of the animals, as pleaded, violate both the AWA and Maryland's animal abuse and neglect statute, and as such, have interfered with public morals as evidenced by the existence of such protectionist statutes in the first place. ECF No. 1 ¶¶ 19−22, 29−34. *See Knox v. Mass. Soc. for Prevention of Cruelty to Animals*, 425 N.E.2d 393, 396 (Mass. App. Ct. 1981) (citing *Commonwealth v. Higgins*, 277 Mass. 191, 194 (1931)) (Animal welfare laws are "directed against acts which may be thought to have a tendency to dull humanitarian feelings and to corrupt the morals of those who observe or have knowledge of those acts."); *Pa. Soc. for Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 348 (Pa. 1968) ("A legislative proscription, such as that found in the cruelty to animals statute, is declarative of public policy and is tantamount to calling the proscribed matter prejudicial to the interests of the public . . . the essence of a public nuisance."). The Complaint sufficiently states a public nuisance claim.

Defendants respond that public nuisance, akin to a *private* nuisance claim, requires as a matter of law interference with property rights or enjoyment of the land. Defendants relatedly contend that non-resident Plaintiffs cannot maintain a public nuisance claim where the nature of the harm is one affecting surrounding property and the local community. ECF No. 14 at 13 (citing *Rosenblatt v. Exxon Company, USA*, 335 Md. 58, 79 (1994)). Defendants are mistaken. In assessing a public nuisance claim, the Court looks to whether the challenged conduct imposes "an injury to the public at large or to all who come in contact with it." *Adams,* 204 Md. at 170; *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 457 F. Supp. 2d 298, 310 (S.D.N.Y. 2006) (applying Maryland law); *Cf. Raynor v. Md. Dep't of Health & Mental*

*Hygiene*, 110 Md. App. 165, 191 (1996) (finding a biting ferret a public nuisance). Here, Plaintiffs aver sufficient facts to make plausible that the Zoo's operations interfere with the public morals of the community at large and all who come in contact with the Zoo—including the Plaintiffs. This is all that is required.

Defendants next challenge, as they did with standing, that the Complaint fails to aver plausibly that the Plaintiffs suffered a legally cognizable special injury ECF No. 14 at 16−18. For the reasons discussed, this argument is unavailing as to Collins. She visited and personally witnessed the "deplorable conditions" to which the Zoo's animals are subjected. ECF No. 1 ¶¶ 38, 49, 70, 73, 103. Collins "derives personal, recreational, educational, and aesthetic benefits from being in the presence of animals" and observing them in humane conditions. *Id.* ¶ 9. After visiting the Zoo, she "developed aesthetic and emotional connections to many of the animals" and "experienced particularly severe distress and anguish" at witnessing them in what she believes to be deplorable conditions and could not return. *Id.* ¶¶ 9, 103−105. These fall into the category of aesthetic and recreational injuries recognized in Maryland. *See Patuxent Riverkeeper v. Maryland Dep't of Env't*, 422 Md. 294, 309 (2011). *Cf. Olympic Game Farm*, 387 F. Supp. 3d at 1206–07; *Lucas*, 2019 WL 5068531, at *4. Accordingly, the Complaint states a claim as to Collins.

As to PETA, the analysis is less straightforward. PETA avers that its "special injury" is confined to counteracting the Zoo's unlawful conduct and correcting public misperceptions of what constitutes "humane" treatment of animals. ECF No. 1 ¶¶ 114−20, 131. Importantly, as a private organization, PETA must set forth facts which make plausible that it has suffered some injury different than that of the general public. *Cf. Mayor & City Council of Balt. v. Monsanto Co.*, No. RDB-19-0483, 2020 WL 1529014, at *9 (D. Md. Mar. 31, 2020) (noting public

agencies relieved of burden of proving special injury). This Court has recognized that an organization may maintain public nuisance actions where it alleges injury to certain public rights, such as the right to fish and navigate public waterways, in a manner different than the general public. *See, e.g., Potomac River Ass'n, Inc. v. Lundeberg Md. Seamanship Sch., Inc.*, 402 F. Supp. 344, 358–59 (D. Md. 1975) (citing *Cook v. Normac Corp.*, 176 Md. 394 (1939)). But strictly speaking, PETA has not alleged any similar interference with its property rights, the rights of its members, or any analogous special injury. *See Bravo Enterprises, Inc.*, 237 A.2d at 362 (finding S.P.C.A. averred no special injury "to any greater degree than the general public when violations of the law relating to cruelty to animals occur.").

This Court could find only one out-of-district case addressing whether an animal welfare association pleaded a special injury sufficient to sustain a public nuisance action. In *Animal Legal Def. Fund v. Olympic Game Farm*, the Court concluded that the individual members, having witnessed the mistreatment and abuse of the animals, conferred a special injury onto the organization itself. *Id.* 387 F. Supp. 3d 1202, 1206–07 (W.D. Wash. 2019). Noting that satisfaction of the special injury requirement is "not a particularly high bar," the Court found the "harms alleged by ALDF's members are sufficiently distinct from the general public," to survive challenge. *Id.* at 1206. *See also Lucas*, 2019 WL 5068531, at *4–5 (special injury sufficiently averred for standing purposes based on same special injury theory). PETA, at least at this juncture, does not pursue this liability theory.

Nonetheless, Defendants do not directly challenge the theory that PETA *does* pursue. Defendants merely argue that PETA's "voluntary expenditures" are not within the "legally protected interests" sufficient to state a claim. ECF No. 14 at 17–18. In so doing, Defendants artificially cabin the nature of PETA's averred special injuries. But the Complaint, viewed as

12

true and most favorably to PETA, also makes clear that the organization has been forced to direct its programming and advocacy efforts toward eradicating the mistreatment of animals at the Zoo. ECF No. 1 ¶ 113 (PETA "brings this suit on its own behalf to protect its programs, which have been perceptibly impaired by Defendants' actions."). PETA also has been injured because it must redirect substantial efforts to disabuse the public that the Zoo is some kind of "refuge" or sanctuary for abandoned or unwanted animals. *Id.* at ¶ 115. To counteract what is, in essence, the Zoo's fraud on the public, PETA has sent staff and volunteers to observe the Zoo's mistreatment of the animals, published the information it gathered about how the animals are actually mistreated on its website and through other media outlets, submitted complaints to government agencies regarding the ongoing mistreatment, and pursued lawsuits to mitigate the ongoing harm to animals—a population that, by definition, cannot seek such relief on their own. *Id.* ¶¶ 116–19.

Defendants' oversimplification of PETA's claimed injury as "spending money" simply does not win the day. Because the averred facts make plausible that the organization has been forced to take extraordinary measures for the protection of the animals at the Zoo, this Court cannot so lightly brush aside the question of whether PETA has averred a "special injury" sufficient to state a public nuisance claim. Thus, at this early stage in the proceeding, the Court cannot conclude that as a matter of law PETA has *failed* to make plausible that it has suffered an injury different than that of general public.

Accordingly, the Court will permit PETA to go forward as a plaintiff. The Court remains concerned that in the end, the claim as to PETA may very well extend beyond the legally protected interests contemplated under Maryland nuisance law. It has already made such concerns known to the parties by ordering briefing on the propriety of certifying to the Maryland

Court of Appeals the viability of the public nuisance claim. *See* ECF No. 23. However, after reviewing the pleadings on certification, the Court is satisfied that Maryland common law provides adequate guidance for the Court to allow this case to proceed at this juncture.[3] The Court also agrees with Plaintiffs that further factual development will aid the question of whether certification is necessary. At present, the Court concludes that PETA has pleaded specific injuries that are different in kind from the general public. The motion to dismiss is denied.

A separate order follows.

|  1/21/21  |  /S/  |
|---|---|
| Date | Paula Xinis |
|  | United States District Judge |

---

[3] This Court may submit to the Maryland Court of Appeals "question[s] of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute." Md. Code Ann., Cts. & Jud. Proc. § 12-603. The Act is designed "to promote the widest possible use of the certification process[.]" *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 705 (2010) (emphasis omitted). This is because, when properly used, certification "ensur[es] the correct legal outcome, aid[s] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008). However, federal courts have readily acknowledged that certification may be premature, and thus not warranted, on an incomplete factual record. *See, e.g.*, *Olin Corp. v. Ins. Co. of N. Am.*, 607 F. Supp. 1377, 1378–79 (S.D.N.Y. 1985) ("certification must arise in a sufficiently developed factual context to sharply define the legal issues raised.") (internal citation omitted). After discovery, the parties may revisit whether PETA's demonstrated "special injury" presents a question of law best addressed by the Court of Appeals in the first instance.