**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**–Southern Division–**

CONSTANCE COLLINS, *et al.*,

Plaintiffs,

–v–

TRI-STATE ZOOLOGICAL PARK OF WESTERN MARYLAND, INC., *et al.*,

Defendants.

Case No. 1:20-cv-01225

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS .............................................................................................. 3

PROCEDURAL HISTORY............................................................................................. 9

SUMMARY JUDGMENT STANDARD...................................................................... 10

ARGUMENT ................................................................................................................. 10

I.    Any unreasonable interference with a right common to the general public, including the rights embodied in Maryland's animal cruelty laws, constitutes a public nuisance. ...... 10

II.    Defendants' operation of Tri-State constitutes a public nuisance................................... 14

    A.    Defendants deny animals in their custody necessary veterinary care in violation of state and federal law. .............................................................................................. 14

        1.    Susie and Sally the Asiatic Black Bears ......................................................... 15

        2.    Charlie the Cougar .......................................................................................... 17

        3.    Diablo the Bobcat............................................................................................ 20

        4.    Snorkle the Vietnamese Potbellied Pig .......................................................... 21

        5.    The Green Iguanas ........................................................................................... 23

        6.    Dream the Miniature Horse.............................................................................. 24

        7.    Bridgette the Basset Hound............................................................................. 25

    B.    Defendants deny Dodger proper protection from the weather and necessary veterinary care in violation of state and federal law.................................................................... 27

    C.    Defendants denied Rocket proper shelter in violation of state and federal law. ......... 30

    D.    Defendants killed approximately twelve parrots by depriving them of proper air in violation of state law. ................................................................................................ 31

III.    Plaintiffs have standing to bring their public nuisance claim. ....................................... 33

CONCLUSION............................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Adams v. Commissioners of Town of Trappe*,
204 Md. 165, 102 A.2d 830 (1954) .................................................................. 32

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 10

*Animal Legal Def. Fund v. Lucas*,
No. 19CV0040, 2019 WL 1082570 (W.D. Pa. Mar. 7, 2019) ............................ 11

*Animal Legal Def. Fund v. Olympic Game Farm, Inc.*,
387 F. Supp. 3d 1202 (W.D. Wash. 2019) ................................................. 11, 34

*Animal Legal Def. Fund v. Special Memories Zoo LLC*,
No. 20-C-216, 2021 WL 101121 (E.D. Wis. Jan. 12, 2021) ............................. 11

*Broadway & E.S. Stage Co. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
15 Abb.Pr.N.S. 51, 1873 WL 9871 (N.Y. Com. Pl. 1873) ................................ 13

*Collins v. Tri-State Zoological Park of W. Maryland, Inc.*,
514 F. Supp. 3d 773 (D. Md. 2021) ........................................... 11, 12, 32, 34

*Commonwealth v. Turner*,
14 N.E. 130 (Mass. 1887) ............................................................................... 13

*Courtney-Pope v. Bd. of Educ. of Carroll Cty.*,
304 F. Supp. 3d 480 (D. Md. 2018) ................................................................. 10

*Knox v. Mass. Soc'y for the Prevention of Cruelty to Animals, Inc.*,
425 N.E.2d 393 (Mass. App. Ct. 1981) ............................................................ 13

*Kuehl v. Sellner*,
965 N.W.2d 926 (Iowa Ct. App. 2021) ............................................................ 11

*Mayor & City Council of Balt. v. Monsanto Co.*,
No. CV RDB-19-0483, 2020 WL 1529014 (D. Md. Mar. 31, 2020) .................... 35

*Patuxent Riverkeeper v. Maryland Dep't of Envt*,
422 Md. 294, 29 A.3d 584 (2011) ................................................................... 34

*Penn. Soc. for Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*,
237 A.2d 342 (Pa. 1968) ................................................................................ 11

*People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*,
397 F. Supp. 3d 768 (D. Md. 2019) ................................................................... 7

*People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*,
424 F. Supp. 3d 404 (D. Md. 2019) ................................................................... 7

*People for the Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.,*
    476 F. Supp. 3d 765 (S.D. Ind. 2020) ................................................................... 18

*Rossignol v. Voorhaar,*
    316 F.3d 516 (4th Cir. 2003) ................................................................................ 10

*State ex rel. Att'y Gen. v. Canty,*
    105 S.W. 1078 (Mo. 1907) ................................................................................... 13

*State v. Porter,*
    16 S.E. 915 (N.C. 1893)........................................................................................ 13

*Strothers v. City of Laurel,*
    895 F.3d 317 (4th Cir. 2018) ................................................................................ 10

*Tadjer v. Montgomery County,*
    479 A.2d 1321 (Md. 1984) ................................................................................... 10

*Tri-State Zoological Park of W. Maryland, Inc. v. People for the Ethical Treatment of Animals, Inc.,*
    141 S. Ct. 2854 (2021).......................................................................................... 7

*United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.,*
    228 Md. App. 203, 137 A.3d 355 (Md. Ct. Spec. App. 2016)............................... 33

*Waters v. People,*
    46 P. 112 (Colo. 1896)......................................................................................... 13

*Witherspoon v. Brennan,*
    449 F. Supp. 3d 491 (D. Md. 2020) ..................................................................... 10

**Statutes**

7 U.S.C. § 2132................................................................................................................. 12

Animal Welfare Act, 7 U.S.C. §§ 2131–2159 ............................................................. 12, 35

Md. Code Ann., Crim. Law § 10-601 ............................................................................... 12

Md. Code Ann., Crim. Law § 10-604 ......................................................................... passim

**Regulations**

9 C.F.R. § 1.1 ............................................................................................................. 2, 12, 15

9 C.F.R. § 2.40 ........................................................................................................... passim

9 C.F.R. § 3.125 ............................................................................................................... 30

9 C.F.R. § 3.76 ............................................................................................................. 8, 28

9 C.F.R. § 3.77 ............................................................................................................. 8, 28

9 C.F.R. § 3.78 ......................................................................................................... 8, 27, 30

**Rules**

Fed. R. Civ. P. 12(b) ......................................................................................................... 9

Fed. R. Civ. P. 26(a)(2) .................................................................................................. 9

Fed. R. Civ. P. 56 ..................................................................................................... 1, 10

Local Rule 301.5 ........................................................................................................... 9

**Other Authorities**

Restatement (Second) of Torts § 821B (1979) .................................................... 10, 11

Restatement (Second) of Torts § 821C (1979) .......................................................... 33

In accordance with Rule 56 of the Federal Rules of Civil Procedure and this Court's Amended Scheduling Order, ECF No. 58, Plaintiffs Constance Collins and People for the Ethical Treatment of Animals, Inc. ("PETA") (together, "Plaintiffs") submit this memorandum in support of their motion for summary judgment against Defendants Tri-State Zoological Park of Western Maryland, Inc., Animal Park, Care & Rescue, Inc., and Robert Candy (collectively "Defendants").

## INTRODUCTION

Defendant maintain a public nuisance in the form of a roadside zoo in Cumberland, Maryland ("Tri-State"), an unaccredited facility that Defendants tout as a "sanctuary" and "animal rescue." Far from "rescuing" animals or providing them with "sanctuary," however, Defendants deny animals basic necessities including appropriate food, proper social groupings, clean, safe housing, and necessary veterinary care, in violation of state and federal law. The conditions at Defendants' facility have led to numerous animal deaths and to immeasurable—and wholly unnecessary—suffering.

Since 2020, at least eleven animals in Defendants' possession have died, and most of those deaths were from causes that remain unknown due to Defendants' failure to provide animals with routine veterinary care, conduct necropsies of deceased animals, and keep adequate records. The surviving animals at Tri-State—who still number in the dozens—languish in squalid, unsafe, and virtually barren enclosures and frequently suffer from gruesome injuries and painful, untreated diseases. For example, a capuchin monkey named Dodger, whom Defendants confine to a ramshackle enclosure without adequate protection from the elements, required emergency surgery to partially amputate sixteen of his frostbitten, necrotic digits. Similarly, Rocket, an arctic fox, required surgical removal of "dead/necrotic tissue" after sustaining a gruesome "degloving

injury"—an injury in which a large portion of skin and underlying soft tissue is ripped from the body—from digging in his shelter, getting "stuck on the fencing," and pulling his leg out.

Elderly animals at Tri-State who require specialized care are routinely warehoused without appropriate treatment or pain management, despite visible signs of discomfort. Free-roaming animals at the facility, including domestic cats, geese, chickens, and ducks, face conspicuous hazards including sharp fences, protruding wires, and even an open exacto knife that was lying in the middle of an area where visitors walked and many animals roamed free. One animal, the duck Pippy, died after being hit by a car in Tri-State's parking lot.

These dystopic conditions at Tri-State have been deemed "deplorable" by multiple veterinarians, including Tri-State's own former veterinarian, Dr. Gale Duncan. Defendants have openly defied Dr. Duncan's directives to improve conditions there and provide their animals with treatment. For example, they refused necessary veterinary care for two Asiatic black bears, Susie and Sally, who suffered from painful, chronic dental disease with "exposed tooth root pulps" for *over a year* after the obvious condition was brought to Mr. Candy's attention. Dr. Duncan ultimately parted ways with Defendants due to "chronic noncompliance" with "veterinar[y] medical recommendations."

Defendants' neglect and mistreatment of animals is proscribed by Maryland's animal abuse and neglect statute, Md. Code Ann., Crim. Law § 10-604, and federal Animal Welfare Regulations, 9 C.F.R. §§ 1.1 *et seq*. Through Defendants' violation of these animal protection laws, which reflect public policy concerning animal welfare and the corresponding moral prohibition against treating animals inhumanely, Defendants unreasonably interfere with public morals and create a public nuisance. Plaintiffs request that this Court enter summary judgment against Defendants and

enjoin this public nuisance to prevent further pain, suffering, and death to the surviving animals in Defendants' care.

## STATEMENT OF FACTS

Defendants operate a roadside zoo in Cumberland, Maryland that is licensed by the U.S. Department of Agriculture ("USDA") to exhibit animals to the public. Since 2005, Defendants have amassed more than 160 citations for violations of federal Animal Welfare Regulations. Declaration of Zeynep J. Graves ("Graves Decl.") ¶ 12 & Ex. K (Tri-State's non-compliant USDA Inspection Reports).

Defendants currently confine and exhibit dozens of mammals, reptiles, and birds, including primates, bears, coatimundis, a New Guinea singing dog, a wolf/dog hybrid, an arctic fox, a kinkajou, a skunk, a raccoon, emus, macaws, alligators, tortoises, turtles, snakes, lizards, a sheep, pigs, goats, miniature horses, a llama, a donkey, geese, peacocks, ducks, chickens, and a turkey. *Id*. ¶ 5 & Ex. D (Candy Dep. Ex. 132).[1] These animals are routinely deprived of basic necessities, including appropriate veterinary care, appropriate nutrition, environmental enrichment, and safe, sanitary housing. Expert Report of Kim Haddad, DVM ("Haddad Decl.") 60; Expert Report of Laura Boehler, DVM ("Boehler Decl.") ¶¶ 75–77; Expert Report of Jason Pratte ("Pratte Decl.") 6−7, 69–70.

It is undisputed that, contrary to federal regulations, Defendants have not had an operative written program of veterinary care ("PVC") since Dr. Gale Duncan stopped serving as Defendants' attending veterinarian in the spring of 2020. *See* 9 C.F.R. § 2.40 (mandating that exhibitors maintain a written PVC that includes "[t]he use of appropriate methods to prevent, control,

---

[1]     Tri-State's inventory is incomplete. For example, it does not include any of the free roaming cats that are at the facility. *See* Graves Decl. ¶ 5 & Ex. D (Candy Dep. Ex. 132).

diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care."); Graves Decl. ¶ 6 & Ex. E (Gold Dep., Jul. 15, 2021) 51:4–7, 177:12–15.

Even during Dr. Duncan's tenure as the facility's attending veterinarian when there was a PVC in place, that plan was "woefully lacking." Haddad Decl. 7–9. Indeed, Defendants' last PVC was so deficient it did not include the primates, reptiles, birds, coatimundis, kinkajous, porcupine, and opossums at Tri-State because "there were certain species that [Dr. Duncan] had not agreed to be the attending veterinarian for because [she] did not feel that [she] was qualified to treat those species[.]" Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 20:22–24:3. Several species of animals at Tri-State *still* go without any veterinary care. Since Dr. Keith Gold stepped in as a consulting veterinarian for Tri-State in the fall of 2020, the kinkajou, sheep, goats, donkey, miniature horses, geese, turkey, peacocks, ducks, and chickens, have not been provided any care, routine or otherwise. *Id*. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 108:19–109:3.

Due, in part, to the lack of a comprehensive PVC, "animals at Tri-State do not receive appropriate veterinary care." Haddad Decl. 60. The veterinary deficiencies are exacerbated by Defendant Candy's pattern of "chronically declin[ing] [veterinary] intervention and delay[ing] treatment" for animals, and his "chronic noncompliance" with "veterinar[y] medical recommendations," including declining or refusing "euthan[asia], referrals, . . . medications, [and] medical procedures." *See* Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 11:6–15, 13:5–20, 39:10–42:16, 79:18–80:6; *see also* Haddad Decl. 7, 11–17, 23–43, 60 (opining on veterinary deficiencies and resulting pain and suffering).

It is undisputed that Defendants fail to provide routine preventative veterinary care, and withhold veterinary care even for animals Defendants know are sick and in need of treatment. Animals who have suffered, or continue to suffer, from Defendants' failures include:

- **Sally and Susie**, Asiatic black bears, have been at Tri-State since November 2009. Graves Decl. ¶ 5 & Ex. D (Candy Dep. Ex. 132) at 2. The bears have suffered from severe dental diseases, including fractured canine teeth and "obvious pulp chamber exposure." Haddad Decl. 40. Both bears "endured years of chronic, constant pain" and unnecessary suffering because Defendants failed to provide routine care and to "follow veterinary diagnostics and treatment." *Id.* 37–40.

- **Charlie**, a cougar, was acquired by Defendants in 2005 when he was ten days old. Graves Decl. ¶ 3 & Ex. B (Candy Dep. Ex. 18) at 1. Defendants denied Charlie routine veterinary care for years and only sought veterinary intervention after Charlie became "clearly extremely ill" and was suffering from kidney disease. Haddad Decl. 26–28. Despite veterinary recommendation to euthanize Charlie, Defendants chose to let him suffer and die a "painful death." *Id.*; Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 45) at 8. Charlie died on November 9, 2018. *Id.* ¶ 3 & Ex. B (Candy Dep. Ex. 18) at 1. No necropsy was performed. *Id.*

- **Diablo**, a bobcat, was acquired by Defendants in 2003. Graves Decl. ¶ 5 & Ex. D (Candy Dep. Ex. 132) at 2. In his 18 years at Tri-State, Diablo never received any physical exam or other routine veterinary care. Haddad Decl. 28. Based on a visual exam performed by Dr. Duncan in May 2019, Diablo was presumptively diagnosed with arthritis: he had "difficulty rising," "decreased mobility," a "hunched appearance," and stiff hind legs. Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 218:18–219:3; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 43) at 2 ("Bobcat shows evidence of arthritis-discussed meloxicam trial for comfort"). Despite his apparent pain, Defendant Candy declined to continue his pain medication. *Id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021)

219:9–22; *id.* ¶ 2 & Ex. A (Candy Dep., Jun. 24, 2021) 260:19–261:2. Diablo died on January 31, 2021. *Id.* ¶ 3 & Ex. B (Candy Dep. Ex. 20) at 2. No necropsy was performed. *Id.* ¶ 5 & Ex. D (Candy Dep. Ex. 132) at 2.

- **Snorkle** (aka "Snorkel"), a Vietnamese potbellied pig, has been in Mr. Candy's care since his birth in 2010. Graves Decl. ¶ 5 & Ex. D (Candy Dep. Ex. 132) at 1; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 61) at 44. Snorkle suffers from an "enormous testicular tumor," overgrown hooves and tusks, a mass on his lower lip, obesity, and possible osteoarthritis. *See* Haddad Decl. 16; Boehler Decl. ¶¶ 52−53. No diagnostic tests have been performed on Snorkle, and he has not received any treatment for his conditions. *See* Boehler Decl. ¶¶ 52−53.

- There are two male **Green Iguanas** at Tri-State, and neither has received any veterinary care despite suffering from numerous apparent conditions including tail necrosis, dysecdysis, missing dorsal spines, and bone deformities. Boehler Decl. ¶ 19. Their age and acquisition date are unknown, because Defendants do not maintain any such records for these iguanas. Graves Decl. ¶ 5 & Ex. D (Candy Dep. Ex. 132) at 7.

- **Dream**, a miniature horse, has been in Tri-State's custody since December 1, 2011. *Id.* 1. Dream was denied timely veterinary intervention until she was so severely malnourished that "her body had started metabolizing her own muscle mass to sustain itself." Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 54) at 30; *id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 99:12–18, 101:2–20.

Defendants' pattern and practice of failing to provide animals in their custody with necessary veterinary care is evidenced, in part, by the immense suffering endured by the now-deceased endangered and threatened animals formerly in their possession:

6

- In January 2018, a lemur—Bandit—died, after suffering from "untreated pain" stemming from a "protracted respiratory infection for nearly two years." *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 424 F. Supp. 3d 404, 422−23 (D. Md. 2019), *aff'd*, 843 F. App'x 493 (4th Cir. 2021), *cert. denied sub nom. Tri-State Zoological Park of W. Maryland, Inc. v. People for the Ethical Treatment of Animals, Inc*., 141 S. Ct. 2854 (2021). Bandit had "exhibited signs of significant distress" before his death, all without receiving "*any* [veterinary] examinations until the day of his death," when he was "bleeding from [the] genital area" and hypothermic. *Id.*

- The tiger Kumar suffered for a prolonged period before his untimely, painful death. *Id.* 423–25. Tri-State "chose . . . to let Kumar suffer" even when its own veterinarian "strongly recommended euthanasia." *Id.* 424. Kumar's necropsy revealed chronic and "consistently painful" oral ulcers, a "deep, penetrating [mouth] wound," a distended colon, and "a two-centimeter long tear and hemorrhaging in the membrane of his abdominal cavity." *Id.* 424–25.

- India died of sepsis, which Tri-State had "allowed . . . to ravage India" for "*more than a month*"—"ravag[ing] India's body so intensely that pus-filled pockets had formed in her heart, tongue, and diaphragm"—all while Tri-State "expressly refused to secure medical treatment." *Id.* 425, 432. A third tiger, Cayenne, died too—as a direct result of Tri-State's failure to provide even "basic veterinary care." *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 397 F. Supp. 3d 768, 776 (D. Md. 2019).

It is also undisputed that Defendants fail to provide the animals in their care with safe, appropriate shelter. For example, Defendants house Dodger, a capuchin monkey, in ambient temperatures that fall below 45 degrees Fahrenheit, contrary to federal regulations. *Compare* Graves Decl. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 206:11–207:11 (testifying that Defendants usually lock Dodger inside when temperatures fall below 30 degrees) *with* 9 C.F.R. §§ 3.76–3.78 (providing minimum ambient temperatures primate housing facilities). Failing to adequately protect Dodger from inclement weather resulted in severe frostbite and the surgical partial amputation of *sixteen* of Dodger's frostbitten, necrotic digits. *See* Graves Decl. ¶ 9 & Ex. H (Gold Dep. Ex. 108) at 13−14; *id*. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 34:9−35:20.

Defendants also fail to provide Rocket, the arctic fox, with proper shelter. As noted below, it is undisputed that Rocket required surgical removal of "dead/necrotic tissue" after sustaining a "degloving injury" from, according to Defendants' theory, digging in his shelter, getting "stuck on the fencing," and pulling his leg out. Graves Decl. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 221:13–23; *id*. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 22:9–18. Rocket sustained further injuries ("about 10 quills in his leg") from a porcupine in an adjacent enclosure, due to the lack of appropriate barriers between the animals. *See* Graves Decl. ¶ 7 & Ex. F (Gold Dep. Ex. 88) at 9−10; Pratte Decl. 37.

It is further undisputed that Defendants failed to provide animals with proper air. Boehler Decl. ¶ 67. On at least one occasion, Defendants' failure resulted in the entirely preventable death of approximately twelve parrots—who died from toxic gas emissions from a propane heater that Defendants believe had either "malfunctioned" or was "just not set right." *See* Graves Decl. ¶ 2 & Ex. A (Candy Dep., Jun. 24, 2021) 225:16–227:10; *id*. ¶ 13 & Ex. L at 2 (USDA report indicating

that "[t]here were birds lost after a heater failure"); Boehler Decl. ¶ 67 (opining on the preventable suffering caused by the toxic gas emissions).

Defendants' egregiously deficient animal care and husbandry practices are proscribed by law. And as discussed below, Defendants' violations of state and federal law also unreasonably interfere with the public morals embodied by those laws. *See* § I, *infra* (discussing, among other things, the history of these statutes as explained in case law and the expert report of Professor Jesse Donahue). Accordingly, Plaintiffs seek to enjoin Defendants' business operation as a public nuisance and transfer the surviving animals to reputable facilities, which would be consistent with the animals' best interests. *See* Haddad Decl. 60; Boehler Decl. ¶¶ 75–78; Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 224:4–8 (agreeing that the animals in Mr. Candy's care would be better off at reputable facilities that have the resources and staff to properly care for the animals).

## PROCEDURAL HISTORY

On May 14, 2020, Plaintiffs filed their Complaint in this matter, seeking declaratory and injunctive relief. (ECF No. 1.) On January 1, 2021, this Court denied Defendants' motion to dismiss pursuant to Federal Rules 12(b)(1) and 12(b)(6). (ECF Nos. 29 & 30.) In accordance with the modified scheduling order (ECF No. 58), the parties completed fact and expert discovery on August 20, 2021 and December 3, 2021, respectively.[2] On November 19, 2021, U.S. Magistrate Judge Mark Coulson granted, in part, Plaintiffs' motion for sanctions for spoliation of evidence (ECF No. 66). Defendants did not object to the Magistrate Judge's order. *See* Local Rule 301.5.

---

[2] Defendants designated six so-called "hybrid experts" in this matter, but did not retain experts in this case or serve any expert reports pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). Plaintiffs are not filing *Daubert* motions at this time.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law." *Witherspoon v. Brennan*, 449 F. Supp. 3d 491, 499 (D. Md. 2020); Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Courtney-Pope v. Bd. of Educ. of Carroll Cty.*, 304 F. Supp. 3d 480, 488 (D. Md. 2018) (quoting *Anderson*, 477 U.S. at 247–48). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

## ARGUMENT

**I.     Any unreasonable interference with a right common to the general public, including the rights embodied in Maryland's animal cruelty laws, constitutes a public nuisance.**

A public nuisance is any "unreasonable interference with a right common to the general public." *Tadjer v. Montgomery County*, 479 A.2d 1321, 1327 (Md. 1984) (quoting Restatement (Second) of Torts ("Restatement") § 821B(1) (1979)). As this Court has explained, "Maryland has historically recognized a public nuisance claim where a defendant's business operations involve

10

dereliction of public morals." *Collins v. Tri-State Zoological Park of W. Maryland, Inc.*, 514 F. Supp. 3d 773, 780 (D. Md. 2021) (collecting cases). "[C]onduct may amount to an unreasonable interference with a public right if it . . . 'is proscribed by a statute, ordinance or administrative regulation.'" *Id.* (quoting Restatement § 821(B)).

Animal protection laws are quintessential examples of statutes the violation of which constitutes an unreasonable interference with a public right. *See Collins*, 514 F. Supp. 3d at 781 (citing cases finding public nuisance "where the defendant's business involves the abuse or mistreatment of animals much like the mistreatment averred here"); *see also Animal Legal Def. Fund v. Lucas*, No. 19CV0040, 2019 WL 1082570, at *2−3 (W.D. Pa. Mar. 7, 2019); *Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, 387 F. Supp. 3d 1202, 1207 (W.D. Wash. 2019) ("The violation of federal and state laws . . . supply a predicate for a public nuisance action." (collecting Washington state court cases)); *Animal Legal Def. Fund v. Special Memories Zoo LLC*, No. 20-C-216, 2021 WL 101121, at *2 (E.D. Wis. Jan. 12, 2021) (enjoining defendants from "maintaining a public nuisance by confining . . . animals in inhumane and unsafe conditions"); *Kuehl v. Sellner*, 965 N.W.2d 926, *4 (Iowa Ct. App. 2021) (affirming trial court's holding that roadside zoo was a public nuisance in that it was "injurious to the health of the animals . . . due to the poor care and living conditions of the animals"); *Penn. Soc. for Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 348 (Pa. 1968) ("A legislative proscription, such as that found in the cruelty to animals statute, is declarative of the public policy and is tantamount to calling the proscribed matter prejudicial to the interests of the public. Injury to the public is the essence of a

public nuisance. Therefore, [the defendant's] activities are properly enjoinable as being contrary to law and prejudicial to the interests of the public." (internal citation omitted)).[3]

Under Maryland's animal abuse and neglect statute, it is a crime to "deprive an animal of necessary sustenance"; to "inflict unnecessary suffering or pain on an animal"; or to "cause, procure, or authorize" such deprivation of sustenance or infliction of suffering or pain. Md. Code Ann., Crim. Law § 10-604(a). State law also prohibits a "person [who] has charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with: (i) nutritious food in sufficient quantity; (ii) necessary veterinary care; (iii) proper drink; (iv) proper air; (v) proper space; (vi) proper shelter; or (vii) proper protection from the weather." *Id*.[4] The Animal Welfare Regulations promulgated under the Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131–2159, provide protection from animal neglect similar to the Maryland Criminal Code Ann., and establish bare minimum federal protections for certain categories of animals in captivity.[5]

As Plaintiffs' expert, Professor Jesse Donahue, has explained, "animal protection laws in state criminal codes, including in Maryland, were enacted to, and continue to, reflect public morals,

---

[3]      As this Court has recognized, "[i]t is also well settled under Maryland law that a private plaintiff may bring a public nuisance claim, even where the conduct sought to be enjoined is also prohibited by law." *Collins*, 514 F. Supp. 3d at 780 n.2 (collecting cases).

[4]      The Maryland Code broadly defines "animal" as "a living creature except a human being." Md. Code Ann., Crim. Law § 10-601(b).

[5]      Animal Welfare Act regulations define "animal" as "any live or dead dog, cat, nonhuman primate, guinea pig, hamster, rabbit, or any other warmblooded animal, which is being used, or is intended for use for . . . exhibition purposes, or as a pet. This term excludes birds . . . bred for use in research; horses not used for research purposes; and other farm animals, such as, but not limited to, livestock or poultry used or intended for use as food or fiber, or livestock or poultry used or intended for use for improving animal nutrition, breeding, management, or production efficiency, or for improving the quality of food or fiber. With respect to a dog, the term means all dogs, including those used for hunting, security, or breeding purposes." 9 C.F.R. § 1.1; *accord* 7 U.S.C. § 2132(g).

and also serve to uphold public morality and prevent cruelty to animals." Expert Report of Jesse Donahue ("Donahue Decl.") ¶ 8; *see also Knox v. Mass. Soc'y for the Prevention of Cruelty to Animals, Inc.*, 425 N.E.2d 393, 395–96 (Mass. App. Ct. 1981) (noting that state's animal protection laws are "directed against acts which may be thought to have a tendency to dull humanitarian feelings and to corrupt the morals of those who observe or have knowledge of those acts." (citation omitted)).[6] Starting in the 1600s, the earliest animal protection laws in Colonial America "were designed to uphold human morality." Donahue Decl. ¶¶ 12−13. "[C]ruelty to animals harmed the human character," and thus laws "sought to stop it or, in some cases, hide the abuse in specially designated nuisance districts." *Id.* ¶ 19. As animal protection laws evolved, the intersection between those laws and human morality remained strong. *See id.* ¶¶ 14−19, 33; *see also id.* ¶ 22 (Maryland placed its anti-cruelty law "in the section on 'Crimes Against Public Health, Conduct, and Sensibilities,' indicating that the legislature wanted this law to prevent public abuses of morality that coarsened human conduct.").

---

[6]     Many courts have described how animal protection laws are specifically aimed at preventing the erosion of public morals by, among other things, seeking to prevent animal mistreatment from being normalized or socially acceptable. *See, e.g.*, *Commonwealth v. Turner*, 14 N.E. 130, 131–32 (Mass. 1887) ("The [cruelty to animals] statute does not define an offense against the rights of property in animals, nor against the rights of the animals that are in a sense protected by it. The offense is against the public morals, which the commission of cruel and barbarous acts tends to corrupt."); *Broadway & E.S. Stage Co. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 15 Abb.Pr.N.S. 51, 77, 1873 WL 9871 (N.Y. Com. Pl. 1873) ("[The anti-cruelty statute] truly has its origin in the intent to save a just standard of humane feeling from being debased by pernicious effects of bad example—the human heart from being hardened by public and frequent exhibitions of cruelty to dumb creatures, committed to the care and which were created for the beneficial use of man."); *Waters v. People,* 46 P. 112, 113 (Colo. 1896) ("[The anti-cruelty statutes'] aim is not only to protect these animals, but to conserve public morals, both of which are undoubtedly proper subjects of legislation."); *State v. Porter*, 16 S.E. 915, 916 (N.C. 1893) ("Man's desire for amusement and sport is no justification for the infliction of suffering or death upon any of the creatures protected by the statute now under consideration. It was enacted to protect the public morals, which the commission of cruel and barbarous acts tends to corrupt."); *State ex rel. Att'y Gen. v. Canty*, 105 S.W. 1078, 1085 (Mo. 1907) (holding that bullfighting is "[a]n act displayed before a public audience which is debasing in its character, debauching in its influence on public morals, and brutalizing in its effect on the spectators is a public nuisance, which a court of equity has jurisdiction to enjoin.").

As explained below, Defendants' egregious animal mistreatment and neglect is proscribed by state and federal law. By operation of law such abhorrent conduct also is deemed to unreasonably interfere with the public morals embodied by those laws. *See supra* p. 11−13.[7] Accordingly, Plaintiffs bring this action to put an end to Defendants' ongoing unlawful and unreasonable interference with public morality via its longstanding cruel treatment of animals, and the conditions in which Defendants maintain them.

## II.       Defendants' operation of Tri-State constitutes a public nuisance.

### A.       Defendants deny animals in their custody necessary veterinary care in violation of state and federal law.

Maryland law prohibits a "person [who] has charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with" "necessary veterinary care." Md. Code Ann., Crim. Law § 10-604(a)(5)(ii). Federal law further mandates that exhibitors like Tri-State "have an attending veterinarian who shall provide adequate veterinary care to its animals." 9 C.F.R. § 2.40(a). "In the case of a part-time attending veterinarian or consulting arrangements, the formal arrangements shall include a written program of veterinary care" that includes, among other things, "[t]he use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care." *Id.* § 2.40(a), (b).

---

[7]       Additionally, social media reviews and comments from members of the public make clear that Defendants are normalizing animal neglect and mistreatment. *See* Declaration of Brittany Peet ("Peet Decl.") ¶¶ 7−9 & Ex. E. For example, one patron's review of Tri-State noted that she was expecting "an animal rescue facility that provides great homes for neglected and abandoned animals"—"[a]nd that is just what [she] discovered." *Id.* ¶ 9 & Ex. E at 5. Others proclaim that there is "nothing wrong with the[]se happy animals." *Id.* 11.

Contrary to federal regulations, Defendants do not have a written program of veterinary care ("PVC") in place. *See* Statement of Facts, *supra* p. 3−4. Even when Defendants had a PVC, it did not cover several species of animals on exhibit at Tri-State. *Id.* The inadequacies of the PVC, coupled with Defendants' "chronic noncompliance" with "veterinar[y] medical recommendations," led to the unnecessary pain and suffering of numerous animals in Defendants' care. Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 11:6–15, 13:5–20; Haddad Decl. 7–17, 23–43, 60.

It is undisputed that Defendants have failed and continue to fail to provide the animals in their care with necessary veterinary care. *See, e.g.*, Haddad Decl. 60. The record evidence "show[s] a pattern of denying animals even the most basic preventative care, the inability of the staff to monitor animals and recognize signs of disease, and Mr. Candy neglecting to bring serious medical conditions to the attention of the veterinarian until the animal is critically ill and the prognosis grave." *Id.* 7. As a result of Defendants' failures, "the animals endure unnecessary pain and suffering," and are subjected to "a high likelihood of injury or death." *Id.* 60.

Below are nine examples of animals whom Defendants deprived of necessary veterinary care in violation of Maryland law. Additionally, with respect to AWA-regulated species, *i.e.*, Susie and Sally (Asiatic black bears), Charlie (a cougar), Diablo (a bobcat), and Snorkle (a Vietnamese potbellied pig), Defendants' failures also violate federal regulations that mandate the provision of "adequate veterinary care." *See* 9 C.F.R. § 1.1 (defining "animal); 9 C.F.R. § 2.40(a).

### 1.  Susie and Sally the Asiatic Black Bears

Since their arrival in 2009, the Asiatic black bears, Susie and Sally, have been "denied the most basic preventative veterinary care." Haddad Decl. 38. Indeed, "for more than 11 years, Susie and Sally were not [physically] examined, did not receive any vaccines, had no blood testing

performed, no radiographs taken, no treatment for internal or external parasites, no nutritional assessment, no enrichment plan, and no behavioral or welfare assessment." *Id.*

This lack of routine care led to painful, chronic dental disease that was left untreated for over a year, despite Defendants' knowledge of the bears' severe condition. Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 69:2–72:12; Haddad Decl. 11, 37–40. Defendant Candy had been aware of the bears' severe dental disease since sometime before September 22, 2019; during a site inspection, Dr. Haddad brought the "obvious disease" to his and Dr. Duncan's attention, Haddad Decl. 40, and Dr. Duncan stated that she had brought the dental disease to Mr. Candy's attention "at least twice" before then. Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 69:10–70:23. Specifically, they had "discussed that [the bears] were chewing on [the] bars" of their enclosure, and that "it was damaging their teeth." *Id.* 69:23–25. Mr. Candy responded with "some kind of dismissive comment," and "declined any kind of dental intervention at that point." *Id.* 69:25–70:7.

Even when Tri-State's then-veterinarian "highly recommend[ed] treatment" "[b]ecause the[] [bears] had exposed tooth root pulps which is known to be quite painful," timely intervention was declined. *Id.* 72:2–12; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex.43) at 1.

It is undisputed that Defendants' repeated failure to "follow veterinary recommended diagnostics and treatments" "result[ed] in unnecessary pain and suffering." Haddad Decl. 40. Indeed, because of Defendants' failures, "[b]oth bears most certainly endured years of chronic, constant pain." *Id.* 11. According to Dr. Haddad, "[d]ental disease is a common problem in captive bears and if untreated, as was the case for Sally and Susie, can lead to systemic infection affecting the heart, kidneys, and other organs." *Id.* 40. In Susie and Sally's case, "[t]heir fractured canine teeth resulted in obvious pulp chamber exposure," which "create[d] a direct route for bacteria to

16

enter and ascend to the tooth apex," and "result[ed] in a painful infection of the alveolar bone, osteomyelitis, where the bone is gradually and painfully destroyed by bacteria." *Id*.

Defendants finally had the bears' teeth examined and treated on December 13, 2020. Graves. Decl. ¶ 9 & Ex. H (Gold Dep. Ex. 113) at 24−25, 32−33; *id*. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 69:2–16.[8] At that time, both "Sally and Susie had fractured mandibular (lower) canine teeth and Sally had a fistulous draining tract, only seen in severe infections, and most certainly endured years of chronic, constant pain." Haddad Decl. 40. Contrary to generally accepted standards, there "was no follow-up care provided to Sally and Susie after their oral surgery." *Id*. This is particularly concerning because on "July 19, 2021, Sally was observed to be excessively licking her lips and engaging in abnormal tongue movements, which may suggest post-extraction complications such as dehiscence [reopening of a wound] or infection." *Id*. 40–41.

Tri-State is a public nuisance in part because of Defendants' mistreatment of the bears Susie and Sally, which violated Maryland law, Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), and federal Animal Welfare Regulations, 9 C.F.R. § 2.40.

### 2. Charlie the Cougar

Despite Charlie's nearly 13.5 years at Tri-State, scant records exist for this animal.[9] The absence of such records indicates that Defendants denied Charlie proper veterinary care, including over a period of almost seven years during which he received no physical exam, vaccination, or

---

[8]     Defendants' decision to finally have the bears' teeth treated seems to have been motivated, at least in part, by this litigation. *See* Graves Decl. ¶ 7 & Ex. F (Gold Dep. Ex. 88) at 7−9 (text message from Defendant Candy to Dr. Gold's office regarding treating one of the bears and mentioning that he did not "want USDA showing up and I haven't done anything, especially since PETA is trying to take the bears.").

[9]     Early records from Tri-State's former veterinarian Dr. Fox, indicated that Charlie had been evaluated as a young cub "for skin disease, intestinal parasites, and . . . an ear infection." Haddad Decl. 26; Graves Decl. ¶ 17 & Ex. P at 1, 7−8. A fecal culture was later performed by Dr. Fox in 2011. *Id.* 7.

any other basic veterinary care. *See* Haddad Decl. 26−28. The lack of appropriate care started when he was just a cub,[10] and continued until the end of his life, during which Charlie likely "endured days of extreme pain and suffering that could have been prevented." *Id*. 28; *see also* Pratte Decl. 41 (opining on Charlie's "undue pain, suffering and extremely negative welfare state").

In May 2018, under Dr. Duncan's tenure, Charlie tested positive for Toxocara ("roundworms") which "affect dogs, cats, and other animals and can be transmitted to humans." Haddad Decl. 26. In cats, Toxocara can cause "vomiting, diarrhea, decreased appetite, and poor body condition." *Id.* 27. Although there are a number of treatments available for this parasite, no records indicate that the intestinal parasite was ever treated. *Id*. 26–27; Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 45) at 5−9. According to Dr. Haddad, Tri-State's failure to provide basic preventative care, including annual fecal examinations and regular deworming, puts the animals, and in the case of Charlie's Toxocara, a zoonotic disease, "the staff, volunteers and the general public at risk." Haddad Decl. 27.

Charlie was next evaluated by Dr. Duncan on November 8, 2018, *one day* before his death. Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 45) at 5−8. By that time, Charlie was extremely ill: he reportedly had not been eating, was "unwilling to move," and was experiencing "splinting" (abdominal contractions), which, according to Dr. Duncan, is "usually indicative of significant abdominal pain." *Id*. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 37:25−39:2; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 45) at 7; Haddad Decl. 28. Charlie also "had a fever and was dehydrated with

---

[10]     Defendants declawed Charlie as a cub "[b]ecause he was . . . going to be used for people to see." Graves Decl. ¶ 2 & Ex. A (Candy Dep., Jun. 24, 2021) 248:12−21. Declawing, which is a "surgical procedure of amputating the last bone (or knuckle) of a [cat's] phalange (or digit)," "is well known to cause ongoing pain, discomfort, or other pathological conditions in the animals." *People for the Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.,* 476 F. Supp. 3d 765, 776 (S.D. Ind. 2020).

pale mucus membranes suggesting anemia." Haddad Decl. 27. Charlie's blood test results further "revealed several abnormalities" and were "consistent with kidney disease." *Id.*

Astonishingly, despite Dr. Duncan's assessment that Charlie was exhibiting signs of pain, no pain medication was provided. *Id.* 27–28. Dr. Duncan determined that Charlie's prognosis was "very poor," but Mr. Candy declined euthanasia. Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 45) at 8. Charlie died the next day; his body was stretched out likely due to "agonal breaths at passing." *Id.* 5. Based on Dr. Duncan's assessment of Charlie's condition, Dr. Duncan noted that Charlie was "[a]bsolutely" suffering and agreed that euthanizing Charlie would have "been the humane thing to do." *Id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 42:10−16. Defendants even declined Dr. Duncan's recommendation that Charlie be necropsied, in part due to concerns "that there was a potential for an infectious disease" that, if present, would put other animals "at risk." *Id.* 42:17−43:10.

According to Dr. Haddad, Charlie very likely "endured days of extreme pain and suffering that could have been prevented." Haddad Decl. 28. By the time Defendants notified Dr. Duncan, Charlie was already extremely ill. *Id.* Lab work conducted the day before Charlie died revealed kidney disease, early detection of which is possible through "regular examinations and laboratory testing." *Id.* If timely diagnosed, "several treatments and nutritional changes . . . can easily be made to keep animals comfortable, eating, and free of pain." *Id.* Yet, "Charlie received no supportive care because no one knew he was sick until the day before he died a painful death." *Id.* Such failure "does not meet any standard of care and is another example of why Mr. Candy is not qualified to . . . car[e] for and mak[e] care decisions for any of the animals at Tri-State." *Id.*

Defendants maintain a public nuisance as evidenced in part by their failure to provide Charlie with necessary veterinary care in violation of Maryland's animal abuse and neglect statute,

Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), and federal Animal Welfare Regulations, 9 C.F.R. § 2.40, including the requirement that the then-attending veterinarian have "appropriate authority to ensure the provision of adequate veterinary care," *Id*. § 2.40(a)(2).

### 3. Diablo the Bobcat

Diablo, a geriatric bobcat, "received a complete lack of veterinary care." Haddad Decl. 28. There is no record of "any kind of physical exam, routine fecal testing, vaccination, or other veterinary care." *Id*. The only diagnostic test performed on Diablo was a single fecal screening for parasites in May 2018 that showed hookworms. However, no treatment or follow-up testing was conducted because Mr. Candy "never provided" Dr. Duncan's office with another fecal sample, despite possible environmental contamination of the first sample. *Id*. 29; Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 215:16–218:8.

Dr. Duncan suspected Diablo had arthritis based on a visual exam. She never physically examined Diablo because "there was no safe way to accomplish that." *Id*. 215:16−23, 218:9–17. At the time, Diablo had "difficulty rising," "decreased mobility," a "hunched appearance," and stiff hind legs *Id*. 218:18–219:3. According to Dr. Duncan, Diablo appeared to be in pain. *Id*. 219:7–8. He was also "[u]nderweight," losing approximately 20% of his bodyweight between Duncan's 2018 and 2019 visual examinations. *Id*. 216:16−25; *id*. ¶ 11 & Ex. J (Duncan Dep. Exs. 43 & 69) at 2, 51 (records showing dates of examinations); Haddad Decl. 28.

Dr. Duncan first prescribed Meloxicam for Diablo in June 2019. Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 69) at 51. However, Defendant Candy did not administer Diablo's medication as prescribed. *See id*. ¶ 2 & Ex. A (Candy Dep., Jun. 24, 2021) 260:19−261:2. Indeed, despite Diablo's apparent pain, Defendant Candy "declined" "further medication," and "never picked up"

20

additional prescriptions of meloxicam that were made available. *Id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 219:9–22.

Diablo's next and final exam was a cursory visual examination by Dr. Gold on October 11, 2020. *Id.* ¶ 7 & Ex. F (Gold Dep. Ex. 100) at 58; *id.* ¶ 6 & Ex. E (Gold Dep., Jul. 15, 2021) 177:9–21. Despite "noting that Diablo had arthritis," Dr. Gold provided no "analgesic medication." Haddad Decl. 29; Graves Decl. ¶ 6 & Ex. E (Gold Dep., Jul. 15, 2021) 179:5–183:1. Other basic diagnostics, like assessing Diablo's body condition score or pain score, were also not done. *See* Haddad Decl. 29. Diablo died on or about January 31, 2021, and, as with the other deaths at Tri-State, no necropsy was performed. Graves Decl. ¶ 3 & Ex. B (Candy Dep. Ex. 20) at 2; *id.* ¶ 6 & Ex. E (Gold Dep., Jul. 15, 2021) 184:15−185:2 (testifying that a necropsy was not performed in part because Diablo was not Dr. Gold's patient).

Defendants maintain a public nuisance in part because they denied Diablo necessary veterinary care in violation of Maryland's animal abuse and neglect statute, Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), and federal Animal Welfare Regulations, 9 C.F.R. § 2.40.

### 4.   Snorkle the Vietnamese Potbellied Pig

In July 2021, Snorkle was observed to be "morbidly obese," and suffering from an "enormous testicular tumor," "overgrown hooves and tusks," and a mass on his lower lip. *See* Haddad Decl. 16; Boehler Decl. ¶¶ 52−53. Because of its size, the testicular tumor hits the pig's leg "with every step" and presses up on Snorkle's rectum. Boehler Decl. ¶ 52. According to Plaintiffs' expert, Dr. Laura Boehler, the tumor "is likely causing painful defecation," and "needs to be removed and . . . screen[ed] for cancer." *Id*. Despite Defendants' "concern" about Snorkle's condition, no such diagnostics have been performed. *See id*. ¶ 2 & Ex. A (Candy Dep., Jun. 24,

2021) 36:2–10; Declaration of Fred Adams, DVM ("Adams Decl.") (Jul. 21, 2021) ¶¶ 2–3.[11]

Snorkle's "growth on his left lower gingiva," which contacts his upper tusk, is also "likely causing pain and making it difficult for Snorkle to chew food." Boehler Decl. ¶ 52. Like his testicular tumor, Snorkle's growth on his lip "should be removed and biopsied to screen for cancer." *Id*. Not only have no such diagnostics been performed, the record is devoid of any indication that Defendants are even aware of this condition, which is apparent upon visual inspection. Snorkle's conditions—"the large testicular region tumor, mass on the lower lip, [and] overgrown hooves"—"are all painful" and "likely exacerbated by his obesity." *Id*. ¶ 53. It is undisputed that Defendants' "[f]ailure to treat these conditions and manage Snorkle's pain causes unnecessary suffering." *Id*. ¶ 53.

During Plaintiffs' July 19, 2021 site inspection, Dr. Boehler also observed Snorkle to have an "increased respiratory rate and effort which could be secondary to pain, pneumonia, obesity or a combination of the three." *Id*. ¶ 52. Based on site inspection observations, Plaintiffs' experts opined that Snorkle could be suffering from osteoarthritis, "which is common in obese pot belly pigs." *Id*.; *see also* Haddad Decl. 16. In light of his condition, Snorkle, at a minimum, "should receive an anti-inflammatory and opioid analgesic at regular intervals." Boehler Decl. ¶ 52; *see also* Haddad Decl. 16 (listing Snorkle as one of the many animals denied appropriate analgesia). However, Tri-State has made no such effort to alleviate his pain, which undisputedly causes Snorkle unnecessary pain and suffering. *See* Haddad Decl. 16−17. Not only do Defendants deny Snorkle pain management, but, since at least Dr. Gold's tenure as Tri-State's consulting

---

[11]     Dr. Fred Adams is a licensed veterinarian who visually inspected, but did not provide any veterinary care to, a potbellied pig at Tri-State in March 2021. According to Dr. Adams, he has not "treated any animals at Tri-State . . . in approximately twenty years." Adams Decl. ¶¶ 2−3.

veterinarian, there is no evidence he has received *any* veterinary care.[12]

Tri-State is a public nuisance in part because of Defendants' ongoing failure to provide Snorkle with necessary veterinary care, including appropriate diagnostics and treatment for his tumor, growth, and possible osteoarthritis, in violation of Maryland law, Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), and federal Animal Welfare Regulations, 9 C.F.R. § 2.40.

### 5.  The Green Iguanas

Many of the reptiles at Tri-State, including the two male green iguanas housed in the "reptile house," are also denied timely veterinary care. Like all the reptiles at Tri-State, the green iguanas were not included in Dr. Duncan's PVC because "there were certain species that [Dr. Duncan] had not agreed to be the attending veterinarian for because [she] did not feel that [she] was qualified to treat those species[.]" Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 20:22–21:8. Although Tri-State's current consulting veterinarian, Dr. Gold, has examined and treated some of the reptiles at Tri-State, no veterinary records exist for the two male generic iguanas that are listed on Tri-State's most recent inventory. *See* Graves Decl. ¶ 5 & Ex. D (Candy Dep. Ex. 132) at 7; *id*. ¶ 6 & Ex. E (Gold Dep., Jul. 15, 2021) 141:16–142:10 (explaining that he had only seen two iguanas at Tri-State: a green iguana and a spiny iguana); *id*. ¶ 7 & Ex. F (Gold Dep. Ex. 92) at 56−57 (Dr. Gold's records for a female green iguana and a spiny iguana).[13]

---

12      The only record indicating that Snorkle has received any vet care, is a record of two vaccinations being administered in 2018 and 2019. Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 61) at 41−43. Despite this, his 2018 Bar-Vac CDT vaccine was not boostered as recommended, and he never received a rabies vaccine in 2019 because Dr. Duncan's team "couldn't restrain him well enough to get two vaccines into him." *Id*. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 137:2–21.

13      A single "medical record," dated October 11, 2020, exists for a female green Iguana. Based on Dr. Gold's "cursory exam[]," the iguana was determined to be within normal limits. Graves Decl. ¶ 7 & Ex. F (Gold Dep. Ex. 92) at 56; *id.* ¶ 6 & Ex. E (Gold Dep., Jul. 15, 2021) 140:12–142:10.

Because of Tri-State's failure to provide proper husbandry and basic veterinary care, the iguanas' sufferings are apparent. During the July 19, 2021 site inspection, for example, one of the iguanas was suffering from visible "tail necrosis," was "lying flat and listless" and "demonstrat[ed] a lack of truncal and carpal lift, which is a hallmark sign of illness in lizards." Boehler Decl. ¶ 19. His body condition was "thin and his skin . . . tented, dull in color, and dry with dysecdysis [a type of abnormal shedding] present, which is a result of dehydration and poor humidity, bacterial or fungal skin infection, and malnutrition resulting in low protein levels in the blood." *Id.* The iguana's dorsal spines were "dull and missing"—signs of "poor humidity, dehydration and nutritional deficiency." *Id.* "A second green iguana [wa]s also dull in color, ha[d] evidence of retained shed, and broken or bent dorsal spines." *Id.*

The green iguanas were both "lethargic," "had abnormal lethargic behaviors and postures," and "evidence of illness secondary to poor husbandry." *Id.* Their conditions—"tail necrosis, dyecdysis, missing dorsal spines, and bone deformities"—"which are common in lizards deprived of proper care, can be painful, lead to kidney failure and metabolic bone disease, systemic infections, and cause unnecessary pain and suffering." *Id.* Dr. Boehler opined that the iguanas were "likely suffering from metabolic bone disease and need veterinary care to reverse it." *Id.* Despite this, as noted above, there is no evidence that these iguanas have received *any* veterinary care. Defendants' failures, which undisputedly violate Maryland law, Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), are further evidence of their maintenance of a public nuisance.

### 6.  Dream the Miniature Horse

According to veterinary expert, Dr. Dickie Vest, Dream is a "documented case of neglect." Expert Report of Dickie J. Vest, DVM ("Vest Decl.") ¶ 16. It is undisputed that Defendants denied Dream necessary veterinary care, until she was "lethargic, depressed, severely underweight," and

24

"[b]oarderline cachectic." *See* Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 98:19–99:18; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 54) at 30. At the time of Dr. Duncan's initial evaluation, Dream was so severely malnourished, "her body had started metabolizing her own muscle mass to sustain itself." *Id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 99:12–18, 101:2–20.

Since Dr. Duncan's last visit to Tri-State on October 3, 2019, Dream has not received any basic veterinary care, including dental care, preventive vaccines and parasite control, or follow-up care despite her history. *See id.* 10:11–23; *id.* ¶ 11 & Ex. J (Duncan Dep. Exs. 42 & 54) at 1, 25; Vest Decl. ¶¶ 15−17, 19. Defendants' history of providing such substandard care has "directly led to poor body condition" and "reduced health status." Vest Decl. ¶ 19.

Tri-State is a public nuisance in part because of Defendants' failure to provide Dream with timely and necessary veterinary care, which violated Maryland's animal abuse and neglect statute. Md. Code Ann., Crim. Law § 10-604(a)(5)(ii).

### 7. Bridgette the Basset Hound

Defendant Candy's inability or unwillingness to provide adequate veterinary care to the animals in his custody extends beyond the animals at Tri-State. His basset hound, Bridgette, for example, is a victim of neglect. *See* Haddad Decl. 34. Dr. Duncan first examined Bridgette on June 1, 2018, when her condition was "[p]otentially" "life threatening." Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 53:11–14; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 46) at 15−17. At the time, Bridgette presented with masses, at least one of which had grown and repeatedly ruptured over a period of one year. *Id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 46) at 15−16. Despite the fact that the mass had burst open at times during the year, it was Dr. Duncan's understanding that Mr. Candy had never brought her in to be examined by a veterinarian. *Id.* ¶ 10 & Ex. I (Duncan

Dep., Jun. 30, 2021) 45:6–15. According to Dr. Haddad, "[i]gnoring a large mass that has repeatedly ruptured is neglect." Haddad Decl. 34.

Bridgette also suffered from "severely" ingrown toenails (which were embedded in her paw pads), and open wounds from prior ingrown nails. Removal of the embedded nails required sedation. Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 46) at 12−13, 16; *id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 46:5–47:6. It is undisputed that Bridgette's embedded toenails were painful and entirely preventable. *Id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 46:18–20, 47:7–9; Haddad Decl. 34. Dr. Duncan recalled that, at the time of her examination, Bridgette was "reluctant to walk" and "non weight bearing on the left front leg." Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 47:21–48:3. Bridgette was also underweight, not eating normally, and had potential for a uterine infection. *Id.*; *see also id.* 50:12–19 (recalling that Bridgette had "stopped eating").[14]

Bridgette finally underwent surgery on July 20, 2018—seven weeks after her initial visit. Graves Decl. ¶ 11 & Ex. J (Duncan Ex. 46) at 12−17. The masses that were finally removed were not biopsied or otherwise tested. *Id.* 12−15; *id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 51:9–21. And despite veterinary recommendation that Bridgette wear an Elizabethan or "E-collar" to prevent her from chewing on her sutures, Bridgette required re-sedation and additional sutures because Defendant Candy did not follow the veterinarian's recommendation. *Id.* ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 52:17–53:10; *id.* ¶ 11 & Ex. J (Duncan Ex. 46) at 18−19.

It is undisputed that Defendant Candy neglected Bridgette by failing to provide her with timely, necessary veterinary care in violation of Maryland's animal abuse and neglect statute. Md. Code Ann., Crim. Law § 10-604(a)(5)(ii).

---

[14]     During her deposition, Dr. Duncan thought that Bridgette had also suffered from "a very severe ear infection." Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 48:4−25.

**B.**     **Defendants deny Dodger proper protection from the weather and necessary veterinary care in violation of state and federal law.**

For the past nine years, Tri-State has housed a capuchin monkey, Dodger, in an outdoor wood-framed structure with wire fencing, with an adjacent narrow indoor holding area. *See* Graves Decl. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 205:16–19; *id*. ¶ 14 & Ex. M (Defs.' Suppl. Answers to PETA's Interrogatories) at 11–12, 14; *id*. ¶ 18 & Ex. Q (Jul. 19, 2021 site inspection photos). In the winter, the indoor holding area is primarily heated by a woodstove. *Id*. ¶ 14 & Ex. M (Defs.' Suppl. Answers to PETA's Interrogatories) at 12.[15] Volunteers are responsible for tending to the woodstove, including "[e]very three to four hours" throughout the night. Graves Decl. ¶ 15 & Ex. N (Moon Dep., Aug. 10, 2021) 62:8–14; *see also* Decl. of William McGuire (Aug. 26, 2021) ¶ 5 ("when the temperature dropped below thirty degrees Fahrenheit," then-volunteer William McGuire "would travel to Tri-State to tend to the wood stoves used to heat certain animal enclosures"). The outdoor portion of Dodger's enclosure is not heated, and, aside from some overhangs and other sheltered areas, it is exposed to the elements. *See id*. ¶ 14 & Ex. M (Defs.' Suppl. Answers to PETA's Interrogatories) at 12, 14; *id*. ¶ 18 & Ex. Q (Jul. 19, 2021 site inspection photos) at 1−3.

Maryland law prohibits a "person [who] has charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with" "proper shelter" or "proper protection from the weather." Md. Code Ann., Crim. Law § 10-604(a)(5)(vi)(vii). Federal law further mandates that "[o]utdoor housing facilities for nonhuman primates" "provide adequate shelter from the elements at all times." 9 C.F.R. § 3.78(b). Specifically, "[t]he shelter must safely

---

[15]     According to Defendants, "supplemental electric heat" is available "if needed." Graves Decl. ¶ 14 & Ex. M (Defs.' Suppl. Answers to PETA's Interrogatories) at 12. Dodger also "has a heat lamp." *Id*. ¶ 15 & Ex. N (Moon Dep., Aug. 10, 2021) 61:24–62:7.

provide heat to the nonhuman primates to prevent the ambient temperature from falling below 45 °F (7.2 °C), except as directed by the attending veterinarian and in accordance with generally accepted professional and husbandry practices." *Id*. The ambient temperature in indoor housing facilities also "must not fall below 45 °F (7.2 °C) for more than 4 consecutive hours when nonhuman primates are present." 9 C.F.R. § 3.76(a); *accord* 9 C.F.R. § 3.77(a) (minimum ambient temperature for sheltered part of housing facilities for primates).

It is undisputed that Defendants fail to provide Dodger with adequate shelter and protection from the elements in violation of these minimum state and federal requirements. Dodger generally has access to the outdoor portion of his enclosure year-round, and "may choose to go inside during inclement weather." Graves Decl. ¶ 14 & Ex. M (Defs.' Suppl. Answers to PETA's Interrogatories) at 12; *id*. ¶ 15 & Ex. N (Moon Dep., Aug. 10, 2021) 60:24–61:2. Critically, this indefensible management practice and "[l]ack of appropriate temperature accommodations led directly to Dodger suffering severe frostbite." Pratte Decl. 8 n.2; Haddad Decl. 32. Specifically, in February 2019, Dodger required emergency surgery to partially amputate sixteen of his frostbitten, necrotic digits. *See* Graves Decl. ¶ 9 & Ex. H (Gold Dep. Ex. 108) at 13−14; *id*. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 34:9−35:20; *id*. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 78:20−79:25, 86:24−87:6.

Defendants "theorize[d]" that the frostbite could have occurred because Dodger "has a habit of putting his fingers in his mouth and going into the cold air and grabbing the metal fence." *Id*. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 206:1–6. However, despite this purported "habit," Defendants did nothing to ensure that Dodger was protected from inclement weather. *See id*. ¶ 14 & Ex. M (Defs.' Suppl. Answers to PETA's Interrogatories) at 12.

After Dodger's digit amputation, Defendants' "added new doors" on Dodger's enclosure "so that he has to go through sectioned areas so that wind can't go in." Defendants can also "lock him in" the indoor portion of his enclosure, and "usually" do so when the temperature is "below 30" degrees. *Id*. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 206:11–207:11.[16] However, even if Defendants *always* lock Dodger inside when temperatures dip below 30 degrees, this still would not meet the AWA's bare minimum standards for primates. *See supra* p. 27−28.

Not only do Defendants deny Dodger adequate shelter and protection from the elements; they also failed to provide him with timely veterinary care after he was injured by being exposed to dangerous temperatures. According to Dr. Duncan's records, Defendants reported on Tuesday, February 5, 2019 that they had been using coconut oil on Dodger's "apparently chapped hands." Graves Decl. ¶ 11 & Ex. J (Duncan Dep. Ex. 52) at 22. Three days later, Defendant Candy reported that Dodger had "not been eating well, [w]as not drinking," and was "not acting [like] [him]self." *Id.* 22. At that point, Dodger had also been "holding his hands abnormally for *at least two weeks*." *Id*. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 78:20–79:9 (emphasis added). Dr. Duncan "repeatedly recommended that [Candy] seek veterinarian intervention," advising that Dodger needed to be seen that day, "potentially on [an] emergency basis." *Id*.; *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 52) at 22. Although Defendants do not know when Dodger was first injured, Dr. Duncan's records make clear that they were aware that something was wrong by February 5, 2021 at the latest. Graves Decl. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 206:8–10 ("it happened and then he

---

[16]     Although Dr. Gold recommended that Defendant Candy not "let [Dodger] outside when it was below a certain temperature," Dr. Gold could not recall what temperature was discussed. *See* Graves Decl. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 48:14–18 ("Q. Do you know what changes were made to Dodger's enclosure after he got frostbite? A. He was not supposed to let him outside when it was below a certain temperature. I don't know what we discussed as a certain temperature."). Nor did Dr. Gold verify if Defendant Candy had followed his recommendation. *Id*. 48:21–49:3.

tried to hide it so you don't know until you find it"); *id.* ¶ 11 & Ex. J (Duncan Dep. Ex. 52) at 22. Yet, Dodger continued to suffer until he was finally seen by a veterinarian on February 12, 2019. *Id*. ¶ 9 & Ex. H (Gold Dep. Ex. 108) at 13−14.

Not only could Dodger's "horribly painful condition" "have been avoided if he was provided with an appropriate enclosure that offered protection from temperature extremes," but he was left to continue to suffer unnecessarily due to a lack of timely veterinary care. Haddad Decl. 26, 31–32; *see also* Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 87:7–10 (agreeing that Dodger would not have suffered from frostbite if he had been adequately protected from the elements).

Tri-State is a public nuisance in part because Defendants' repeated failures vis-à-vis Dodger, which unequivocally violate state and federal law. *See* Md. Code Ann., Crim. Law §§ 10-604(a)(5)(ii)(vi)(vii); 9 C.F.R. §§ 2.40, 3.78(b).

## C.     Defendants denied Rocket proper shelter in violation of state and federal law.

Rocket, the arctic fox, sustained a "degloving" injury and injuries from a porcupine because of Defendants' failure to provide him with safe and appropriate shelter. Maryland law prohibits a "person [who] has charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with" "proper shelter." Md. Code Ann., Crim. Law § 10-604(a)(5)(vi). Federal regulations further provide that "indoor and outdoor housing facilities shall be structurally sound and shall be maintained in good repair to protect the animals from injury and to contain the animals." 9 C.F.R. § 3.125(a).

Contrary to these basic requirements, Rocket sustained a serious degloving injury in June 2020 due to his inappropriate shelter. *See, e.g.*, Pratte Decl. 37; Haddad Decl. 29–30; Graves Decl. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 21:14–27:9. Specifically, Defendants believe the injury was sustained when Rocket—who dug and exposed fencing at the bottom of his enclosure—"got

stuck on the fencing" and "pulled [his leg] out." Graves Decl. ¶ 4 & Ex. C (Candy Dep., Aug. 11, 2021) 221:13–23. The injury required surgical removal of "dead/necrotic tissue." *Id*. ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 22:17–18.[17]

In November 2020, approximately five months after the degloving injury, Rocket sustained additional injuries after he stuck a limb into an adjacent enclosure to, according to Defendant Candy, "play with the porcupine." Graves Decl. ¶ 7 & Ex. F (Gold Dep. Ex. 88) at 9−10. Defendant Candy reported to his veterinarian that Rocket had "about 10 quills in his leg" and a "small limp." *Id*. It is unclear if Defendant Candy removed all the quills. *Id.* 10 ("I . . . removed all the quills (hopefully)."). Rocket's injury was never assessed by a veterinarian. *See id.* ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 33:6–19.

Both of Rocket's injuries could easily have been avoided if Defendants provided Rocket with an appropriate, safe enclosure, including appropriate barriers between the fox and porcupine enclosures. *See* Pratte Decl. 37. Defendants' failures are inexcusable.

### D. Defendants killed approximately twelve parrots by depriving them of proper air in violation of state law.

Before 2018, Defendants used propane tanks as a heat source in animal buildings, including a glass bird building. Graves Decl. ¶ 16 & Ex. O (Candy Dep., Mar. 16, 2018) 251:16–21, 252:15–253:11. According to Tri-State volunteer Rella Moon, volunteers have not received any training or instructions regarding the use of propane at Tri-State. *Id.* ¶ 15 & Ex. N (Moon Dep., Aug. 10, 2021) 23:6–15.

---

[17]     When hospitalized, a fecal test revealed Rocket was positive for coccidia. Graves Decl. ¶ 9 & Ex. H (Gold Dep. Ex. 106) at 2; *id.* ¶ 8 & Ex. G (Gold Dep., Jul. 22, 2021) 23:7–8. Treatment was provided but no follow-up screening was performed. *Id.* 29:20–30:9. Rocket's emergency veterinary visit was the first time Defendants provided the young fox with any veterinary care. Standard animal acquisition protocols mandate that Rocket should have received a veterinary examination, and an initial round of vaccinations, days after Defendants acquired him in May 2020. Haddad Decl. ¶ 29–30.

Maryland law prohibits a "person [who] has charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with" "proper air." Md. Code Ann., Crim. Law § 10-604(a)(5)(iv). Contrary to this basic prohibition, on at least one occasion, approximately 12 parrots, including a macaw, cockatoos, parakeets, and possibly a love bird and an Amazon parrot, died from a propane heater that Defendants believe had either malfunctioned or was "just not set right." *See* Graves Decl. ¶ 2 & Ex. A (Candy Dep., Jun. 24, 2021) 225:16–227:10. Graves Decl. ¶ 13 & Ex. L at 2 ("birds [were] lost after a heater failure in the bird house").

According to Dr. Boehler, "[p]ropane based heaters emit toxic gasses, including carbon monoxide, which are highly toxic to birds and fatal once inhaled." Boehler Decl. ¶ 67. The bird deaths caused by propane tank failure are "horrific cases of animal suffering that were fully preventable." *Id*.

\* \* \*

It is undisputed that Defendants have denied animals necessary veterinary care, protection from the elements, appropriate shelter, and proper air. Such animal neglect and mistreatment is not only proscribed by law, but it involves a "dereliction of public morals," which are embodied by those laws. *See Collins*, 514 F. Supp. 3d at 780 (collecting cases). Accordingly, because Defendants' "operations interfere with the public morals of the community at large and all who come in contact with the Zoo—including the Plaintiffs"—their ongoing animal mistreatment and neglect constitutes a public nuisance. *See Collins*, 514 F. Supp. 3d at 782; *see also id.* ("In assessing a public nuisance claim, the Court looks to whether the challenged conduct imposes 'an injury to the public at large or to all who come in contact with it.'" (quoting *Adams v. Commissioners of Town of Trappe*, 204 Md. 165, 170, 102 A.2d 830, 834 (1954)).

**III.    Plaintiffs have standing to bring their public nuisance claim.**

In Maryland, a private party may maintain a public nuisance action if the party has "suffered harm of a kind different from that suffered by other members of the public . . ." Restatement § 821C. *See also United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.*, 228 Md. App. 203, 231, 137 A.3d 355, 372 (Md. Ct. Spec. App. 2016), *aff'd*, 453 Md. 482, 162 A.3d 909 (Md. 2017) (defining special injury by reference to § 821C).

It is undisputed that Plaintiff Constance Collins has suffered an injury to her aesthetic interest in viewing animals in humane settings, which is distinct from the harm suffered by the general public. Specifically, Ms. Collins has an aesthetic, recreational, educational, and personal interest in seeing animals in a humane, safe, and psychologically enriching setting. Declaration of Constance Collins ¶ 2. In July 2018, when Ms. Collins visited Tri-State with her husband and friends, she personally observed several animals in deplorable conditions, and developed an aesthetic and emotional connection to many of the suffering animals. *Id*. ¶¶ 3−13.  Among other animals, Ms. Collins observed a "small grey-colored pony lying on the dirt ground," who appeared "lethargic and malnourished," and a wolf-dog hybrid who was "panting" and "pacing in continuous circles in a small corn-crib." *Id*. ¶¶ 7−8. Ms. Collins also observed a solitary monkey who was "scratching, pulling, and picking at his or her stomach." *Id*. ¶ 10.  Never before had Ms. Collins "witnessed so many animals in obvious distress." *Id*. ¶ 15.

Ms. Collins' injury, including distress and anguish, resulted from Defendants' maintenance of the animals at Tri-State in unlawful and deplorable conditions. *See id*. ¶ 13. Due to the animal mistreatment and suffering that she witnessed, Ms. Collins was "almost in a frantic panic": she felt upset, "sick to her stomach," and determined to try to improve the animals' situation. *Id*. ¶¶ 13−14. Ms. Collins was so distraught and outraged by Defendants' inhumane (and illegal) conduct that

Ms. Collins and her husband contacted and reported their observations to news media, and multiple government and non-governmental agencies. *Id*. ¶ 14. Ms. Collins wishes to see the animals currently confined by Defendants in a humane setting, but is deprived from doing so because Defendants continue to confine the animals in inhumane conditions. *Id*. ¶ 16. If the animals were living in a humane setting, Ms. Collins would return to visit the animals. *Id*. ¶ 17.

Ms. Collins' injuries to her aesthetic interest in viewing animals constitutes a special injury for the purposes of a public nuisance action. *See Collins,* 514 F. Supp. 3d at 789−80, 782 (citing *Patuxent Riverkeeper v. Maryland Dep't of Envt*, 422 Md. 294, 309, 29 A.3d 584 (2011)). *Cf. Animal Legal Def. Fund*, 387 F. Supp. 3d at 1206−07 (finding aesthetic injuries suffered by organization's members sufficient to constitute a "special injury" in public nuisance claim).

PETA, too, has suffered a special injury, differing from that suffered by the general public. As explained in Sections I & II, *supra*, Defendants' conduct unlawfully interferes with public morality through its ongoing violation of state and federal animal protection laws. Unlike the public generally, PETA is "dedicated to protecting animals, including those used in entertainment, from abuse, neglect, and cruelty." Peet Decl. ¶ 3. Thus, Defendants' uniquely egregious mistreatment and neglect of captive animals has "directly frustrated, and continues to frustrate, PETA's mission" to protect animals from abuse and neglect. *Id*. ¶¶ 3, 7, 9, 13, 14. For years, PETA has diverted substantial resources to identify and counteract Defendants' unlawful treatment of animals. *Id.* ¶¶ 6−7, 10−13, 15−26 & Exs. F−L. PETA is compelled not only to divert substantial monetary and staff resources away from programs at the core of its mission to counteract Defendants' unlawful conduct, but also to correct public misperceptions of what constitutes "humane" treatment of animals. *Id.* ¶¶ 7−12, 18.

34

The ongoing mission impairment and economic injury PETA suffers as a result of Defendants unlawful animal mistreatment is different in kind and degree from the general moral harms suffered by the general public. Thus, PETA has suffered a cognizable special injury. *See* Restatement § 821C cmt. h ("Pecuniary loss to the plaintiff resulting from the public nuisance is normally a different kind of harm from that suffered by the general public."); *Mayor & City Council of Balt. v. Monsanto Co*., No. CV RDB-19-0483, 2020 WL 1529014, at *9 (D. Md. Mar. 31, 2020) (holding that allegations that plaintiff "incurred costs as a result of implementing impervious surface restoration efforts" "suffice to allege standing to bring a public nuisance claim at this stage").

## CONCLUSION

For the foregoing reasons, Plaintiffs Constance Collins and PETA respectfully request that the Court grant their motion for summary judgment by declaring that Defendants' operation of Tri-State violates Maryland's animal abuse and neglect statute, Md. Code Ann., Crim. Law § 10-604, and the Animal Welfare Regulations promulgated under the Animal Welfare Act, 7 U.S.C. §§ 2131–2159, and is a public nuisance under Maryland law.

Plaintiffs request an injunction: (1) ordering Defendants to cease maintaining a public nuisance, namely by confining animals in inhumane and unsafe conditions; (2) terminating all Defendants' ownership and possessory rights with respect to the animals confined at Tri-State or Defendants' real property; (3) prohibiting Defendants from obtaining or exhibiting other animals; and (4) prohibiting Defendants from holding Tri-State out as a sanctuary or animal rescue.

In the event this Court grants summary judgment against Defendants, Plaintiffs request a hearing with this Court to address appropriate placement of the surviving animals in Defendants' possession, consistent with their best interests.

Date    December 20, 2021              Respectfully submitted,
        Baltimore, Maryland

                                         /s/ Adam B. Abelson
                                         Adam B. Abelson (#29532)
                                         Zuckerman Spaeder LLP
                                         100 East Pratt Street, Suite 2440
                                         Baltimore, Maryland 21202
                                         (410) 332–0444; (410) 659–0436 (fax)
                                         aabelson@zuckerman.com

                                         Marcos E. Hasbun (Pro Hac Vice)
                                         Zuckerman Spaeder LLP
                                         101 East Kennedy Boulevard, Suite 1200
                                         Tampa, Florida 33602–5838
                                         (813) 221–1010; (813) 223–7961 (fax)
                                         mhasbun@zuckerman.com

                                         Caitlin Hawks (Pro Hac Vice)
                                         Zeynep Graves (Pro Hac Vice)
                                         PETA Foundation
                                         2154 West Sunset Boulevard
                                         Los Angeles, CA 90026
                                         (323) 210-2263; (213) 484-1648 (fax)
                                         caitlinh@petaf.org
                                         zeynepg@petaf.org

                                         Counsel for Plaintiffs.