IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

–Southern Division–

|  |  |
|---|---|
| CONSTANCE COLLINS, *et al.*, <br><br> *Plaintiffs,* <br><br> –v– <br><br> TRI-STATE ZOOLOGICAL PARK OF WESTERN MARYLAND, INC., *et al.*, <br><br> *Defendants.* | Case No. 1:20-cv-01225 |

### EXPERT REPORT OF JESSE DONAHUE, PH.D.

**I.    Background and Qualifications**

1.      I am a professor at Saginaw Valley State University in Michigan where I regularly teach a course called "Animals, Habitats, and Politics." I received my doctoral degree in political science from Boston College and my undergraduate degree in politics from University of California, Santa Cruz. I have co-authored four books on the history, politics, and law of zoos in the United States including: *Increasingly Legal Rights for Zoo Animals: Justice on the Ark*, Rowman and Littlefield, 2017; *American Zoos During the Depression*: *A New Deal for Animals*, Jefferson, MacFarland Press, 2010; *Political Animals: Public Art in American Zoos and Aquariums*, Lexington Books 2007; *The Politics of Zoos: Exotic Animals and Their Protectors*, Cornell University Press, 2006. I have also presented many peer-reviewed conference papers on animal law and politics at national academic conferences. My CV is attached here as Appendix I.

2.      I have never testified as an expert at a trial or by deposition.

3.      I am being compensated at a rate of $150.00 per hour, up to a maximum of $1,800.00 per day, for my time spent in connection with this matter.

7890239 1

## II.      Resources

4.       The facts I drew upon to formulate my opinion are from scholarly monographs about the history of the animal welfare movement, animal welfare legal and historical repositories, state criminal codes, Congressional subcommittee hearings, and court cases. In preparing my report, I also reviewed the Complaint filed in the above-captioned matter, and the memorandum opinion in *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, 424 F. Supp. 3d 404 (D. Md. 2019).

5.        See Appendix II for a full list of resources upon which this report is based.

## III.     Scope of Opinion

6.       I have been retained by counsel for Constance Collins and People for the Ethical Treatment of Animals, Inc. to opine on the history and purpose of animal protection laws in the United States, with a specific focus on the intersection between animal protection laws and public morals.

## IV.      Methodology

7.       In drafting this report and formulating my opinion, I reviewed and conducted a detailed analysis of scholarly monographs, animal welfare legal and historical repositories, state criminal codes, Congressional subcommittee hearings, and court cases as they apply to the intersection between animal protection laws and public morals.

## V.       Summary of Opinion

8.       Based upon the history of the animal welfare movement, the history of state animal cruelty statutes, and the history and text of the Animal Welfare Act (AWA), my opinion is that animal protection laws in state criminal codes, including in Maryland, were enacted to, and continue to, reflect public morals, and also serve to uphold public morality and prevent cruelty to animals. To support this opinion, I reviewed the history and purpose of animal protection laws in the United States to identify the early intersection between animal protection laws and public morals. This review confirmed that some state legislatures, including Maryland's, intentionally placed their anti-cruelty statutes in public morality sections of their criminal codes. Further, this review confirmed that some states, including Maryland, wrote their anti-cruelty laws to cover all animals.

7890239 1

Finally, this review confirmed that the federal AWA was also supported by later animal welfare groups for reasons of morality as well as preventing animal cruelty.

## VI.    Opinion

### A.  Early Anti-Cruelty Laws in the United States

9.      Animal anti-cruelty statutes were initially based on early Puritan law, and later, on the ideas and work of animal welfare activists who were motivated by their sense of morality to reduce animal cruelty. From the start of the country, animals were used as transportation, food sources, companion animals, entertainers, and, later, educators. This increased dramatically in the 1800s as Americans moved off of farms and migrated to cities. Since farming, food and transportation were the source of so much of the interaction between humans and animals formed through farming, food, and transportation, the early laws and statutes were designed to specifically protect those animals, but also sometimes included all animals.

10.     Horses pulled overloaded busloads of people in cities, and often were beaten, to maximize profits for the transportation companies, resulting in frequent lameness for the overburdened and poorly treated horses. Similarly, animals used for food frequently endured cruel, painful abuse before death. Cattle were driven into major cities like Chicago and St. Louis, and once there, were either slaughtered or shipped via trains to large cities on the East Coast and then killed. There were no laws governing their transport, and rail companies had a vested interest in packing as many cattle as possible into the trains and not providing any food or water. Cattle and pigs stood for days, packed into cars in brutal conditions before they were killed in slaughterhouses in their destination cities. In the absence of any regulation governing their treatment, they often died painful deaths.

11.     Similarly, marine animals like sea turtles consumed for food were transported and killed in brutal ways. One of the infamous incidents that motivated Henry Bergh, America's first real animal welfare advocate and the founder of the American Society for the Prevention of Cruelty to Animals (ASPCA), was witnessing the shipment of live sea turtles stacked upside down on their backs, in high rows, on a large horse-drawn cart. To prevent them from falling off of the cart, the company had punctured their flippers and threaded a rope through each one so that they were tied together in pain before they were killed. Bergh, the creator of one of the first anti-cruelty statutes

3

in a state criminal code, witnessed this incident in the United States and another similar one involving the beating of a lame horse while serving as a diplomat in Russia. Bergh and other early animal welfare activists were inspired by their religious beliefs to create the first anti-cruelty movement and statutes that protected animals.

12.     Early U.S. anti-cruelty laws were among the first in the world, and led states to enact anti-cruelty statutes throughout the country. Around eleven years after the Puritans established the Massachusetts Bay Colony, they adopted the first law to protect animals. In 1638, the General Court of Massachusetts, led by Reverend Nathaniel Ward, compiled a legal code for the Colony. It was called the "Body of Liberties" and was formally adopted in 1641. The Liberties—which had the effect of laws—were the statutes that governed the colony and were written to cover all citizens. Liberties 92 and 93, under the heading "Off the Bruitte Creature," gave animals some of the first legal protections. Liberty 92 provided that "no man shall exercise any Tirranny or Crueltie towards any bruite Creature which are usuallie kept for man's use." Liberty 93 held that any man who was leading cattle could legally "rest or refresh them" for a "competent time" in common areas if they needed food or water to regain their strength.

13.     These early laws were designed to uphold human morality.[1] Religious scholars who focus on morality and animals in the United States stress that the Old and New Testaments repeatedly urge compassionate behavior toward animals. As one scholar on animals and Christianity has noted, "[t]he Gospel as exemplified by Jesus Christ is about service to the sick, poor disadvantaged, diseased, imprisoned, and all others who are regarded as the lowest of all, and not the least to the whole world of suffering non-human creatures. . . . We cannot love God and be indifferent to suffering creatures."[2] Some American writers, like Thomas Paine (1737-1809), used their religion to urge Americans to avoid cruelty to animals. Paine, the son of Quakers, wrote the pamphlet "Common Sense" that is best known for its ideas on democracy, but also discusses the best

---

[1] LEWIS G. REGENSTEIN, REPLENISH THE EARTH: A HISTORY OF ORGANIZED RELIGION'S TREATMENT OF ANIMALS AND NATURE – INCLUDING THE BIBLE'S MESSAGE OF CONSERVATION AND KINDNESS TOWARD ANIMALS 98 (Crossroad Press, 1991).

[2] ANDREW LINZEY, ANIMAL GOSPEL: A CHRISTIAN FAITH AS THOUGH ANIMALS MATTERED 94 (Hoddard and Stoughton, 1998).

7890239 1

treatment of animals. In Paine's "Age of Reason," he wrote that "everything of cruelty to animals is a violation of moral duty."[3]

14.　　Henry Bergh and his early animal welfare activists incorporated these religious ideals about compassion to animals into their activism by arguing that cruelty to animals was immoral. Bergh called work for state animal anti-cruelty laws a moral struggle. By investigating and prosecuting animal cruelty, animal welfare advocates hoped to both abolish cruelty against animals and elevate the morality of human beings. We see this, for example, when Bergh "proclaimed that this was 'a moral question' that had 'no perplexing side issues.'"[4] He hoped that his cause would "unite all men and women of goodwill."[5] To support his argument against animal cruelty in the case of the sea turtles, Bergh reached out to Louis Agassiz, naturalist and Harvard Professor. Bergh asked him whether sea turtles could suffer when shipped upside down without food, and with puncture wounds in their flippers and ropes threaded through the wounds to keep them immobilized. Agassiz affirmed that of course they could experience pain, and that the lack of concern for animals paralleled the human lack of concern for other humans in the slave trade. The same kinds of arguments in favor of cruelty were made about Africans stolen and shipped across the ocean in brutal conditions, justified on the belief that they were not entitled to the same kind of moral consideration offered to people of European descent. Agassiz stated that "[t]he abolition of slavery was just one important step on a continuing journey of moral progress" that included the focus on compassionately caring for animals.[6] As one animal history scholar has noted:

> The anticruelty movement reflected a wider trend in Gilded Age America, the expansion of state power to curb individual property rights when they threatened the common good. Coping with the many challenges of the expanding city, reformers passed new regulations that aimed to protect the public from smoke and sewage, tainted food, bogus medicine, fire hazards, dangerous working conditions, and industrial pollution. In just this way Bergh's anticruelty law treated a man

---

[3] THOMAS PAINE, AGE OF REASON (1795).

[4] ERNEST FREEBERG. A TRAITOR TO HIS SPECIES: HENRY BERGH AND BIRTH OF THE ANIMAL RIGHTS MOVEMENT 8 (Basic Books, 2020).

[5] *Id*. at 8.

[6] *Id.* at 18.

7890239 1

clobbering his horse in the street as a threat to the whole society, an assault not only on the animal's well-being but also on the public's.[7]

15.     City councils in the United States tried to effectively hide the brutality against animals in what were sometimes called nuisance districts. In New York, for example, "officials tried to centralize stockyards and slaughterhouses, locating them in the City's northern margin or in a 'nuisance district' on the Hudson River at Thirty-Eighth Street." Advocates for nuisance districts wanted to promote better human health, but also hide some human behavior that they did not want to encourage. Animal welfare advocates during this period argued that people who allowed their children to watch animals killed at slaughterhouses "had their [children's] native empathy hardened to indifference." The inhumane treatment of animals at slaughterhouses gave young souls "their first lesson in crime and cruelty."[8] Animal welfare activists were not just focused on the corrupting effect of brutality against agricultural animals or animals used for transport. Bergh and his fellow activists also argued that "[w]orking class rat fights and upper-class pigeon shooting tournaments were both wrong for the same reason. They corrupted the character of the men who enjoyed them."[9]

16.     Bergh and other early animal welfare activists understood that appealing to citizens' morality alone was important, but was not a successful way to prevent animal cruelty. As a result, he and his fellow members of the ASPCA lobbied the New York State Legislature to enact what would become the most famous anti-cruelty statute in its criminal code.[10] He persuaded the New York legislature to allow his organization to serve as enforcers of the law in exchange for

---

[7] *Id*. at 40.

[8] *Id*. at 144.

[9] *Id*. at 147, 143, 144, 168.

[10] Although the Puritan law and Maine's anti-cruelty statute that will be discussed later preceded the New York statute, scholars have focused the most on New York's statute because of the greater work done by Bergh.

6

compensation. He hired and sent out employees of the ASPCA to investigate animal cruelty which made the New York anti-cruelty statute more than a vague pronouncement of ideals.[11]

17.     Bergh's supporters worked for him because of his morality. Dr. Bellows, a champion of Bergh, proposed that Bergh become the President of the ASPCA because this was a role that needed "great moral courage" and a movement that they recommended to all "humane and Christian men and women."[12] Supportive citizens who wrote to *The New York Times* noted that they supported Bergh because of their belief that "cruelty is the unpardonable sin . . ."[13] Similarly activists condemned vivisection, the act of experimenting surgically on animals without anesthesia, because it "deaden[end] and corrupt[ed] the moral sensibilities of young students whom witnessed the experiment."[14] Bergh also warned of destructive parallels in human medicine. Poor people were used without their consent or knowledge in medical experiments. He cited a teaching hospital that allowed patients with "fractured limbs" to remain without treatment for days so that a class of students could watch as bones were reset.[15] Bergh also appealed directly to judges who he felt were not providing the proper sentence to animal abusers in New York under the statute he had worked to enact. He wrote an open letter to *The New York Times* directed to a New York judge, Justice Elliott, and decried an "unaccountable unwillingness" on his part to "enforce the laws enacted for the protection of dumb animals."[16] For Bergh, the problem with this was that it was not only cruel to the animals, but it also caused a bad "reaction on ourselves" when these laws are not enforced.[17]

---

[11] DIANE L. BEERS, FOR THE PREVENTION OF CRUELTY: THE HISTORY AND LEGACY OF ANIMAL RIGHTS IN THE UNITED STATES 44 (Swallow Press, 2006).

[12] *The Henry Bergh Testimonial*, NEW YORK TIMES, Apr. 17, 1871, at 4.

[13] W.G.H., *Encouragement for Henry Bergh*, NEW YORK TIMES, Feb. 21, 1875, at 5.

[14] *Henry Bergh on Vivisection*, NEW YORK TIMES, Feb. 2, 1882, at 8.

[15] *Id.*

[16] Henry Bergh, *Letter from Mr. Henry Bergh*, NEW YORK TIMES, Mar. 8, 1874, at 3.

[17] *Id.*

7890239 1

18.     Bergh extended his work on preventing animal cruelty to creating the first interest group to stop cruelty to children. His fame in preventing animal cruelty gave other citizens in New York the impetus for creating an interest group, enacting legislation, and enforcing children anti-cruelty laws. Prior to Bergh's time, it was effectively legal to abuse children through excessive corporal punishment. The ASPCA inspired Marietta Angell Wheeler, the wife of a Missionary who worked at St. Luke's, a Methodist Mission in New York, to pursue that same action for a child in 1874. During her missionary work in a poor area of New York City, she had heard the cries of a child. She befriended a neighbor of the child in an adjacent apartment who confirmed that the child was regularly beaten by her parents. Wheeler convinced Bergh and ASPCA's attorney, Elbridge T. Gerry, to take on the case of the child. Bergh sent an investigator to the house who observed the child, interviewed the parents, and had the New York police remove the child from the home. It was clear that Mary Ellen Wilson, the child, had been beaten severely for years. Bergh explained that his work to prevent animal cruelty closely paralleled his work to prevent cruelty to children; he analogized the girl to a "cur in the streets" who is helpless to remedy her own situation.[18]

19.     In short, the early animal welfare activists in the United States were deeply motivated by their interest in protecting the morality of society. They wanted to stop cruelty to animals both because it harmed the animals themselves and because it ultimately harmed the people who either participated in or witnessed the abuse. Because cruelty to animals harmed the human character, the earliest laws sought to stop it or, in some cases, hide the abuse in specially designated nuisance districts.

**B.  State Animal Cruelty Statutes**

20.     An analysis of the language of state anti-cruelty statutes illustrates that states made decisions about which animals to protect and where to place anti-cruelty laws within state criminal codes, regardless of whether they relegated certain use and abuse of animals to nuisance districts. Maine, for example, had one of the earliest animal anti-cruelty statutes (1821). Under Maine's

---

[18] ERIC A. SHELMAN & STEPHEN LAZORITZ, M.D., THE MARY ELLEN WILSON CHILD ABUSE CASE AND THE BEGINNING OF CHILDREN'S RIGHTS IN 19TH CENTURY AMERICA 32 (McFarland & Company, 2005).

7890239 1

statute, it was an offense, punishable by fine or imprisonment, for "any person" to "cruelly beat any horse or cattle."[19] This early statute was directed at "any person," and thus applied to the owner of the animal as well as any other person. Maine's early statute was therefore not just about harming someone else's property; it targeted animal cruelty committed by anyone. Henry Bergh used the same kind of language to push for the New York Statute enacted in 1829, which provided: "Every person who . . . shall maliciously kill, maim or wound any horse, ox or other cattle, or any sheep, belonging to another, or . . . shall maliciously and cruelly beat or torture any such animals, whether belonging to himself or another, shall upon conviction, be adjudged guilty of a misdemeanor."[20] Like Maine's statute, New York's law intended to prevent cruelty by "every person"—even by people who owned the animals.

21.     Through the language of these anti-cruelty statutes, we can also see which animals the enactors sought to protect. As we would expect given the early work on protecting animals used for food and transportation, sometimes these statutes explicitly protected cattle or horses, as in the case of the New York statute. We can see this, for example, through the criminalization of certain types of behavior. For example, the Connecticut anti-cruelty statute prohibits "[a]ny person" from "overdriv[ing], driv[ing] when overloaded, [and] overwork[ing]" animals.[21] However, it also extends protections to prevent cruelty to "any animal." Similarly, Minnesota extended its anti-cruelty statute beyond farm and transport animals to include any "other animal."[22] Similarly, Maryland's legislature made it a crime to deprive sustenance to "an animal" rather than limiting the law to specific types of animals.[23]

---

[19] Me. Laws ch. IV § 7 (1821). Main's statute, which was enacted in 1821, preceded New York's, and was therefore not created because of a state chapter of Bergh's organization.

[20] N.Y. Rev. Stat. tit. 6 § 26 (1829).

[21] Conn. Gen. Stat. Ann. § 53-247(a).

[22] Minn. Stat. ch. 96 § 18 (1858).

[23] Md. Code Ann., Crim. Law § 10-604(a)(2); *see also id*. § 10-601(b) (broadly defining "[a]nimal" as "a living creature except a human being").

7890239 1

22.     The anti-cruelty statutes' placement within state codes offers additional insight into the enactors' thoughts about the laws. Specifically, many anti-cruelty statutes, including those in Michigan, New Hampshire, Minnesota, Pennsylvania, and Maryland, were placed within the nuisance and public morality sections of the states' criminal codes.[24] This is because nuisance laws cover behavior that is a breach of the public peace, and identifies behavior that the state wished to minimize or eliminate. Similarly, several statutes were placed within the public morality sections of state criminal codes because of the state's interest in preventing violence. We see this, for example, in state criminal code chapters entitled "Of Offenses Against Chastity, Decency and Morality" and similar variations of this phrase. For example, Section 18 of Chapter 96 from Minnesota Public Statutes 1860-1872 covers the treatment of animals and is titled, "Offenses Against Chastity, Morality."[25] Similarly, Maryland placed its criminal law against animal cruelty in the section on "Crimes Against Public Health, Conduct, and Sensibilities," indicating that the legislature wanted this law to prevent public abuses of morality that coarsened human conduct.[26] Today, states prosecute these cases in part because a large body of scholarship has found that people who treat animals inhumanely also are likely to treat humans cruelly. For example, in a study of abused children in New Jersey, 60% of the households had abused companion animals as well.[27] As the early animal welfare activists noted, there is a clear connection between animal abuse and human abuse. States have an interest in protecting the human public by protecting companion animals and animals used for entertainment and education.

23.     It is also true that these statutes were not immediately enforced or completely understood. For example, Minnesota's initial state anti-cruelty statute used the word "beasts" to describe the animals it covered. Following an unsuccessful prosecution under the state's anti-cruelty statute,

---

[24] Mich. Rev. Stat. ch. 8 § 22 (1838); N.H. Rev. Stat. ch. 219 § 12 (1843); Minn. Stat. ch. 96 § 18 (1858); Pa. Laws tit. IV § 46 (1860).

[25] Minn. Stat. ch. 96 § 18 (1858).

[26] Md. Code Ann., Crim. Law § 10-601-623; Md. Code Ann., Crim. Law § 3-222.

[27] Catherine A. Faver & Elizabeth B. Strand, *Domestic Violence and Animal Cruelty: Untangling the Web of Abuse*, 39 J. OF SOC. WORK EDUC. 237, 239 (2003).

Minnesota changed the term "beast" to "animal" to make it clear that its statute encompassed all animals.[28]

24.     Judicial opinions in cruelty cases also give us further insight into what judges sometimes thought about anti-cruelty statute enforcement. When courts ruled on the cases, they were sometimes explicit about why the anti-cruelty statutes were placed in the morality sections of state criminal law. Judge Arnold in Mississippi, for example, opined that "[L]aws, and the enforcement or observance of laws for the protection of dumb brutes from cruelty, are, in my judgment, among the best evidences of the justice and benevolence of men." Judge Arnold further noted that "cruelty to them manifests a vicious and degraded nature, and it tends inevitably to cruelty to men."[29] We see a similar concern for public morality in a case in Pennsylvania in the latter 1700s involving the killing of a horse. In that case, the Attorney General who prosecuted the case did so on "principle and not merely on precedent." And the principle was that a man named Teischer had "maliciously, willfully, and wickedly" killed his horse. The Attorney General argued that this was a violation of common law and required public prosecution because it was a "public evil . . . and against good morals . . . [and therefore] an offence, by the common law." This principle, the Attorney General argued, "affects the killing of a horse, as much, as least, as the burning of an empty barn."[30] Chief Justice M'Kean of the Pennsylvania Supreme Court agreed with the Attorney General and concluded "whatever amounts to a public wrong may be made the subject of an indictment."[31] He pointed to the fact that state citizens who had "poison[ed] . . . chickens" and "kill[ed] a dog" had also previously been indicted on the grounds that they committed "public wrongs" in Pennsylvania. He found that other "heinous offenses might be perpetuated with absolute impunity" if the case had been prosecuted as a civil suit.

---

[28] David Favre & Vivian Tsang, *The Development of Anti-Cruelty Laws During the 1800s*, 1 DET. C. L. REV. 1 (1993).

[29] *Stephens v. State*, 3 So. 458–59 (Miss. 1887).

[30] *Republica v. Teischer*, 1 Dall. 335 (Penn. 1788).

[31] *Id.*

11

7890239 1

C. **Regulating Zoos Through Federal Legislation**

25.      This history of national legislation impacting zoos beginning in the 1960s is similar to the ASPCA's focus on local statutes in that national animal welfare groups pushed for legislation aimed at improving animal welfare at zoos and aquariums. Interest groups like the Animal Welfare Institute (AWI), Defenders of Wildlife, the Humane Society of the United States (HSUS), and the ASPCA (Bergh's group) were now focusing on zoos. Defenders of Wildlife expanded their focus on wildlife in nature to zoos and engaged in what they called "a crusade" against "roadside zoos" where they investigated and publicized a range of roadside zoo animal abuse including "inadequate space, filthy cages, isolation, and poor veterinary care."[32] They believed that federal oversight would more effectively combat these abuses than the existing state statutes did. They hoped to supplement state law aimed at animal abuse in captive settings, not supplant it. Together with the other animal welfare organizations mentioned above, Defenders of Wildlife convinced Congress to hold hearings on animal welfare that reviewed the existing Animal Welfare Act (1966) in an attempt to expand its oversight and cover additional animals including zoo animals. At the 1970 hearings, sponsored by Congressman Whitehurst (R) from Virginia, animal welfare groups urged Congress to expand the federal Animal Welfare Act to include zoos. Christine Stevens, the President of AWI, shared a letter she received from John Merhtens, the then-director of the Columbia Zoo in South Carolina, who had visited roadside zoos and urged AWI to push for federal legislation. He described reporting the "cruelties" he saw at roadside zoos to "various local humane societies" after finding "the remains of an animal in an unused cage" and "a one-year-old Indian tiger so emaciated and crippled by rickets that it could not walk properly."[33]

26.      The HSUS and AWI were both motivated by moral principles governing the relationship between animals and humans to convince Congress to expand the AWA's scope to include zoos.

_____

[32] JESSE DONAHUE & ERIK TRUMP, THE POLITICS OF ZOOS: EXOTIC ANIMALS AND THEIR PROTECTORS 26-27 (Cornell Univ. Press, 2006).

[33] *Id*. at 29. *Care of Animals Used for Research, Experimentation, or Held for Sale as Pets: Hearings on H.R. 13957 Before the House of Representatives Subcomm. on Livestock and Grains of the Comm. of Agric.*, 91st Cong., 2nd Sess. 34, 38-39 (1970) (statement of Christine Stevens, President, Animal Welfare Institute, and Secretary for Society for Animal Protective Legislation).

7890239 1

By the early 1970s, the HSUS' mission was inspired by Joseph Wood Krutch's *The Great Chain of Life* (1957), in which he urged Americans to adopt "an intimate relation with the natural world." Krutch was deeply motivated by his religion and said of hunters, for example, that he believed that "when a person wantonly destroys one of the works of man we call him a Vandal, and when he destroys one of the works of God we call him a sportsman."[34] He forgave hunters for their moral "blind spot," however.[35] He reminded his readers that "'one can't have a reverence for life' without a vivid sense that it exists in even the 'lower orders of animals.'"[36] The central goal was to prevent animal suffering to any considerable degree. Krutch believed that "to call a man 'an animal' is to endow him with a heritage so rich that his potentialities seem hardly less than when he was called the son of God."[37] It was in our interest as humans not to destroy other species, but we could not do that, Krutch said, unless people had a reverence for other animals, which could be loosely described as a "Love, fellow-feeling, or reverence for life."[38] John Ray, the English 17th Century naturalist, shared the conviction that "God made other living things not exclusively for the use of man but also for his delight and theirs."[39] The implication is that people in any situation should seek not to harm them, unless out of necessity rather than for reasons of entertainment. He called for a sense of "community" among living things.[40]

27.     Inspired by Krutch's work, John Hoyt, the then-director of HSUS, expanded his organization's work to include wild animals and zoo animals. Hoyt pushed HSUS to advocate for greater legislation on behalf of zoo and wild animals for "moral [and] ethical" reasons.[41]

---

[34] JOSEPH WOOD KRUTCH, THE GREAT CHAIN OF LIFE 148 (Houghton Mifflin, 1959).

[35] *Id.*

[36] *Id.* at 152.

[37] *Id.* at 154.

[38] *Id.* at 161.

[39] *Id.*

[40] *Id.* at 162.

[41] BERNARD UNTI, PROTECTING ALL ANIMALS: A FIFTY-YEAR HISTORY OF THE HUMANE SOCIETY OF THE UNITED STATES 1-40 (The Humane Society Press, 2004). DONAHUE & TRUMP, *supra* note 32 at 27. KRUTCH, *supra* note 34.

13

7890239 1

28.     Similarly, AWI's director Christine Stevens—who played a key role in advocating for both the AWA and the Endangered Species Act—was motivated in part by the philosophical and religious work of the polymath Albert Schweitzer, who championed animal welfare in part for moral reasons. Like Bergh, Schweitzer's initial sympathy for animals started with his exposure to animal cruelty to horses used for transportation, but later evolved to encompass all animals. He noted that as "a young child [he] used to suffer particularly because the poor animals must endure so much pain and want."[42] He composed his own prayer before bed asking God to keep animals "from evil."[43] Later Schweitzer called for a "reverence for life" in which the "strangeness between us and other creatures is . . . removed."[44] AWI instituted an award called the Albert Schweitzer Medal for people who have championed animal welfare.

29.     HSUS, AWI, and Defenders of Wildlife participated in the 1970 Congressional hearings that ultimately convinced Congress to expand the AWA to include zoos. The Subcommittee on Livestock and Grains held hearings on expanding the AZA on June 8 and 9, 1970. Animal welfare groups testified and submitted documents urging the passage of the act so that it could, in part, end animal cruelty at zoos. Multiple witnesses testified about the abuses that they witnessed, including abuses at roadside zoos, or what they sometimes called commercial zoos because most large zoos were run and funded by cities at that time. For example, Dorothy Dyce, an employee of AWI, testified that she visited Noells' Ark and Chimp Farm in Tarpon Springs, Florida, where she "saw a female Orangutan in a cage so small she could not move" or "stand or lie down in the filthy cage in which she was imprisoned." During a later visit to the same roadside zoo, she saw an adult chimpanzee "rocking back and forth in her bare cage, her eyes dazed and seemingly sightless."[45]

---

[42] ANN COTTRELL FREE, ANIMALS, NATURE AND ALBERT SCHWEITZER 2 (The Flying Fox Press, 2000).

[43] *Id.*

[44] ALBERT SCHWEITZER, REVERENCE FOR LIFE 115 (Harper & Row, 1969).

[45] *Care of Animals Used for Research, Experimentation, or Held for Sale as Pets: Hearings on H.R. 13957 Before the House of Representatives Subcomm. on Livestock and Grains of the Comm. of Agric.*, 91st Cong., 2nd Sess. 77 (1970) (statement of Dorothy Dyce, Laboratory Animal Consultant for the Animal Welfare Institute).

7890239 1

Defenders of Wildlife submitted a letter urging Congress to enact the legislation because one of their field members traveled to more than "100 establishments exploiting animals for exhibition purposes including roadside zoos, city zoos, pet shops, wild animal dealer shops, traveling circuses, and parks." During that work, the representative saw "the overcrowding, the neglect and the unbelievably bad conditions the animals were forced to endure."[46]

30.      The proposed law would include greater regulation of all caged animals including those used in research. In his testimony in favor of the legislation, Cleveland Amory, president of the Fund for Animals in New York City, argued for the act on moral grounds. He condemned both the "flimsy moral ground" of experiments like the one in which dolphins had electrodes placed in their brains.[47] The dolphins would "weep and cry piteously" even as they tried to comply with the researcher's demands. Eventually, however, they all committed suicide rather than continue with the experiment.[48] It was also immoral, Armory argued, that taxpayers funded these experiments.[49] Similarly, members of the Captive Animals' Protection Society submitted a letter to the hearing in which they argued that the "commercial expediency" of circuses should not be allowed to "overrule humanitarian aims" and "[e]ven public demand" should not be an argument "against moral principles"[50] At the time, circuses and zoos had a great deal in common because zoos frequently had trained animal act shows, and circuses often set up menageries of animals that patrons could visit before or after the circus performance. They highlighted how circuses attempted to hide their abuse of animals by training the animals out of sight, and suggested that the public had a right to know about this and prevent it through legislation. Similarly, small businesses that exhibited caged animals to lure in customers were also targets of this legislation.

31.      Small stores sometimes exhibited monkeys in store windows to entice customers. The executive director of the Norfolk, Virginia Society for the Prevention of Cruelty to Animals

---

[46] *Id.* at 92 (statement of Cecile B. O'Marr, Field Representative, Defenders of Wildlife).

[47] *Id.* at 22 (statement of Cleveland Amory, President, The Fund for Animals).

[48] *Id*.

[49] *Id*.

[50] *Id.* at 40 (letter from Virginia McKenna and Bill Travers, Captive Animals' Protection Society).

7890239 1

described a capuchin monkey in a space so small he could only sit. The Norfolk SPCA rescued the monkey, but it took months of therapy to get him to walk.[51] They inspected an amusement park that also exhibited exotic animals including monkeys. In that exhibit the "the emaciated animals actually ate the flesh off each other's tails and the front feet of one."[52] The Norfolk SPCA representative testified that, although they liberally distributed educational information about animal cruelty, it was not enough to stop determined people from harming animals, so they supported the passage of the law to include captive exhibition animals.

32.     The new legislation (PL-91-579), signed into law by President Johnson in 1972, placed the implementation of the AWA for zoos in the Department of Agriculture under the Animal and Plant Health Inspection Service. The national AWA was extended in 1972 and 1985 to include and regulate zoos, and supplement state anti-cruelty statutes. The AWA included zoos so that the Department of Agriculture could enforce animal welfare by promulgating national regulations requiring minimum enclosure size, appropriate veterinary care, and proper nutrition and water for the animals. Specifically, the 1985 amendments to the AWA directed the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."[53] They further provided that such standards "shall include minimum requirements," including "for a physical environment adequate to promote the psychological well-being of primates."[54]

---

[51] *Id*. at 79 (statement of Mrs. Mary Frances Morrisette, President, Virginia Federation of Humane Societies, and Executive Director of the Norfolk Society for the Prevention of Cruelty to Animals).

[52] *Id*.

[53] Animal Welfare Act, Pub. L. No. 99-198 § 1752, 99 Stat. 1354, 1645 (1985) (codified at 7 U.S.C. § 2143(a)).

[54] *Id*.

7890239 1

## VII.   Conclusion

33.     In my opinion, based on my review of the scholarship in this field, contemporaneous writings, case law, statutes, and legislative history, there is a strong intersection between public morality and laws against animal cruelty. It is clear that leaders and members of animal welfare organizations advocated for state anti-cruelty statutes, and later federal animal welfare law, in part because of their desire to promote goodness and human morality that they felt was diminished when animals were abused.

Pursuant to 28 U.S.C. § 1746, I, Jesse Donahue, Ph.D. declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 9th day of September 2021.

Jesse Donahue, Ph.D.

17

7890239.1

**Appendix I**

# Curriculum Vitae

**JESSE COLLEEN DONAHUE**

Address:    Office: GN 213
                Department of Political Science
                Saginaw Valley State University
                University Center, MI  48710
                Email: jdonahue@svsu.edu

## EDUCATION:

Boston College, Ph.D.  1996
University of California, Santa Cruz, B.A. 1989

## TEACHING EXPERIENCE:

**PROFESSOR:**

Saginaw Valley State University, University Center, Michigan, present.

**COURSES TAUGHT AT SVSU:**

**Undergraduate Courses**

PS 118 – Introduction to Political Science
PS 123 - The American Political System
PS 225   - Statistics
PS 260 - Public Organization and Administration
PS 262 - State and Local Government
PS 319 - Gender and Politics
PS 331 – American Presidency
PS 342 – Terrorism
PS 345 - Public Policymaking in the United States
PS 346 – Animals, Habitats, and Politics
H392 – Political Movements of the 1960s

PS485 – Senior Seminar

**Graduate Courses**

OLA 525 - Research Methods
OLA 560 - Gender, Race, and the Organization

**PUBLISHED SCHOLARSHIP:**

**PUBLISHED PEER REVIEWED BOOKS:**

*Snakes and American Culture: A Hisstory*, co-authored with Connor Shaw-Draves, MacFarland Press, 2019.

*Increasingly Legal Rights for Zoo Animals: Justice on the Ark.* (Edited Volume.) Rowman and Littlefield, 2017.

*American Zoos During the Depression*: *A New Deal for Animals*, co-authored with Erik Trump, Jefferson, North Carolina: MacFarland Press, 2010.

*Political Animals: Public Art in American Zoos and Aquariums* co-authored with Erik Trump, Lanham, Maryland: Lexington Books 2007.

*The Politics of Zoos: Exotic Animals and Their Protectors* co-authored with Erik Trump Ithaca, Cornell University Press, 2006.

**PUBLISHED PEER REVIEWED CHAPTERS OF BOOKS:**

"Surplus Animals are Being Dealt With," in Christine Van Tuyl, Ed. *Zoos and Animal Welfare* (Greenhaven Press: Detroit, 2008).

"The American Animal." Co-authored with Erik Trump in Lee Trepanier ed., *Democracy, Pluralism & Utah* (Southern Utah University Press, 2007).

"Gender and Citizen Participation: Is There A Different Voice?" co-authored with Kay Schlozman, Sidney Verba, and Nancy Burns. In *Political Science: Foundations for a Fifth Millennium*. 1997. Edited by Gregory M. Scott. New Jersey: Prentice Hall.

**PUBLISHED PEER REVIEWED ARTICLES:**

"The Non Representation of Gender: School Committee Members and Gender Equity." 1999.  *Women & Politics*, Vol. 20 (3): 65 - 81

"It Doesn't Matter: Some Cautionary Findings About Sex and Representation From School Committee Conversations." 1997. *Policy Studies Journal*, vol 25, (4): 630 - 647.

"Gender and Citizen Participation: Is There A Different Voice?" co-authored with Kay Schlozman, Sidney Verba, and Nancy Burns.  *American Journal of Political Science*. 1995.  Vol. 39: 267-293.

"Movement Scholarship and Feminism in the 1980s." 1996.  *Women & Politics* 16: 61-80.


**PUBLISHED BOOK REVIEWS:**

Daniel E. Bender. *The Animal Game: Searching for Wilderness at the American Zoo*. Cambridge, Mass.: Harvard University Press, 2016. *American Historical Review*, December 2017.

Conserving Endangered Species by Inviting Everyone to the Table," Review of Irus Braverman's *Wild Life: The Institution of Nature* (Palo Alto: Stanford University Press, 2015), *Society and Animals*, 2016, Vol. 1-2.

Review of *The Nature of the Beasts: Empire and Exhibition at the Tokyo Imperial Zoo*. in the *American Historical Review*, 2014*.

"Review of *The Year of the Woman: Myths and Realities*." 1996.  *Women & Politics* 16 (4): 115 - 117.

"Review of *Decoding Abortion Rhetoric: Communicating Social Change; Pro-Choice and Anti-Abortion: Constitutional Theory and Public Policy; Abortion Politics in the United States and Canada: Studies in Public Opinion; Abortion Politics in American State*s;" 1997. *Women & Politics* 17 (4): 93 - 100.

**DISSERTATION:**

Dissertation Title: *Women and Men of the Board:  Gender and Educational Politics*. Advisers, Kay Lehman Schlozman, Boston College; Sidney Verba, Harvard University; Nancy Burns, University of Michigan; and Duane Oldfield, Boston College.

**PEER REVIEWED CONFERENCE PAPER PRESENTATIONS:**

Northeast Political Science Association Conference, "David Brooks: Conservative Interpreter for a Liberal Audience," Mystic Lake Connecticut, April 2020 (Conference rescheduled to April 2021.)

McMaster University Zoo Workshop, "Back to the Future: The New Politics of Elite Access to Exotic Captive Animals," Hamilton, Canada, December 2-3 2017.

Midwest Political Science Association Conference, "Returning them to the Sea: The Politics of Marine Mammal Reintroductions," Chicago, April 7, 2016.

Popular Culture Association Conference, "Enhancing Legal Rights for Zoo Animals," New Orleans, April 1 2015.

Popular Culture Association Conference, "Close Encounters of the Reptile Kind," Washington D.C. April 2013.

Popular Culture Association and American Culture Association Conference, "Danger! Circus Snakes Escape, Bite and Terrify Audiences," St. Louis, MO, March 31 – April 3, 2010.

Popular Culture Association and American Culture Association Conference, "From the Circus to the Zoo: Gus Knudson, Animal Welfare, and the New Deal," New Orleans, LA, April 8 – 11, 2009.

Highlights of Research and Creativity Lecture Series, Saginaw Valley State University, MI, "Tigers, Elephants, Dolphins and Rattlesnakes, Oh My! The Politics of Zoos in the United States" January 27, 2009.

American Association of the History of Medicine Conference, "Snakebite: Bringing Antivenin to the United States and Brazil at the Turn of the 19th Century," Rochester, NY, April 12, 2008.

AZA Annual Conference. "The Politics of Zoos." Tampa, Fl. September 24, 2006.

Midwest Political Science Association Meeting, Chicago, IL "Separation of Church and Zoo: The Politics of Religion and American Zoos." April 2006.

Midwest Political Science Association Meeting, Chicago, Il, "Laws of the Jungle and Sea: Zoos, Aquariums and American Courts," April 2005.

Midwest Political Science Association Meeting, Chicago, Il "The Politics of Public Art in Zoos," April, 2004.

Midwest Political Science Association Meeting, Chicago, IL "Cheetohs Cheetahs and Other Corporate Animals" April 17, 2002.

Southwestern Social Science Academy, Fort Worth, Texas.  "Children, Children, Children: Reconsidering the Focus on Women's" Policy Concerns in State Legislatures. March 15, 2001.

Saginaw Valley State University, University Center, MI, "Miles From Nowhere: Lobbying for Women at the State and Local Level."  Michigan Academy.  March 10 -11, 2000.

Saginaw Valley State University, University Center, MI "Who Really Shows Up?: Lobbying for Women at the State Level.  Michigan Academy.  March 10 - 11, 2000.

Saginaw Valley State University, University Center, MI, " Children's Trust Fund Needs Assessment Study." December 4, 1998.

Midwest Political Science Association Meeting, Chicago Illinois, "Gender and Special Education." April 13, 1998.

Marquette University, Milwaukee, WI, "Committee Talk." Women and Citizenship in the Twenty-first Century," March 13 -15, 1996.

Boston College, Chestnut Hill, Massachusetts, "The Non-Representation of Gender: School Committee Members and Gender Equity." The National Association of Women in Catholic Higher Education, July 13, 1996.

Midwest Political Science Association Meeting, Chicago, Illinois, "Gender and Citizen Participation: Is There a Different Voice?" April 15, 1994.

Department of Government, Harvard University, Cambridge, Massachusetts, "Gender and Citizen Participation: Is There a Different Voice?" November, 1993.


**INVITED LECTURES:**

Invited Speaker and Panelist by Midland Center for the Arts on Political Activism in Detroit, November 2, 2019.

The Kitty Through the Door: Increasing Legal Rights for Zoo Animals, AZA Conference, Seattle, WA, September 25, 2018.

La historia política de los zoológicos estadounidenses , UADE, Buenos Aires, May 8 and 9, 2018.

Trump and Gender, Consejo Argentino para las Relaciones Internationales, Buenos

Aires, May 8, 2018.

Increasing Legal Rights for Zoo Animals: Justice on the Ark, Unitarian Universalist Church, Midland MI, March 12, 2017.

Zoos and Aquariums Moving Forward as Welfare Centers. Ethnical Challenges and Global Commitment, Royal Oak, MI, Detroit Zoo, May 4-6, 2017.

Highlights of Research and Creativity Lecture Series, Saginaw Valley State University, MI, "Whiskey for Everyone: Curing Snakebites in the United States, March 27, 2012

Future of Zoos Symposium, Buffalo, New York. February 10-11, 2012.

Detroit Zoological Society, Detroit, "From Good Care to Great Welfare: Advancing Zoo Animal Welfare Science and Policy." Presentation. August 6-7, 2011.

CRC Research Presentation, Zoo Politics, Midland, February 8, 2011.

Political Science Department Research Presentation, Saginaw Valley State University, April 12, 2011.


**CURRICULAR DEVELOPMENT ACTIVITIES:**

**Program Development**

Part of a team that created the Gender Studies Minor at SVSU. 1997 - 1998.
Completely Revised the Political Science Major. Winter 2000.


**New Course Development:**

PS - 225, Statistics
PS - 319, Gender and Politics
PS – 331, American Presidency and Congress
PS 346 – Animals, Habitats, and Politics
H – 392 Political Movements of the 1960s
PS 485 – Terrorism.
OLA - 525, Research Methods
OLA - 560, Gender, Race, and the Organization


**PROFESSIONAL ACTIVITIES:**

Member of the Ray and Pat Brown Awards Committee, Popular Culture Association, 2011- 2015.

Organized and Hosted State-wide Ready-to-Run Conference, April 2015.

Webinar on Animals in Student Housing, 2015.

Manuscript Reviewer for journal <u>Gender & Politics</u>, 2006 – 2009.

Manuscript Reviewer for journal <u>Women & Politics</u>, 1994 - 2004.

Manuscript Review for <u>The Private Roots of Public Action: Gender, Equality and Public Action</u>.  Cambridge: Harvard University Press. 2001.

Member of the Women and Politics Division of the American Political Science Association. 1996 - present.

Member of the American Political Science Association. 1996 - present.

Chair for panel titled "Women and Health Care: Do We Count?" Michigan Women's Studies Association Meeting, April 1998.

Discussant for panel titled "Gender and Public Opinion."  Midwest Political Science Association Annual Meeting, April 1997.


**<u>HONORS:</u>**

Excellence in On-line Teaching Award, Saginaw Valley State University, 2020

Earl Warrick, Excellence in Scholarship Award, Saginaw Valley State University 2011.

Faculty Association Scholarship Award, Saginaw Valley State University, 2010.

Political Science Department Research Award, Saginaw Valley State University, 2010.

Honors Program Leadership Award, Saginaw Valley State University, 2009.

Women's History Month Award.  Saginaw Valley State University.  March 2002.

Research assistant for paper titled "Gender and the Pathways to Participation," awarded the Sophinisba Beckinridge Award for best paper on women at the Midwest Political Science Association Conference in April 1994.

Boston College, Chestnut Hill, Massachusetts, Graduate School of Arts and Sciences Distinguished Teaching Award, May 4, 1992.

University of California, Santa Cruz, California, Honors in Politics, June 1989.

University of California, Santa Cruz, California, College Honors, June 1989.

**GRANTS, FELLOWSHIPS AND SCHOLARSHIPS:**

Ruth and Ted Braun Fellowship, August 2006.

State of Michigan.  June 2001.  Grant from the Children's Trust Fund. Needs Assessment Study for Bay County.

Chippewa Nature Center. February 2001.  Grant for A Survey for their Educational Programs Division. Passed Grant on to MPLA Graduate Student Jukie Ng.

State of Michigan.  August 1998.  Grant from the Children's Trust Fund for a Needs Assessment Study for the Prevention of Child Abuse.

Saginaw Valley State University, University Center, Michigan, Unit Committee Grant and Release Time, 1997.

Boston College, Chestnut Hill, Massachusetts, College Dissertation Fellowship, 1995-1996.

Boston College, Chestnut Hill, Massachusetts, Department Tuition Scholarships, 1995 - 1996, 1994 - 1995, 1993 - 1994, 1992 - 1993, 1991 - 1992, .

Boston College, Chestnut Hill, Massachusetts, Tip O'Neill Fellowship, 1990 - 1991.

Advisor Dissertation Grant, 1995.  This grant came from the Kellogg Foundation and the Ford Foundation grants to the Citizen Participation Project.

**UNIVERSITY SERVICE:**

University-Wide and College Committees

ABS Academic Initiatives Committee, 2019 – present.

ABS Retention Committee, 2019 - present

Grade Grievance Committee, 2013- present

Faculty Ambassadors Committee, 2015- 2018

ABS Strategic Planning Committee, 2015

ABS Dean's Search Committee, 2015

ABS IRB Review Committee, 2015

Honors Program, Chair 2005-2009

Academic Integrity Task Force – Co-Chair, 2005.

Pioneer Renovation Task Force, 2005.

Member of the Faculty Association Executive Board, 2001- Winter 2006

Best Practices Task Force, Faculty Association, March 2002.

Chair of the Honors Committee, September 2003 – December 2003.

Member of the Gender Studies Committee - September 1998 – 2008.

Member of Public Safety Committee.  September 2003 –2005.

CRAP Committee member, 2004 – 2005

Presenter at the Faculty Association PPC File Workshop, Fall 2005.

Presenter at the Faculty Association Evaluation Process Workshop, Fall 2002 – 2005

Member of Faculty Association Grade Grievance Study Group, 2004.

Faculty Childcare Needs Assessment Study Coordinator 2003.

Presenter at Faculty Association Chairing Departments Workshop.  October 2002.

Chair of the Gender Studies Committee, September 1999 - September 2000.

Temporary Chair of Honors Committee - January 1999 - July 1999.

Member of the Honors Committee - August 1997 - 2005.

Member of the Internal Review Board - January 1999 - 2001

General Education Task Force, September - December, 1996.

**Evaluation Teams and Search Committees**

Sherry Kaufman Evaluation Team Fall 2019

Pam Edwards-Ham Evaluation Team Chair, Fall 2015

Dustin Spencer, Fall 2015

Robert Durst Evaluation Team, Fall 2015

Emily Beard Evaluation Team, Fall 2014

Political Science Department Search Committee Chair, Fall 2014 – Winter 2015

Political Science Department Search Committee, Winter 2014

Renee MacMillon's Evaluation Team, Fall 2013

Sheruni Ratnabalasuriar,  Evaluation Team, Fall 2013

James Bowers Evaluation Team, Fall 2012

Colleen D'Arcy's Evaluation Team, Fall 2010

Chair of Dan Gates's Evaluation Team, Fall 2009

Member of Jo Jaksa's Evaluation Team, Fall 2009

Chair of Stewart French's Evaluation Team, Fall 2008

Member of Holly Child's Evaluation Team, Fall 2008

Chair of Michelle Silva's Evaluation Team, Fall 2007

Member of Margaret Borkowski's Evaluation Team, Fall 2006

Chair of Lee Trepanier's Evaluation Team, Fall 2005

Member of Ruth Sawyers Evaluation Team, Fall 2005

Member of Evelyn Ravuri's Evaluation Team, Fall 2005.

Member of Marie Cassar's Evaluation Team, Fall 2004

Chair of Elson Boles' Evaluation Team.  Fall 2002

Member of Alex Nalbach's Evaluation Team. Fall 2002

Melissa Seitz' Evaluation Committee, Fall 2001

Chair of Mark Nicol's Evaluation Team.  Fall 2001

Member of Doug McGee's Evaluation Team. Fall 2001

Chair of Mark Gordon's Evaluation Committee, Fall 2000

Debra Comb's Evaluation Committee, Fall 2000

Pam Ross's Evalutation Committee, Fall 1999.

Cliff Dorne's evaluation Team, October 1998 - December 1998.

History Search Committee, January - March 1997.


**SPECIAL SERVICE TO THE UNIVERSITY**

Organizer and Presenter of the Voting Process in the 2020 Elections, Saginaw Valley State University October 4, 2020

Organizer and Presenter of the Virtual Presentation on Retrospective on the First Four Years of the Trump Presidency, October 11, 2020

Served as an organizer for Governor Whitmer's Tri City Region on the Status of Women in Michigan, March 2020.
Presenter at the Elections in Perspective Roundtable, October 19, 2016.

Guest Lecture in Moot Court, October 6, 2014.

SPSS Faculty Training Session, February 2014

Patient Affordable Care Act panel member, November 2013.

Discrimination in Academia panel member, November 2012

Earl Warrick Lecture, April, 2012

SVSU Law Journal Adviser, 2010- Present.

Lecture for the Dow Fall Focus Series, 2010.

Presenter at the Faculty Association's Classroom Management Workshop, October, 2009.

Brought Dr. Kay Scholzman (Boston College) to SVSU, January 24, 2005.

Edwards Lecture Discussant for "An Agenda for Gender Reconciliation," Sept. 16, 2004.

Speaker on 1960s Round Table. Saginaw Valley State University.  November 2003.

Speaker on Gender and Leadership Issues.  Saginaw Valley State University, July    2003

Speaker on Middle East Round Table.  Saginaw Valley State University.  November, 2002.

Speaker on Amnesty International Round Table. Saginaw Valley State University. March 2002

Member of the Creating the Future Campaign, 2002.

Conducted Statistical Analysis of Writing Center Data for the Writing  Center.

Organized Faculty Workshop on Publishing - November 14, 1997.


**POLITICAL SCIENCE DEPARTMENTAL SERVICE:**

Internship Director 2019- present

Representative for department for ABS college initiatives

Representative for department for ABS college retention committee

Assessment Director for PS 225, 2010 –present

Created Student Exchange Program with UADE Political Science Department, Buenos Aires, May 2018.

Department Chair, May 2013 – to May 2018.

Wrote the External Review Report 2015

Chair of PS External Review Committee, 2015

*Law Review* Advisor, 2011- present

Organizer of the Department Scholarship 2008- present

Member of Departmental Search Committee, 2013

Political Science Department Scholarships Coordinator, 2013- present

Political Science Awards Committee, 2013 - present

Political Science Research Award Committee, 2010

Political Science Department Teaching Award Committee, 2009

Political Science Department Student Enrichment Award Committee, 2009.

Member of Political Science Search Committee, 2006.

Chair of the department 2000 – December 2004.

Member of Political Science Search Committee, Fall 2004.

Chair of Political Science Department Search, Winter 2001

Created Departmental Website September to December 2000.

Chair of Political Science Department Search, Fall 2000

Arranging and Supervising Political Science

      Internships, September 1996 to June 2000.

Talk on the Politics of Impeachment, October 22, 1998.

Political Science Search Committee, Fall 1998.

Organizer for the Political Science Department's Graduate School and Career

      Meeting.

Political Science Department Search Committee, Fall 1997.

Hosting U.S. Senator Carl Levin, 1997.

## **ORGANIZATIONAL LEADERSHIP AND ADMINISTRATION SERVICE:**

Capstone Thesis Advisor, 1998 - 2000.

Organizer of the annual OLA student orientation meeting 1998 & 1999.

Talk on conducting Needs Assessment studies, November 9, 1998.

**GENDER STUDIES COMMITTEE SERVICE:**

Coordinator of the Gender Studies Program 2018- Present.

Member of Gender Studies Committee, 1999 – 2008.

Chair of the Gender Studies Committee, 1999 - 2000.

**COMMUNITY SERVICE FOR THE UNIVERSITY**

Interview with Channel 12, September 4, 2020 – Voting in the upcoming presidential election

Interview with ABC News, Channel 5, September 29, 2020 – Presidential Debates

Midland County Humane Society Board Member, December 2019 – present.

Interview with ABC News 12 about state and national abortion politics, May 14, 2019.

Interviews (4) with NBC 25 about the results of the 2018 Midterm Elections, November 7, 2018.

Interview with TV 5 about the gender gap among voters in the 2018 Midterm Elections, November 7, 2018.

Interview with Al Jazeera English on 2018 Midterm Elections, October 15, 2018.

Interview with the *Atlantic Monthly* on universities and the presidential election, February 28, 2017.

Presenter at the Civic Engagement Institute, June 2016 – April 2017.

Presenter at the Civic Engagement Institute, June 2014- June 2015

Interview with Steve Carmody, from Michigan Public Radio about Michigan voters and the presidential election, June 13, 2016.

Research Project with SVSU Students for the Animals & Society Institute, Ann Arbor & Washington D.C., 2015-2016.

Research Project with SVSU Students for the National Zoo, Washington D.C., 2013

Interview with Barrie Barber, Saginaw News, Campaign Ads, July 21, 2006 Interview with Barrie Barber, *Saginaw News* on President Bush, Jan. 20, 2005.

Interview for Channel 12 on Voter Turnout, September 28, 2004.

Interview about election recall issues.  *Saginaw News*.  July 20, 2003.

Interviewed William Hudnut III for the SVSU Journal *Cardinals*.  Summer 2003,1: 10-18.

Interview about gender and governor's office.  Channel 5. June 2003

Interview about gender and workplace issues. *Saginaw News*.  June 2002.

Member of Panel about Patriot Act with Guest Stephen Zunes, Nov. 21, 2002.

Guest Speaker for the Advocacy Bootcamp for College Women sponsored by Davenport University, Delta College, Northwood University, SVSU, and YWCA of Bay County. March 2002.

Supervised a survey for the Chippewa Nature Center conducted by MPLA graduate
student Jukie Ng. 2001.

Guest Speaker for the Advocacy Bootcamp for College Women sponsored by Davenport University, Delta College, Northwood University, SVSU, and  YWCA of Bay  County. March 23, 2001.

Speaking engagement at the Bay City Women's Business and Professional

Organization March 24, 1999.

Radio Interview with Cameron Knowles WSGW about the Politics of

Impeachment, August 1998..

Television Interview with TV 5 News about President Clinton's bombing of

terrorist bases in the Sudan and Afganistan, August 1998.

Television Interview with TV 5 News correspondent Peter Newton about

Candidates and web sites, July 1998.

Interview with the Frank Lee of the <u>Bay City Times</u> for an article on Candidates and

web sites, July 1998.

Speaking engagement on the anniversary of Roe V. Wade, January 1998.

Cleaning up Fornier Park in Midland, April 1997 - present.

Speaking engagement at the Social Security Administration. Talk entitled "Women

and World Politics," April 1998.

## Appendix II

### References

BEASTLY MORALITY: ANIMALS AS ETHICAL AGENTS (Jonathan K. Krane, Ed., 2016).

DIANE L. BEERS, FOR THE PREVENTION OF CRUELTY: THE HISTORY AND LEGACY OF ANIMAL RIGHTS IN THE UNITED STATES (Swallow Press, 2006).

Henry Bergh, *Letter from Mr. Henry Bergh*, NEW YORK TIMES, Mar. 8, 1874.

JESSE DONAHUE & ERIK TRUMP, THE POLITICS OF ZOOS: EXOTIC ANIMALS AND THEIR PROTECTORS Cornell Univ. Press, 2006).

David Favre & Vivian Tsang, *The Development of Anti-Cruelty Laws During the 1800s*, 1 DET. C. L. REV. 1 (1993).

Catherine A. Faver & Elizabeth B. Strand, *Domestic Violence and Animal Cruelty: Untangling the Web of Abuse*, 39 J. OF SOC. WORK EDUC. 237 (2003).

ANN COTTRELL FREE, ANIMALS, NATURE AND ALBERT SCHWEITZER (The Flying Fox Press, 2000).

ERNEST FREEBERG. A TRAITOR TO HIS SPECIES: HENRY BERGH AND BIRTH OF THE ANIMAL RIGHTS MOVEMENT (Basic Books, 2020).

Peter Hennigan, *Property War: Prostitution, Red Light Districts, and the Transformation of Public Nuisance Laws in the Progressive Era*, 16 YALE J. L. & HUMANITIES 123 (2004).

*Henry Bergh and the Brooklyn Board of Health,* NEW YORK TIMES, Apr. 27, 1871.

*Henry Bergh on Vivisection*, NEW YORK TIMES, Feb. 2, 1882.

LISA KEMMERER, ANIMALS AND WORLD RELIGIONS (Oxford Univ. Press, 2012).

JOSEPH WOOD KRUTCH, THE GREAT CHAIN OF LIFE (Houghton Mifflin, 1959).

MARION S. LANE & STEPHEN L. ZAWISTOWSKI, THE HERITAGE OF CARE: THE AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS (Preager, 2008).

ANDREW LINZEY, ANIMAL GOSPEL: A CHRISTIAN FAITH AS THOUGH ANIMALS MATTERED (Hoddard and Stoughton, 1998).

Ian MacLachlan, *A bloody offal nuisance: the persistence of private slaughter-house in nineteenth-century London*, 34 URBAN HISTORY 227 (2007).

7890239 1

LEWIS G. REGENSTEIN, REPLENISH THE EARTH: A HISTORY OF ORGANIZED RELIGION'S TREATMENT OF ANIMALS AND NATURE – INCLUDING THE BIBLE'S MESSAGE OF CONSERVATION AND KINDNESS TOWARD ANIMALS (Crossroad Press, 1991).

MATTHIEU RICARD, A PLEA FOR THE ANIMALS: THE MORAL, PHILOSOPHICAL, AND EVOLUTIONARY IMPERATIVE TO TREAT ALL BEINGS WITH COMPASSION (Shambhala Press, 2016).

FRANCES H. ROWLEY, THE HUMANE IDEA (American Humane Society, 1912).

THOMAS PAINE, AGE OF REASON (1795).

ERIC A. SHELMAN & STEPHEN LAZORITZ, M.D., THE MARY ELLEN WILSON CHILD ABUSE CASE AND THE BEGINNING OF CHILDREN'S RIGHTS IN 19TH CENTURY AMERICA (McFarland & Company, 2005).

PETER SINGER, ANIMAL LIBERATION (Harper Collins, 2002).

ALBERT SCHWEITZER, REVERENCE FOR LIFE (Harper & Row, 1969).

BERNARD UNTI, PROTECTING ALL ANIMALS: A FIFTY-YEAR HISTORY OF THE HUMANE SOCIETY OF THE UNITED STATES (The Humane Society Press, 2004).

BRUCE A. WAGMAN, ET AL., ANIMAL LAW: CASES AND MATERIALS (4th ed. 2010).

PAUL WALDAU, THE SPECTER OF SPECIESISM: BUDDHIST AND CHRISTIAN VIEWS OF ANIMALS (Oxford Univ. Press, 2002).

K. Michelle Welsh. *Animal Cruelty Cases*, 26 ANIMAL LAW, Jul.-Aug. 2009, at 64.

W.G.H., *Encouragement for Henry Bergh*, NEW YORK TIMES, Feb. 21, 1875.

Rebecca F. Wisch, *Brief Summary of State Cruelty Laws,* MICHIGAN STATE UNIV. ANIMAL LEGAL AND HISTORICAL CENTER (Updated 2010), https://www.animallaw.info/intro/state-anti-cruelty-laws.

**Government Documents**

*Federal Assistance for Zoos and Aquariums: Hearings on S. 2042 and S. 2774 Before the Senate Subcommittee on the Smithsonian Institution of the Committee on Rules and Administration*, 93rd Cong. (1974).

*Care of Animals Used for Research, Experimentation, or Held for Sale as Pets: Hearings on H.R. 13957 Before the House of Representatives Subcommittee on Livestock and Grains of the Committee of Agriculture*, 91st Cong., 2nd Sess. (1970).

ii

**State Statutes**

Minn. Stat. ch. 96 § 18 (1858).

Conn. Gen. Stat. Ann. § 53-247(a).

N.H. Rev. Stat. ch. 219 § 12 (1843).

Md. Code Ann., Crim. Law § 3-222, §§ 10-601-623.

Me. Laws ch. IV § 7 (1821)

Mich. Rev. Stat. ch. 8 § 22 (1838)

N.Y. Rev. Stat. tit. 6 § 26 (1829).

Pa. Laws tit. IV § 46 (1860).

**Court Cases**

*Republica v.Teischer* 1 Dall. U.S. 335 (Penn 1788).

*Stephens v. State* 3 so 458-59 (Miss. 1887).

iii