AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

**PeTA**
FOUNDATION

**EXHIBIT F**

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

**Washington**
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

**Los Angeles**
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

**Norfolk**
501 Front St.
Norfolk, VA 23510
757-622-PETA

October 14, 2021

Tina Jarvis
Permits Coordinator
Maryland Department of Natural Resources
Wildlife and Heritage Service

Via e-mail: tina.jarvis@maryland.gov

Re:     Request to Investigate Tri-State Zoological Park of Western Maryland,
        Inc. for Apparent Violations of its Scientific Collecting Permit (No.
        56207)

Dear Ms. Jarvis:

I am writing on behalf of PETA to request that the Maryland Department of
Natural Resources (MDDNR) investigate Tri-State Zoological Park of Western
Maryland, Inc. (Tri-State) and its owner and operator, Robert (aka Bob) Candy,
for releasing a non-releasable opossum in apparent violation of the terms and
conditions set forth in Tri-State's MDDNR scientific collecting permit (No.
56207).

MDDNR regulations require a person to obtain a permit from the Wildlife and
Heritage Service before possessing any live wildlife for release into the wild.
Md. Code Regs. 08.03.09.04(A). The term "wildlife" is defined broadly to
include "every living creature, not human, wild by nature, endowed with
sensation and power or voluntary motion." Md. Code Ann., Nat. Res. § 10-
101(dd)(1). Once issued, a permit may be suspended or revoked if a permittee
violates the terms and conditions of the permit or any state or federal wildlife
laws or regulations. *Id.* § 10-911(a).

Tri-State currently holds a scientific collecting permit that allows it to possess
several "non-releasable animals," including two opossums. Ex. 1, Tri-State
Scientific Collecting Application and Permit. While there is no reference to
"non-releasable animals" in the statute or regulations governing scientific
collecting permits, the regulations addressing wildlife rehabilitation—an
activity for which Tri-State does not hold a permit—defines "non-releasable
wildlife" as "an animal that cannot be released because of permanent injury,
degenerative physical condition as a result of illness, or habituation to humans
that would significantly reduce the chance of the animals surviving in the wild."
Md. Code Regs. 08.03.12.02(B)(5).

Like the statute governing MDDNR permits, the general conditions of Tri-
State's 2021 permit make clear that the agency may revoke a permit for
violations of the permit's terms and conditions. Ex. 1, Tri-State Scientific
Collecting Application and Permit. One of the conditions of Tri-State's permit
requires that all activities authorized in the permit "be carried out in accord with
and for the purposes described in the application submitted." *Id.* On its January

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

PETA012469

2, 2021 renewal application, Tri-State indicated that it was in possession of two opossums, describing them as being "[k]ept as pets (mom killed), not releasable, under vet care[.]"[1] *Id.*

According to records PETA obtained from Tri-State, the facility released an opossum named Sir Vivor on July 15, 2021 "after [one] year [of] rehab care." Ex. 2, Tri-State Animal Records. During a deposition on August 11, 2021, Mr. Candy confirmed that Tri-State released this opossum after purporting to have rehabilitated the opossum despite not holding an MDDNR wildlife rehabilitator permit. Ex. 3, Excerpt from Tri-State and Animal Park, Care, & Rescue, Inc. Deposition, at 91:4−15. A wildlife rehabilitator permit is required before a person may rehabilitate wildlife, and a violation of this requirement is a misdemeanor. Md. Code Regs. 08.03.12.04(A); *Id.* 08.03.12.24. Mr. Candy nevertheless claimed that his MDDNR permit authorized him to release the opossum and that he went to the agency's office in person to "mak[e] sure [he] could release it." Ex. 3 at 91:16−92:1.

The bare description provided in Tri-State's application indicates that the non-releasable opossums were "kept as pets"—significantly reducing their chance of survival in the wild. There are no provisions in Tri-State's permit allowing for their release into the wild. And Tri-State's application does not seek approval to do so, meaning that Tri-State's release of a non-releasable animal is an activity that is not being carried out in accordance with the purposes described in its application. By releasing wildlife that were explicitly listed in its 2021 application and permit as "non-releasable," Tri-State has apparently violated the terms and conditions of its scientific collecting permit, subjecting its permit to suspension or revocation. Mr. Candy also claimed that he rehabilitated an animal without the requisite permit, which may constitute a separate violation of Md. Code Regs. 08.03.12.04.[2]

Accordingly, PETA respectfully requests that the MDDNR investigate Robert Candy and Tri-State for releasing a non-releasable opossum in apparent violation of the conditions in Tri-State's scientific collecting permit after purportedly rehabilitating the animal without the requisite wildlife rehabilitator permit. Please hold all responsible parties fully accountable for any violations you find, including by revoking Tri-State's permit pursuant to Md. Code Ann. § 10-911(a).

Could you please let me know of the outcome of your investigation?

Very truly yours,

Jonathan Morris
Counsel, Captive Animal Law Enforcement
360-994-0336 | JonathanM@petaf.org

---

[1] Tri-State's Records for Sir Vivor apparently provide a differing account, explaining that the opossum was found at Sheetz, a convenience store located in Cumberland, Maryland. Ex. 2, Tri-State Animal Records.

[2] The U.S. Department of Agriculture (USDA) issued Tri-State a citation this year for failing to maintain adequate outdoor facilities for several species of animals, including those species of wildlife listed on Tri-State's scientific collecting permit, apparently providing independent grounds for the suspension or revocation of Tri-State's permit pursuant to Md. Code Ann., Nat. Res. § 10-911(a). Ex. 4, USDA citation of Tri-State (Jan. 8, 2021).

PETA012470



AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

August 2, 2021

Robert M. Gibbens, D.V.M.
Director, Animal Welfare Operations
USDA-APHIS-Animal Care

*Via e-mail*:    robert.m.gibbens@usda.gov

Re:    Request for Investigation of Tri-State Zoological Park of Western Maryland,
Inc. (51-C-0064)

Dear Dr. Gibbens:

On behalf of People for the Ethical Treatment of Animals, Inc. ("PETA") and its more
than 6.5 million members and supporters, I am writing to request that the USDA
investigate Tri-State Zoological Park of Western Maryland, Inc. ("Tri-State"), a
roadside zoo owned and operated by Robert Candy, for failing to employ an attending
veterinarian under formal arrangements and maintain a written program of veterinary
care ("PVC") in violation of 9 C.F.R. § 2.40(a).

According to deposition testimony obtained by PETA in a pending federal lawsuit,
*Collins v. Tri-State Zoological Park of Western Maryland, Inc.*, Case No. 1:20-cv-
01225 (D. Md.), Tri-State has not had an attending veterinarian or an operative program
of veterinary care since approximately the spring of 2020. Tri-State's last attending
veterinarian, Dr. Gale Duncan of Mountainview Veterinary Services, last visited Tri-
State on October 3, 2019, and, sometime thereafter, stopped serving as Tri-State's
attending veterinarian. On June 30, 2021, Dr. Duncan testified that she parted ways
with Tri-State due to "chronic noncompliance" with "veterinar[y] medical
recommendations," including "euthan[asia], referrals, . . . medications, [and] medical
procedures" that were "declined or refused by Mr. Candy." Exh. 1 Deposition Tr. of
Dr. Gale Duncan (June 30, 2021) ("Duncan Tr.") at 11:6–15, 13:5–20; *see also, e.g.*,
*id.* at 39:11–42:16 (testimony regarding the "suffering" mountain lion, Charlie, who
Mr. Candy's refused to euthanize); *id.* 80:3–6 (testifying that Mr. Candy had
"chronically declined intervention and delayed treatment for other animals").

During Dr. Duncan's tenure as Tri-State's attending veterinarian, Tri-State did not have
a comprehensive PVC for all the animals at its facility. According to Dr. Duncan, the
primates, reptiles, birds, coatimundis, kinkajous, porcupine, and opossums at Tri-State
were not included in its PVC because "there were certain species that [Dr. Duncan] had
not agreed to be the attending veterinarian for because [she] did not feel that [she] was
qualified to treat those species[.]" *See, e.g.*, Exh. 1, Duncan Tr. at 20:22–24:3.

Since Dr. Duncan's departure, Tri-State has informally consulted with Dr. Keith Gold
of Chadwell Animal Hospital in Abingdon, Maryland. However, as of July 22, 2021,
Dr. Gold was not employed under formal arrangements and, aside from creating
purported enrichment plans for the singly-housed primates at Tri-State, no program of
veterinary care was established. *See* Exh. 2, Deposition Tr. of Dr. Keith Gold (July 15,
2021) at 39:1–6 ("Q. Are you currently the attending veterinarian for the animals at

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

**Washington**
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

**Los Angeles**
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

**Norfolk**
501 Front St.
Norfolk, VA 23510
757-622-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

1

PETA012424

Tri-State? A. I am helping him out. We have no official paperwork or anything like that, but I am more than willing to help him with his animals right now; yes."); *id.* 51:4–10 ("Q. [D]id you ever create a written program of veterinary care for the animals at Tri-State? A. No. Like I said, we're just in the beginning process."); *id.* 177:13–15 ("I'm not a Tri-State veterinarian. I'm a veterinarian that helps Tri-State.").

During Dr. Gold's tenure as a consulting veterinarian for Tri-State, several species of animals exhibited at the facility—including the wolf, kinkajous, sheep, goats, donkey, miniature horses, geese, turkeys, peacocks, ducks, and chickens—have not been provided any care, routine or otherwise. *See* Exh. 3, Deposition Tr. of Dr. Keith Gold (July 22, 2021) at 18:16–19:2; 108:19–109:3.

As you know, the employment of an attending veterinarian and the establishment of a program of veterinary care to prevent, control, diagnose, and treat diseases and injuries, are critical to ensuring that animals at regulated facilities are provided with adequate veterinary care.

PETA urges you to investigate and ensure that Tri-State employs a qualified veterinarian with sufficient authority to ensure the provision of adequate veterinary care for the animals, and that a PVC is established and followed. Please also ensure that animals at Tri-State are being provided with adequate veterinary care, space, shelter, food, and water and are otherwise handled in accordance with the AWA, and hold Tri-State fully accountable for all violations that you discover during your inspection.

As the USDA is, or should be aware, during the pendency of PETA's Endangered Species Act citizen-suit, which went to trial in November, 2019, *five of the nine* species at issue in that suit died as a consequence of Tri-State's substandard care. United States District Court Judge Paula Xinis, who, after a six-day bench trial issued a permanent injunction barring Tri-State from ever owning or exhibiting any endangered or threatened species ever again, described Tri-State as "fetid and dystopic," finding that "the uncontroverted testimony reflects that every animal at issue suffered under Tri-State's living conditions." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 424 F. Supp. 3d 404, 408 (D. Md. 2019), *aff'd*, 843 F. App'x 493 (4th Cir. 2021), *cert. denied sub nom. Tri-State Zoo of Md, et al. v. PETA*, No. 20-1183, 2021 WL 2637860 (U.S. June 28, 2021). The USDA must act to stop the suffering of the remaining species at Tri-State.

Thank you for your attention to this important matter. Please inform me of the complaint number that your agency assigns to this correspondence.


Very truly yours,

Brittany Peet, Esq.
Deputy General Counsel, Captive Animal Law Enforcement
PETA Foundation
BrittanyP@petaf.org | 202-251-4995


Attachments

PETA012425

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

**PETA**
F O U N D A T I O N

March 31, 2020

Robert M. Gibbens, D.V.M.
Director, Animal Welfare Operations
USDA-APHIS-Animal Care

*Via e-mail*:   robert.m.gibbens@usda.gov

Re:   Request for Nonrenewal and/or Termination of Tri-State Zoological Park
of Western Maryland Inc.'s Animal Welfare Act License

Dear Dr. Gibbens:

On behalf of People for the Ethical Treatment of Animals, Inc. (PETA) and its more
than 6.5 million members and supporters, I am writing to request that the USDA
terminate and/or deny the renewal of Animal Welfare Act (AWA) exhibitor license
number 51-C-0064, issued to Tri-State Zoological Park of Western Maryland, Inc.
("Tri-State"), a roadside zoo owned and operated by Robert Candy.

The USDA cannot lawfully renew Tri-State's license, which is set to expire on
April 30, 2020. As part of the renewal process, Tri-State must certify that its facility
"is in compliance with the regulations and standards" of the AWA. 9 C.F.R.
§ 2.2(b). Regardless of what Tri-State certifies, its operations are grossly and
consistently out of compliance with AWA standards. *See Animal Legal Defense
Fund, Inc. v. Perdue*, 872 F. 3d 602, 619 (D.C. Cir. 2017). As detailed in the
attached appendix, a recent memorandum opinion by the United States District
Court for the District of Maryland, which describes the conditions at Tri-State as
"fetid and dystopic," and evidence presented at the trial which resulted in that
opinion, highlight some of Tri-State's egregious AWA violations, many of which
persist. *See People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological
Park of W. Maryland, Inc.*, (No. 17-02148), 2019 WL 7185560, at 2 (D. Md. Dec.
26, 2019) (hereinafter, "Mem. Op.") [Exh. 1].

When the record before the agency is replete with evidence documenting that an
exhibitor's self-certification of compliance with the AWA is blatantly false, it is
arbitrary and capricious for the USDA to rely on that certification for demonstrating
that the facility complies with AWA standards—a requirement for issuing a license.
7 U.S.C. § 2133; *Perdue*, 872 F.3d at 619. Because the USDA cannot rely on the
exhibitor's self-certification of compliance, and because the evidence shows Tri-
State's operations are "routinely and currently out of compliance with AWA
standards," the USDA cannot lawfully issue a renewal. *Perdue*, 872 F.3d at 620.

In addition, the USDA should terminate Tri-State's license because Tri-State, along
with Mr. Candy, have flagrantly violated federal laws pertaining to the welfare of
animals. *See* 9 C.F.R. § 2.11(a)(6) (prohibiting the issuance of AWA licenses to
anyone who has been found to violate Federal or State laws pertaining to the

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

Washington, D.C.
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Berkeley
2855 Telegraph Ave.
Ste. 301
Berkeley, CA 94705
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.
AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

ownership or welfare of animals); *see also id.* at § 2.12 (authorizing license termination on this basis). Specifically, following a six-day bench trial, a federal judge found that Tri-State violated the Endangered Species Act , 16 U.S.C. §§ 1531-11544, and its implementing regulations by, *inter alia,* denying animals proper veterinary care, failing to meet the animals' basic nutritional needs, and keeping the animals in chronically filthy environments. *See* Exh. 1, Mem. Op.

Indeed—as evidenced by the U.S. District Court's order, which permanently enjoined Tri-State and Mr. Candy from owning or possessing any federally-protected species and terminated their ownership and possessory rights in the lion and tigers at Tri-State, as well as by evidence that surfaced during the pendency of that matter—renewal of Tri-State's license would be contrary to the purposes of the AWA and would be arbitrary, capricious, and an abuse of discretion.

Very truly yours,

Zeynep J. Graves, Litigation Manager
ZeynepG@petaf.org | 323-210-2263

Attachment

cc: aceast@aphis.usda.gov
    Stephen Vaden, General Counsel, USDA (stephen.vaden@ogc.usda.gov)

PETA009455

## APPENDIX

## I.     Background

Tri-State has a long history of violating the Animal Welfare Act ("AWA") and demonstrated inability to provide proper care for its animals—as evidenced, in part, by multiple premature deaths marked by horrific suffering and neglect at its facility, *see* Section II *infra*, and its more than seventy AWA citations issued by the USDA since 2008.[1] Indeed, Tri-State's chronic and willful disregard for animal welfare led to a forty-five day suspension of the facility's AWA license in 2013 and an official warning against the facility in 2015.[2] Recent evidence outlined herein confirms Tri-State's ongoing AWA violations and flagrant disregard for the welfare of animals in its care.

Some of Tri-State's most egregious conduct negatively affecting the welfare of the animals in its care was highlighted in PETA's recent lawsuit against Tri-State, Robert Candy, and Animal Park, Care & Rescue, Inc. (the "Defendants"), in which PETA alleged and proved numerous violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-11544, and its implementing regulations. *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, No. 17-02148 (D. Md. 2019) (the "ESA Action'). The summary judgment and trial orders in the ESA Action, as well as the evidence that surfaced in that case, demonstrate Tri-State's complete disregard for the welfare of the animals in its care—a pattern of neglect that is underscored by the deaths of one lemur (Bandit), three tigers (Cayenne, Kumar, and India), and one lion (Mbube aka "Bu"), who all suffered greatly prior to death. Indeed, since PETA notified Tri-State of its intent to file suit in December 2016, five of the nine animals at issue in the ESA Action "died early and tragic deaths," Exh. 1, Mem. Op. at 10—each of whom was denied adequate veterinary care in addition to other basic necessities required under both the ESA and the AWA.

On December 26, 2019, following a six-day bench trial in the ESA Action, the United States District Court for the District of Maryland found in favor of PETA on all theories of liability presented at trial. *Id.* at 1. The court—which described the conditions of the animals at Tri-State as "fetid and dystopic" and noted that "[f]ilth and feces dominate Tri-State," *id.* at 2—entered a declaration that Defendants violated the ESA and its implementing regulations by unlawfully taking nine federally protected animals and by possessing two tigers and one lion who were unlawfully taken. Order at 1-2, *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, No. 17-02148 (D. Md. Dec. 26, 2019) [Exh. 5]. The court also enjoined Defendants from continuing to violate the ESA, and enjoined Defendants, their officers, agents, and others from owning, acquiring, or possessing any endangered or threatened

---

[1] Compendium of Tri-State's non-compliant USDA Inspection Reports [Exh. 2].

[2] Tri-State Zoological Park of Western Maryland, Inc. et al., AWA Docket No. 11-0222, 72 Agric. Dec. 128 (U.S.D.A. Mar. 22, 2013) (Decision and Order) [Exh. 3]; USDA, Official Warning Violation of Federal Regulations, Tri-State Zoological Park of Western Maryland (51-C-0064), Case No. MD150021 (May 28, 2015) [Exh. 4].

PETA009456

species of animals in the future. *Id.* at 2.[3] The surviving tigers and lion have since been transferred to The Wild Animal Sanctuary (84-C-0019) per the court's order.

As explained below, Tri-State's license should be revoked and renewal of its license would be arbitrary, capricious, and an abuse of discretion, and contrary to the purposes of the AWA.

## II.    The USDA should terminate Tri-State's license due to violations of federal law.

The USDA should terminate Tri-State's license due to its recent flagrant violations of federal laws pertaining to the welfare of animals. Specifically, AWA regulations provide that:

> A license will not be issued to any applicant who: . . . has been found to have violated any Federal, State, or local laws or regulations pertaining to the transportation, ownership, neglect, or welfare of animals, or is otherwise unfit to be licensed and the Administrator determines that the issuance of a license would be contrary to the purposes of the Act.

9 C.F.R. § 2.11(a)(6); *see also id.* at § 2.12 (authorizing license termination on these bases).

On December 26, 2019, the United States District Court for the District of Maryland found, in part, that Tri-State and Mr. Candy violated the ESA by unlawfully "taking" each of the nine federally-protected animals at issue, and continued to violate the ESA by unlawfully taking the surviving big cats, Peka, Cheyenne, and Mowgli. *See* Exh. 1, Mem. Op. at 21. The ESA Action revealed Tri-State's chronic failure to provide animals in its care with necessary veterinary care, safe, sanitary environments, adequate nutrition, and species-appropriate shelter from the elements, social groups, and enrichment. As the court explained, "[t]he uncontroverted testimony reflects that every animal at issue suffered under Tri-State's living conditions," *id.* at 1, and "the evidence overwhelmingly demonstrates that every protected animal has been harassed, harmed, or both in a most grievous fashion at Tri-State," *id.* at 17. The court's specific findings are as follows:

- Tiger (Kumar): The tiger Kumar—who died on July 7, 2019—was downed for ten days, during which "he received no meaningful care." *Id.* at 12. Tri-State did not give the tiger any pain management, despite Kumar's pain and obvious distress. *Id.* Instead of euthanizing Kumar, per the attending veterinarian's recommendation, "[Mr.] Candy chose instead to let Kumar suffer." *Id.* "[T]en days after first being found down and immobile and seven days after being unable to eat food without being syringed into his mouth, Kumar died." *Id.* "[T]he manner of [the tiger Kumar's] death indisputably demonstrates that Defendants harmed him. His necropsy reflects that he suffered for months before his death, from broken, pulp-exposed teeth, ulcerated gums, and a punctured lip. . . . Similarly,

---

[3] Although an appeal is currently pending in the Fourth Circuit, Tri-State has not challenged the District Court's findings that it has violated the ESA. Brief of Defendants-Appellants at 6-7, *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, Case No. 20-1010 (4th Cir. 2020) [Exh. 6]. Moreover, despite the appeal, the United States Court of Appeals for the Fourth Circuit rejected Tri-State's request to prevent the animals' transfer to The Wild Animal Sanctuary pending conclusion of the appeal. Order, *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, Case No. 20-1010 (4th Cir. Jan. 27, 2020) [Exh. 7].

PETA009457

Kumar's paws and hind leg were pocked with ulcers most likely caused by the filthy concrete on which Kumar had dragged his body while Defendants left him to suffer after his spinal stroke. Defendants' complete failure to treat Kumar's mouth and paws, while leaving him to languish in filthy surroundings, caused injury to Kumar and disrupted his normal behaviors such that he was both harmed and harassed in violation of the ESA." *Id.* at 20 (internal record citations omitted). "The lack of veterinary care during the days leading up to [the tiger] Kumar's death also injured Kumar and significantly disrupted his normal behaviors, such that it constitutes both harm and harassment under the ESA." *Id.*

- Tiger (India): The tiger India was also "harassed and harmed directly by Defendants." *Id.* at 20. India died of sepsis on August 14, 2019, and pathology reports indicated that painful "pus-filled pockets had formed in her heart, tongue, and diaphragm." *Id.* at 13. "For *more than a month*, Defendants allowed the virulent infection to ravage India. She barely ate or moved yet was given no care. In fact, Candy expressly refused to secure medical treatment—even when Dr. Duncan [Tri-State's attending veterinarian] told him that failure to do so would lead to her death. And, while opting to ignore treatment, Defendants simultaneously failed to provide her with *anything* to ease her severe pain. . . . Unquestionably Defendants are directly responsible for India's death. Their violation of the ESA is patent." *Id.* at 20 (internal record citations omitted).

- Tigers: "[D]efendants['] provision of squalid living conditions harassed the tigers. The tigers' concrete dens, in which they have been confined for their entire lives, defy generally accepted husbandry practices. The record evidence shows the swimming pool den as a dirty, dilapidated pen. The water in the outdoor enclosures is similarly filthy, static and filled with feces. The water in the indoor enclosures, too, is dirty and sits in uncleaned bowls. Failure to clean routinely the animals' enclosures squarely disregards industry standards" *Id.* at 19 (internal record citations omitted).

- Tigers: "[T]he barren enclosures and lack of enrichment deprive the tigers of their ability to 'engage in their natural behaviors . . .' Further, the 'lack of enrichment leads to boredom and the development of abnormal behaviors such as pacing, excessive grooming, and other potentially self-injurious behaviors.' The enclosures are also deficient in that their lack of insulation and adequate cooling and shade puts the tigers at risk of hypothermia, dehydration, and damage to the cats' pads and mucous membranes, as well as overheating, . . . heat sickness, and stroke. Overall, the tigers' enclosures are so far removed from their natural habits and from accepted husbandry practices that they significantly disrupt a multitude of typical tiger behaviors and put the tigers at a high likelihood of injury. As such, they constitute 'harassment' of all the tigers (dead and alive) and violate the ESA." *Id.* at 19 (internal record citations omitted).

- Tiger (Mowgli): "[The tiger] Mowgli is obese. His muscles are flaccid. He has suffered for years with a skin infection that can easily be diagnosed, but has yet to be, and which is likely easily treated, but has not been. . . . Defendants have injured Mowgli and as such, have harassed and harmed him in violation of the ESA." *Id.* at 20.

PETA009458

- Lions: "[T]ri-State's deplorable conditions have harassed [lions] Peka and Mbube. Each has lived in isolation and were given no 'social interactions [that] are integral to the well-being of lions.' For years, neither Bu or Peka had any chance to engage in a wide range of normal social behaviors, such as grooming, stalking, hunting, and play. Their enclosures are barren. They are exposed to harsh temperatures with little reprieve. . . . The creation and perpetuation of drastic conditions has foster[e]d the likelihood of serious injury to Peka 'by annoying it to such an extent as to significantly disrupt normal behavioral patterns.'" *Id.* at 18 (internal record citations omitted).

- Lion (Peka): "It is undisputed that [the lion] Peka . . . suffers from an abnormal gait yet has never been examined or treated for it. The abnormal gait likely causes Peka discomfort and pain and puts her at risk of further joint problems such as degenerative joint disease. . . . Defendants' failure to diagnose and treat Peka's gait abnormality constitutes harassment under the ESA." *Id.* at 15, 18 (internal record citations omitted).

- Lion (Mbube): "The uncontroverted evidence . . . reveals that [the lion] Bu met a slow and painful demise without any real veterinary care. . . . For Bu's entire life, Defendants provided him no veterinary care. . . . It is without question that Defendants have harmed Mbube, to the point of a painful death, and in violation of the ESA." *Id.* at 10, 19.[4]

- Lemurs (Bandit and Alfredo): "Defendants subjected [lemurs] Bandit and Alfredo to an onslaught of environmental assaults that harassed and harmed them. Bandit lived largely in isolation and contrary to his normal species behavior. He, and later with Alfredo, were deprived of any real opportunity to act as lemurs do. In a stark environment, Bandit and Alfredo could not forage, explore, mark, or engage in other normal behaviors. Defendants further harassed the lemurs by surrounding them with filth and a natural predator. Smells of lingering urine and feces disrupted their olfactory communications and their ability to scent-mark and put them at high risk of physical pain and permanent physical damage to their mucous membranes. Defendants also failed to protect the lemurs from the elements for nearly half of calendar year 2015. . . . The lemurs' isolating, barren, freezing, dirty, stress-inducing enclosure essentially stripped Bandit and Alfredo of almost of all of their natural behaviors, creating a high likelihood of both psychological and physical injury. As such, Defendants harassed both Bandit and Alfredo in violation of the ESA." *Id.* at 21 (internal record citations omitted).

- Lemur (Bandit): The lemur "Bandit . . . suffered from a protracted respiratory infection for nearly two years, from 2016 till his death in January 2018. . . . It is also beyond dispute that Bandit exhibited signs of significant distress. Both [experts] opine that Bandit's ripping at his penis represented a long-term condition due to chronic stress and anxiety. Because Bandit suffered no underlying medical condition to explain his mutilated genitals, and in combination with the deplorable conditions in which Bandit lived every day—isolation or

---

[4] On October 6, 2016, the USDA cited Tri-State for failing to provide the lion Mbube with adequate veterinary care and directed Tri-State to have a veterinarian with exotic cat experience examine the lion by October 10, 2016. Exh. 2, *supra* note 1 at 82. Critically, as trial evidence in the ESA Action revealed, Tri-State failed to comply with the USDA's simple directive. *See e.g.*, *id.*; *see also* Exh. 1, Mem. Op. at 10.

PETA009459

near isolation, stinky filth, predators nearby—the Court credits PETA's experts' conclusion that Bandit's self-mutilation was in 'response to chronic distress.' . . . [D]efendants' chronic lack of care to [lemur] Bandit harmed him. The Court further finds that Bandit's self-mutilation was mostly likely the result of significant distress that was the natural byproduct of his living at Tri-State. Because Defendants confined Bandit to an environment that disrupted his normal behaviors leading to his self-mutilation, and because they then failed to monitor, treat, and alleviate those life-threatening and ultimately fatal injuries, they have both harmed and harassed Bandit in violation of the ESA." *Id.* at 11-12, 21 (internal record citations omitted).

In addition to the above holdings, the court also found at the summary judgment stage of the ESA Action that Tri-State violated federal law by failing to provide a now-deceased tiger named Cayenne with adequate veterinary care. *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 397 F. Supp. 3d 768, 776 (D. Md. 2019) [Exh. 8]. Specifically, the court held that "'Cayenne died due to the lack of basic veterinary care,'" after being anesthetized by Tri-State's attending veterinarian, Dr. Gale Duncan, who admitted that "she lacked *any* specialized experience or training in medical care for tigers." *Id.* (internal quotation marks omitted). Cayenne went into respiratory arrest after Dr. Duncan put her under anesthesia. *Id.* at 773. Instead of reversing the anesthesia, Dr. Duncan continued with diagnostics despite the fact that she "lacked the skills or equipment" to provide Cayenne with necessary support while under anesthesia. *Id.* at 774. Then, "despite the high risk of an adverse reaction during the recovery period, Dr. Duncan left Cayenne unattended during anesthetic recovery, where she suffered from a heart attack and died. *Id.* at 776.

The District Court's opinions in the ESA Action highlights Tri-State's "flagrant and persistent violations" of federal law. *See* Exh. 1, Mem. Op. at 1. In light these years' long, egregious violations, as well as Tri-State's demonstrated unfitness for licensure, the USDA should terminate Tri-State's license.

### III.   Renewing Tri-State's AWA license would violate the APA.

Agency action is unlawful under the Administrative Procedure act (APA) if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious in violation of the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Perdue*, 872 F.3d at 611 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).

As detailed below, Tri-State is not in compliance with the AWA and cannot demonstrate compliance with the AWA and the regulations promulgated to ensure the humane care of animals. While the USDA only conducted one inspection at Tri-State this past year, the facility's history of chronic noncompliance and its current, ongoing noncompliance are demonstrated extensively in the evidence attached herein and discussed below.

PETA009460

**A. Tri-State routinely denies animals adequate veterinary care.**

Tri-State has demonstrated a pattern of failing to adequately prevent and treat serious, and in some cases *fatal*, health problems, which has persisted since Tri-State's last license renewal. Despite Tri-State's obligation to provide adequate veterinary care for its animals in accordance with AWA regulations, *see* 9 C.F.R. § 2.40, the court in the ESA Action, which had an independent duty to assess compliance with the AWA for the purposes of ESA liability, *see Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 744 (W.D. Tex. 2017), determined that "[Tri-State] *never came close* to complying with this regulation." Ex. 1, Mem. Op. at 3 (emphasis added). The following incidents exemplify Tri-State's chronic and ongoing failure to provide animals in its care with adequate veterinary care:

- In September 2019, two Himalayan bears at Tri-State were observed to suffer from "obvious chronic, severe and painful dental disease."[5] At that time, the bears were also observed chewing on the enclosure fencing, which veterinary expert, Dr. Kim Haddad, opined "further traumatiz[es] their teeth."[6] When these concerns were brought to the attention of Mr. Candy and his attending veterinarian, Dr. Duncan, Mr. Candy responded that the bears belonged to another zoo. Even if this were the case, AWA regulations mandate that Tri-State—who has had custody of these bears for *at least* 6 years[7]—provide adequate veterinary care to the animals in its care.

- Kumar the tiger was denied adequate veterinary care for a prolonged period before his untimely, long and painful death on July 7, 2019. Ex. 1, Mem. Op. at 12. Kumar—who went down on June 27, 2019, and could not stand or eat—was observed dragging himself approximately 30 feet across his enclosure. *Id.* Tri-State's attending veterinarian "strongly recommended euthanasia," but Tri-State did not heed her advice. Necropsy results revealed that Kumar suffered from chronic, untreated conditions that could have been easily addressed in a timely fashion if Kumar had been provided with appropriate veterinary care. For example, Kumar's mouth was "riddled with ulcers, cuts, and other injuries . . . Large portions of two canine teeth were missing, exposing raw pulp. One canine tooth had punctured Kumar's mandible, creating a deep, penetrating wound." *Id.* at 13 (internal record citations omitted). The ulcers, broken teeth, and wounds were "chronic" and "consistently painful." *Id.* Kumar also suffered from painful ulcers and lesions on his paw pads and hind legs, which "presented as having developed over time." *Id.* He also suffered from a distended colon and "a two-centimeter long tear and hemorrhaging in the membrane of his abdominal cavity." *Id.* Not only did Tri-State deny Kumar adequate and timely veterinary care, thereby allowing these painful conditions to persist for many years, his suffering was also inexcusably prolonged due to Mr. Candy's refusal to comply with his attending veterinarian Dr. Duncan's advice to euthanize Kumar.

---

[5] Supplemental Expert Report of Kim Haddad (Oct. 29, 2019) at 22-24 [Exh. 9].

[6] *Id.*

[7] *See* USDA Inspection Report Inventory (Nov. 6, 2014) [Exh. 10].

PETA009461

- The tiger India—who did not receive *any* routine examinations or preventative veterinary care, *id.* at 13—was denied adequate veterinary care throughout her life and up until her untimely death. While alive, India suffered from chronic flystrike: "[her] ears had been eaten so badly and for so long that the veterinarian who performed her necropsy believed that her ears had been 'surgically truncated.'" *Id.* at 14. Despite this fact, Tri-State "did not take steps to rectify the source of the problem. . ." *Id.* Evidence in the ESA Action further showed that India died on August 14, 2019, of myocarditis and sepsis, the latter of which was "likely due to an untreated or poorly treated bacterial infection and . . . the myocarditis was in turn the result of the sepsis," according to the pathologist that Tri-State engaged. *Id.* 13. Veterinary expert Dr. Kim Haddad opined that India's enlarged heart is a condition that is "'considered incredibly painful . . . like having a heart attack,'" and that the "pus-filled pockets in her heart and diaphragm made her every breath painful." *Id.* at 13-14. A month before India's death, Mr. Candy's notes reflected that India ate three times, and post-mortem records indicated that, at the time of death, her "intestinal tract was completely empty, and she was pale and icteric." *Id.* at 13. India was not examined by a veterinarian until she was gravely ill. *Id.* And even then, Mr. Candy declined to comply with Tri-State's attending veterinarian Dr. Duncan's recommendation that the he transfer India to a facility that could conduct further diagnostics and surgery. Despite India's "incredibly painful" conditions, India received no pain management and no palliative care. *Id.* at 14.

- The tiger Cayenne also died due to the lack of appropriate veterinary care.  AWA regulations require attending veterinarians to have experience "in the care and management of the species being attended," 9 C.F.R. § 1.1, and for licensees to maintain programs of veterinary care that include "[t]he use of appropriate methods to . . . diagnose . . . diseases," 9 C.F.R. § 2.40(b)(2). In direct violation of these regulations, Cayenne was anesthetized for a simple blood test and x-rays by Dr. Duncan, who "lacked *any* specialized experience or training in medical care for tigers" and did not have access to standard monitoring equipment or an anesthetic reversal agent in contravention of generally accepted standards of veterinary care. Exh. 8, *People for the Ethical Treatment of Animals, Inc.*, 397 F. Supp. 3d at 774-76. Cayenne—who had already experienced respiratory arrest soon after being anesthetized—was left unattended during recovery while Dr. Duncan vaccinated a free-roaming domestic cat at Tri-State. *Id.* at 773-74. When Dr. Duncan returned, Cayenne was dead. *Id.* at 774.

- The tiger Mowgli was left to suffer from a reoccurring skin condition, which "manifests itself in red, itchy hotspots and large patches of lost fur." Exh. 1, Mem. Op. at 15. Mowgli's skin condition was credited to be caused by Tri-State's "dereliction" including confining him to an enclosure that was "uninsulated, damp, rarely cleaned, and filled with feces and rotting carcasses." *Id.* at 16. At trial, Tri-State "produced no record evidence that Mowgli has *ever* had a routine examination by a veterinarian or received basic vaccinations." *Id.*

- Tri-State denied the lion Peka adequate veterinary care by failing to have a veterinarian properly examine or treat her abnormal gait. As the court in the ESA Action found, Peka's "abnormal gait likely causes Peka discomfort and pain and puts her at risk of further joint problems such as degenerative joint disease." *Id.* at 15.

9

PETA009462

- The lemur Bandit was also denied adequate veterinary care. During his life, he suffered from "untreated pain" stemming from a "protracted respiratory infection for nearly two years, from 2016 till his death in January 2018." Exh. 1, Mem. Op. at 11. Bandit was also found to have "exhibited signs of significant distress," including by self-mutilating by tearing off part of his genitals. *Id.* at 12. According to veterinary and animal behavior experts, Bandit's self-mutilation "represented a long-term condition due to chronic stress and anxiety." *Id.* Veterinary records produced by Tri-State indicated that Bandit did not receive *"any* [veterinary] examinations until the day of his death," when he was "bleeding from the genital area" and hypothermic. *Id.* at 11.

- Tri-State also failed to have a veterinarian examine a Japanese macaque, Mrs. Mack, until she had a baseball-sized firm mass and maggots in her vaginal area.[8] When her condition was finally brought to Tri-State's then-attending veterinarian Dr. Fox's attention in April 2017, Mrs. Mack was "down-n-out"—"prognosis poor."[9] Mrs. Mack subsequently died.[10]

**B. Tri-State routinely denies animals adequate nutrition.**

Tri-State has also demonstrated a pattern of failing to provide animals with wholesome, appropriate food in direct contravention of AWA regulations, which mandate that: "[f]ood . . . be wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain all animals in good health," and that "diet[s] . . . be prepared with consideration for the age, species, condition, size, and type of the animal." 9 C.F.R. § 3.129(a). The following are examples of Tri-State's failure to abide with this basic regulation:

- In the ESA Action, the court found that Tri-State failed to provide for the lion and tigers' "'basic nutritional needs.'" Exh. 1, Mem. Op. at 9. This was evidenced, in part, by pathological findings for tigers India and Cayenne, which showed they had "abnormal amounts of fat around their vital organs, which was likely due to "chronic nutritional imbalances."[11]

- During the pendency of the ESA Action, Mr. Candy "admitted to allowing carcasses to remain in the Big Cats' enclosures for up to three days, or six times as long as recommended by the USDA." *Id.* at 8. As the District Court found, Tri-State's "repeated defiance of USDA [nutritional] guidelines presents not only loss in nutritional value but also places the Big Cats at risk of 'serious [gastrointestinal] diseases' including sepsis, from which India succumbed." *Id.*

- Tri-State was also found to handle frozen meats fed to the animals at Tri-State in a manner that defies USDA's Manual on Handling Frozen/Thawed Meat and Prey Items Fed to

---

[8] Patient Record [Exh. 11].

[9] *Id.*

[10] Deposition Transcript of Robert Candy (excerpt) (Mar. 16, 2018) at 112:7-113:1 (testifying that the male Japanese macaque was transferred to another facility in 2017 after the female macaque died) [Exh. 12].

[11] Trial Transcript, Vol. 3 (excerpt) (Nov. 20, 2018) at 13:11-15 [Exh. 13].

PETA009463

Captive Exotic Animals. Specifically, Mr. Candy thaws meat in a heated furnace room under the reptile exhibit. The meat, which is exposed to free-roaming domestic cats who "foraged freely atop the packages," is subsequently fed to animals at Tri-State. *Id.* at 9.

- In May 2018, Tri-State's attending veterinarian noted that a miniature horse was "[s]everely underweight," "weak [and] borderline cachectic."[12] According to Mr. Candy, the horse reportedly "loses weight every winter – possibly being shoved out of [the] way by larger goats and other horse."[13]Although not regulated by the AWA, *see* 9 C.F.R. § 1.1 (defining "animal"), the relatively recent condition of this miniature horse is another example of Tri-State's inability or unwillingness to provide animals in its care with appropriate nutrition.

### C. Tri-State denies animals safe, sanitary enclosures.

Tri-State's chronic AWA non-compliance is further underscored by the facility's persistent failure to properly clean the animal enclosures, implement a "safe and effective" pest control program, and to prevent excessive water from pooling in the enclosures, in violation of 9 C.F.R. §§ 1.319 and § 3.127(c). As evidenced by the following references to the District Court's findings in the ESA Action and related evidence presented in that case, Tri-State is routinely and, on information and belief, currently out of compliance with the AWA sanitation and outdoor facility regulations:

- The District Court found that the tigers' outdoor enclosures, described as a "fetid cesspool," "contained piles of feces . . . and large spots of urine residue accumulated over time." Exh. 1, Mem. Op. at 3, 8. Pools provided for swimming were found to be "filthy, static, and filled with feces." *Id.* at 19. The indoor enclosures were likewise found to be filthy: "tufts of fur coated rusted bars, and carcasses, bones, feathers, fur, and debris mixed with dirty straw." *Id.* at 3. Mowgli the tiger's den was further described as "damp, rarely cleaned, and filled with feces and rotting carcasses." *Id.* at 16. As the District Court aptly noted: "The filthy state of the tiger's enclosures is shocking but not surprising—no protocol or schedule for cleaning and sanitation of the tigers' enclosures exists at Tri-State." *Id.* at 19.

- The District Court further found that in the reptile room, where a squirrel monkey is held, "'decaying remnants of fruits and vegetables were scattered across the floor, and there were [ ] large smears of feces, presumably from the sulcatas [tortoises].'" *Id.* at 2 (alterations in original).

- As recently as September 22, 2019, the water in the outdoor portion of the bear enclosure was observed to be filthy.[14] A member of the public observed the pool in a similar condition

---

[12] Mountainview Veterinary Service, Patient History Report (May 29, 2018) at 2 [Exh. 14].

[13] *Id.*

[14] Exh. 9, Supplemental Expert Report of Kim Haddad (Oct. 29, 2019) at 22 (noting that the bears were confined to a "barren enclosure with a pool of filthy water.").

PETA009464

in July 2018. At that time, the pool water was described as "covered in green algae and scum."[15]

- During a March 3, 2018, court ordered site inspection, animal behavior expert, Mr. Jay Pratte observed and documented "standing water in many animal exhibits, indicative of a clear lack of drainage and persisting muddy conditions."[16] Mr. Pratte also observed "clear presence of rodent activity and damage throughout facility: access holes chewed through wood, feces left on surfaces, paths and holes in ground in and around animal exhibits."[17]

\* \* \* \*

Tri-State's current and routine noncompliance with the AWA and its implementing regulations, demonstrates the entity's complete disregard for the AWA and its unfitness to be licensed. As evidenced by the attached exhibits, Tri-State's operations are "routinely and currently out of compliance with AWA standards," and thus cannot be lawfully issued a renewal. *Perdue*, 872 F.3d at 620. Indeed, renewal of Tri-State's license would be arbitrary, capricious, an abuse of discretion, and contrary to the purposes of the AWA.

## IV. CONCLUSION

Because the USDA cannot rely on Tri-State's self-certification of compliance, and because the evidence shows that Tri-State routinely fails to comply with AWA standards and has operated in flagrant violation of federal law, the USDA must terminate and/or not renew Tri-State's license.

---

[15] *See, e.g.,* Declaration of Connie Collins (Aug. 27, 2018) at ¶ 8 [Exh. 15].

[16] Expert Report of Jay Pratte re Tri-State Zoological Park of Western Maryland (June 2018) at 79 [Exh. 16]. *See also id* at 83 (photos of standing water and mud in animal enclosures).

[17] *Id.* at 80.

12

PETA009465

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS



December 18, 2020

USDA/APHIS/Animal Care

Via e-mail: Animalcare@usda.gov

Re:     Request for Investigation of Apparent Animal Welfare Act Violations
        at Tri State Zoological Park Of Western Maryland (License No. 51-C-0064)

Dear USDA Animal Care:

I am writing on behalf of PETA to request that the U.S. Department of Agriculture investigate Tri State Zoological Park Of Western Maryland ("Tri-State," License No. 51-C-0064) for a Himalayan black bear in apparent need of veterinary care in violation of the Animal Welfare Act (AWA).

On December 13, 2020, Jessica Candy Simmons posted photos on Facebook of two Himalayan black bears named Suzi and Sally at Tri-State. One of the bears appears to have opacity of both eyes, lateral strabismus of the right eye (lateral deviation/eye is turned to the side instead of facing forward) with a prominent/raised third eyelid, all indicators of prominent ocular disease. (*See* Ex. 1.) The opacity of the left eye is consistent with corneal ulceration due to trauma, entropion, distichia or other causes, although uveitis and an underlying condition may also be present and, if left untreated, either condition can lead to severe complications including chronic pain and blindness. The lateral strabismus, prominent third eyelid and opacity of the right eye is equally concerning and warrants immediate evaluation as this presentation can also indicate a painful and serious underlying condition that can have severe consequences if not treated.

In my twelve years of clinical and research experience with Asiatic black bears, including serving as the senior veterinarian at an accredited sanctuary overseas, providing veterinary care to over 170 rescued bears, the majority of whom were Asiatic black bears, I have diagnosed, treated, and managed multiple bears with various forms of ocular disease and attest that bears are impressively stoic and hide pain. It is therefore imperative that a thorough ophthalmic examination by a trained and qualified veterinarian with experience handling, anesthetizing, and treating bears, ideally in consultation with an ophthalmologist, is needed in addition to performing a comprehensive physical examination and appropriate diagnostics to institute timely and appropriate treatment, including appropriate analgesia/pain management.

Please inspect this bear and her veterinary records, and ensure that she is receiving adequate veterinary care pursuant to 9 C.F.R. § 2.40. As required by 9 C.F.R. § 2.40, please also ensure that Tri-State consults with a qualified veterinarian who is trained and experienced in treating bears as Tri-State's most recent known attending veterinarian lacked training and experience with big cats and primates, and appeared to have very limited experience with other exotic animals. (*See* Ex. 2, pg. 7 and Ex. 3, pg. 6.) In fact, the United States District Court for the District of Maryland found that her inadequate care of at least one tiger at Tri-State led to that tiger's death and stated

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

Washington, D.C.
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Berkeley
2855 Telegraph Ave.
Ste. 301
Berkeley, CA 94705
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

PETA003731

that "the provision of veterinary care remained grossly inadequate" under her care. (*See* Ex. 2, pg. 9 and Ex. 3, pg. 7-8.)

Please ensure that all animals at Tri-State are being provided with adequate veterinary care, space, shelter, food, and water and are otherwise handled in accordance with the AWA. Please also hold Tri-State fully accountable for all violations that you discover during your inspection.

Thank you for your attention to this important matter. Please inform me of the complaint number that your agency assigns to this correspondence.

Very truly yours,

*Monica K. H. Bando, MS, BVSc, PhD, MRCVS*
Wildlife Veterinarian, Captive Animal Law Enforcement
509-288-2821| monicab@petaf.org

cc:   Andrea D'Ambrosio, Animal Care Inspector, (andrea.d'ambrosio@aphis.usda.gov)

2

PETA003732

**PETA**
F O U N D A T I O N

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

September 16, 2016

Elizabeth Goldentyer, D.V.M.
Director, Animal Welfare Operations
USDA/APHIS/AC Eastern Region

Via e-mail: betty.j.goldentyer@usda.gov; aceast@aphis.usda.gov

Re:   Urgent Request for Investigation of Reports of Lion and Pig in Poor Condition at
       Tri-State Zoo (License No. 51-C-0064)

Dear Dr. Goldentyer:

I am writing on behalf of PETA to request that the USDA urgently investigate Tri-State
Zoological Park of Western Maryland ("Tri-State"; license no. 51-C-0064) regarding
reports of a lion and pig in need of veterinary attention, in apparent violation of the
Animal Welfare Act (AWA).

PETA received reports from a concerned citizen who observed and documented a lion
in emaciated body condition on September 11. *See* Photo 1. According to wildlife
veterinarian Dr. Christine Capaldo, this animal's body condition is a 1.5 out of 5 on the
Animal Welfare Inspection Guide's Body Condition Assessment Chart for lions
(attached) and should be evaluated by a veterinarian immediately.

The eyewitness also documented a pig with apparent skin issues around the periorbital
region of his face and behind his ears. *See* Photo 2. Dr. Capaldo stated that "the red
skin behind the ears is most likely sunburn since this is an area with little hair.
However, dry skin or bacterial infections can also cause red, flaky skin. Causes of
conjunctival inflammation and excess tearing in pigs could be due to irritants, bacterial
or viral infections, or other causes such as entropion which can cause corneal
ulceration." *See* Photo 3.

Please inspect these and all animals at Tri-State, as well as their veterinary records, and
ensure that they are receiving adequate veterinary care pursuant to 9 C.F.R. § 2.40.
Please also inspect the nutritive value of the food that this lion is provided, in
accordance with 9 C.F.R. § 3.129(a).

The eyewitness also reported observing isolated primates, dilapidated enclosures, and
filthy tiger pools, which are all recurring concerns at Tri-State. Please ensure that all
animals at Tri-State are provided with clean water, food, shelter, and care consistent
with the mandates of the AWA and hold the facility fully accountable for any and all
violations that you discover during your investigation.

Thank you for your attention to this important matter. Please inform me of the
complaint number that your agency assigns to this correspondence.

Very truly yours,

Deborah Metzler, M.S.
Wildlife Specialist, Captive Animal Law Enforcement
509-859-6079 | DeborahM@petaf.org

Attachment

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

Washington, D.C.
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Oakland
554 Grand Ave.
Oakland, CA 94610
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

**Photo Appendix**



Photo 1: Male lion at Tri-State in emaciated body condition.

PETA0001083



Photo 2: Pig with redness around the periorbital region and behind the ears,
indicative of sunburn or other skin pathology.



Photo 3: Pig with excess tearing, which can be a sign of environmental irritants, infection, or entropion.

PETA0001084

## Lion



1
EMACIATED: All ribs and vertebral bodies prominently showing, skin laying over hips and femur



2
UNDERWEIGHT: Ribs, vertebral bodies and hips slightly showing, "tucked up" appearance



3
OPTIMAL BODY WEIGHT: Hint of ribs and vertebral bodies



4
OVERWEIGHT: No hips or ribs showing, rotund appearance to abdomen



5
OBESE: Abdomen sagging, obvious fat over hips and shoulders

Source: USDA-APHIS

**Figure D-6  Lion Body Assessment Chart**

PETA0001127

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

**PeTA**
F O U N D A T I O N

June 17, 2016

Elizabeth Goldentyer, D.V.M.
Regional Director
USDA/APHIS/AC Eastern Region

Via e-mail: betty.j.goldentyer@usda.gov; aceast@aphis.usda.gov

Re:   Request for Investigation of Primate Housed in Isolation, Filthy Water in
       Tiger Enclosure, and Missing Secondary Barriers

Dear Dr. Goldentyer:

I am writing on behalf of People for the Ethical Treatment of Animals (PETA) to
request that the U.S. Department of Agriculture (USDA) promptly investigate Tri-
State Zoological Park ("Tri-State Zoo"; license no. 51-C-0064). On May 26, 2016,
I visited Tri-State Zoo, where I observed and documented the following apparent
violations of the Animal Welfare Act (AWA):

- A solitary primate self-inducing regurgitation
- Apparently contaminated water in a tiger enclosure
- No secondary barriers preventing members of the public from engaging in
  direct contact with lynx and porcupine

Please ensure that animals at Tri-State Zoo are provided with adequate veterinary
care, shelter, and water and are otherwise handled in accordance with the AWA.
Please also hold the facility fully accountable for any and all violations that you
discover during your investigation.

Thank you for your attention to this important matter. Please inform me of the
complaint number that your agency assigns to this correspondence.

Sincerely,

Lewis Crary
Captive Wildlife Specialist
Captive Animal Law Enforcement | PETA Foundation
202-540-2182 | LewisC@petaf.org

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

Washington, D.C.
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Oakland
554 Grand Ave.
Oakland, CA 94610
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
- PETA U.S.
- PETA Asia
- PETA India
- PETA France
- PETA Australia
- PETA Germany
- PETA Netherlands
- PETA Foundation (U.K.)

PETA0001075

## Appendix

### 1. Social Primate Self-Inducing Regurgitation While Confined in Isolation

I observed a white-faced capuchin monkey named Dodger housed individually. White-faced capuchin monkeys have complex physical, social, and psychological needs and, in the wild, live in large social groups and form coalitions with their kin. Researchers have observed that capuchin monkeys, like humans, demonstrate cultural learning and social traditions (Perry, 2011; 2003).[1,2] Without valuable interaction with others of their kind, primates suffer from loneliness, deprivation, and depression.

Housing this monkey in isolation is an apparent violation of 9 C.F.R. § 3.81, which states that exhibitors "must develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates," and § 3.81(a), which requires that "[t]he environment enhancement plan must include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature."

I observed this capuchin monkey picking at his toes and pushing his hand down his throat until he induced a gag reflex—a well-established stereotypic and self-destructive behavior exhibited by isolated primates. He was also missing a patch of hair above his tail. Nonhuman primates' stereotypies and hair loss—likely from hair picking—are signs of poor welfare and stress. Georgia Mason, a behavioral biologist, states the following:

> [S]tereotypies should warn us that the animal has probably been in an unchanging and frustrating environment, and that its welfare has probably been unsatisfactory. Much evidence does indeed link the development of stereotypies with specific sub-optimal environments. The development of a stereotypy in an individual is therefore the sign of an animal that has probably been suffering, and whose well-being may be poor still.[3]

The PETA Foundation relayed documentation of this same capuchin monkey engaging in stereotypic behavior to the USDA in 2014 and 2015 (attached). In accordance with 9 C.F.R. § 3.81(b), "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities." As is apparent from Dodger's behavior and hair loss, the Tri-State Zoo does not appear to be following or developing a plan of environmental enhancement that is *adequately* addressing his psychological needs. Because he "show[s] signs of being in psychological distress through behavior or appearance," he "must be provided special attention regarding enhancement of [his] environment, based on the needs of the individual species and in accordance with the instructions of the attending veterinarian." 9 C.F.R. § 3.81(c).

Pursuant to 9 C.F.R. § 3.81(e)(1), this type of exemption from the environment enhancement plan "must be reviewed at least every 30 days by the attending veterinarian." Please investigate whether the attending veterinarian has provided such an exemption for Dodger, if it is being reviewed every 30 days as required, and, if so, whether the exemption provides an adequate welfare justification for the isolation of this highly social animal.

---

[1]Perry, S. (2011). Social traditions and social learning in capuchin monkeys (*Cebus*). *Phil. Trans. R. Soc. B, 366,* 988–996.
[2]Perry, S., *et al.* (2003). Social conventions in wild white-faced capuchin monkeys: Evidence for traditions in a neotropical primate. *Current Anthropology, 44*(2), 241–268.
[3]Mason, G.J. (1991). Stereotypies and suffering. *Behavioural Processes, 25,* 103–111.

## 2.  Contaminated Water in Tiger Enclosure

I observed at least three tigers who were confined to a cage converted from a concrete swimming pool. The "deep" end of the pool appeared unable to drain, and several inches of discolored water containing leaves and other unidentifiable pieces of debris had accumulated. An adjacent larger pool apparently *intended* to hold water also contained dark brown water with pieces of debris covering most of the surface.

In the wild, tigers cool off by entering rivers or lakes. On the day of my visit, the temperature in Cumberland, Maryland, reached 86 degrees. Any tiger seeking relief from this heat would be forced to enter this apparently dirty and stagnant water, in apparent violation of 9 C.F.R. § 3.127(c), which states that "[a] suitable method shall be provided to rapidly eliminate excess water," and in potential violation of § 3.130, which states that "[a]ll water receptacles shall be kept clean and sanitary."

The state of these pools may deter the tigers from cooling themselves and may also be dangerous to drink from, in apparent violation of 9 C.F.R. § 2.131 (b)(1), which requires that "[h]andling of all animals shall be done as expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort."

## 3.  No Secondary Barriers Preventing Members of the Public From Reaching Into Enclosures

During my visit, there were no secondary barriers preventing members of the public from approaching and reaching into enclosures housing lynx and a porcupine. Direct contact with these animals could result in injures to the animals and members of the public and is in apparent violation of 9 C.F.R. § 2.131(c)(1), which states that "[d]uring public exhibition, any animal must be handled so there is minimal risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public so as to assure the safety of animals and the public"; § 3.127(d), which states that "all outdoor housing facilities (i.e., facilities not entirely indoors) must be enclosed by a perimeter fence that is of sufficient height to keep animals and unauthorized persons out"; § 3.125(a), which states that "[t]he indoor and outdoor housing facilities shall be structurally sound and shall be maintained in good repair to protect the animals from injury and to contain the animals"; and § 2.131(d)(1), which states that [a]nimals shall be exhibited only for periods of time and under conditions consistent with their good health and well-being."

**Tri-State Zoological Park Photographs**
Documented on May 26, 2016



Photographs 1 and 2: Tigers confined to enclosure containing apparently stagnant, unclean water

PETA0001078



Photograph 2.

PETA0001079



Photograph 3: Demonstrating accessibility to lynx (no secondary barrier)

PETA0001080



Photograph 4: Demonstrating accessibility to squirrel monkey (no secondary barrier)

PETA0001081

**PETA**
F O U N D A T I O N

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

June 23, 2015

Elizabeth Goldentyer, D.V.M.
Regional Director
USDA/APHIS/AC Eastern Region

**Via e-mail: betty.j.goldentyer@usda.gov; aceast@aphis.usda.gov**

Re:     Request for Investigation of Solitary Primates, Animals in Need of
        Veterinary Care, and Unsanitary Conditions at Tri-State Zoological Park

Dear Dr. Goldentyer,

I am writing on behalf of People for the Ethical Treatment of Animals (PETA) to
request that the U.S. Department of Agriculture (USDA) promptly investigate Tri-
State Zoological Park ("Tri-State"; license no. 51-C-0064). Witnesses who visited
Tri-State on June 9, 2015, observed and documented the following apparent
violations of the Animal Welfare Act (AWA):

- Social primates housed in isolation
- An obese Asian black bear who may be suffering from a lack of adequate
  veterinary care, an inadequate diet, and/or inadequate space
- Enclosures and facility grounds soiled with excreta and trash

Please ensure that the animals at Tri-State are provided with adequate veterinary
care, shelter, food, and water and are otherwise handled in accordance with the
AWA. Please hold the facility fully accountable for any and all violations that you
discover during your investigation.

Thank you for your attention to this important matter. Please inform me of the
complaint number that your agency assigns to this correspondence.

Sincerely,

Brittany Peet
Deputy Director, Captive Animal Law Enforcement, PETA Foundation
202-540-2191 | BrittanyP@petaf.org

**Attachments**
- USDA Complaint Number AC15-194
- Photographs 1–4

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

Washington, D.C.
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Oakland
554 Grand Ave.
Oakland, CA 94610
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

PETA0001068

## Appendix

### a. Social Primates Kept in Isolation

The witnesses observed that a capuchin monkey and a squirrel monkey were each confined individually. Primates have complex physical, social, and psychological needs. In the wild, white-faced capuchin monkeys live in large social groups and form coalitions with their kin. Researchers have observed that capuchin monkeys, like humans, demonstrate cultural learning[1] and social traditions.[2] In the wild, squirrel monkeys have very large social groups with complex dominance hierarchies, and much of their lives involve navigating group politics.[3] Without this necessary interaction with others of their kind, primates are afflicted with loneliness, boredom, and depression, which can manifest in stereotypic behavior.

Confining primates in isolation violates 9 C.F.R. § 3.81, which states that exhibitors "must develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates" and § 3.81(a), which requires that "[t]he environment enhancement plan must include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature."

The witnesses also observed that Dodger, the capuchin monkey, had a hairless patch above his tail (Photograph 1). PETA previously reported this issue to the USDA on February 9, 2015, but the issue remains unaddressed.[4] Nonhuman primates' stereotypies and hair loss—likely from hair pulling—are signs of poor welfare and stress. According to Georgia Mason:

> [S]tereotypies should warn us that the animal has probably been in an unchanging and frustrating environment, and that its welfare has probably been unsatisfactory. Much evidence does indeed link the development of stereotypies with specific sub-optimal environments. The development of a stereotypy in an individual is therefore the sign of an animal that has probably been suffering, and whose well-being may be poor still.[5]

In accordance with 9 C.F.R. § 3.81(b), "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities." As is apparent from Dodger's hair loss, Tri-State does not appear to be following a plan of environmental enhancement that is *adequately* addressing his psychological needs. Because he "show[s] signs of being in psychological distress through behavior or appearance," he "must be provided special attention regarding enhancement of their environment, based on the needs of the individual species and in accordance with the instructions of the attending veterinarian." 9 C.F.R. § 3.81(c).

### b. Obese Asian Black Bear

The witnesses observed that the bear on exhibit was obese (Photograph 2). Please examine this bear's veterinary records to determine whether the bear is receiving adequate veterinary care for this condition, pursuant to 9 C.F.R. § 2.40. The bear's condition may also be caused by lack of an adequate diet pursuant to 9 C.F.R. § 3.129(a) (requiring that "food shall be wholesome, palatable, and [of]

---

[1] Perry, S. (2011). Social traditions and social learning in capuchin monkeys (*Cebus*). *Phil. Trans. R. Soc. B,* 366, 988–996.
[2] Perry, S., et al. (2003). Social conventions in wild white-faced capuchin monkeys: Evidence for traditions in a neotropical primate. *Current Anthropology,* 44(2), 241–68.
[3] Sapolsky, R. M. (2005). The influence of social hierarchy on primate health. *Science,* 308, 648–652.
[4] USDA complaint number AC15-194, dated February 9, 2015, attached.
[5] Mason, G. J. (1991). Stereotypies and suffering. *Behavioural Processes,* 25, 103–111.

PETA0001069

nutritive value to maintain all animals in good health") or failure to provide the bear with adequate space, pursuant to 9 C.F.R. § 3.128 (requiring that "[e]nclosures shall be constructed and maintained so as to provide sufficient space" and that "[i]nadequate space may be indicated by evidence of … poor condition").

**c.  Failure to Clean and Sanitize Enclosures and Premises**

The witnesses observed that the kinkajous are confined to unsanitary enclosures, with floors covered with excreta and old, rotten food (Photograph 3). Palatable food was apparently unavailable, as the food receptacle was also covered with feces. These conditions appear to violate 9 C.F.R. § 3.131(a), requiring that "[e]xcreta shall be removed from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors," and 9 C.F.R. § 3.129(a) and (b), requiring that "food shall be wholesome, palatable, and free from contamination" and "food receptacles, if used, shall be … placed so as to minimize contamination," respectively.

**d.  Failure to Provide Clean Water**

During the time the witnesses visited Tri-State, the weather was sunny and the temperature reached a high of 80 degrees,[6] but it did not appear that clean water was supplied to any of the facility's animals, including free-roaming rabbits, in apparent violation of 9 C.F.R. § 3.130, which requires that "water … must be provided as often as necessary for the health and comfort of the animal." (*See*, e.g., Photograph 4.)

---

[6]"Weather History for KCBE," http://www.wunderground.com/history/airport/KCBE/2015/6/9/DailyHistory.html.

PETA0001070

**Tri-State Zoological Park**
**License No. 51-C-0064**
**Cumberland, Maryland**
**June 9, 2015**



Photograph 1: Hair loss above a capuchin monkey's tail



Photograph 2: An obese Asian black bear

PETA0001071



Photograph 3: Kinkajou food receptacle full of excreta

PETA0001072



Photograph 4: Example of dirty drinking water provided for animals at the Tri-State Zoo
(sheep lying to the left of the tortoise)

PETA0001073



**AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS**

June 11, 2015

The Honorable Michael O. Twigg
State's Attorney
Office of the State's Attorney for Allegany County, Maryland
59 Prospect Sq., Ste. 111
Cumberland, MD 21502

**Via e-mail: motwigg@alleganygov.org and UPS**

Re: Follow-Up Regarding Tri-State Zoological Park

Dear Mr. Twigg,

I am writing to follow up on PETA's correspondence of February 27 and to provide you with additional evidence to demonstrate that Bob Candy, the owner of Tri-State Zoological Park ("Tri-State") is intentionally engaging in knowingly illegal conduct relating to the care and treatment of the animals confined at Tri-State. On March 4, three PETA witnesses volunteered at Tri-State. They observed and documented evidence of apparent violations of Maryland law as well as evidence documenting Candy's knowledge of conditions at Tri-State that violate the federal Animal Welfare Act (AWA) and intentional attempts to deceive a federal investigator in order to avoid AWA citations.

Please keep me updated on the status of your investigation, and don't hesitate to contact me if I can provide any additional information. I can be reached at 202-540-2191 or BrittanyP@petaf.org.

Very truly yours,

Brittany Peet
Deputy Director | Captive Animal Law Enforcement

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

**Washington, D.C.**
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

**Los Angeles**
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

**Norfolk**
501 Front St.
Norfolk, VA 23510
757-622-PETA

**Oakland**
554 Grand Ave.
Oakland, CA 94610
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

PETA0001062

## Appendix

### 1.  Apparent Violations of Maryland Law Preventing Abuse or Neglect of Animals

Three PETA witnesses volunteered at Tri-State on March 4, 2015, from approximately 10 a.m. to approximately 2:15 p.m. As detailed in the subsections below, the witnesses observed and/or documented numerous apparent violations of Md. Code Ann., Crim. Law § 10-604(a)(2), (3), (5), prohibiting "depriv[ing] an animal of necessary sustenance; inflict[ing] unnecessary suffering or pain on an animal … unnecessarily fail[ing] to provide the animal with nutritious food in sufficient quantity, necessary veterinary care, proper drink, air, space, shelter, or protection from the weather."

Additionally, as explained in each subsection, the witnesses' reports supplement PETA's attached February 27 correspondence, which outlined Tri-State's history of violating federal animal-welfare laws and demonstrated that Bob Candy is intentionally engaging in conduct that he knows violates the law, particularly keeping animals in ways he knows are unlawful, as described in detail below. As detailed in Section 2, the U.S. Department of Agriculture (USDA) was conducting an inspection the same day that PETA witnesses were at Tri-State. The inspection report, in which Tri-State was cited for numerous violations of the AWA, is attached. You will note that the USDA did not cite the facility for all apparent violations observed by the witnesses. I would like to reiterate that, as we discussed during our February meeting, the USDA systematically fails to cite for or even notice many animal welfare issues due to insufficient and improperly trained inspectors and the agency's refusal to regulate some species of animals, including birds.

### a.  Failure to Provide Animals With Veterinary Care in Apparent Violation of Md. Code Ann., Crim. Law § 10-604(a)(3) and (5)

Maryland law prohibits inflicting unnecessary suffering or pain on an animal, and it prohibits the person who is in charge or has custody of an animal to fail unnecessarily to provide an animal with required veterinary care. Md. Code Ann., Crim. Law § 10-604(a)(3) and (5). On March 4, the witnesses observed the following evidence of Tri-State's apparent continued failure to provide animals with adequate veterinary care:

- A capuchin monkey named Dodger was missing a nail on one of his toes, and he picked at his tail—an apparently stereotypic behavior—which began to bleed (video); Dodger was missing fur from an area at the base of his tail that was approximately four times larger than it was during the witnesses' previous visit in January (video). Dodger's stereotypies and hair loss—likely from hair picking—are likely signs of poor welfare and stress. According to behavioral biologist and published author Georgia Mason:

  > [S]tereotypies should warn us that the animal has probably been in an unchanging and frustrating environment, and that its welfare has probably been unsatisfactory. Much evidence does indeed link the development of stereotypies with specific sub-optimal environments. The development of a stereotypy in an individual is therefore the sign of an animal that has probably been suffering, and whose well-being may be poor still.[1]

---

[1] G.J. Mason, *Stereotypies and Suffering*, 25 Behavioural Processes 103, 111 (1991).

PETA0001063

As is apparent from Dodger's self-injurious behavior, Tri-State does *not* appear to be following a plan of environmental enhancement that is adequately addressing the primate's psychological needs. Additionally, Dodger is confined alone and his social needs are not being met.

- A green-cheeked Amazon parrot was wheezing deeply (video).
- A skunk was missing hair on both sides of his or her neck, which, according to a volunteer named Kathy, was because of an unspecified "condition" (photo 1). Kathy did not indicate that the skunk was receiving veterinary care for this "condition."
- A white cat was suffering from an apparently untreated wound between her shoulder blades (photo 2).
- A donkey had overgrown hooves in need of farrier care (photo 3). Wildlife veterinarian Dr. Heather Rally reviewed the attached photo and opined that in addition to overgrown hooves, the donkey is likely suffering or will be suffering from thrush, given the muddy substrate on which the animal is forced to stand.
- A white cockatoo was missing feathers on his or her chest, likely because the bird was engaging in stereotypic self-mutilation[2] (video).

## b. Failure to Sanitize Animal Enclosures and Facility Grounds in Apparent Violation of Md. Code Ann., Crim. Law § 10-604(a)(5)

Maryland law prohibits the person who is in charge or has custody of an animal from unnecessarily failing to provide the animal with proper air and space. Md. Code Ann., Crim. Law § 10-604(a)(5). The witnesses observed numerous instances of Tri-State failing to sanitize the animal enclosures adequately by removing animal excreta and rotten food, thereby depriving the animals of proper living space and in some cases even fresh air:

- The rat tanks were so filthy that the animals were barely visible through the sides of the tanks. The bedding in the rat tank was mixed with numerous piles of feces, and beside the tank there was a cat litterbox filled with feces and urine, apparently from cats who roamed freely at the facility (video, video).
- The enclosure that contained pigs and peacocks was filled with mud and soiled with feces, and even the straw in the pig shed contained large amounts of feces, as did a plastic doghouse in the shed (video).
- The floor of the goat shed was mostly covered with piles of old feces (video).
- The floor of the bird building was covered with feces, and plastic containers of water were also soiled with feces, while a food bowl contained brown fruit and feces (video).
- A cat litterbox on the floor of the reptile room contained multiple piles of feces and drenched with urine, indicating that it is not being cleaned regularly, as did a snake enclosure containing two large snakes. A tray on the floor of the turtle enclosure contained shriveled vegetables, which were accessible to all of the turtles and were apparently the only food source available to the animals (video).

---

[2] *Id.*

PETA0001064

- A rancid smell emanated from three cat litterboxes in the kinkajou room and in the hallway, and each contained excessive amounts of feces and urine. A plastic tub inside the kinkajou enclosure was filled with piles of feces and rotting food (video).
- A foul odor emanated from the ferret cage, in which dried urine, piles of feces, and old food had accumulated. The squalid cage attracted swarming flies (video).
- The lemur enclosure contained a slimy and discolored pile of food on the floor that was available to the animals (video).
- The concrete floor of an enclosure containing two dogs had a large amount of feces (video).

**c. Failure to Provide Animals With Adequate Sanitary Food in Apparent Violation of Md. Code Ann., Crim. Law § 10-604(a)(2) and (5)**

Maryland law prohibits depriving animals of necessary sustenance and also prohibits the person who is in charge or has custody of an animal from unnecessarily failing to provide an animal with proper food. Md. Code Ann., Crim. Law § 10-604(a)(2) and (5). The witnesses observed the following instances of Tri-State's failure to provide animals with adequate food:

- A volunteer named John instructed a witness to use a dirty plastic trough as a food container for the pigs. The trough contained feces, but John simply dumped the feces out of the trough rather than cleaning and sanitizing it prior to using it as a food container, thus risking disease transmission to the pigs from the unsanitary container. Moreover, a cantaloupe that a pig was attempting to eat out of the trough was moldy (video).
- A dead calf was lying on the ground. According to Kathy, the calf was a stillborn meant as feed for the tigers. Feeding tigers a dead animal who was kept in unsanitary conditions and without refrigeration risks disease transmission to the tigers, thereby jeopardizing their health (video).
- Bears were not provided with any food, since they were supposedly hibernating, but at least one bear was awake (video). Else Poulsen, a captive-wildlife management consultant specializing in bears and bear husbandry, with nearly 35 years of experience in animal behavior and who has studied and published extensively on the subject of bear behavior, has opined that caretakers should never withhold food from bears, even if the bears are presumed to be hibernating, since only the bears know when they are in metabolic depression (i.e., in hibernation), and to deprive the bears of food creates a risk of hunger or even starvation[3].

**d. Failure to Provide Animals With Adequate Clean Water in Apparent Violation of Md. Code Ann., Crim. Law § 10-604(a)(2) and (5)**

Maryland law prohibits depriving animals of necessary sustenance and also prohibits the person who is in charge or has custody of an animal from unnecessarily failing to provide an animal with proper water. Md. Code Ann., Crim. Law § 10-604(a) and (5). The witnesses observed the following instances of Tri-State failing to provide animals with adequate clean water:

- The capuchin monkey Dodger spilled all his water, and it was not refilled while the witnesses were present, (video), and he was eating snow, according to Kathy, likely because he spilled all his water and was thirsty.

---

[3] E-mail from Else Poulsen to Rachel Mathews, Counsel, PETA Foundation (Dec. 17, 2014).

PETA0001065

- The bears were not provided with any water. Ms. Poulsen has stated that bears who are presumed to be in hibernation should have dry kibble and water accessible to them at all times[4] in order to prevent dehydration. In fact, the USDA cited another roadside zoo for failing to provide bears with water in an effort to "encourage" hibernation. USDA Inspection Report, Natural Bridge Zoo, Lic. No. 52-C-0035, Jan. 6, 2015 ("Bears periodically leave their den during winter months and drink water and/or eat and do need to be provided with potable water during winter months").
- The water tub in the sheep enclosure contained ice and discolored water that did not appear to be fresh (video).
- An enclosure containing two dogs did not have any water (video).

**e.  Failure to Drain Animal Enclosures in Apparent Violation of Md. Code Ann., Crim. Law § 10-604(a)(5)**

Maryland law prohibits the person who is in charge or has custody of an animal from unnecessarily failing to provide an animal with proper shelter or protection from the elements. Md. Code Ann., Crim. Law § 10-604(a)(5). By failing to provide animal enclosures with adequate drainage and forcing numerous animals to live in standing water and mud—risking foot infections and disease transmission—Tri-State is failing to provide animals with proper shelter or protect them from the elements. The witnesses observed the following instances of Tri-State failing to drain animal enclosures:

- The ground in the enclosures containing the donkey, llama, goat, and pig consisted entirely of feces and mud, with no dry areas for the animals to stand on (video, video).
- A llama was confined to a small stall full of standing water, with no dry area for the llama to stand on (video). The llama appeared to be drinking the muddy water.

**f.  Failure to Contain Animals Safely in Apparent Violation of Md. Code Ann., Crim. Law § 10-604(a)(5)**

Maryland law prohibits the person who is in charge or has custody of an animal from unnecessarily failing to provide an animal with proper shelter. Md. Code Ann., Crim. Law § 10-604(a)(5). Tri-State apparently violated this provision by failing to provide a capuchin monkey with a safe enclosure. The witnesses and Kathy saw Dodger, the capuchin, pull up a wooden board with exposed nails from a platform in the enclosure, throw it around the enclosure, and slam it on his forefingers (video). The capuchin also found a piece of blue plastic and was chewing on it (video). To the witnesses' knowledge, Kathy did nothing to remedy either situation.

**2.  Evidence of Tri-State's Knowledge of Violations and Attempts to Deceive Law-Enforcement Authorities**

The witnesses' visit to Tri-State corresponded with an unannounced inspection of the facility by the USDA. The witnesses observed and in some cases documented Candy and facility volunteers scrambling to abate conditions that they admitted to knowing were in violation of federal law in order to avoid being cited by the USDA. Facility representatives also admitted to intentionally deceiving and

---

[4] *Id.*

4

PETA0001066

attempting to confuse federal law-enforcement officials in order to avoid being cited. Additionally, Candy stated that the USDA has no power to enforce fines, so the agency can fine him as much as it likes. This, again, speaks to Tri-State's intent and knowledge that many of the conditions under which it keeps animals violate the law.

The witnesses observed numerous instances of Tri-State representatives displaying clear knowledge of illegal conduct and conditions at the facility:

- A volunteer named John called Candy shortly after the witnesses' arrival, and following the conversation, John asked the witnesses to shovel excessive feces that had accumulated in farmed-animal enclosures, in the hope that the facility would not be fined if the USDA inspectors saw cleaning in progress.
- A volunteer named George asked the witnesses to take buckets containing fruit and vegetable scraps, at least some of which were moldy, to feed the pigs, stating that having food on the floor is a violation and that the buckets needed to be moved.
- George told one of the witnesses that he, George, had to clean the reptile room quickly because its floor was covered in feces, old food, and other debris. George later asked the witness to sweep the kitchen floor before the USDA inspectors could observe it, explaining that it's a violation for the floor to be dirty.
- A facility volunteer named Kathy stated that Tri-State was going to be "nailed" with violations and be "hit, big-time" and said that she knew that George had not been feeding animals or cleaning properly.
- Kathy listed conditions at Tri-State for which she expected the facility to be cited by the USDA: mounds of old food on the floor of the lemur house; a capuchin monkey named Dodger who tore a wooden board off a platform in an enclosure and picked at his bleeding toe, which appeared to be missing a nail; cardboard boxes containing food that were sitting on the kitchen floor; an open bucket of dog food that was sitting on the floor in the kinkajou room; and items that were stacked on top of refrigerators.
- Kathy told the witnesses that Candy had been stalling coming to the facility that day to give volunteers time to clean before the inspectors saw the premises, in order to avoid USDA citations.

The witnesses also observed instances of Tri-State representatives intentionally deceiving federal authorities:

- Kathy stated that Candy instructed her to claim to the USDA inspectors that a gray cat with feline immunodeficiency virus belonged to her, in order to avoid getting the facility in trouble with the USDA. Kathy then reported that she confronted one of the USDA inspectors and told her to delete photos of the gray cat since the cat was hers.
- Kathy told witnesses that USDA inspector Gloria was in an accident, that she suffers from a bad memory and has trouble focusing as a result, and that Kathy and Candy are able to get out of citations by distracting Gloria.
- A witness saw and documented that Kathy was hiding a filthy tub that had been removed from the kinkajou enclosure by putting it inside a box and then covering it with another box (video).

5



AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

April 17, 2015

Elizabeth Goldentyer, D.V.M.
Regional Director, USDA/APHIS/AC Eastern Region

**Via e-mail: betty.j.goldentyer@usda.gov**

Re:     Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064,
        Issued to Bob Candy, dba "Tri-State Zoological Park of Western Maryland"

Dear Dr. Goldentyer:

I am writing on behalf of PETA to request that the U.S. Department of Agriculture
(USDA) deny the renewal of Animal Welfare Act (AWA) exhibitor license number
51-C-0064, issued to Bob Candy, doing business as "Tri-State Zoological Park of
Western Maryland" (collectively, "Tri-State").

The USDA cannot lawfully renew Tri-State's license, which is set to expire on
April 30, 2015, because Tri-State cannot demonstrate compliance with the AWA, as
required by the statute's text and regulations.[1] Rather, Tri-State has demonstrated a
willful disregard for the AWA. In the past 10 years, the USDA cited Tri-State for
violating the AWA more than 100 times. Nearly every on-site inspection resulted in at
least one citation, many for structural or staffing issues that persist over time. The
USDA has cited Tri-State more than a dozen times since the facility's license was
suspended in 2013. Nine of these citations were issued since Tri-State's license was
renewed last year, and five were issued just last month. These citations, together with
PETA's complaint to the USDA and reports made to PETA, show that Tri-State:

- Isolates primates, often without meeting their psychological needs
- Confines animals to unsafe and unsanitary enclosures, including many that are
  muddy, have standing water, or are covered with feces
- Fails to abate conditions that attract rodents, roaches, and flies and allows cats,
  including obviously sick cats, to roam the facility freely
- Denies animals veterinary care, including a capuchin whose toe is bloody
- Employs insufficient and inadequately trained staff
- Delays inspection and deceives or distracts the inspector to evade citations

If the USDA renews Tri-State's license, the animals held at the decrepit and filthy
facility will continue to suffer in violation of the AWA. For the reasons detailed in the
attached appendix, PETA respectfully requests that the USDA deny the renewal of
Tri-State's exhibitor's license. Thank you for your attention to this important matter.

Very truly yours,

Jenni James
Counsel, Captive Animal Law Enforcement
805-206-9316 | JenniJ@petaf.org

Attachments

Washington, D.C.
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Oakland
554 Grand Ave.
Oakland, CA 94610
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
● PETA U.S.
● PETA Asia
● PETA India
● PETA France
● PETA Australia
● PETA Germany
● PETA Netherlands
● PETA Foundation (U.K.)

---

[1] *See* 7 U.S.C. § 2133 ("no [exhibitor's] license shall be issued until the … exhibitor shall have
demonstrated that his facilities comply with the standards promulgated" under the act.); *see also*
9 C.F.R. §§ 2.11(a)(1), 2.2(b), 2.3(a) ("a license will not be issued" unless each applicant, including
applicants for renewal licenses, "certifies … he or she is in compliance with the regulations and
standards and agrees to continue to comply with the regulations and standards" and "demonstrate[s]
that his or her premises and … facilities … comply with the regulations and standards.").

PETA006487

## Appendix

### I.    Legal Background

The AWA states unequivocally that no AWA license "shall be issued until the dealer or exhibitor shall have *demonstrated* that his facilities comply with" AWA standards.[1] As a federal district court made clear in a case involving the renewal of an exhibitor's AWA license, "the express language of the statutory mandate … requires a demonstration of compliance before such issuance [i.e., granting a renewal license] is proper."[2] Thus, absent a *demonstration* of compliance—separate and distinct from a certification of compliance[3]—the USDA cannot lawfully issue a renewal license to Bob Candy, dba as "Tri-State Zoological Park of Western Maryland" (collectively, "Tri-State").

Tri-State has not and cannot demonstrate compliance with the AWA and the regulations promulgated to ensure the humane care of animals. Tri-State's history of chronic noncompliance is documented extensively in the evidence attached herein and discussed below, including:

- The Decision and Order ("Order")[4] issued in Tri-State's appeal of a recent enforcement action that resulted in the suspension of Tri-State's license in 2013;
- Thirty-two USDA inspection reports,[5] documenting more than 100 citations issued to Tri-State over the past ten years, which are also summarized on PETA's fact sheet[6];
- Reports made to PETA by three witnesses who volunteered at Tri-State earlier this year, describing conditions that also apparently violate the AWA;
- PETA's letter of complaint submitted to the USDA on Feb. 9, 2015[7] and assigned complaint number AC15-194 ("PETA Complaint"); and
- Documents provided to PETA by the U.S. Fish & Wildlife Service (FWS) regarding its investigation of Tri-State's unlawful possession of an injured crow in November 2014[8] ("FWS Investigation").

---

[1] 7 U.S.C. § 2133 (emphasis added).

[2] *See* Ex. 1, Order Denying Defendant's Motion to Dismiss, *Ray, et al. v. Vilsack, et al.*, No.  5:12-CV-212-BO (E.D.N.C. Jan. 18, 2013) [hereinafter "*Ray v. Vilsack* MTD"]; *see also id.* (license renewal "is not a discretionary enforcement action, but rather an agency action carried out according to statutory mandates issued by Congress and subject to judicial review").

[3]*See* 7 U.S.C. § 2133; *see also* Ex. 1, *Ray v. Vilsack* MTD, *supra* note 2; *compare* 9 C.F.R. 2.2 (calling for self-certification of AWA compliance), *with* 9 C.F.R. § 2.3 (*additionally* providing that "[e]ach applicant must *demonstrate* that his or her premises and any animals, facilities, vehicles, equipment, or other premises used or intended for use in the business comply with the regulations and standards" (*emphasis added*)); *see also id.* § 2.1 (requiring that *both* section 2.2 *and* section 2.3 be satisfied for a license to be issued); Revision of Definitions, Regulations, and Standards for the Humane Handling, Care, Treatment, and Transportation of Dogs, Cats, and Certain Other Warmblooded Animals, 44 Fed. Reg. 63488, 63489 (Nov. 2, 1979) ("The Animal Welfare Act requires, *in addition to* a written application and payment of reasonable fees, that dealers and exhibitors *demonstrate* that their facilities comply with the standards promulgated by the Secretary" (*emphasis added*)).

[4] Ex. 2, *In re: Tri-State Zoological Park of Western Maryland, Inc., and Robert L. Candy, an Individual*, Decision and Order, USDA Docket No 11-0222, at 42 (Mar. 22, 2013) [hereinafter "Order"].

[5] Ex. 3, USDA Inspection Reports, Nov. 2014-Mar. 2015 (citations since last renewal); Ex. 4, USDA Inspection Reports, Aug. 2013-Apr. 2014 (citations between suspension and last renewal); Ex. 5, USDA Inspection Reports, Feb. 2011-Apr. 2013 (citations issued during enforcement proceedings); Ex. 6, USDA Inspection Reports, May 2006-Sept. 2010 (inspections considered during enforcement); and Ex. 7, USDA Inspection Reports, Dec. 2004-Feb. 2006 (early citations).

[6] Ex. 8, PETA Fact Sheet, Tri-State Zoological Gardens of Western Maryland.

[7] Ex. 9, Letter to Dr. Goldentyer from Delcianna Winders (Feb. 9, 2015) [hereinafter "PETA Complaint"].

Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064, 1

PETA006488

This evidence demonstrates that Tri-State has consistently and willfully confined animals in unsafe, unsanitary, and inhumane conditions that fall short of the minimal housekeeping and husbandry standards set forth by the AWA. Since many of the unlawful conditions stem from chronic structural and staffing deficiencies that Tri-State has apparently not resolved, the facility cannot demonstrate compliance with the AWA. Since Tri-State cannot simultaneously violate the AWA standards and demonstrate compliance with them, the USDA cannot lawfully renew Tri-State's exhibitor license.

## II.     Tri-State Cannot Demonstrate Compliance with AWA Standards
### A.  Tri-State's Violation of the AWA is Both Chronic and Willful

The volume, nature, context, and timing of the citations issued to Tri-State demonstrate that the facility's noncompliance with the AWA is both chronic and willful. In the past ten years, the USDA has cited Tri-State for more than 100 violations of the AWA. At least 30 of these were for repeat violations, and most related either to Tri-State's failure to confine animals in safe and sanitary conditions or to the facility's many structural and staffing deficiencies. Tri-State's chronic violation of the AWA resulted in a temporary suspension of the facility's license in 2013.

In a Decision and Order concluding Tri-State's unsuccessful appeal of the enforcement proceeding that resulted in the 2013 suspension, the USDA found that Tri-State's Candy "demonstrate[d] a lack of cooperation and commitment to full compliance with the [AWA]" and noted that Candy "maintain[ed] that so long as he "cures" defects, he should be considered compliant."[9] Candy's interpretation of the AWA's requirements is untenable. Under Candy's interpretation of compliance, animals would not so receive humane care and treatment at all times, as is required by the AWA, but would instead suffer inhumane care and treatment *unless and until* such conditions were detected and documented by a USDA inspector. Even then, these inhumane conditions could persist until a licensee decided to "cure" the violations. After finding that Candy's repeated violations "suggest[ed] lack of good faith and demonstrate[d] willful violation" of the AWA,[10] The USDA determined that "a 45-day suspension of Tri-State's Animal Welfare Act license and a cease and desist order should be sufficient to deter Tri-State, Mr. Candy, and others from future violations."[11]

Deterrence was clearly not achieved. Since issuing Tri-State's renewal license last year, the USDA has cited the facility for nine violations of the AWA. Five of these citations were issued just last month. Tri-State received another four citations in the short period between the 2013 suspension and the 2014 renewal. The facility received another 18 citations in the two years between the start of the enforcement proceedings and the time the suspension began. Half of these were for repeat violations. Tri-State's continued and repeated violation of the AWA suggests that Candy still believes he need not comply with the AWA unless and until he has been cited repeatedly.

Tri-State's numerous citations may be just a fraction of those that the USDA might have detected if not for the reportedly deceptive practices of Candy and the Tri-State staff. According to the

---

[8] Ex. 10, U.S. Fish & Wildlife Service Investigation Report and Notes (Nov. 2014) [hereinafter "FWS Investigation"].
[9] Ex. 2, *supra* note 4, Order at 42.
[10] *Id.* at 47.
[11] Ex. 2, *supra* note 4, Order at 48.

PETA006489

three witnesses ("Witness 1", "Witness 2", and "Witness 3") who volunteered at Tri-State earlier this year, and who were present during the facility's USDA inspection last month, Kathy, a long-term volunteer, told them that she and Candy intentionally distract the USDA inspector, Dr. Gloria McFadden, to evade citations. Kathy, who was one of two volunteers living at the facility at the time, told the witnesses that Dr. McFadden's memory became impaired several years prior when she was injured in an accident. As a result, she said, she and Candy could cause the inspector to forget about citations she intended to record by distracting her before she wrote them down, and that she and Candy intentionally did so. Witness 1 and Witness 3 recalled that Kathy also stated that it was easy to tell Dr. McFadden that they would return to certain areas later and then skip them entirely.

Moreover, according to Witness 3, Kathy told the witnesses that since the inspector must be accompanied by the owner, Candy had delayed his arrival to allow the volunteers longer to clean the facility and avoid citations. According to the witnesses, Kathy told them that Candy had intentionally kept the inspectors waiting for about 30 minutes that morning. Candy's distraction and delay tactics, apparently designed to conceal the full extent of his unlawful and inhumane practices, suggest that he routinely and willfully violates the AWA.

According to Witness 2, shortly after Dr. McFadden left, Candy spoke candidly to the witnesses about the deterrent effect of various USDA enforcement efforts. Witness 2 reported that Candy said that he does not care about citations and that he has told USDA inspectors that he does not care about citations. Candy then went on to say that he was not concerned with fines, since the USDA could not enforce them. Witness 3 reported that Candy said he had no intention of paying any fines. According to Witness 1 and Witness 2, Candy then stated that the worst the USDA could do is take away his exhibitor's license, but that he was not concerned even then because he would still retain possession of his animals. Witness 1 also reported that Candy criticized the USDA as inefficient, since he went for trial in 2012 for an issue that occurred in 2006.

Despite Candy's apparent disdain for the USDA and its enforcement powers, he did reportedly take at least one more step to avoid citations. According to Witness 1, Kathy told the witnesses that Candy instructed her to tell the inspectors that she owned the many cats who roamed the facility, so that the USDA would not have jurisdiction over them. In fact, Kathy apparently did not own the cats that roamed Tri-State. To the contrary, she reportedly told Witness 2 that she prevented at least one of the of roaming cats, a gray cat who was infected with Feline Immunodeficiency Virus (FIV), from entering her home because she had two cats living inside. According to Witness 1, Kathy disclosed that when she saw the inspector taking pictures of the gray cat that morning, she lied and claimed the cat was hers and instructed the inspector to delete the photos that had been taken. Moreover, Tri-State supplied the roaming cats with litter boxes, which Witness 1 reported seeing in various places in the facility, including one in the building that held the squirrel monkey and the reptiles and Witness 2 saw litter boxes in the room holding the kinkajous and under the tank holding the rats.

Tri-State's recent and repeated AWA citations, together with Candy's reported attempts to intentionally evade citations and obstruct USDA inspections, indicate that Candy continues to "demonstrate a lack of cooperation and commitment to full compliance with the [AWA]."[12]

_____

[12] _Id_. at 42.

Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064, 3

Since Tri-State continues to operate in chronic violation of the AWA, Tri-State cannot demonstrate compliance with the AWA, as required by 9 C.F.R. § 2.3(b), and the USDA cannot lawfully issue Tri-State's renewal license. Moreover, Candy cannot truthfully certify that he is in compliance with the Act, as required by 9 CFR § 2.2(b). Since Candy cannot apply for a renewal license without stating, falsely, that he complies with the AWA, and a license will not be issued to any applicant who "[h]as made any false or fraudulent statements ... to the Department,"[13] the USDA cannot issue Tri-State's renewal license.

### B.  Social Primates Isolated With No Regard For Their Psychological Well-Being

Tri-State has a history of isolating social primates without the environmental enrichment plan that is required by 9 C.F.R. § 3.81(c)(4) and apparently without justification, as required by 9 C.F.R. § 3.81(a).

- Tri-State's most recent citation for the unlawful isolation of primates was issued in November 2014, after the inspector found a singly-house marmoset who was held without an environmental enrichment plan in place to ensure the primate's psychological well-being.[14]
- The facility was also cited in August 2009, after the inspector found a squirrel monkey and a lemur, each housed alone, and their needs were not addressed in the facility's primate enrichment plan.[15]
- Tri-State was also cited in May 2006 for isolating a lemur without addressing the lemur's need for additional enrichment.[16]
- Three months earlier, in February 2006, Tri-State was cited because it did not have a complete enrichment plan for any of the primates at the facility.[17] This was a repeat violation.
- The facility was cited for failing to have an enrichment plan in January 2006 as well.[18]
- Just four months earlier, in September 2005, Tri-State was also cited for failing to address the needs of three singly-housed primates: a capuchin, a pigtail macaque, and a rhesus macaque.[19]

According to inventories supplied to the USDA by Tri-State in 2013 and 2014,[20] and the observations of the witnesses who recently volunteered there, the facility also holds a single capuchin monkey. Although the facility has not yet been cited for the isolation of the capuchin, reports from the witnesses suggest that the capuchin is also suffering. As described in greater detail in § II.C.1, *infra*, according to Witness 1, all three witnesses saw the capuchin handling a piece of wood that the primate had pried off a platform inside the enclosure, chewed hard plastic into pieces, and paced around the enclosure in which he was confined during the facility's most recent inspection. Pacing is widely recognized as a stereotypical behavior that is commonly

---

[13] 9 C.F.R. § 2.11(a)(6).
[14] Ex. 3, *supra* note 5, USDA Inspection Report (Nov. 6, 2014).
[15] Ex. 6, *supra* note 5, USDA Inspection Report (Aug. 3, 2009).
[16] Ex. 6, *supra* note 5, (USDA Inspection Report (May 17, 2006).
[17] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[18] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[19] Ex. 7, *supra* note 5, USDA Inspection Report (Sept. 28, 2005).
[20] Ex. 11, Tri-State Renewal Applications at 2, 4.

PETA006491

associated with stress.[21] The capuchin also appeared to engage in self harm and overgrooming, both common stereotypies.[22] As discussed in § II.E, *infra*, Witness 1 and Witness 2 reported that the capuchin picked at his toe and tail until they bled. In addition, Witness 1 saw the primate scratch repeatedly at a bald spot on his back at the base of his tail. Witness 2 and Witness 3 noticed that the bald spot appeared larger than it had been during a previous visit. The pacing and picking are evidence that the capuchin is suffering psychological harm as a result of his isolation. Notably, in December 2014, Witness 1 saw the isolated squirrel monkey engage in behavior that might be self harm. The squirrel monkey appeared to bite at his own arm.

USDA regulations require facilities to "develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates," that includes "specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature."[23] The social housing of primates "must be in accordance with currently accepted professional standards, as cited in appropriate professional journals or reference guides, *and* as directed by the attending veterinarian."[24] The *only* appropriate reasons for isolating an animal are aggression, debilitation, illness, or incompatibility.[25]

At Tri-State, there is no evidence that the marmoset, squirrel monkey, and capuchin are isolated because they are aggressive, debilitated,[26] ill, or incompatible with others of their kind. Rather, it appears they are isolated because the facility has elected to acquire and exhibit only one of each of these types of primate. Although Tri-State is well aware of its obligation to take special care to safeguard the psychological well-being of singly-housed social primates, the facility does not appear to have taken steps to remedy the isolation of these three primates. Instead, Tri-State elected, yet again, to subject a social primate to isolation in the absence of an environmental enrichment plan, and in willful violation of the AWA.

As long as Tri-State houses social primates in isolation, apparently without justification as narrowly provided by 9 C.F.R. § 3.81(a), and often without ensuring the primates' psychological

---

[21] *See* Joseph C. E. Barber, *Animal Behavioral Concerns*, *in* Zookeeping: An Introduction to the Science and Technology, 387, 391 (Mark D. Irwin, et al. eds., 2013) ("When animals are observed performing behaviors that seem to have no obvious goal or function (e.g., pacing to and fro), and when certain behaviors are repeated time and again ... they may be performing abnormal repetitive behaviors (ARBs) or more specifically stereotypic behaviors or stereotypies"); *id.* at 405 ("reduction in stereotypic behavior" is one of the "commonly used measures by which enrichment is evaluated in published papers"; "enrichment is a highly effective strategy for reducing stereotypic behavior"; *see also* Kathleen N. Morgan and Chris T. Tromborg, *Sources of Stress in Captivity*, 102 Applied Animal Behaviour Science, 262, 263 (2007) ("Behaviorally, chronic stress may be indicated by ... increased abnormal behavior").

[22] *See* Erica Miller and Sandra Woltman, *Wildlife Rehabilitation*, *in* Zookeeping: An Introduction to the Science and Technology, 573, 581 (Mark D. Irwin, et al. eds., 2013) (behavioral enrichment can help prevent "self-mutilating or overgrooming, reduce [] stereotypic behaviors," and reduce stress).

[23] 9 C.F.R. § 3.81(a).

[24] *Id.* (emphasis added).

[25] *Id.* (emphasis added).

[26] According to Witness 1, Candy said that the capuchin's fangs were removed by a prior owner and thus he would not be able to be around another of his species. Although this disability would prevent the capuchin from being safely housed with other intact capuchins, there is no evidence that Tri-State has isolated the capuchin for this reason, and his psychological suffering could be alleviated if he were housed in such a way that he could see and hear other capuchins.

Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064, 5

well-being, Tri-State cannot demonstrate compliance with the AWA. Since Tri-State cannot demonstrate compliance with the AWA, USDA cannot lawfully issue Tri-State's renewal license.

### C. Tri-State Confines Animals in Unsafe and Unsanitary Conditions

Tri-State's many citations, supplemented by complaints and witness reports, demonstrate that the facility confines animals in unsafe and unsanitary conditions, contrary to the AWA.

#### 1. Capuchin and Other Primates at Risk of Harm by Unsafe Enclosures

As mentioned briefly in § II.B, *supra*, the witnesses who volunteered at Tri-State during the facility's inspection last month reportedly saw a singly-housed capuchin named Dodger with a board that he had pulled off of a platform inside the enclosure holding him. Witness 3 reported that they first heard Dodger prying the board off when they walked down a pathway outside the enclosure. Witness 1 reported that at least two screws protruded from the board and that Dodger threw the board around the enclosure, ultimately slamming it on to a wooden platform and apparently catching his fingers underneath it when he did. According to Witness 1 and Witness 3, Kathy was also present and did nothing to protect the capuchin from harm. Witness 2 reported that Dodger later picked up a piece of blue plastic, which Witness 1 thought might have come from a broken plastic ball, and began chewing it. Witness 2 reported that the capuchin reportedly chewed on the plastic for two minutes, breaking it into pieces. According to Witness 1, the plastic made a cracking sound as it broke into smaller pieces, and although Kathy saw Dodger chewing the plastic, she did nothing to remove it. Witness 3 also reported that Dodger slammed the water bucket in the enclosure against the wall, spilling the water. By isolating the capuchin, apparently without justification under 9 C.F.R. § 3.81(a), in an enclosure that contained a loose board and broken plastic, Tri-State apparently subjected the primate to a risk of harm, in violation of the AWA.

Dodger is among many animals who have been confined at Tri-State in unlawful and unsafe conditions.

- In January 2014, after finding frozen water in a drinking receptacle in an enclosure with a snow macaque, the USDA cited Tri-State for allowing the temperature in the building to drop below 45 degrees, in violation of 9 C.F.R. § 3.77(a).[27]
- A year later, PETA reported to USDA that Tri-State appeared to be violating 9 C.F.R. § 3.127(b), by confining two dogs outside with only one small kennel between them, subjecting at least one dog to temperatures that were in the low 20s.[28]
- In September 2005, Tri-State was cited for violating 9 C.F.R § 3.52(a), after confining six rabbits in an enclosure that did not allow all of them to access shade at the same time.[29]
- Four months later, in February 2006, Tri-State was cited for confining two rabbits in an outdoor hutch that was primarily made of wire, exposing the rabbits to wind and extremely cold weather.[30]
- In September 2005, Tri-State was also cited for violating 9 C.F.R § 3.127(a) after denying a lion[31] shade.

---

[27] Ex. 4, *supra* note 5, USDA Inspection Report (Jan. 27, 2014).
[28] Ex. 9, *supra* note 7, PETA Complaint at 3.
[29] Ex. 7, *supra* note 5, USDA Inspection Report (Sept. 28, 2005).
[30] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).

PETA006493

- Tri-State was cited again for violating 9 C.F.R § 3.127(a) in January 2008 after denying five ferrets[32] shade.
- Tri-State was cited for violating 9 C.F.R. § 3.127(b) twice in 2006 after leaving tigers[33] outside without adequate shelter.
- In February 2006, the cougars[34] were also not provided adequate shelter for winter temperatures, in violation of 9 C.F.R. § 3.127(b).
- In November 2006, the roof of a shelter provided to the macaque was cracked[35] and the shelter provided to the artic fox had a large hole in the roof,[36] in further violation of 9 C.F.R. § 3.127(b).
- Tri-State was cited for violating 9 C.F.R. 3.80(a)(2)(ii), in September 2007 after a pigtail macaque was found dead near a partially chewed heat lamp cord.[37]
- Tri-State was cited twice in 2006 for violating 9 C.F.R. § 3.80(b)(2), after the inspector found two large macaques in an enclosure that was less than 5 square feet[38] and a juvenile lemur in a small, dark enclosure.[39]
- In January 2006, Tri-State was cited because the squirrel monkey was held in an enclosure that had damaged and missing plaster and areas of wood that were missing paint.[40] Tri-State also held lemurs and capuchins in enclosures made with untreated wood.[41]
- In September 2005, Tri-State was cited when the inspector saw that the squirrel monkeys were confined in an enclosure that had a cracked glass.[42]

Because Tri-State continues to confine primates in unsafe conditions that violate the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

## 2.    Animals Confined in Filthy, Feces-Filled Enclosures

Last month, the USDA cited Tri-State for confining a coatimundi in an enclosure that had "excessive" amounts of dried feces coating a platform and a "treat cup [that] was soiled."[43] During the inspection on April 24, 2014, *just days before Tri-State's last renewal license was issued,* the inspector found excessive feces, urine, food, and other debris accumulated in the litter pan of a kinkajou enclosure.[44]

---

[31] Ex. 7, *supra* note 5, USDA Inspection Report (Sept. 28, 2005).
[32] Ex. 6, *supra* note 5, USDA Inspection Report (Jun. 2, 2008).
[33] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006) and USDA Inspection Report (Jan. 5, 2006).
[34] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[35] Ex. 6, *supra* note 5, USDA Inspection Report (Nov. 29, 2006).
[36] *Id.*
[37] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 26, 2007).
[38] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[39] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[40] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[41] *Id.*
[42] Ex. 7, *supra* note 5, USDA Inspection Report (Sept. 28, 2005).
[43] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).
[44] Ex. 4, *supra* note 5, USDA Inspection Report (Apr. 24, 2014).

PETA006494

According to the witnesses who volunteered at the facility during the USDA inspection last month, many other animals at Tri-State were also confined in enclosures that were overrun by feces or filthy in other ways.

- Witness 3 observed that the big cat enclosures were wet, muddy, snowy, and covered in feces.
- Witness 1 reported seeing piles of feces in the cages holding the kinkajous. Witness 3 reported seeing full tub of feces, liquid, and rotting food in a cage that normally held kinkajous. Witness 3 said the tub looked as if it had not been cleaned for more than a month.
- Witness 3 reported that the concrete floor of the enclosure holding two dogs was completely covered in feces.
- Witness 3 saw feces piled up in tub at the bottom of a cage holding ferrets.
- Witness 3 and Witness 1 both saw rats held in a glass tank that was so dirty the rats were barely visible from the side. Witness 1 said the water bowl in the tank appeared very murky and brown in color.
- Witness 1 and Witness 3 also saw donkeys, goats, pigs, and a llama held in enclosures that consisted entirely of feces and mud. Witness 1 saw a goat in a shed that had a floor that was mostly covered with feces.
- Witness 2 saw feces in cages holding birds. Witness 3 observed feces throughout the cages holding the birds.[45]

Witness 3 also reported that Kathy told the witnesses that they did not need to worry about cleaning several enclosures, including those holding the capuchin, coatimundi, raccoon, bobcats, skunk, and porcupine, since the USDA inspectors had already seen them. In February 2015, PETA requested that the USDA investigate unsanitary conditions, providing video of feces and rotten food covering the floor of the enclosures holding kinkajous.[46]

Tri-State has been cited numerous times for confining animals in dirty or feces-filled enclosures:

- In October 2011, Tri-State was cited after the inspector saw a build up of brown material on the upper wall near a perch used by the kinkajou.[47]
- Tri-State was cited in June 2008 and August 2009 for confining older tigers in an enclosure with a small pool that had excessive amounts of feces and urine.[48] During the enforcement proceeding that resulted in the 2013 suspension of his license, Candy referred to this pool as the tigers' toilet.[49]
- Tri-State was cited again, in November 2009, after the inspector found a similarly soiled pool in an enclosure holding a young tiger.[50]

---

[45] Although the USDA has not yet developed specific standards for birds, these warm-blooded animals are covered by the plain language of the AWA (*see* 7 U.S.C. § 2132(g); *see also* 9 C.F.R. § 1.1), AWA regulations, including the general AWA standards set forth in subpart F, 9 C.F.R. §§ 3.125–142.

[46] Ex. 9, *supra* note 7, PETA Complaint at 3.

[47] Ex. 5, *supra* note 5, USDA Inspection Report (Oct. 6, 2011).

[48] Ex. 6, *supra* note 5, USDA Inspection Report (Aug. 3, 2009)) and USDA Inspection Report (Jun. 2, 2008).

[49] Ex. 2, *supra* note 4, Order at 29.

[50] Ex. 6, *supra* note 5, USDA Inspection Report (Nov. 20, 2009).

PETA006495

- In August 2009, there were excessive amounts of feces, some of it dried, in the enclosures holding goats, pigs, servals, and bobcats.[51]
- In February 2006, Tri-State was cited for violating 9 C.F.R. § 3.84, after the inspector found primates in enclosures that had feces built up on surfaces.[52] This was a repeat citation as the inspector also noted a build up of dirt and debris the month before.[53]
- In February 2006, the inspector also found that the outdoor pens holding livestock were a mix of feces and mud, and that the house holding mammals and reptiles had an excessive amount of feces.[54] Feces left by roaming birds were found through the public areas.[55]
- In January 2006, Tri-State was also cited for the excessive amount of feces in a cage pan provided for a singly-housed gray rabbit.[56] Pans beneath other cages holding rabbits were actually beginning to deteriorate and the cages were apparently not sanitized within the past 30 days.[57]
- Tri-State was cited six times for violating 9 C.F.R. § 3.131(b), after the facility persistently confined big cats in enclosures that were made of cracked or damaged concrete, which is impossible to properly sanitize.[58]
- Tri-State was also cited in September 2012 for two 3 inch holes in the concrete floor of an off-exhibit area of the enclosure holding the tiger.[59]

Because Tri-State continues to confine animals in filthy, feces-filled enclosures, in violation of the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### 3.    Animals Confined in Enclosures Covered in Mud or Standing Water

Last month, the USDA cited Tri-State for confining animals in enclosures that had standing water or other drainage issues. An enclosure holding two pigs apparently lacked sufficient drainage as it was "excessively muddy" and had "a pool of standing water around the water receptacle."[60] An alpaca[61] was locked, for at least three hours, in a shelter stall that had standing water and mud, which the inspector noted could "cause foot problems" and "excessive chilling in cold water."[62]

According to the witnesses who volunteered at Tri-State during the USDA inspection last month, many other enclosures were also filled with mud or standing water:

---

[51] Ex. 6, *supra* note 5, USDA Inspection Report (Aug. 3, 2009).
[52] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[53] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[54] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[55] *Id.*
[56] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[57] *Id.*
[58] Ex. 5, *supra* note 5, USDA Inspection Report (Jul. 3, 2012), USDA Inspection Report (Mar. 2, 2012), USDA Inspection Report (Oct. 6, 2011), USDA Inspection Report (Jun. 9, 2011), USDA Inspection Report (Feb. 10, 2011); and Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 29, 2010).
[59] Ex. 5, *supra* note 5, USDA Inspection Report (Sept. 14, 2012).
[60] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).
[61] According to Witness 3, the alpaca was also part llama and was named Misty. Witness 3 suspected that Misty was confined during the inspection because shad recently become aggressive and often attempted to escape.
[62] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).

PETA006496

- According to Witness 3, there was snow, mud, and puddles of standing water in an enclosure holding a donkey named Demo.
- Witness 3 further reported that a goat who was held in an enclosure with a miniature horse was standing in one of two empty tubs, apparently because there was no other dry area available. Witness 1 also reported seeing the goat standing in a tub, surrounded by deep mud on all sides. Witness 2 reported seeing approximately 60 piles of feces in the enclosure and also noted that there was no dry ground.
- Witness 1 saw one half of a dog house filled with feces and straw and a large amount of feces in the straw inside a shed, both in an enclosure holding pigs.
- Witness 3 reported that the concrete floor of the enclosure holding the singing dog was covered in snow, ice, and puddles of standing water.
- Witness 1 reported seeing a donkey whose fur was wet and covered in places by both wet and dry mud.
- According to Witness 1, in a building holding birds, feces covered the heater and floor and was piled an inch thick in some places.

Tri-State's previous citations for mud and standing water include:

- A citation for violating 9 C.F.R § 3.127, which was issued in May 2006 because the ground in the pen holding pigs was damp, there was mud mixed with feces near the shelter, and the drainage pool had a small amount of green material floating on the water.[63]
- Tri-State was cited for the same violation twice more, earlier in 2006, when the inspector described the facility as "one giant puddle" and noted that few if any of the hoofstock had a truly dry area to lie down.[64]

Because Tri-State continues to confine animals in wet and muddy enclosures, in violation of the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### 4.    Moldy and Rotten Food, Accumulated Food Waste

Last month, USDA inspectors cited Tri-State for insufficient housekeeping or sanitation after finding that the enclosure holding the coatimundi had "excessive" amounts of dried feces coating one platform, a "buildup of food wastes" on another, and a "treat cup was soiled."[65] Tri-State was also cited because inspectors noted that discarded produce outside the enclosure holding eight pigs increased the risk of rodents, "odors, and disease hazards."[66]

The witnesses who volunteered at Tri-State during the inspection last month reported further the following unsanitary conditions:

- Witness 2 reported that the cage holding ferrets smelled of old food and feces and a plastic bowl in the cage had old food mixed with urine and feces.

---

[63] Ex. 6, *supra* note 5, USDA Inspection Report (May 17, 2006).
[64] Ex. 5, *supra* note 5, USDA Inspection Report (Feb. 14, 2006) and USDA Inspection Report (Jan. 5, 2006).
[65] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).
[66] *Id.*

PETA006497

- The kitchen smelled strongly of rotting food and mold, the floor was covered in trash and dirt, Witness 2 and Witness 3 reported that the refrigerators were dirty and had rotting food in them.
- There were buckets of fruit and vegetable scraps on the floor of the kitchen that a volunteer instructed Witness 1 and Witness 2 to feed to the pigs. Witness 1 saw that the scraps appeared to be slimy and that one of the buckets contained bananas that were brown and very wet. When feeding the pigs, Witness 1 noticed that a cantaloupe appeared moldy. Witness 2 also reported seeing spots of white and black mold on the cantaloupe and saw banana peels that had turned black with age.
- According to Witness 1, some of the scraps were fed to the pigs from a plastic container that had been contaminated by feces. Witness 1 watched as John, another volunteer who lived on the premises, removed the plastic container from an enclosure holding goats, knocked the container on the ground, and caused several pieces of feces to fall out. John then handed the container to Witness 1 and instructed Witness 1 to pour the food scraps in it.
- According to Witness 3, a mound of slimy and discolored food was on the floor of the enclosure holding two ring-tailed lemurs.
- Witness 3 saw that the concrete floor of the enclosure holding two dogs was completely covered with feces.
- According to Witness 1, the water sources in a building that held birds were brown and contaminated by feces, and a metal bowl in the building held brown and withering fruit.

Tri-State has been cited repeatedly for violations issued as a result of food waste or insufficient sanitation:

- A citation issued in November 2014 after the inspector found that the rug in the kitchen was "sufficiently worn that it [could] no longer be cleaned and sanitized effectively."[67]
- In February 2006, Tri-State was cited because the kitchen floor was excessively dirty and not sealed in many areas, food debris had accumulated under the cutting boards, several ceiling tiles were missing over the prep area, exposing the insulation, and an open barrel of animal bones sat in the middle of the kitchen floor, letting off a moderate odor.[68]
- At the same time, an unused refrigerator was turned off and was dirty and held a bag containing an unknown substance, another refrigerator that held fruit was dirty, and uncovered bone scraps were kept uncovered in a freezer with other packages of meat.[69]
- A month prior, Tri-State was cited after the inspector found uncovered produce, meant for the primates, in a refrigerator.[70] The freezer portion of the appliance contained a dead guinea pig and dead pheasant, both unwrapped and with a pool of blood.[71] A freezer holding chicken also contained blood.[72] The chest freezer contained thawed deer rib cages that were rotting and that smelled of decay.[73]

---

[67] Ex. 3, *supra* note 5, USDA Inspection Report (Nov. 6, 2014).
[68] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[69] *Id.*
[70] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[71] *Id.*
[72] *Id.*
[73] *Id.*

Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064, 11

- In February 2006, Tri-State was also cited for failing to feed rabbits daily, in violation of 9 C.F.R. § 3.54(a), after the inspector found the food pan used by the Angora rabbits had old moist caked food at the bottom and fresh pellets and feces on top, indicating that the rabbits had apparently not eaten the contaminated food[74] This was a repeat citation.[75]

Because Tri-State continues to confine animals in filthy feces-filled enclosures, in violation of the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### 5. Animals Confined Without Food or Water

In addition, the witnesses noted that the following enclosures lacked food, water, or both:

- Witness 2 saw that the bowls in the enclosures holding tigers named Mowgli and Cheyenne were empty and dry. The witnesses reported that Kathy reportedly tried, with little success, to fill the bowls from outside the enclosures during the inspection.
- Witness 3 reported that the donkey named Demo was held in an enclosure that did not appear to have any water.
- Witness 1 saw pigs held in a muddy enclosure without water, other than a few shallow, muddy puddles.
- Witness 3 saw two macaques in an enclosure that did not appear to have any food or water. The macaques reportedly could not access the indoor portion of the enclosure.
- Witness 3 reported that there was no food or water available to the alpaca who was locked in the muddy stall during the inspection. She was reportedly drinking the water pooled on the ground.
- Witness 3 also did not see any food or water in the enclosure holding two dogs.
- Witness 2 and Witness 3 reported that the bears were held in an enclosure without food or water and there were no food or water containers, other than an empty metal bath tub.

In February 2015, PETA reported that several animals at Tri-State were confined without food or water.[76] PETA provided video of several rats in a cage with an empty water dish and an apparently old, unpeeled orange as the only source of food.[77] PETA also reported that the squirrel monkey, bobcats, and foxes were confined without food or water,[78] and the water containers for several farmed animals were "frozen solid."[79]

Tri-State has been cited previously for failing to provide animals with food or water.

- In November 2009, Tri-State was cited because the drinking water provided to a lion was greenish in color.[80]
- In February 2006, Tri-State was cited as a result of the dirty drinking water that was in a bowl on the floor of the enclosure holding guinea pigs.[81]

---

[74] Ex. 5, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[75] *See* § II.C.5, *infra*.
[76] Ex. 9, *supra* note 7, PETA Complaint at 2-3.
[77] *Id*. at 2.
[78] *Id*.
[79] *Id*. at 2-3.
[80] Ex. 6, *supra* note 5, USDA Inspection Report (Nov. 20, 2009).

PETA006499

- In January 2006, Tri-State was cited after the inspector found an excessively thin Angora rabbit in a cage that did not have any food in it.[82]

Because Tri-State continues to confine animals without clean water, as required by the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### 6.    Fences and Facilities in Disrepair, Gates Left Open

Last month, USDA inspectors cited Tri-State after finding two areas that needed repair. The wooden platform that served as a barrier between the public and three tigers was crumbling, jeopardizing the integrity of the wire panel fence attached to it.[83] The wooden fence around the petting zoo was "excessively worn" and leaning in places.[84] The citation for the petting zoo fence was a repeat violation. Four months prior, the inspector clearly stated that the "board fencing must be repaired ... or replaced" by Dec. 30, 2014.[85] Tri-State had only repaired the broken fence post.[86] During the November 2014 inspection, the inspector also found that a "portion of the primary perimeter fence" around the enclosure holding the young tigers was "movable" and was not sufficiently secured "to facilitate containment of the animals in the event of an escape."[87]

Witness 1 reported that during the inspection last month, the roof of Tri-State's kitchen was leaking. Witness 1 saw that someone had stapled a clear plastic to the ceiling. This apparent attempt to repair the leak was reportedly unsuccessful. Witness 1 reported that a bucket was placed under the leak, and directly in front of the door to the kitchen. This bucket was reportedly half filled with water, and a steady drip from the ceiling added to the bucket's contents. Witness 2 also saw the bucket on the floor and water dripping from the plastic on the ceiling.

During inspections in the brief period between Tri-State's license suspension in 2013 and renewal in 2014, the inspector found the perimeter fence along the front of the property was compromised in two ways: a section of chicken wire at the top of the fence was "rusty and detached" and tree branches were "pushing down on the barb and chicken wire" in another area.[88] The perimeter fence along the parking lot was compromised by a board that was "leaning outward."[89]

In November 2014, Tri-State was also cited for insufficient perimeter fencing after the inspector found that the "entrance gates, which are part of the perimeter, were open" and, as a result, three people were able to enter and "walk to the back of the property before being noticed."[90] This was a repeat violation. The inspector was also able to enter the facility unnoticed in January 2014.[91]

---

[81] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[82] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).
[83] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).
[84] *Id.*
[85] Ex. 3, *supra* note 5, USDA Inspection Report (Nov. 6, 2014).
[86] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).
[87] Ex. 3, *supra* note 5, USDA Inspection Report (Nov. 6, 2014).
[88] Ex. 4, *supra* note 5, USDA Inspection Report (Aug. 21, 2013).
[89] *Id.*
[90] Ex. 3, *supra* note 5, USDA Inspection Report (Nov. 6, 2014).
[91] Ex. 4, *supra* note 5, USDA Inspection Report (Jan. 27, 2014).

Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064, 13

PETA006500

Tri-State has been cited for numerous other issues related to fencing or security:

- In July 2012, Tri-State was cited because the dividing fence between two enclosures holding tigers did not have a kick-in or substantial overhang, as is necessary to contain adult tigers.[92]
- Tri-State was cited for the same issue four months earlier, in March 2012.[93] In addition, the enclosure holding lions was made of a collection of wire panels tied to chain link in a way that the inspector believed might not adequately contain the lions.[94] A ledge in the enclosure holding tigers was also wide enough to allow a tiger to gain footing and leap out of the enclosure.[95]
- The March citation was also a repeat violation, as Tri-State was cited for the same issues three times in 2011,[96] and twice in 2010.[97]
- The deficiencies in the lion enclosure dated even farther back. Tri-State was cited for the inadequate fencing twice in 2009.[98]
- In September 2007, Tri-State was cited for another inadequate fence design, this time because a fence around an enclosure holding a young lion was constructed of wood and small gauge wire that was not of sufficient strength to contain the big cat.[99]
- Tri-State also received many citations for fences that were loose or not connected well, including the fence around a female cougar;[100] another around a lion, this one consisting in part of hog panels that were not attached to bottom or side support posts and that were not buried in the ground;[101] a fence around a tiger that was not secure at the bottom where a large rock was located;[102] a fence around tigers that was made of 14 gauge wire and heavier paneling that was only attached to fence posts by bent nails;[103] and a fence holding lions that was barely 6 feet tall and that was bent and broken in some places and that was not always attached to a solid anchor.[104]
- Fencing issues were not reserved to big cats. Tri-State was also cited for fences that had sharp edges, placing goats and llamas at risk of injury.[105]
- Some fencing issues were so severe that animals escaped, including three llamas and a goat, who roamed the facility before being contained again,[106] and two artic foxes who escaped and evaded capture.[107]

---

[92] Ex. 5, *supra* note 5, USDA Inspection Report (Jul. 3, 2012).

[93] Ex. 5, *supra* note 5, USDA Inspection Report (Mar. 2, 2012).

[94] *Id.*

[95] *Id.*

[96] Ex. 5, *supra* note 5, USDA Inspection Report (Oct. 6, 2011), USDA Inspection Report (Jun. 9, 2011), USDA Inspection Report (Feb. 10, 2011).

[97] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 29, 2010), USDA Inspection Report (May 19, 2010).

[98] Ex. 6, *supra* note 5, USDA Inspection Report (Nov. 20, 2009), USDA Inspection Report (Aug. 3, 2009).

[99] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 26, 2007).

[100] Ex. 6, *supra* note 5, USDA Inspection Report (Mar. 11, 2009).

[101] Ex. 6, *supra* note 5, USDA Inspection Report (May 17, 2006); Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).

[102] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).

[103] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).

[104] *Id.*

[105] Ex. 7, *supra* note 5, USDA Inspection Report (May 23, 2007), USDA Inspection Report (Nov. 29, 2006).

[106] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006), USDA Inspection Report (Jan. 5, 2006).

[107] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006), USDA Inspection Report (Jan. 9, 2006).

PETA006501

- Many citations were issued because big cats[108] and other animals[109] were held in enclosures that were not entirely contained by the perimeter fence, or because the facility's perimeter fence was in disrepair.[110]

Because Tri-State consistently fails to secure the animals at the facility, as required by the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### D.  Roaches, Rodents, and Domestic Cats Roam Freely

Tri-State's inspection reports reveal the presence of rodents at the facility, including during the inspection last month, in March 2015, when rodent feces was found in the feed room.[111] Tri-State had already been cited the previous year after the inspector found open bags of feed and food spilled on the floor and instructed the facility to improve its husbandry practices to "prevent the harborage and attraction of pests."[112]

In addition, as PETA reported to the USDA in February 2015, Tri-State allows many domestic cats to roam the facility freely.[113] Some of these cats show clear signs of illness and thus place the exhibited animals at risk.[114]

The witnesses who volunteered at Tri-State during the last inspection also reported seeing many domestic cats around the property. Witness 1 saw approximately six cats, in the facility's kitchen and in the room that held the squirrel monkey and the reptiles. One of the cats was white and had a red wound that was about the size of a nickel in between her shoulder blades. Witness 3 saw the same wounded white cat enter the room holding the ferrets and rats. Witness 1 and Witness 3 later watched as the white cat climbed on to a box of thawing and expired fish fillets[115] outside the kitchen. Witness 1 reported that the plastic wrapping on some of the packages had been torn and the fillets appeared to have been chewed. Witness 3 noted that the cat may have eaten the fish, which were dark brown in color and appeared slimy. Later, Witness 1 saw two cats in the room that room that holds the squirrel monkey and the reptiles. One was reportedly gray and white and had crusty eyes. Witness 3 also saw the gray and white cat in the kitchen. Witness 3 noted that the cat had black crusty discharge under both eyes.

Witness 2 also noted the presence of flies at Tri-State, including buzzing around the rotting food in the enclosure holding the kinkajous and buzzing above a bowl of food, feces, and urine inside the enclosure holding the ferrets.

---

[108] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 26, 2007); Ex. 7, *supra* note 5, USDA Inspection Report (Sept. 7, 2006), USDA Inspection Report (Jan. 5, 2006).

[109] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 28, 2005).

[110] Ex. 6, *supra* note 5, USDA Inspection Report (Aug. 3, 2009); Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006), USDA Inspection Report (Jan. 5, 2006).

[111] Ex. 3, *supra* note 5, USDA Inspection Report (Mar. 4, 2015).

[112] Ex. 4, *supra* note 5, USDA Inspection Report (Jan. 27, 2014).

[113] Ex. 9, *supra* note 7, PETA Complaint at 2.

[114] *Id.*

[115] Witness 1 reported that the expiration dates on the packages indicated that most of the fillets had expired two weeks earlier.

Request for Non-Renewal of Animal Welfare Act License No. 51-C-0064, 15

PETA006502

The USDA cited Tri-State multiple times after finding evidence of pest infestations.

- In September 2012, Tri-State was cited for violating 9 C.F.R. § 3.131(b), after the inspector noted that many flies were in the enclosure holding the skunks.[116] The inspector noted that the housing structures were soiled and there was an excessive amount of food waste on the ground.[117]
- In November 2011, Tri-State was cited for violating 9 C.F.R § 3.131(d), after the inspector saw roaches on the viewing window of the off-exhibit entry door for the kinkajou.[118]
- In September 2010, the inspector saw a live mouse running into one of two rodent holes in the enclosure holding a lemur.[119]
- In June 2008, the inspector saw a live rat running across the enclosure holding three young tigers.[120]
- In May 2007, Tri-State was cited for violating 9 C.F.R § 3.131(d), in part because files were present in the building holding reptiles and in several off-exhibit or shelter areas.[121]
- A year earlier, in May 2006, the inspector saw a mouse inside an enclosure holding the binturong.[122]
- In February 2006, the inspector saw rodent feces in the kitchen and noted that the visitor room smelled of rodents.[123] The inspector also heard a rodent scurrying around inside a bag of hog feed[124] and found an accumulation of bedding and rodent feces under the enclosure holding the fennec fox and agouti.[125]
- A month earlier, the inspector saw abundant evidence of rodent activity, including at least three live mice in the feed storage area.[126]

Because Tri-State continues to allow rodents and other pests to infest the facility, in violation of the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### E. Animals Apparently Denied Veterinary Care

The witnesses observed several animals at Tri-State who appeared to be in need of veterinary care. As mentioned in § II.C.3, *supra*, Witness 3 reported that a goat named Demo had overgrown hooves. According to Witness 2, a bird, who was apparently a green-cheeked Amazon, made an audible sound when breathing. Witness 3 saw a skunk who was missing hair along both sides of his or her neck. Kathy told Witness 3 that the skunk suffered from a skin condition.

---

[116] Ex. 5, *supra* note 5, USDA Inspection Report (Sept. 14, 2012).
[117] *Id.*
[118] Ex. 5, *supra* note 5, USDA Inspection Report (Nov. 2, 2011).
[119] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 29, 2010).
[120] Ex. 6, *supra* note 5, USDA Inspection Report (Jun. 2, 2008).
[121] Ex. 6, *supra* note 5, USDA Inspection Report (May 23, 2007).
[122] Ex. 6, *supra* note 5, USDA Inspection Report (May. 17, 2006).
[123] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).
[124] *Id.*
[125] *Id.*
[126] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).

PETA006503

The witnesses all reported seeing Dodger the capuchin pick at his tail until it bled. Witness 1 and Witness 2 also saw Dodger picking at his foot and all three witnesses saw that Dodger was missing a toenail. Kathy had apparently not noticed the missing toenail until the witnesses pointed it out. . In fact, Witness 3 reportedly noticed the toe was bothering the capuchin more than a month earlier and shared that observation with Candy then.

PETA also reported the capuchin's condition to the USDA on Feb. 9, 2015.[127] In this complaint, PETA reported that a visitor to the facility, Witness 3, had alerted Candy to the capuchin's bloody and raw toe, but the concern was dismissed when Candy said, "monkeys just do that sometimes."[128] PETA also reported a sheep whose head tilted at a sharp angle and asked the USDA to determine whether the animal had received veterinary care, as required by 9 C.F.R. § 2.40(a) and (b)(2).[129]

Tri-State was previously cited repeatedly for failing to provide animals with veterinary care, including goats with overgrown hooves,[130] goats who were limping[131] rabbits with matted fur,[132] and rabbits who needed nail trims.[133] In addition, Tri-State has been cited repeatedly for expired medications,[134] failure to provide a Program of Veterinary Care for review,[135] and failure to have the big cat diets approved by a veterinarian.[136]

In November 2014, PETA asked the FWS to investigate the presence of an injured crow at Tri-State. The FWS seized[137] the bird after confirming that the crow was held at Tri-State in violation of the Migratory Bird Treaty Act[138] Candy admitted that the bird had been held at his facility for three to four years.[139] After seizing the crow from Tri-State's 501(c)(3) alter-ego, Animal Park Care & Rescue, FWS took the bird to a veterinarian who told the agency that the bird had suffered a traumatic injury approximately ten days prior and not received any treatment for the injury during that time.[140] During the investigation, Candy apparently attempted to mislead the FWS, claiming that the crow had received treatment at his facility.[141] Candy, however, also said that his veterinarian believed that "nature was the best medicine."[142] This statement, if true, calls into question the quality of care given to any of the animals held at Tri-State.

---

[127] Ex. 9, *supra* note 7, PETA Complaint at 2.

[128] *Id.*

[129] *Id.*

[130] Ex. 6, *supra* note 5, USDA Inspection Report (Nov. 20, 2009), Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 7, 2006); Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006)

[131] Ex. 6, *supra* note 5, USDA Inspection Report (Aug. 3, 2009)

[132] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006), USDA Inspection Report (Jan. 5, 2006).

[133] Ex. 6, *supra* note 5, USDA Inspection Report (Jan. 5, 2006)

[134] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006), USDA Inspection Report (Jan. 5, 2006).

[135] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 3, 2008), USDA Inspection Report (Jun. 2, 2008).

[136] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).

[137] Ex. 11, *supra* note 9, FWS Investigation, at 1-3.

[138] 16 U.S.C. §§ 703-12.

[139] Ex. 11, *supra* note 9, FWS Investigation, at 8.

[140] *See id.* at 7 ("the injury had not been treated prior ... estimated that the injury was 10 days old plus or minus a day or so), and 9 ("nail still dangling [] no treatment prior[,] nail would have been removed if it had been treated").

[141] *See id.* at 9 ("The bird is under vet care[,] we have two on staff. ...It has already been treated[,] it is / was being cared for.").

[142] *See id.* at 11 ("My vet believes nature is the best medicine for wild animals.").

PETA006504

Because Tri-State denies animals, like the capuchin, prompt and proper veterinary care, as required by the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

### F. Inadequate and Unqualified Staff

The failures above all suggest that Tri-State does not have a "sufficient number of adequately trained employees" to "maintain the professionally acceptable level of husbandry practices" required by the AWA.[143] Indeed, the volunteers who work at Tri-State demonstrate a distinct lack of expertise. Kathy boasted to the witnesses that she had been bitten by most of the animals at the facility. Witness 3 recalled that she specifically mentioned snakes, tigers, a lemur, and a groundhog. Kathy reportedly revealed that the tiger named Mowgli had recently bitten her finger so hard that the fingernail came off. Witness 3 saw that the fingernail on Kathy's right index finger was indeed small and appeared to be growing back in. She also reportedly had scars on her arms. Witness 2 said she also told them that Candy had also once been attacked by a lion but that he told the hospital he had fallen down a hill and been stabbed by a stick.

PETA reported additional failures of Tri-State's staff in the February 2015 complaint.[144] PETA included a screenshot of a video of Candy suspending a skunk by the tail, in apparent violation of 9 C.F.R. § 2.131(b)(1),[145] and provided additional photographs of Tri-State volunteers touching big cats without supervision, in apparent violation of 9 C.F.R. § 2.131(d)(2)-(3).[146]

Tri-State has been cited numerous times for staff failures or inadequacies:

- In February 2011, Tri-State was cited after staff allowed the public into an off-exhibit area to view a white tiger, with no barrier in between.[147] This was a repeat citation.
- Tri-State was cited in June 2008 after staff allowed the public to enter off-exhibit areas for enclosures holding a lion and three young tigers.[148] Tri-State staff allowed the children to touch the tigers.[149]
- Tri-State was cited for violating 9 C.F.R § 3.85 in September 2007, after the pigtail macaque was apparently electrocuted,[150] and in January 2006, when the inspector noted that new or inexperienced volunteers worked alone on certain days of the week.[151]
- Tri-State was cited for violating 9 C.F.R § 3.132 twice in 2006, when the inspector noted that the facility relied on inexperienced employees who were not supervised by someone with a background in animal care.[152]

---

[143] 9 C.F.R. § 3.132.
[144] Ex. 9, *supra* note 7, PETA complaint.
[145] *Id.* at 2.
[146] *Id.* at 3.
[147] Ex. 5, *supra* note 5, USDA Inspection Report (Feb. 10, 2011).
[148] Ex. 6, *supra* note 5, USDA Inspection Report (Jun. 2, 2008).
[149] *Id.*
[150] Ex. 6, *supra* note 5, USDA Inspection Report (Sept. 26, 2007).
[151] Ex. 7, *supra* note 5, USDA Inspection Report (Jan . 5, 2006).
[152] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006); Ex. 6, *supra* note 5, USDA Inspection Report (May 17, 2006).

PETA006505

- Tri-State has also been cited for basic husbandry failures that betray the staff's inexperience or unprofessionalism, including food that was stored in open containers,[153] dirty containers,[154] or directly on the ground.[155]

Because Tri-State does not have a sufficient number of adequately trained employees to maintain an acceptable level of husbandry, as required by the AWA, Tri-State cannot demonstrate compliance with the AWA or truthfully certify compliance. As a result, the USDA cannot lawfully issue a renewal license to Tri-State.

## III.    Conclusion

The many violations and apparent violations documented above establish that Tri-State has not and cannot demonstrate compliance with the AWA. Since an applicant must be able to demonstrate compliance and certify truthfully that the facility complies with the AWA before a license may issue, the USDA must deny Tri-State's application for renewal.

---

[153] Ex. 4, *supra* note 5, USDA Inspection Report (Apr. 25, 2013); Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006)

[154] Ex. 7, *supra* note 5, USDA Inspection Report (Jan. 5, 2006).

[155] Ex. 7, *supra* note 5, USDA Inspection Report (Feb. 14, 2006).

PETA006506

**PETA**
F O U N D A T I O N

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

February 27, 2015

Michael O. Twigg
State's Attorney
Office of the State's Attorney for Allegany County, Maryland
59 Prospect Square, Ste. 111
Cumberland, MD 21502

**Via e-mail: motwigg@alleganygov.org and UPS**

Re: Tri-State Zoological Park

Dear Mr. Twigg:

Thank you again for meeting with Jeff Kerr, Chris Fontes, Colin Henstock, and me on February 9 to discuss apparent violations of Maryland state law at Tri-State Zoological Park (Tri-State). At our meeting, you inquired about the availability of evidence to demonstrate that Bob Candy is intentionally engaging in conduct that he knows to be in violation of the law, particularly in relation to his intent and knowledge that the way in which he is keeping animals is unlawful. You requested copies of the U.S. Department of Agriculture (USDA) inspection reports, which I had previously sent to you via Hightail and which will also be attached to a hard copy of this letter that is being shipped via UPS. For ease of reference, please see this factsheet, which provides a chronological list of Tri-State's Animal Welfare Act (AWA) violations. We have also compiled a categorical list of Tri-State's AWA violations in the attached appendix.

Please note also that Candy and Tri-State were found liable for "willfully" violating the AWA regulations in 2013, in an administrative enforcement proceeding before the USDA.[1] The specific violations for which Candy was previously found liable appear in italics below. These prior violations support the argument that Candy is aware—at least as to the types of violations for which he was found liable—that keeping animals in these conditions is unlawful. Citations for additional violations since the USDA decision offer further evidence of Candy's knowledge and intent.

Please do not hesitate to contact me if I can provide any additional information. I can be reached at 202-540-2191 or BrittanyP@petaf.org.

Very truly yours,

Brittany Peet
Deputy Director | Captive Animal Law Enforcement

Attachments

---

[1] *In re Tri-State Zoological Park of Western Maryland, Inc., and Robert L. Candy, an Individual,* Decision and Order, USDA Docket No. 11-0222 (March 22, 2013). (Attached)

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

**Washington, D.C.**
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

**Los Angeles**
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

**Norfolk**
501 Front St.
Norfolk, VA 23510
757-622-PETA

**Oakland**
554 Grand Ave.
Oakland, CA 94610
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.
AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

PETA0000901

**Table of Contents**

I.     **VETERINARY CARE** .......................................................................................**3**

II.    **HANDLING OF ANIMALS** ..............................................................................**3**
     A.  Failure to handle animals so that there is minimal risk of harm to the animal and to the public with sufficient distance and/or barriers between the animal and general public during public exhibition. 9 C.F.R. § 2.131(c)(1) .................................................. 3
     B.  Failure to exhibit animals only for periods of time and under conditions consistent with their good health and well-being. 9 C.F.R. § 2.131(d)(1) ........................................ 4

III.   **SPECIFICATIONS FOR THE HUMANE HANDLING, CARE, TREATMENT AND TRANSPORTATION OF RABBITS**............................................................**4**
     A.  Failure to properly store supplies of food and bedding in facilities that adequately protect such supplies against infestation or contamination by vermin. 9 C.F.R. § 3.50(d) ............. 4
     B.  Failure to provide shelter from sunlight. 9 C.F.R. § 3.52(a) ....................................... 5
     C.  Failure to provide shelter from cold weather. 9 C.F.R. § 3.52(c) ............................... 5
     D.  Failure to feed rabbits at least once a day except as otherwise might be required to provide adequate veterinary care. 9 C.F.R. § 3.54(a) .......................................................... 5
     E.  Failure to have surfaces in the housing facilities constructed in a manner and made of materials that allow them to be readily cleaned and sanitized, and failure to maintain by spot cleaning and sanitizing. 9 C.F.R. § 3.54 ............................................................ 5

IV.   **SPECIFICATIONS FOR THE HUMANE HANDLING, CARE, TREATMENT, AND TRANSPORTATION OF PRIMATES** ...........................................................**6**
     A.  Failure to keep housing and areas used for storing animal food or bedding free of any accumulation of trash, waste material, junk, weeds, and other discarded materials. 9 C.F.R. § 3.75 (b) ........................................................................................................... 6
     B.  Failure to construct and maintain surfaces in a manner that can be readily cleaned and sanitized. 9 C.F.R. § 3.75(c) ............................................................................ 6
     C.  Failure to store supplies of food and bedding in a manner that protects the supplies from spoilage, contamination, and vermin infestation. 9 C.F.R. § 3.75(e) ......................... 6
     D.  Failure to provide sufficient drainage and waste disposal. 9 C.F.R. § 3.75(e) ............ 7
     E.  Failure to provide ample lighting as appropriate for the species involved. 9 C.F.R. § 3.76(c) ................................................................................................................ 7
     F.  Failure to provide adequate sheltered holding facilities that provides sufficient heat or cooling when necessary to protect primates from temperature extremes. 9 C.F.R. § 3.77(a) .............................................................................................................. 7
     G.  Failure to have a perimeter fence sufficient to keep unwanted species and unauthorized persons from entering the premises, and to prevent physical contact between animals inside the enclosure and outside the perimeter fence. 9 C.F.R. § 3.77(f) ............................ 7
     H.  Failure to provide primary enclosures constructed and maintained so that they protect primates from injury. 9 C.F.R. § 3.80(a)(2)(ii) .................................................... 7
     I.  Failure to provide the minimum space that must be provided to each primate. 9 C.F.R. § 3.80(b)(2) .......................................................................................................... 7
     J.  Failure to provide environment enhancement to promote psychological well–being. 9 C.F.R. § 3.81 ...................................................................................................... 8
     K.  Failure to properly clean and sanitize primary enclosures and premises where housing facilities are located. Failure to provide safe and effective pest control. 9 C.F.R. § 3.84 .... 8
     L.  Failure to have enough employees properly trained to provide sufficient care to primates. 9 C.F.R. § 3.85 ...................................................................................................... 9

{00185069}

**V.**  **SPECIFICATIONS FOR THE HUMANE HANDLING, CARE, TREATMENT, AND TRANSPORTATION OF WARM-BLOODED ANIMALS OTHER THAN DOGS, CATS, RABBITS, HAMSTERS, GUINEA PIGS, PRIMATES, AND MARINE MAMMALS** ........................................................................................................ **9**

A.  Failure to provide structurally sound holding and maintain in good repair to protect the animals from injury and to contain them. 9 C.F.R. § 3.125(a) ...................................... 9

B.  Failure to store food and bedding in facilities which adequately protect such supplies against deterioration, molding, or contamination by vermin. 9 C.F.R. § 3.125(c) ............ 12

C.  Failure to provide the removal and disposal of animal wastes. 9 C.F.R. § 3.125(d) .......... 12

D.  Failure to provide sufficient lighting appropriate for the species involved. 9 C.F.R. § 3.126(c) ................................................................................................................... 13

E.  Failure to provide shelter from sunlight. 9 C.F.R. § 3.127(a) ............................................ 13

F.  Failure to provide shelter from inclement weather. 9 C.F.R. § 3.127(b) ........................... 13

G.  Failure to provide a suitable method to rapidly eliminate excess water. 9 C.F.R. § 3.127(c) ................................................................................................................... 13

H.  Failure to provide a sufficient perimeter fence to keep animals protected from unauthorized persons or animals from entering premises and to act as a second containment system for the animals at the facility. 9 C.F.R. § 3.127(d) ................................................................. 14

I.  Failure to provide food that is wholesome, palatable, and free from contamination. 9 C.F.R. § 3.129(a) ................................................................................................................... 15

J.  Failure to provide clean and sanitary food receptacles. 9 C.F.R. § 3.129(b) ..................... 15

K.  Failure to provide clean and sanitary water receptacles. 9 C.F.R. § 3.130 ........................ 15

L.  Failure to remove excreta from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors. 9 C.F.R. § 3.131(a) ...................................................................................... 15

M.  Failure to properly sanitize enclosures. 9 C.F.R. § 3.131(b) ............................................. 16

N.  Failure to keep premises clean and in good repair in order to protect the animals from injury and to facilitate prescribed husbandry practices. 9 C.F.R. § 3.131(c) ..................... 17

O.  Failure to establish and maintain a safe and effective pest control program. 9 C.F.R. § 3.131(d) ................................................................................................................... 18

P.  Failure to provide a sufficient number of adequately trained employees. 9 C.F.R. § 3.132 ................................................................................................................... 19

**VI.**  **IDENTIFICATION OF ANIMALS** ............................................................................ **20**

{00185069}2

PETA0000903

## APPENDIX

Tri-State, USDA exhibitor license #51-C-0064, has been cited for the following AWA noncompliant items:

## I.   VETERINARY CARE

**A.   Failure to establish and maintain programs of adequate veterinary care that include the use of appropriate methods to treat diseases and injuries. 9 C.F.R. § 2.40**

    a)   *November 20, 2009 – there were goats with hoof problems and though a veterinarian had seen and diagnosed the condition the frequency of hoof trims was not noted and there was no documentation of the hoof trims. (Inspection id 324090919230950)*

    b)   *August 3, 2009 – one young silver/black goat and the adult black goat were limping. (Inspection id 215092110000416)*

    c)   *September 3, 2008 – the Program of Veterinary Care was not available for review. This was a repeat citation. (Inspection id 204939)*

    d)   *June 2, 2008 – an updated Program of Veterinary Care was not available for review. (Inspection id 204893)*

    e)   *September 7, 2006 – a goat named Whodini, Jr. had overgrown hooves. (Inspection id 204624)*

    f)   February 14, 2006 – the following items were cited, these were repeat citations (inspection id 204519):

        1.   Four bottles of outdated drugs were found, one with an expiration date of 2003, two from 2004, and another from 2005.

        2.   One Angora rabbit was matted and in need of grooming.

        3.   Both Angora rabbits were thin with prominent bony processes along the spine and pelvis. Also these rabbits may have been without adequate water and food for a period of time or intermittently.

    g)   January 5, 2006 – the following items were cited (inspection id 204500):

        1.   The rabbits held in the visitor building needed their nails trimmed. One gray rabbit's nails were curling around the pen wire. The one angora rabbit was very severely matted.

        2.   The goat with a genetic leg condition had overgrown front hooves.

        3.   Four bottles of outdated drugs were found, one with an expiration date of 2003, two from 2004, and another from 2005. Isolytes IV was opened with a needle set and tubing installed.

## II.   HANDLING OF ANIMALS

**A.   Failure to handle animals so that there is minimal risk of harm to the animal and to the public with sufficient distance and/or barriers between the animal and general public during public exhibition. 9 C.F.R. § 2.131(c)(1)**

    a)   February 10, 2011 – the public was allowed into the off-exhibit area of the white tiger with an attendant to view the tiger, there was no barrier to prevent the public from coming into direct contact with the animal. This was a repeat citation. (Inspection id 45111706520343)

{00185069}3

b) August 3, 2009 – the lower rung of the barrier fence in front of the enclosure holding the binturong was detached from a pole. A child had been observed steeping over the broken rung to pet one of the resident domestic cats. (Inspection id 215092110000416)

c) June 2, 2008 – the following items were cited (inspection id 204893):

    *1. The public was allowed to enter the off-exhibit area for the one lion and the three young tigers, there wasn't a barrier in this area and the public, including young children were allowed to touch the tigers and take photos while being supervised by a volunteer. The public could get within less than one inch of the primary enclosure fence for the lion to take photos.*

    2. Part of the barrier fence in the front of the enclosure holding the young lion had been removed allowing the public to come in direct contact with the animals and the barrier fence was only 3 feet in height.

    3. There was no barrier fence around the enclosure holding the young porcupine.

d) May 17, 2006 – there was an insufficient barrier fence surrounding the enclosure holding the cougar. (Inspection id 204578)

**B. Failure to exhibit animals only for periods of time and under conditions consistent with their good health and well-being. 9 C.F.R. § 2.131(d)(1)**

    a) *September 29, 2010 – the entry door to the indoor enclosure holding the squirrel monkey had openings wide enough to allow the monkey to put his hands through and to allow a person to put a finger through. (Inspection id 278101220550091)*

**III.   SPECIFICATIONS FOR THE HUMANE HANDLING, CARE, TREATMENT AND TRANSPORTATION OF RABBITS**

**A. Failure to properly store supplies of food and bedding in facilities that adequately protect such supplies against infestation or contamination by vermin. 9 C.F.R. § 3.50(d)**

    a) February 14, 2006 – the following items were cited, these are repeat citations (inspection id 204519):

        1. A new load of hay had been delivered and was stored directly on the ground.

        2. The stainless steel rabbit racks under the house holding reptiles were empty but feces and waste had not been removed and properly disposed of.

    b) January 1, 2006 – the following items were cited (inspection id 204500):

        1. Rabbit feed was stored in the building holding squirrel monkeys in uncovered containers.

        2. A wheel barrow full of feces and other pen debris was left by the cages holding rabbits and under the overhang outside the building holding squirrel monkeys.

**B. Failure to provide shelter from sunlight. 9 C.F.R. § 3.52(a)**

    a) September 28, 2005 – the outdoor enclosure holding rabbits only had one shelter that did not allow all 6 rabbits to rest under at the same time. There were two big holes dug by the rabbits as a cooling method. (Inspection id 204460)

**C. Failure to provide shelter from cold weather. 9 C.F.R. § 3.52(c)**

{00185069}4

a) February 14, 2006 – the two angora rabbits were in an outdoor hutch that provided 3-sided shelter which made up 1/3 of the enclosure, the rest of the hutch was constructed of wire which left the rabbits somewhat exposed to wind and extremely cold weather. (Inspection id 204519)

**D. Failure to feed rabbits at least once a day except as otherwise might be required to provide adequate veterinary care. 9 C.F.R. § 3.54(a)**

a) February 14, 2006 – the food pan used by the angora rabbits had old moist caked food at the bottom with fresh pellets on top, rabbit feces was also present in the bowl. The rabbits had not eaten the food from the last feeding and the food was probably contaminated and not palatable. This was a repeat citation. (Inspection id 204519)

b) January 5, 2006 – there was one Angora rabbit that was excessively thin; the enclosure holding this rabbit had no food in it at 2:30pm. This was the same rabbit with the large build-up of mats in his coat. (Inspection id 204500)

**E. Failure to have surfaces in the housing facilities constructed in a manner and made of materials that allow them to be readily cleaned and sanitized, and failure to maintain by spot cleaning and sanitizing. 9 C.F.R. § 3.54**

a) February 14, 2006 – the following items were cited (inspection id 204519):

   1. There were wall areas in the enclosure holding the squirrel monkey that was damaged and missing plaster, there were also areas of wood that were missing paint and a large amount of untreated structural wood surfaces in the enclosures holding lemurs and capuchins.

   2. The enclosures holding a number of primates had an excessive amount of feces and material build-up on the surfaces, including perches.

   3. Excreta and food waste was present under the enclosure holding the pigtail macaque.

b) January 5, 2006 – the following items were cited (inspection id 204500):

   1. Four of the outdoor cages holding rabbits near the house holding reptiles had excessively soiled bedding and a build-up of material around the sides of the trough. An excessive amount of feces was in the cage pan provided for the singly housed grey rabbit.

   2. There was no evidence that any cages holding rabbits or other enclosures had been sanitized within the past 30 days.

   3. The pans in the cages holding rabbits were beginning to deteriorate.

**IV. SPECIFICATIONS FOR THE HUMANE HANDLING, CARE, TREATMENT, AND TRANSPORTATION OF PRIMATES**

**A. Failure to keep housing and areas used for storing animal food or bedding free of any accumulation of trash, waste material, junk, weeds, and other discarded materials. 9 C.F.R. § 3.75 (b).**

a) February 14, 2006 – the following items were cited. These were repeat citations. (Inspection id 204519)

{00185069}5

PETA0000906