**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
–Southern Division–**

CONSTANCE COLLINS, *et al.*,

              Plaintiffs,

–v–

TRI-STATE ZOOLOGICAL PARK OF
WESTERN MARYLAND, INC., *et al*.,

              Defendants.

Case No. 1:20-cv-01225

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[1]**

In accordance to Rule 56 of the Federal Rules of Civil Procedure, Defendants Tri-State

Zoological Park of Western Maryland, Inc., Animal Park, Care & Rescue, Inc., and Robert

Candy (collectively "Defendants"), by and through their undersigned counsel, hereby move

this Court for an Order granting summary judgement in Defendants' favor. In support of this

Cross-Motion, Defendants submit this memorandum in Support of Defendants' Cross Motion

for Summary Judgment and in Opposition Plaintiffs Constance Collins and People for the

Ethical Treatment of Animals, Inc. ("PETA")'s (together, "Plaintiffs") Motion for Summary

Judgment.

**PROCEDURAL HISTORY**

Plaintiffs bring this public nuisance action, alleging that the roadside zoo owned and

operated by Defendants violates Maryland's cruelty to animals' statute, Md. Code, Crim. Law

---

[1] We apologize to the Court and Opposing Counsel as we had technology breakdown where we could not connect to the court system to e-file our papers.

§ 10-604, and the Animal Welfare Act, 7 U.S.C. §§ 2131–2159 ("AWA"), and thus constitutes a public nuisance under Maryland common law. In their memorandum for summary judgment ("Pl. SJM"), Plaintiffs contend Defendants have unlawfully harmed, harassed, wounded, and caused the death of animals, including many protected by the ESA, for years without meaningful repercussion. *See* Pl. SJM, at p. 7; Md. Code., Crim. Code § 10-604. Plaintiffs assert these alleged practices impair the public morals and create a public nuisance. *Id.* at p. 7.

Defendant Robert Candy maintains a small, privately owned, exotic animal zoo located in Cumberland, Maryland ("Tri-State"). Tri-State is a small facility that takes in homeless and unwanted exotic and farm animals and either finds them homes, or cares for them at the facility until their deaths. Plaintiffs' allegations of neglect and cruelty are based upon nothing more than sensationalized and overblown "sensitivity" on behalf of Plaintiff Collins, who lives states away from Tri-State.

## STANDARD OF REVIEW

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "[T]his standard provides that the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Courtney-Pope v. Bd. of Educ. of Carroll Cty.*, 304 F. Supp. 3d 480, 488 (D. Md. 2018) (quoting Anderson, 477 U.S. at 247–48). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

## ARGUMENT

### I. Defendants' Use Of Their Property Does Not Intrude Upon Public Property Nor A Property Right Common To The Public So As To Constitute A Public Nuisance

The concept of nuisance is rooted in Maryland common law. *Wash. Suburban Sanitary Comm'n v. CAE-Link Corp.*, 330 Md. 115, 124 (1993). Although the doctrine originally developed to safeguard private landowners from being dispossessed of their property, it evolved to protect private landowners from "substantial interferences" with the possession of their land. *Wietzke v. Chesapeake Conference Ass'n*, 421 Md. 355, 373-74 (2011).

Maryland courts have adopted Section 13 of the Restatement (Second) of Torts § 821D (1965), which more narrowly defines a private nuisance as "a non-trespassory invasion of another's interest in the private use or enjoyment of land." *See, e.g.*, *Rosenblatt v. Exxon Co.*, U.S.A., 335 Md. 58, 80 (1994); *Exxon Corp. v. Yarema*, 69 Md. App. 124, 147 (1986).

To be considered a public, as opposed to private, the nuisance *must* affect an interest common to the general public, rather than peculiar to one individual, or several.

The *Restatement (Second) of Torts* § 821(b) states:

"Public Nuisance

 "(1) A public nuisance is an unreasonable interference with a right common to the general public.

"(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

"(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

"(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

"(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Id. at 87.

Moreover, the Restatement explains in *comment g* that "Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons.  There must be some interference with a public right.  A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured . . ."

In this case, the display of rescued animals whose condition might not appeal to the aesthetics of every human eye does not qualify as a public nuisance. Here, just because  one of the Plaintiff's was allegedly sensitive to the condition and appearance of the zoo, it does not establish some sort of distress that could rise to the level of a public nuisance under any rational interpretation of the law.  For example, *Schuman v. Greenbelt Homes, Inc.*, 212 Md. App. 451, 456 (2013) a hyper-sensitive plaintiff. In *Schuman*, The Court explained that in order to identify what is a nuisance, it must consider what "'ordinary people, acting reasonably, have a right to demand in the way of health and comfort under all

the circumstances'" and that "it is not enough if a particular plaintiff is 'offended or annoyed if he is particularly sensitive.'" *Id.* at 523.  Therefore, even if Plaintiff Collins actually had a particular sensitivity to the way the zoo is displayed and the way the animals appeared when she visited, her subjective reaction is not sufficient to establish a public nuisance. Tri-State Zoo was never issued any citations nor had been under any scrutiny prior to this case. An "eggshell plaintiff's" alleged emotional discomfort cannot create out of thin air a public nuisance. *Id.* at 525.

Finally, not every interference with a public right will constitute a public nuisance since the interference must be unreasonable. Accordingly, a plaintiff must demonstrate that defendant's interference with the plaintiff's property rights is both unreasonable and substantial in order to recover for nuisance. *Exxon Mobil Corp. v. Albright (Albright I)*, 433 Md. 303, 409-11, *modified on other grounds, Exxon Mobil Corp. v. Albright* (*Albright II*), 433 Md. 502 (2013); *accord Exxon Mobil Corp. v. Ford*, 433 Md. 426, 485-86 (2013) (following *Albright I*'s rationale and concluding that appellees with potable wells that had not tested positive for contamination failed to show substantial interference sufficient to sustain actions in nuisance).  Further, the nuisance doctrine also evolved to protect the rights of the public as well where a "right common to the general interest" has been interfered with. *Wietzke*, 421 Md. at 374.

*Burley v. City of Annapolis*, 182 Md. 307, 34 A.2d 603 (1943) concerned the propriety of the revocation of billiard table licenses by a municipal corporation. The Court explained:

> Public nuisances, that is to say, those nuisances which have a common effect and produce a common damage, are usually placed in three classifications: First, those which are nuisances per se or by statute; second, those which prejudice public health

> or comfort such as slaughterhouses, livery stables, etc.; third, those which in their nature are not nuisances, but may become so by reason of their locality, surroundings, or the manner in which they may be maintained.

In this case, Plaintiffs claim that Defendants maintain a public nuisance in the form of a roadside zoo where the animals that reside there are denied standard care, in violation of state and federal law.  Further, Plaintiffs contend that these conditions have led to numerous animal deaths and continue to contribute to "immeasurable—and wholly unnecessary—suffering."

To the contrary, there have been *no* citations issued by the County of Cumberland or State of Maryland for animal cruelty, nor has they been any claims of nuisance by the County of Cumberland or the State of Maryland.  Further, on February 4, 2020, the zoo was inspected by the USDA Animal and Plant Health Inspection Service (APHIS).  The USDA did *not* uncover or report anything concerning regarding the welfare of the animals. *See* February 4, 2020 Jamilon Nieman Email re. Tri-State Zoo #15730, attached as Declaration of John Candy ("Candy Decl.") Ex. 1).   Mr. Nieman's inspection clearly shows that Defendants had voluminous documentation from the facility and veterinarian to show all the actions that had been taken with respect to the well-being and care of the animals.

In this case, there is no factual allegation that an animal has injured the public. The Plaintiffs themselves have not been injured by Defendants or the animals in any way, lacking a material element to have standing which is injury in fact. Likewise, there has been no prosecution of any violation of law on the part of the Defendants. Nor do the documents attached to the Memorandum in Support of the Motion for Summary Judgment contain a proof of any crime, or any evidence that anything about the zoo is a danger to public health,

and certainly do not contain any support for the conclusion that it would fit under the Restatement's version of a public nuisance.

## II.    Defendants' Operation Of Tri-state Does Not Constitute A Public Nuisance

Under any reading of the relevant law, the zoo is not a public nuisance. The elements of a public nuisance were discussed by the Court of Appeals in *Tadjer v. Montgomery Cnty.*, 300 Md. 539, 551–53, 479 A.2d 1321 (1984). Quoting Dean Prosser, the Court of Appeals said: "***To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several.***" The Court of Appeals held: "A public nuisance is an unreasonable interference with a right in common to the general public." *Id.* (emphasis added).

The fact that the zoo is open to public is insufficient. To show that anything is a public nuisance, it must be shown either that it seriously affects the health of the neighborhood, or that it renders the enjoyment of life and property uncomfortable. The determination of whether it is a public nuisance, as opposed to a private nuisance, depends on the number of houses and people in the immediate vicinity. Of course, whether the requisite number are affected is a question of fact for the jury. The question of whether something is a public nuisance is determined by its influence on the health of the neighborhood or the enjoyment of life and property. Plaintiffs have failed to adduce facts that prove any negative influence either on the health of the neighborhood or the enjoyment of life and property so as to constitute a public nuisance.

One of the fundamental principles of public nuisance in Maryland is set forth in *Adams v. Comm'rs of Trappe*, 102 A. 2d 830, 834 (Md. App. 1954):

> It is a basic principle that courts of equity have jurisdiction over issues of property and the maintenance of civil rights, and do not interpose their aid in matters merely criminal which do not affect any rights of property. That principle, however, does not preclude injunctive relief against the commission of criminal acts which, unless enjoined, would operate to cause an irreparable injury to property or rights of a pecuniary nature. As we stated in *Clark v. Todd*, 192 Md. 487, 492, 64 A.2d 547, if criminal offenses are primarily and essentially an injury to property, preventive relief may be granted by the court of equity within the same limits as where the element of criminality is entirely absent. In such a case, the court does not intervene to prevent the commission of the crime, although that may incidentally result, but to protect individual property from destruction.

The Plaintiffs here complain as though this were a case brought under the Endangered Species Act, that they do not believe they have gleaned every bit of information from the backroom drawers and file cabinets of the Zoo, and that the Zoo, in the ordinary course of its operations, moved animals around and updated records to more accurately reflect the status of the animals.

How this relates to a public nuisance is anyone's guess, since even if there were a criminal act alleged, one must, under *Adams v. Commissioners of Trappe*, Id. at 834, tie that criminal act to an injury to Plaintiffs before it becomes relevant to a public nuisance case. Plaintiffs include detailed factual allegations in their Motion for Summary Judgment that the zoo residents were subjected to criminal mistreatment because Maryland law prohibits a "person [who] has charge or custody of an animal, as owner or otherwise, [from] unnecessarily fail[ing] to provide the animal with" "necessary veterinary care." Md. Code Ann., Crim. Law § 10-604(a)(5)(ii). However, there is nothing tying these factual allegations, to any property damage that fits a public nuisance claim, nor any nuisance claim whatsoever.

Finally, the Code of Maryland (the "Maryland Code") provides clear insight as to legislative intent concerning specific codified substantive contexts where public resources are earmarked to address the harm caused by "public nuisances." The most basic rule of statutory construction requires that legislative acts must be construed, or read as a whole, so that internal inconsistencies are avoided. *Dictionary of Law* (7th Ed. 2009) p. 295.

A review of the Maryland Code demonstrates conclusively that Defendants' operation of Tri-State <u>does not fall</u> into any of these commercial, public or social contexts such that the facts alleged by Plaintiff's constitute a public nuisance:

References to and inclusion of the phrase "public nuisance" in the Maryland Code include:

(i)   "A place where alcoholic beverages are sold in violation of this article or Title 5 of the Tax - General Article is a . . . public nuisance." Md. Code, Alco. Bev. § 32-2614 (a), § 27-2616 (a), § 29-2612 (a).

(ii)   "An innkeeper may refuse to provide lodging or services to or may remove from a lodging establishment an individual who. . . . "2) while on the premises of the lodging establishment is under the influence of alcohol, drugs, or other intoxicating substance so as to create a public nuisance; (3) while on the premises is disorderly so as to create a public nuisance"; Md. Code, Bus. Reg. § 15-203(a)(2) and (3).

(iii)   "An "End the Violence" P.R.O.T.E.C.T. Coordinator shall reside in the jurisdiction in which the high-crime micro-zone is located.   An "End the Violence" P.R.O.T.E.C.T. Coordinator shall. . . . "; (4) assist with rapid response to [public nuisances]; Md. Code, Pub. Safety § 4-1502 (b) and (c)(4).

(iv)   "(a) . . . (1) For purposes of this section, an "immediate threat" exists if any meat, seafood, poultry, vegetable, fruit, or any other perishable substance that is intended for consumption as food. . . ."; 2) If a food poses an immediate threat, it shall be considered a public nuisance." Md. Code, Health-Gen. § 21-254.

(v)   "(a)(1) A telegraph or telephone company or a corporation authorized under § 5-410(a)(3) of this article may construct lines. . . . "; (b) A line constructed under subsection (a) of this section is not a public nuisance and is not subject to abatement by a private party if the line does not interfere with or disturb. . . ." Md. Code, Pub. Util. § 8-103.

(vi)     "(a) In this section, "sport shooting range" means an area designed and used for trapshooting, skeet shooting, or other target shooting. (b) This section applies only to private nuisance actions and does not apply to public nuisance actions." Md. Code, Cts. & Jud. Proc. § 5-403.1.

(vii)    "Because the quality of the waters of this State is vital to the public and private interests of its citizens and because pollution constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, . . ." Md. Code, Env't § 4-402

(viii)   "(g) Each sign, signal, marking, or device prohibited by this section is a public nuisance, and the authority that has jurisdiction over the highway may remove it without notice."

(ix)     "(a) The purpose of this subtitle is to establish effective programs and to provide additional and cumulative remedies to prevent, abate, and control pollution of the waters of this State. (b) Because the quality of the waters of this State is vital to the interests of the citizens of this State, because pollution is a menace to public health and welfare, creates public nuisances, harms wildlife, fish, and aquatic life." Md. Code, Env't § 9-302

*(x)*     "(a)(1) In this section, "displacement" means the provision of garbage collection, removal, or disposal services by a governing body of a county . . . ."; (2) "Displacement" does not include circumstances in which; (ii) the person that has been providing the garbage collection, removal, or disposal services. . . ."; 2. has acted in a manner resulting in a substantial public nuisance." Md. Code, Local Gov't § 13-402.1

(xi)     "(a)  (3) "Local code violation" means a violation under the following provisions of the Baltimore City Code as amended from time to time or under any applicable code relating to the following provisions incorporated by Baltimore City by reference: (i) Nuisance control, waste control, and noise regulation titles of the Health Code of Baltimore City; (ii) The public nuisance and neighborhood nuisance provisions under City Code Article 19, Police Ordinances. . . ." Md. Code, Real. Prop. § 14-123.

None of the facts alleged fit within any of these types of categories that a plain reading of the Code suggests the Legislature intended might contemplate individuals engaging or creating a "public nuisance." The Defendants and the zoo are not serving alcohol, nor bringing the animals to places where alcohol is served, they are not lodging patrons nor bringing the animals to hotels or motels, they do not employ nor solicit volunteers that are otherwise working as End the Violence" P.R.O.T.E.C.T. Coordinators in high-crime micro-zones, they do not use the flora or fauna on zoo premises as food for human consumption,

they are not engaged in construction of any telephone or telegraph lines or fixtures, polluting any water, engaging the animals to work on the highway or otherwise hold up highway signs, permitting sport shooting on zoo premises so as to qualify as a sport shooting range, the animals are not "displacing" garbage nor is the zoo engaged in garbage collection, removal or disposal services, and, the facts alleged of do not fall within the meaning of "local code violation" pursuant to the provisions of the Baltimore City Code since the zoo is not in Baltimore City.

There is nothing in the Maryland Code that suggests it was the intention of the legislature to permit one private actor to claim another private actor keeping rescued animals in a private zoo is engaged in any act that constitutes a "public nuisance", outside of what is developed at common law and the law of nuisance, and in particular activities that intrude upon a protected *property right* of the aggrieved party.

Were it the intention of the legislature to scrutinize or put zoo operations specifically under a microscope for potential "public nuisances" the Maryland Code would include explicit references to a zoo or animal rescue facility as a commercial or recreational context where specific actions and omissions might legally constitute or create a "public nuisance". The legislature would have included language to the effect that the emotional or psychological impact that results from viewing animals, in varying states of age and health, amounts to a "public nuisance" thereby giving persons such as the Plaintiffs a cause of action and standing.

A.    **Plaintiffs' Allegations That Defendants Deny Animals Necessary Veterinary Care In Violation Of State And Federal Law Is Rebutted And Therefore A Genuine Issue Of Material Fact Exists Requiring Trial**

Plaintiffs' claim that Defendants' have failed and continue to fail to provide the animals in their care with necessary veterinary care, is disputed.  The evidence shows no pattern of denying animals treatment by licensed veterinarians or the inability of the staff to monitor animals and recognize signs of disease, not any neglect and abuse in relation thereto. Candy Decl. ¶ 5 & Ex. G.  Mr. Candy brought serious medical conditions and symptoms to the attention of veterinarians and did not act nor omit to act so as to cause the animals to endure unnecessary pain and suffering, nor a high likelihood of injury or death. Declaration of Keith Gold, DVM ("Gold Decl.) ¶ 10; Candy Decl. ¶¶3-11 & Ex. B.

When USDA Inspector Jamilson A. Niemann inspected the Defendants' property in February 2020 he reported that there was nothing concerning about the welfare of the animals. Dr. Gold reviewed his report and confirmed there was ample documentation from the facility and vet to show that action was taken.  Dr. Gold confirmed that the animals were addressed quickly with initial exam and bloodwork by the vet, and the owner was detailed in describing how he cared for the animals while they were ill and how he gave them their medications.  The evidence also proves that much of the medical condition of the animals was simply related to old age and that the facility itself was neither upscale nor fancy, but of sufficient standards. Gold Decl. ¶¶ 8-11; Candy Decl. ¶ 11 &  Ex. A.

Plaintiffs' allegations regarding the Defendants depriving the specific animal residents of the zoo of necessary veterinary care are rebuttable based on sworn testimony, USDA reports and the assessments of attending veterinarians.  Gold Decl. ¶¶10, 19-20; Candy Decl. ¶¶ 8, 21 – 23.

1.     <u>Susie and Sally the Asiatic Black Bears</u>

Since their arrival at the age of eighteen Susie and Sally have lived a good life at Tri-State and are now well into enjoying "bear retirement."  They have remained the property of the Natural Bridge Zoo while residing at Defendant's Zoo and in 2020 realized the ripe old bear age of 32 years.  Defendant's understanding was that the lifespan of Asiatic Bears is 30, although they may live to 37, although he noted that Dr. Haddad the Plaintiff's veterinarian reported they live into their 40s.  Either way Susie and Sally are enjoying their "golden years" at 32 whether one accepts they live to 30, 37 or even 45. The "bears are observed daily… provided proper nutrition, housing and enrichment," as verified by USDA, Attending Vets and the bears owners from Natural Bridge Zoo. Gold Decl. ¶ 12; Candy Decl. ¶12 & Ex. F.  In December 2020 Defendants' attending veterinarian Dr. Gold, his staff and a dental veterinarian Dr. Cranfield performed teeth extraction on both Susie and Sally, exams and bloodwork. In October 2021, Dr. Gold performed a visual checkup following up after the oral surgery in 2020 and in 13 years the USDA found no violations with respect to the bears' care. Gold Decl. ¶ 12; Candy Decl. ¶ 12. The Plaintiffs have deceptively misrepresented and mischaracterized age-related concerns with dental health otherwise normal and typical for all mammals as a "public nuisance".

2.     Charlie the Cougar

The death of Charlie the Cougar was reviewed and assessed by Mr. Neimann as "a weird one" and he himself admitted he was expecting to find some problems with how Defendants cared and paid attention to the animals' health with "the big cat loss they had there." But he only found a "couple of minor issues that I spoke to them about." Dr. Gold reviewed the report's finding and concurred with the assessment. Gold Decl. ¶ 8.

Charlie was the most beloved animal at the zoo.  Friendly and constantly purring, he greeted the public from afar at a safe and barriered distance. While the public did not have access to Charlie, he was observed daily by all attending veterinarians and staff. Big cat veterinarians Dr. Bergman and Dr. Sheppard at Camelot Big Cat Rescue were consulted, and test results were escalated for their expert review if there were any concerns raised about the state of his health. Candy Decl. ¶ 13 .

On November 8, 2018, after noticing that Charlie did not seem to be acting his normal self and had eaten little the previous two days, Defendants called attending veterinarian Dr. Duncan. Plaintiffs argue that "According to Dr. Haddad, Charlie very likely 'endured days of extreme pain and suffering that could have been prevented.'" Haddad Decl. ¶ 28. Defendants reported that Charlie "did not give any previous indication (as big cats often won't) prior to him noticing Charlie's unusual state and having Dr. Duncan examine Charlie duly sending blood tests and consulting Dr. Bergman. Medication was administered on November 9th by Dr. Duncan's replacement Dr. Isaiah. Defendant was told Charlie probably passed away due to a combination of kidney failure and his advanced age of 13.5 years." Candy Decl. ¶ 13.

According to Defendants, Dr. Duncan discussed euthanasia, but there was no diagnosis to justify euthanasia. The reports were sent to the big cat expert and medications were administered the following day. Candy Decl. ¶ 13.

Unfortunately, Charlie passed away during the night of November 9th despite having commenced medication as treatment. Defendants were told that he probably passed away due to kidney failure as well as his advanced age (13.5 years old). Dr. Duncan's *ex post facto* assessment that euthanizing Charlie would have "been the humane thing to do" Ex. 1 (Duncan Dep. June 30, 2021) 42:10-16 does not establish an element of any so-called public nuisance offence as evidenced by any alleged failure to provide Charlie with necessary veterinary care. Defendants summoned Dr. Duncan when behavioral symptoms put him on notice of potential health concerns and followed the replacement veterinarian's advice to commence medication with relevant tests and consultations reviewed by a big cat expert. There was no requirement for a necropsy factually or legally as Charlie lived by himself, the cause of death was assessed as likely renal failure, and these are not required by USDA or AWA regulations. USDA reviewed all records and found no violations. Candy Decl. ¶ 13.

### 3.    Diablo the Bobcat

There is nothing in the record that suggests Defendant denied Diablo necessary veterinary care in violation of Maryland's animal abuse and neglect statute, Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), and federal Animal Welfare Regulations, 9 C.F.R. § 2.40.

Diablo became a resident of Defendants' zoo in 2002 and was observed daily through interaction and was visually examined by all attending veterinarians, as well as the veterinarian techs Darcey Bowen and Susan Miller. Diablo was not receptive to handling, so was routinely monitored for movement, eating, feces, breathing and interaction.  As he grew

older, Diablo was monitored for his movement, which was described as arthritic. He had been previously prescribed prednisone by Dr. Fox as well as daily doses of cosequin and fish oil.  He continued to thrive until he finally went to sleep and passed peacefully in 2021 at the age of 22, surpassing what Defendant understood was the normal bobcat lifespan of 12 – 15 years.  On account of the cat's age, treatment was focused on the animal's comfort and care centered in the last of his golden years with cosequin and fish oil.  Dr. McFadden from USDA had also observed Diablo over his tenure residing at the zoo and neither voiced nor communicated any concerns whatsoever. Candy Decl. ¶ 14.

The Plaintiffs' allegations that "Defendant Candy 'declined' 'further medication,' and 'never picked up'" additional prescriptions of meloxicam that were made available, Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 219:9–22,  is neither true nor dispositive of any neglect or nuisance but was an informed decision made by the Defendant based on recommendations furnished by other qualified veterinarians to follow a different course of veterinary care.  Candy Decl. ¶ 14 & Ex. E.

### 4.      Snorkle the Vietnamese Potbellied Pig

There is nothing in the record that suggests Tri-State is a public nuisance in part because of Defendants' alleged ongoing failure to provide Snorkle with necessary veterinary care, including appropriate diagnostics and treatment for his tumor, growth, and possible osteoarthritis, in alleged violation of Maryland law, Md. Code Ann., Crim. Law § 10-604(a)(5)(ii), and federal Animal Welfare Regulations, 9 C.F.R. § 2.40.

Snorkle was born at the zoo in 2010 and originally raised in a private home. He returned to reside at the Defendants' zoo due to his friendliness with people and his

tendency to destroy household items. While classified as a private pet, Snorkle falls under Defendants' USDA exhibitors license while at the zoo.  Candy Decl. ¶ 17.

In 2021, Snorkel developed a tumor in his testicle area. Defendants called Dr. Fred Adams, a local farm veterinarian to come and examine Snorkel (as well as a tour of other animals at the zoo) because Dr. Gold's preference is not to treat farm animals.  Plaintiffs' allegation that "[n]ot only have no such diagnostics been performed, the record is devoid of any indication that Defendants are even aware of this condition, which is apparent upon visual inspection" is disputed given that Defendant Candy himself swore to observe the tumour and contacted Dr. Adams. Candy Decl. ¶ 15.

At the request of Defendants, Dr. Adams came to the zoo in February 2021 and provided recommendations and a report.  Dr. Adams again came out on September 1, 2021 for a request to examine the zoo's handicapped sheep and look again at Snorkle. Again, he assessed that Snorkel was in no pain. Candy Decl. ¶ 15.   An unannounced USDA inspection also took place that day and the inspector met with Dr. Adams. Dr. Adams came to the Defendants' zoo again on September 24th to vaccinate the horses and donkey. On this third visit in 2021 he also visually inspected the sheep and Snorkle. He did not find him to be in any pain.  Snorkel is able to urinate and defecate without any issues or pain.   Snorkle's alleged pain and conditions do not interfere with the enjoyment of life in light of his ability to try to mate. According to Defendant Candy Snorkle "still cannot be put with the other female pigs." Candy Decl. ¶ 15 & Ex. C.

5.    The Green Iguanas

The two male green iguanas housed in the "reptile house," were not, as Plaintiffs' argue, denied timely veterinary care and there is no undisputed evidence that Defendant violated Maryland law with respect to these animals.

Contrary to Plaintiffs' claim that the green iguanas were not included in Dr. Duncan's PVC because "there were certain species that [Dr. Duncan] had not agreed to be the attending veterinarian for because [she] did not feel that [she] was qualified to treat those species[.]" Graves Decl. ¶ 10 & Ex. I (Duncan Dep., Jun. 30, 2021) 20:22–21:8, the "the iguanas were not included in Dr. Duncan's PVC because they were likely not at the zoo during her tenure, not because she refused to treat them." Candy Decl. ¶ 16;  Gold Decl. ¶ 14.

Reptiles are not regulated under the Animal Welfare Act, and thus are not required to be included on a PVC.  The reptiles at Defendants' zoo were formerly pets or sent from other zoos and many arrived in poor condition for a variety of reasons. When possible, the zoo adopted out the reptiles. However, those still subject to private ownership are not amenable to adoption, as per the respective owners' request. Candy Decl. ¶ 16.

One of the iguanas arrived at the zoo as recently as just around a month prior to PETA's walk-through visit.  All reptiles, including the iguanas, were examined by Dr. Gold during his visits in October 2020 and 2021. Dr. Gold was also called regarding any issues or concerns with the health of any reptiles, including the iguanas. All medications required for treatment were prescribed and administered when necessary. Gold Decl. ¶ 14; Candy Decl. ¶ 16.

6.   <u>Dream the Miniature Horse</u>

Plaintiffs' allegations that Tri-State is a public nuisance in part because of Defendants' failure to provide Dream with timely and necessary veterinary care is false.

Plaintiffs claim in their Motion for Summary Judgment that "[s]ince Dr. Duncan's last visit to Tri-State on October 3, 2019, Dream has not received any basic veterinary care [or] . . . preventive vaccines. . . . " Since her arrival in 2011, Dream has been seen by Defendants attending veterinarians every year.  Defendants also consulted with local horse farms and veterinarians when required.  Despite Dream's elderly status, as per Dr. Duncan's opinion, she is doing well at the Zoo. Dream received her latest vaccines on September 24, 2021, from Dr. Fred Adams and at the time of that treatment was considered to be in good condition. Candy Decl. 17.

Dr. Dickie Vest, the Plaintiffs' veterinary expert, who claims that Dream is a "documented case of neglect" Expert Report of Dickie J. Vest, DVM ("Vest Decl.") ¶ 16, has never seen nor examined in person any of the equine animals at Defendants' zoo. To the best of Defendants' knowledge, Dr. Vest diagnosed Dream using a picture supplied by PETA from March 2018.  Candy Decl. ¶ 25. Moreover, despite PETA having been in attendance at the zoo on two or more occasions, and most recently July 19, 2021, they did not supply Dr. Vest with any updated information or pictures.  In direct contradiction to Dr. Vest's assessments, there are no concerns from any regulatory agencies regarding the care of the horses. Candy Decl. ¶ 17.

Dr. Duncan has been asked to examine the horses at the zoo. While equine animals are not included under Defendants' USDA license and therefore by definition excluded from

the attending veterinarian's PVC, Defendants treat the equine as though they are.  Candy Decl. ¶ 21.

### 7.    Bridgette the Basset Hound

Plaintiffs' claims that Defendant Candy's alleged inability or unwillingness to provide adequate veterinary care to the zoo's animals likewise extends to his family pet, Bridgette the basset hound, are also disputed. There is no evidence that supports Plaintiffs' allegations that the 13-year-old privately owned family pet is a victim of neglect.

As with any family pet there is a reasonable expectation of need for veterinary care. Defendant admitted to having knowledge and belief that Bassets are listed as the number ten most expensive dog breed due to possible health issues and veterinary visits. Since birth, Bridget had been seen and treated by LaVale Veterinary Hospital and Dr. Fox. Candy Decl. ¶ 18.

In 2018, the zoo started a relationship with a new attending veterinarian, Dr. Duncan, and on June 1, 2018, Bridgette was taken to Dr. Duncan for a mass on her leg. Although it was not considered life threatening, because she constantly played with the other Bassets Defendants were concerned with the mass potentially opening and reopening. After examination, an appointment was made for surgery. The veterinary office scheduled the surgery for the seven-week timeframe because the condition and surgery were not considered life threatening. This fact of scheduling contradicts Plaintiff's allegations in their Motion that "Dr. Duncan first examined Bridgette on June 1, 2018, when her condition was '[p]otentially' 'life threatening.'"  Bridgette is, as described by Defendants, active and bouncy. On account of her energy and proclivity to be physically active she had an incident where she

opened a stitch and had to be rechecked by the vet, which was done immediately.  Candy Decl. ¶ 18.

Also as is typical for the breed of dog, Bridgette does have one nail that grows quickly and has a tendency to curl in. Her nails were trimmed regularly at home and at the veterinarians, and there was and is absolutely no evidence of any removal of a nail from her foot pad. Contrary to the facts alleged in Plaintiffs' motion for summary judgment, Bridgette did and does not suffer from "severely" ingrown toenails.  Bridget is presently under the care of Lavale Vet as her routine veterinarian. Again, in 2021 she had to have a mass removed from her leg and this procedure was completed at Lavale Vet. During this course of treatment at Lavale Vet, she again received her annual checkup and examination and was found to be in good condition and health. Candy Decl. ¶ 18.

There is absolutely no evidence, nor any such "undisputed" evidence as the Plaintiffs' suggest in their Motion for Summary Judgment, that Defendant Candy neglected his family pet Bridgette in violation of Maryland's animal abuse and neglect statute.

### B.    Defendants Did Not Deny Dodger Proper Protection From The Weather And Necessary Veterinary Care In Violation Of State And Federal Law

Contrary to Plaintiffs' allegations, Defendants at all times have provided Dodger adequate shelter and protection from the elements and likewise provided him with timely veterinary care after he started to show symptoms and signs of possible injury.

Dodger is around twenty-five (25) years old and has resided at the zoo over nine (9) years, although he is privately owned.  Dodger does not seem to like women and children, but is attached to Defendant Candy and will permit no one else to handle him. Candy Decl. ¶23.  Moving him out of the zoo and away from Defendant Candy would be detrimental to

his physical and mental health, as opined by numerous vets and the USDA. At present, residing with the Defendant and after his surgical procedure, Dodger is doing well.  Gold Decl. ¶ 15; Candy Decl. ¶ 19.

Dodger's enclosure has a heated indoor area and an outdoor viewing area. He has been in the same enclosure for the entire period of residency at the zoo and has never encountered any issues with staying inside when cold, although he prefers to be outside during the day, weather permitting.  The indoor housing area is heated by a woodstove, two (2) electric heaters and an infrared heat lamp, so as to maintain a temperature above 45 degrees Fahrenheit in accordance with and as required by the Animal Welfare Act.  There are no requirements to heat the outdoor area.  In order to satisfy Dodger's curiosity and interest in going out, additional glass walls and openings were installed so as to permit him to see the outdoors while staying warm locked. Dodger's enclosure, diet, and enrichment plans have all been reviewed and inspected by the USDA on an annual basis and with no violations reported.  In response to one of PETA's complaints the USDA also investigated Dodger's injuries and their findings concluded no neglect, abuse, or any other violations. Dodger has been examined annually by Dr. Gold and vaccinated as per his recommendations in his role as the attending veterinarian. All recommended treatments and diagnostic procedures such as blood tests were followed and completed. For approximately ten (10) years Dodger and his area have been duly viewed and inspected by USDA with no concerns. Gold Decl. ¶16; Candy Decl. ¶ 20.

On account of Dodger's habit of putting his hands in this mouth, Defendant consulted veterinarians that were familiar with and knowledgeable about primates. Defendant spoke to two veterinarian techs who were familiar with Dodger and had worked with him as a

private pet through Dr. Ryan's office and recommended the use of coconut oil on his hands and his biscuits to soothe them and to ensure eating.

In February 2019, Dodger showed symptoms of a problem, noticeable only by him not interacting as he did usually with the zoo staff. The staff and Defendants also noticed that he was hiding his hands that they had been treating with coconut oil. In trying to ascertain what might be the problem, they observed that he continued to hide his hands in an unusual fashion. Defendants' could not determine when Dodger first incurred an injury to his hands but they determined that he "tried to hide it [the injury] so you don't know until you find it." Ex. C (Candy Dep., Aug. 11, 2021) 206:8–10 at 11 & Ex. J (Duncan Dep. Ex. 52) at 22. After ascertaining the injury was more serious, an appointment was made with Dr. Gold, who has extensive experience with primates and was familiar with the USDA and was seen on February 12, 2019. *Id.* ¶ 9 & Ex. H (Gold Dep. Ex. 108) at 13–14. Dodger was taken to Dr. Gold and a surgical procedure was performed on his hands as per Dr. Gold's recommendation. Dr. Gold diagnosed the cause of the condition as likely caused by frostbite and specifically recommended amputation of digits as opposed to a protracted course of treatment. Gold Decl. ¶ 15; Candy Decl. ¶ 19.

Dodger received timely veterinary care when Defendants and his team were able to discern that the source of Dodger's unusual behavior was related to some issue or symptom that was connected with his hands. The facts and the reviews and the inspections by the USDA show the condition was not due to any lack of appropriate temperature controls within indoor enclosures or violations of federal or state law, nor any alleged neglect or abuse.. Candy Decl. ¶ 20. Defendants "usually" "lock[ed] him in" the indoor portion of his enclosure

when the outside temperature was "below 30" degrees.  Ex. C (Candy Dep., Aug. 11, 2021) 206:11–207:11 as per Dr. Gold's recommendations. Gold Decl. ¶ 16.

### C.    Defendants Did Not, As Plaintiffs Allege, Kill 'Approximately' Twelve Parrots

The death of the 'approximate' twelve parrots was the subject matter of another complaint by Plaintiff PETA and subsequently determined by USDA to have been an accident, on account of a heater issue.

A volunteer by the name of William McGuire ("McGuire"), was responsible for incorrectly setting the propane heater implicated in the death of the 'approximate' twelve birds.  McGuire and his wife Lynn were both volunteers at Tri-State and their sole responsibility was the care of the birds (parrots).  Plaintiffs argue that "according to Tri-State volunteer Rella Moon, volunteers have not received any training or instructions regarding the use of propane at Tri-State." However, clearly articulated zoo protocols specifically included making no changes nor moving any animals without a member of zoo personnel present so as to act as a monitor for the required period of time. Candy Decl. ¶ 24. McGuire chose not to follow zoo protocols by changing the tank during the night without any zoo personnel present.  McGuire's refusal to follow protocols resulted in the death of a number of birds. This unfortunate accident was described by the parties responsible for USDA's investigation as an accidental heater malfunction.   Related to that incident, McGuire aggravated the situation, by again not following protocols and by removing a macaw from the zoo premises and refusing to return her (Scarlet) until the police were notified. Candy Decl. ¶ 24.

After several incidents that put Defendants on notice of their refusal to follow zoo protocols, generalized incompetence, bad faith and/or reckless volunteer activity, specifically putting the birds at risk and threatening the general safety and security of zoo operations. Lynn McGuire was terminated for various reasons including failure to follow zoo protocols and instructions whose effect was detrimental to the care of the animals. On several occasions Defendants invoked recourses under the zoo's disciplinary procedures. Examples of such incidents included a parrot escaping or being stolen because McGuire did not secure cage doors, a rosella bird escaping and a macaw named Rio being removed from the zoo premises by McGuire and his wife for unauthorized surgery. This latter incident was a blatant violation of zoo protocols since they removed the bird without permission and without first seeking diagnosis and treatment from the attending veterinarian. In December 2019, after the removal of the macaw, McGuire stated he quit and theft charges were filed against him. The charges were dropped pursuant to a 2021 plea deal, if he agreed to return the macaw. The bird was returned in terrible condition and Defendants' arranged for immediate emergency care and surgery which was performed by veterinarian Dr. Gold. Arrangements for the bird's adoption were made but she passed away at the veterinarian's. McGuire and his wife were instructed repeatedly regarding the proper electrical wiring including the use of extension cords and inspections. Despite several reminders and instructions on proper wiring and the use of 250-watt heat bulbs he continued to overload the receptacles and overloaded infrared head bulbs that had to be removed by zoo personnel for everyone's safety. Candy Decl. ¶ 24.

### III.    Plaintiffs Have No Standing

While Plaintiffs' motion for summary judgment should be denied for all the foregoing reasons, Defendants' motion should be granted. Plaintiffs do not allege that any activities of the Defendants actually emanate beyond the boundaries of the zoo property into the "community at large" in such a way as to intrude upon the public or private property rights of others.  Nor do they bear any relation to the safety, health and welfare of the community. This is not a nationwide and public complaint.  Any allegations that Ms. Collins was emotionally distressed are wholly devoid of facts to support this claim. Instead, she recites elements of the intentional tort but offers no facts showing how Defendants' conduct was intentional or in reckless disregard of Plaintiffs rights, in what manner the conduct was extreme and outrageous, or that any Plaintiff suffered extreme and severe mental distress. This claim contains nothing more than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Valadez v. Emmis Commc'ns*, 229 P.2d 389, 394 (Kan. 2010).

No matter what formulation of standing is applied, the Plaintiffs cannot demonstrate that they have "legally protected" interests that are being violated such as to generate a case or controversy under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1998). Because Plaintiffs fail to state a claim that they have a legally protected interest under Maryland public nuisance law, then it naturally follows that they also lack standing under Article III and under the Maryland substantive laws of standing. *State Ctr. LLC v. Lexington Charles Ltd P'ship*, 438 Md.451, 92A.3d 400, at 499, 428 (2014). Furthermore, even if the Maryland law were more restrictive in terms of establishing standing, the failure to state a claim alone would mandate dismissal of this action.

## IV.     The Court Lacks Subject Matter Jurisdiction

The Court lacks subject matter jurisdiction in this diversity action because the amount in controversy is not $75,000 or more.  Having raised the issue in good faith, Defendants respectfully take the position that the Court should require that Plaintiffs show the basis for the conclusory allegations in the Complaint that more than $75,000 is in controversy. Candy Decl. ¶ 4 & Ex. D; Declaration of Carole Baskin ¶¶ 22-23.  Defendants also believe that Plaintiffs have made no progress in advancing any claim of a special injury as required by law, and as set forth by this Court in its Order denying the Motion to Dismiss in this matter.

Defendant likewise argues that  "[A] federal court in the exercise of its diversity jurisdiction should act conservatively when asked to predict how a state court would proceed on a novel issue of state law." *Rhodes v. E.I. DuPont Nemours & Co.*, 636 F.3d. 88 at 97-98 (4th Cir. 2011), citing to *Day & Zimmermann*, 423 U.S. at 4, 96 S.Ct. 167. (1975).

By accepting the Plaintiffs' view of public nuisance in this case this Court would expand the substantive law of Maryland on behalf of the Maryland Court of Appeals.   If this Court has any notion whatsoever that the Maryland Court of Appeals might embrace this novel use of public nuisance law as advanced by the Plaintiffs, then the question should be certified to the Court of Appeals of Maryland, along with a request for a determination of whether the theory advanced is frivolous or meritless.

**V.  The Plaintiff Has Not Proven Any Damages**

    **A.**    **Ms. Collins Does Not Plead Any Cognizable Damages Under The Law Of Maryland That Would Entitle Her To Injunctive Relief**

Plaintiff Ms. Collins alleges that she experienced emotional distress from what she experienced at the zoo.  However, Ms. Collins does not elaborate what kind of emotional distress that she experienced and does not provide any evidence to prove her emotional distress. There is no evidence that links the zoo to her emotional distress other than her conclusory claim that she experienced it.  However, without a physical injury or legitimate fear of physical injury, an action for damage to property interests cannot generally sustain a claim for emotional distress damages. *Albright I*, 433 Md. at 303, 71 A.3d. at 30, *see also Dobbins v. Wash. Suburban Sanitary Comm'n*, 338 Md. 341, 351, 658 A.2d 675, 679-80 (1995). Ms. Collins cannot assert her alleged emotional distress as a ground for an injunction because it does not arise from any legally protected interest under Maryland public nuisance law. By her own admission, Ms. Collins indicated that she will not return to the zoo unless the conditions she saw are altered.  Therefore, there is no longer a need for an injunction since she is safe from any further harm, she believes she might experience and she resides 250 miles away.

Plaintiffs cannot reasonably construe themselves to be any part of any "community at large" with the Defendants.  And without any property or pecuniary interest within the "community at large," Plaintiffs cannot be affected by the Defendants' use of its property upon the Plaintiffs.

There are no allegations by Plaintiffs that any public right is being impaired by any activities carried on by the Defendants at what is purely a private business enterprise.  Since public nuisance law does not arise from the entry of an offended party onto the property, it will affect those activities on the surrounding properties or surrounding neighborhood.  This is not the case here.  While public nuisance laws have been used to shut down gambling houses or similar establishments, that this is because of the incidental harm to the property rights of others who own or use other private or public properties surrounding the offending property, and not due to any concern with what is done upon the actual premises, so long as no elements of public nuisance emanate out from the property itself to affect any of the surrounding area. An offended party cannot drive to the defendant's property from out of town (much less out of state), voluntarily enter upon it, and then claim standing to close it down as a nuisance. Neither is there any reason to think there is a public right to have a zoo 250 miles away from one's home with which one happens to be pleased.

### B.      PETA has no damages to claim

Further, Plaintiff PETA has no damages other than those voluntarily assumed by its own expenditures, and voluntary expenditures, without the need to protect a valid property interest. It cannot justify injunctive relief from what is nothing more than an alleged fabricated "private nuisance." PETA asserts its voluntary expenditures as a basis for standing. Unless PETA can show it needs injunctive relief in order to protect its legally protected property interests from a nuisance created by the Defendants, PETA cannot qualify for such an injunction under the public nuisance common law of Maryland.

In short, the Maryland common law of public nuisance and the Endangered Species Act are, as their respective titles indicate to the average reader, not the same body of law.

The Endangered Species Act has a very broad "citizen suit" provision restrained only by Article III of the United States Constitution. To the contrary, the public nuisance laws of Maryland require that as part and parcel of both stating a claim and showing standing, that a plaintiff must demonstrate that it has a legally protected property interest in the "community at large" that is being violated or endangered by the activities of a defendant upon its own property.

### CONCLUSION

For all the above reasons, Defendants respectfully request that Plaintiffs' Motion for Summary judgment be denied in full and Defendant's cross motion for summary judgment be granted.